UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT OF
NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/9/2024
```

-------------------------------------------------------------------X

689 EATERY CORP., etc. *et ano*,   :

                Plaintiffs,   :

                      :       02-cv-4431 (LJL)

    -v-   :

                      :     OPINION AND ORDER

CITY OF NEW YORK, *et al.*,   :

                Defendants.   :

-------------------------------------------------------------------X


-------------------------------------------------------------------X

59 MURRAY ENTERPRISES, INC. etc., *et ano*,   :

                Plaintiffs,   :

                      :       02-cv-4432 (LJL)

    -v-   :

                      :     OPINION AND ORDER

CITY OF NEW YORK, *et al.*,   :

                Defendants.   :

-------------------------------------------------------------------X


-------------------------------------------------------------------X

CLUB AT 60TH STREET, *et al.*,   :

                Plaintiffs,   :

                      :       02-cv-8333 (LJL)

    -v-   :

                      :     OPINION AND ORDER

CITY OF NEW YORK,   :

                Defendant.   :

-------------------------------------------------------------------X
-------------------------------------------------------------------X

336 LLC, etc., *et al.*,   :

                Plaintiffs,   :

                      :       18-cv-3732 (LJL)

    -v-   :

                      :     OPINION AND ORDER

CITY OF NEW YORK,   :

                Defendant.   :

-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

This case, comprised of four consolidated actions, involves a decades-long challenge to the constitutionality of amendments to the New York City Zoning Resolution that define and regulate adult entertainment establishments.  Plaintiffs are nineteen corporations or limited liability corporations which own, operate, or lease space to establishments that provide adult entertainment, including eight gentlemen's clubs ("Club Plaintiffs")[1] and eleven adult bookstores ("Bookstore Plaintiffs") that sell or rent adults books and videos and contain private booths for patrons to view adult films.[2]  Defendants are the City of New York (the "City"), the former Mayor of New York, and the current and preceding Commissioners of the City's Department of Buildings ("DOB"), the city agency charged with issuing permits to build new and alter existing buildings (collectively, "Defendants").

This case represents the continuation of a dispute between the purveyors of adult entertainment and the City, which began in the early 1990s when the City first enacted zoning

---

[1] The eight Club Plaintiffs—which collectively brought the first three of the four suits pending before this Court—include, in the first case, CM-ECF 02-cv-4431 Dkt. No. 77 ¶¶ 4–5: (1) 725 Eatery, Corp., doing business as "Platinum Dolls"; (2) 689 Eatery, Corp., doing business as "Satin Dolls"; in the second case, CM-ECF 02-cv-4432 Dkt. No. 26 ¶¶ 7–10, (3) 59 Murray Enterprises, Inc., doing business as "New York Dolls," located in Manhattan; (4) AAM Holding Corp., doing business as "Private Eyes," located in Manhattan; (5) West 20th Enterprises Corp., doing business as "VIP Club New York," located in Manhattan; (6) JNS Ventures Ltd., doing business as "Vixen," located in Queens; and, in the third case, CM-ECF 02-cv-8333 Dkt. No. 42 ¶¶ 7–8, (7) Club at 60th Street, Inc., which leases out a portion of its Manhattan premises to (8) Jacaranda Club, LLC, doing business as "Sapphire."

[2] The eleven Bookstore Plaintiffs, which collectively brought the final of the four suits consolidated here, include: (1) 336 LLC, doing business as "Erotica," located in Brooklyn; (2) Chelsea 7 Corp., located in Manhattan; (3) Gotham Video Sales & Distribution Inc., located in Manhattan; (4) Rainbow Station 7 Inc., located in Manhattan; (5) Video Lovers Inc., located in Brooklyn; (6) Vishara Video, Inc., located in Manhattan; (7) Vishans Video, Inc., located in Manhattan; (8) 725 Video Outlet Inc., located in Manhattan; (9) Jaysara Video, Inc., located in Manhattan; (10) DCD Exclusive Video, Inc., located in Queens; and (11) 557 Entertainment Inc., located in Manhattan.  CM-ECF 18-3732 Dkt. No. 78 ¶¶ 11–27.

laws aimed specifically at adult entertainment establishments.  The City—like many other
municipalities around the country—sought to ameliorate elevated crime rates, lowered property
values, and decreased quality of life, by restricting where adult entertainment establishments
could operate.

In 1995, the City adopted regulations that restricted adult entertainment establishments to
certain areas of New York City, and prohibited them from being located near each other or
"sensitive receptors" such as schools and houses of worship.  Protracted litigation ensued.
Although both state and federal courts ultimately found the City's efforts constitutional, the
litigation stemming from the 1995 law also resulted in a determination by New York's highest
court that adult establishments that limited their adult components to less than forty percent of
their floor area and stock-in-trade were not subject to the law.  Many adult establishments thus
modified their internal configurations and limited their stock-in-trade to avoid becoming falling
subject to the law.  But, in 2001, in response to what the City viewed as attempts to circumvent
the spirit of the adult-use regulations through "sham" compliance, the City amended its zoning
law again.  Plaintiffs challenge the constitutionality of the 2001 amendments to the zoning law
under the First Amendment's Free Expression Clause and the Fourteenth Amendment's Equal
Protection Clause.  The Bookstore Plaintiffs also allege a violation of the Fourteenth Amendment
Due Process Clause.  Plaintiffs seek permanent injunctive relief enjoining enforcement of the
zoning law.

On September 30, 2019, the Honorable William H. Pauley III, to whom the case was then
assigned, entered a preliminary injunction against the enforcement of the 2001 Amendments.
*725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424 (S.D.N.Y. 2019).  By agreement of
the parties, this Court has conducted a trial on the papers with respect to Plaintiffs' demand for

declaratory relief and a permanent injunction.  The Court heard closing arguments on the evidence over two days on November 28 and 29, 2023.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1).  To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

## FINDINGS OF FACT

This case concerns changes to New York City's Zoning Resolution made in 2001 that restrict where "adult establishments" may locate around the City.  *See, e.g.*, CM-ECF 02-cv-4431, Dkt. No. 77.[3]  But a description of the events leading up to the 2001 changes, including the City's enactment of its inaugural zoning restrictions on adult establishments in 1995, is necessary for a proper understanding of the issues presented for decision.

## I. The History of Zoning and Adult Entertainment in New York City

New York City, long considered a cultural capital of the United States, was also for many years a haven to a thriving business in adult entertainment.  The presence of adult entertainment establishments in New York City is noted as early as the 1920s.  Dkt. No. 83 at 216–26 ("Freeman Aff.") ¶ 11.  At that time, theaters in Times Square in Manhattan, struggling to stay afloat without liquor sales during the Prohibition Era, began showing "B" movies to largely male audiences or converting into burlesque houses.  *Id.*  Other adult entertainment establishments, including adult bookstores and arcades, soon also began congregating in Times Square.  *Id.*

---

[3] Plaintiffs filed identical motions seeking permanent injunctive relief in all four suits, with the exception of Bookstore Plaintiffs' additional due process challenge.  Defendants uniformly opposed with identical filings across the actions.  Accordingly, for ease of reference, the Court cites to the submissions and docket numbers corresponding to the first case filed, Case No. 02-cv-4431, unless otherwise noted.

But Times Square—which experienced rapid gentrification over the course of the 1990s and 2000s—was far from the tourist mecca known today.  *Id.* ¶ 19; Dkt. No. 83 at 161–211 ("Kelley Decl.") ¶ 17.  Around the same time that theaters began showing sexually explicit content to drive sales in the 1920s, Times Square began developing a reputation as the "red light district" of the City.  Freeman Aff. ¶¶ 11–12.

During the Prohibition Era, land-use regulations, then in their infancy, were not contemplated to address the effects of adult entertainment establishments on their surrounding neighborhoods.  In fact, the government agency tasked with regulating land use and recommending zoning changes, the City Planning Commission ("CPC") and the Department of City Planning ("DCP"), did not yet exist.  Dkt. No. 162-2, Ex. 24 ("CPC Planning History"), at 182–83.[4]  And although New York City did have a zoning code, groundbreaking at the time of its enactment in 1916 as the nation's first local zoning law, it did not seek to regulate the growing number of adult businesses.  CPC Planning History at 184–85.  The 1916 Ordinance establishing the zoning code instead addressed itself to more fundamental topics like the height and form limits on buildings.  CPC Planning History at 184–85.

Over the course of the following two decades, adult uses continued to proliferate city-wide, and in particular, in Times Square.  By the middle of the twentieth century, the reputation

---

[4] The City Charter established the CPC in 1936.  CPC Planning History at 183.  The establishment of the CPC "provided the structure for comprehensive planning in New York City, replacing a haphazard planning and zoning system that functioned principally through the interaction of interest groups and political forces."  CPC Planning History at 183.  The CPC is "generally charged with planning for the orderly growth, development and improvement of the City of New York."  Dkt. No. 102 ("Laremont Decl.") ¶ 1.  The CPC's specific responsibilities "include evaluating and giving preliminary approval to amendments" to the City's Zoning Resolution.  *Id.*  DCP, for its part, "provides staff assistance" to the CPC, *id.*, and is headed by the CPC chairperson and staffed with engineers, architects, experts, and other officers and employees, CPC Planning History at 184.

5

of Times Square as home to the City's (and perhaps the nation's) x-rated business was cemented. Freeman Aff. ¶¶ 11–12.

But still, even as the number of adult entertainment businesses increased in the mid-twentieth century, New York City did not adopt zoning restrictions specifically targeting these businesses. In 1961, as technological advances and modern planning ideals rendered the 1916 zoning law an anachronism, the City replaced the 1916 zoning code with the still-operative Zoning Resolution ("Z.R."). CPC Planning History at 184–85. The Zoning Resolution aimed to promote and protect "public health, safety and general welfare," Laremont Decl. ¶ 2 (quoting the Zoning Resolution Preamble), by regulating, *inter alia*, the height and bulk of buildings and other structures, the area of open spaces, the density of the residential population, and the location of trades, industries, and buildings designed for specific uses within the City. CPC Planning History at 185; Dkt. No. 212-1 ("Amron Decl.") ¶ 2 (citing Z.R. § 11-01). To further these goals, the Zoning Resolution divides the City into three basic types of zoning districts: (1) residential, the most common zoning districts, accounting for about seventy-five percent of the City's zoned land area, Dkt. No. 216-1 ("CSF") ¶ 2; (2) commercial, typically in areas "with a high degree of transit accessibility as well as an established pattern of commercial development, where a high degree of future commercial development is anticipated"; and (3) manufacturing, Amron Decl. ¶¶ 2, 10. Within these three broad categories are numerous subgroups to which more specific regulations apply. *Id.* ¶ 2.

When first enacted, the 1961 Zoning Resolution, like its predecessor, did not contain any restrictions that applied specifically to adult entertainment establishments. *See* Dkt. No. 101-1 ("Karnovsky Decl.") ¶ 7. Nevertheless, and despite their growth in the early- and mid-twentieth century, the absolute number of adult entertainment establishments city-wide remained relatively

low due to restrictions on the sale and distribution of pornography.[5]  Dkt. No. 162-4, Ex. 41

("DCP Study"), at 331.  But as those restrictions were lifted in the second half of the 1960s, the

number of adult establishments in New York City grew to 151 by 1976—an increase of over

1,500% from the nine establishments that the City identified in 1965.  *See id.*

      The government response to the dramatic increase of adult entertainment establishments

in New York City was varied.  In 1976, the United States Supreme Court upheld Detroit's "anti-

skid row" zoning ordinance, which restricted how close adult entertainment establishments could

be to each other and to residential areas.  *See Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50

(1976).  In the wake of that decision, the DCP, a division of the CPC, began preparing zoning

recommendations modeled after the Detroit ordinance.  DCP Study at 344.  That same year, for

the first time, CPC proposed a similar change to the New York City Zoning Resolution.  *See id.*;

Dkt. No. 162-7, Ex. 52 ("Karnovsky Aff.") ¶ 16.  Based on its findings that adult uses had

negative impacts on their surrounding areas, Karnovsky Decl. ¶ 15, the DCP sought to

distinguish adult entertainment establishments from other businesses, to restrict the locations in

which adult establishments could operate to a few commercial districts, and to prohibit such

establishments from operating in close proximity with one another or with churches and schools,

DCP Study at 341–46.  But the plan "drew sharp denunciations" from a variety of groups, and

---

[5] Legal bans or restrictions on pornography were, before the 1960s, quite common and justified
by reason of the content's "obscenity."  And the ban extended well beyond what today would be
considered pornography.  For example, in 1933, federal agents blocked importation of James
Joyce's *Ulysses*—considered by some the greatest modern American novel—for its passages
describing sex acts.  19 U.S.C. § 1305.  The ban stood until courts intervened.  *See, e.g.*, *United
States v. One Book Called "Ulysses"*, 5 F. Supp. 182, 185 (S.D.N.Y. 1933), *aff'd sub nom.
United States v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705 (2d Cir. 1934) (A.N.
Hand, J.); *see also Grove Press, Inc. v. Christenberry*, 276 F.2d 433 (2d Cir. 1960) (finding that
D.H. Lawrence's *Lady Chatterley's Lover* was not obscene).  Other heralded classics, including
John Steinbeck's *The Grapes of Wrath* and Joseph Heller's *Catch-22*, were also banned or
prohibited.  *See, e.g.*, *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 (6th Cir. 1976).

ultimately failed,[6] *id.*, leaving regulators to find alternative solutions.  The City permanently

banned "physical culture establishments"—a zoning term for massage parlors—in 1978.  *Id.* at

344–46.  Between 1978 and 1983, the City closed 106 illegal establishments, and eventually

pursued civil actions against sex-oriented businesses under nuisance abatements laws,

successfully closing prostitution hotels and virtually eliminating the practice of sexually explicit

hand-billing on City streets.  *Id.* at 348–49; *see* Karnovsky Aff. ¶ 17.  New York State, for its

part, declared portions of the City "blighted" to justify using eminent domain to acquire

properties for redevelopment.  Freeman Aff. ¶ 14.

Between 1976 and 1984, the City saw a thirteen percent decline in the number of adult

entertainment establishments.  DCP Study at 304.  But whether even that modest decline was

driven specifically by the government's regulatory efforts is unclear.  As DCP noted, other

factors—namely, technological advances and the start of major construction projects in Midtown

Manhattan that increased investor confidence in the neighborhood's prospects as a commercial

hub—may have driven the decline.  *Id.* at 331.

Whatever the reason for the decline, it was short-lived.  Between 1984 and 1993, the

number of adult entertainment establishments in New York City increased by 35%, *id.* at 335,

with the boroughs of Manhattan and Queens seeing the greatest increases, *id.* at 331.  By Fall

1993, there were 177 such establishments in New York City, with over 100 located in Manhattan

alone.  Dkt. No. 162-5, Ex. 41-1, at 395–99.  The type of adult entertainment establishments

emerging also changed—as technological advances drove down prices of adult entertainment

created for private consumption and reduced patronage at adult theaters, the number of adult

---

[6] Views in opposition to the amendment were primarily voiced by individuals and groups from
the four boroughs other than Manhattan, who accused the CPC of fostering red light districts
outside of Manhattan.  DCP Study at 345–46.

bookstores which sold and rented adult films increased precipitously and the number of adult theaters was reduced by half. *See* DCP Study at 305. The number of nude or topless bars also increased, growth ascribed to careful recasting by such bars as upscale entertainment centers that catered to young businessmen with disposable incomes. *Id.* at 330. By 1993, the landscape of New York City adult entertainment establishments was comprised of 49% adult bookstores (including video stores) and peepshows, 38% nude and topless bars, and 13% adult theaters. *Id.* at 333. The majority of these establishments were located in four community districts in Manhattan, specifically around Times Square and Chelsea. *Id.* at 332, 335.

Troubled by the rise in adult entertainment establishments and the accessibility of adult material, various groups—including elected officials—undertook studies to understand the impacts of adult entertainment establishments on the community. *See, e.g.*, Laremont Decl. ¶ 7. The Borough President of Manhattan established the Task Force on the Regulation of Sex-Related Businesses, which conducted a public fact-finding hearing in November 1993 regarding the impacts of adult entertainment establishments. DCP Study at 351–52. That same year, the Chelsea Action Coalition and Community Board undertook to study the economic impact of adult video stores in the neighborhood. And, in 1994, the Times Square Business Improvement District found a negative relationship between adult entertainment establishments and property values, as well as a positive relationship between adult uses and crime complaints. *Id.* at 307. Then, in November 1994, the City commissioned DCP to conduct a study on the effects of adult entertainment.[7] Karnovsky Decl. ¶ 7; CSF ¶ 4. The DCP Study, as described in greater detail *infra*, reviewed the findings of these studies and others that further described how and where

---

[7] In addition, in 1993 and 1994, two neighborhood-specific surveys of Chelsea and Times Square concluded that the proliferation of adult entertainment businesses had created negative economic consequences. *See* DCP Study at 307; Karnovsky Decl. ¶¶ 18–19.

adult businesses operated in New York City, reviewed trends in growth and development of

adult uses, surveyed adult entertainment studies conducted by other municipalities, and

conducted an independent survey of the impact of New York City's adult entertainment

establishments on their surroundings.  *See* Laremont Decl. ¶ 8.  The DCP Study ultimately led to

amendments to the City's Zoning Resolution which would, for the first time, distinguish between

adult entertainment and other commercial establishments.

## II.     The Enactment of the 1995 Regulations

New York City enacted its first iteration of zoning restrictions specifically targeting adult

establishments—specifically "adult eating or drinking establishments," "adult book stores," a

category which includes adult video stores, and "adult theaters,"—in 1995 by adopting changes

to the Zoning Resolution (the "1995 Regulations").  CSF ¶ 1.

### A.     The 1995 Regulations

The 1995 Regulations subjected all businesses that fell within its definition of "adult

establishments" to locational, size, signage, and amortization limits.  Dkt. No. 162-1, Ex. 1

("1995 Z.R."), at 22–26; CSF ¶ 3; *see also* Amron Decl. ¶ 3.  Adult establishments were

prohibited in residential districts, as well as those commercial and manufacturing districts that

permitted new residential uses.[8]  1995 Z.R. at 25, 27–28.  Within the remaining commercial and

manufacturing districts in which adult establishments were allowed, adult establishments were

required to be located at least 500 feet from certain "sensitive receptors" (*i.e.*, an existing house

of worship, school, or daycare), any other adult establishment, and certain districts in which adult

---

[8] The 1995 Regulations further provided that if a zoning district was reclassified into a different
district category in which adult entertainment establishments were categorically barred from
operating—for example, if a manufacturing district was reclassified as a residential zoning
district—adult entertainment establishments in that district would be required to relocate or shut
down.  Amron Decl. ¶ 8.

uses were not permitted.[9]  *Id.* § 32-01; CSF ¶ 3.  The 1995 Regulations further barred more than

one adult establishment from being located on a single lot.  1995 Z.R. § 32-01(d).  The size of

each adult establishment could not exceed 10,000 square feet in floor area and cellar space.  *Id.*

§ 32-01(e).  Finally, the 1995 Regulations imposed limitations on the size and type of advertising

permitted to be used, including by adult establishments.  CSF ¶ 3.  The 1995 Regulations

restricted the size, placement, and illumination of accessory business signs that adult

establishments could use to advertise.  1995 Z.R. §§ 32-69, 42-55.

The Adult uses that did not conform with the location and size restrictions were subject to the

"amortization" or "mandatory termination" provisions.[10]  To give owners time to recoup their

investment in the adult portion of the establishment, most non-conforming adult uses were given

one year to either relocate, close, or conform their businesses to the zoning requirements.[11]  *Id.*

§ 52-77.  Adult establishments could apply to the Board of Standards and Appeals for additional

time to amortize their establishments, so long as they did so at least 120 days before the required

termination date.  *Id.* § 52-734.

The 1995 Regulations defined an "adult establishment" as "a commercial establishment

where a 'substantial portion' of the establishment includes an adult book store, adult eating or

drinking establishment, adult theater, or other adult commercial establishment, or any

---

[9] The 1995 Regulations contemplated a narrow exception for adult entertainment establishments operating in manufacturing districts, which could be located within 500 feet of a boundary of some specified manufacturing districts.  1995 Z.R. § 42-01(b).

[10] Adult entertainment establishments that failed to comply only with the signage restrictions, however, were not subject to the mandatory termination provisions.

[11] The 1995 Regulations contemplated a limited exception for adult establishments existing as of October 25, 1995.  *See* 1995 Z.R. § 32-01(f).  Those establishments, if not located in prohibited zoning districts, and if otherwise conforming except that they were located within 500 feet of another adult use, located on the same zoning lot of another adult use, or exceeded 10,000 square feet of usable floor area, were not subject to the mandatory termination provisions.  *Id.*

combination thereof."  CSF ¶ 5; 1995 Z.R. § 12-10.  The 1995 Regulations go on to define each

type of specific establishment.

The 1995 Regulations defined an "adult eating or drinking establishment" as:

an eating or drinking establishment which regularly features any one or more of the
following: (1) live performances which are characterized by an emphasis on
"specified anatomical areas" or "specified sexual activities"; or, (2) films, motion
pictures, video cassettes, slides or other photographic reproductions which are
characterized by an emphasis upon the depiction or description of "specified sexual
activities" or "specified anatomical areas"; or (3) employees who, as part of their
employment, regularly expose to patrons "specified anatomical areas[,]" and which
is not customarily open to the general public during such features because it
excludes minors by reason of age.

1995 Z.R. § 12-10(b); CSF ¶ 7.  The 1995 Regulations further defined the meaning of "specified

sexual activities" and "specified anatomical areas," which appeared in the definitions of both

"adult eating and drinking establishments" and "adult book stores."[12]  1995 Z.R. § 12-10.  The

1995 Regulations defined an "adult book store" as:

a book store which has as a "substantial portion" of its stock-in-trade any one or more of
the following: (1) books, magazines, periodicals or other printed matter which are
characterized by an emphasis upon the depiction or description of "specified sexual
activities" or "specified anatomical areas"; or (2) photographs, films, motion pictures,
video cassettes, slides or other visual representations which are characterized by an

---

[12] The 1995 Regulations defined "specified sexual activities" as "(i) human genitals in a state of
sexual stimulation or arousal; (ii) actual or simulated acts of human masturbation, sexual
intercourse or sodomy; or (iii) fondling or other erotic touching of human genitals, pubic region,
buttock, anus or female breast."  1995 Z.R. § 12-10(d).  The Regulations defined "specified
anatomical areas" as "(i) less than completely or opaquely concealed: (a) human genitals, pubic
region, (b) human buttock, anus, or (c) female breast below a point immediately above the top of
the areola; or (ii) human male genitals in a discernibly turgid state, even if completely and
opaquely concealed."  *Id*.  These definitions were common among zoning restrictions that
municipalities imposed on adult establishments.  *See, e.g.*, *Am. Mini Theatres*, 427 U.S. at 53
n.4; *Cheshire Bridge Holdings, LLC v. City of Atlanta*, 15 F.4th 1362, 1367 (11th Cir. 2021);
*Ent. Prods., Inc. v. Shelby County*, 588 F.3d 372 (6th Cir. 2009), *cert. denied*, 562 U.S. 835
(2010); *Dream Palace v. County of Maricopa*, 384 F.3d 990 (9th Cir. 2004); *Baby Dolls Topless
Saloons, Inc. v. City of Dallas*, 295 F.3d 471 (5th Cir.), *cert. denied*, 537 U.S. 1088 (2002);
*Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 994 (7th Cir. 2002); *Moore v. Brown*, 215
F.3d 1320 (4th Cir. 2000); *T&A's, Inc. v. Town Bd. of Town of Ramapo*, 109 F. Supp. 2d 161
(S.D.N.Y. 2000) (Parker, J.).

emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas."

1995 Z.R. § 12-10(a); CSF ¶ 6.  And, although not relevant to this litigation, the 1995 Regulations defined an adult theater as:

> a theater which regularly features one or more of the following: (1) films, motion pictures, video cassettes, slides or similar photographic reproductions characterized by an emphasis on the depiction or description of "specified sexual activities" or "specified anatomical areas"; or, (2) live performances characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; and which is not customarily open to the general public during such features because it excludes minors by reason of age.

1995 Z.R. § 12-10(c).  Finally, the 1995 Regulations provided a catchall term for "[a]n other adult commercial establishment," defined as:

> a facility—other than an adult book store, adult eating and drinking establishment, adult theater, commercial studio, or business or trade school—which features employees who as part of their employment, regularly expose to patrons "specified anatomical areas" and which is not customarily open to the general public during such features because it excludes minors by reason of age.

*Id.* § 12-10(d).

Having set forth the definitions of the types of establishments that were subject to the restrictions, the 1995 Regulations went on to define the phrase "substantial portion"—which ultimately became central to this litigation—as it was used in some of the definitions:

> For the purpose of determining whether a 'substantial portion' of an establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or combination thereof, the following factors shall be considered: (1) the amount of floor area and cellar space accessible to customers and allocated to such uses; and (2) the amount of floor area and cellar space accessible to customers and allocated to such uses as compared to the total floor area and cellar space accessible to customers in the establishment.

*Id.* § 12-10.  The 1995 Regulations provide further guidance as to the meaning of "substantial portion" with respect to adult bookstores:

> For the purpose of determining whether a bookstore has a "substantial portion" of [sexually explicit] stock in materials . . . , the following factors shall be considered:

13

> (1) the amount of such stock accessible to customers as compared to the total stock accessible to customers in the establishment; and (2) the amount of floor area and cellar space accessible to customers containing such stock; and (3) the amount of floor area and cellar space accessible to customers containing such stock as compared to the total floor area and cellar space accessible to customers in the establishment.

*Id*. Under the 1995 Regulations, businesses falling within these definitions were limited to approximately 11% of the City's overall land area. Dkt. No. 162-7, Ex. 53 ("Sec. Karnovsky Aff.") ¶ 85. And, as noted above, "adult entertainment establishments" were subjected to limitations on size and external signage.

### B. The Adoption of the 1995 Regulations

The 1995 Regulations were the product of work and studies conducted by the CPC and the DCP. Under the New York City Charter, zoning amendments are proposed by the DCP or other planning groups, preliminarily approved by the CPC, and adopted by the New York City Council. Amron Decl. ¶ 1; CPC Planning History at 184. All zoning proposal plans are subject to an environmental analysis and are referred by the DCP to all affected community boards,[13] all affected borough boards, and all affected borough presidents, for hearing, review, and a written recommendation. N.Y. City Charter ch. 8 § 197-a(c). In addition, before approving a plan, the CPC must hold a public hearing. *Id.* § 197-a(d). If the plan is approved by the CPC, it is subject to review and action by the City Council. *Id.* Before approving a plan, the City Council must also hold a public hearing. *Id.* § 197-d(c). An affirmative vote of a majority of council members is required to approve, approve with modifications, or disapprove, a plan. *Id.* That process was followed with respect to the 1995 Regulations, and, later, the amendments that the City enacted in 2001. *See* CSF ¶¶ 192–93.

---

[13] There are presently 59 community districts in New York City, each of which is represented by a community board. CPC Planning History at 186.

But before the provisions that would become the 1995 Regulations were drafted, the DCP conducted an "Adult Entertainment Study" in 1994 to "evaluate the nature and extent of adverse impacts associated with adult entertainment uses." DCP Study at 312. The DCP Study ultimately found a relationship between adult entertainment establishments and negative secondary effects based on its assessment of, *inter alia*, studies conducted by other municipalities evaluating the impact of adult entertainment establishments, the results of neighborhood-specific studies undertaken by two New York City neighborhoods, and DCP's own survey results.

The DCP Study begins with the acknowledgments that "[t]here is a vast array of businesses that may be considered 'adult,'" and that "'adult use' is technically defined differently from municipality to municipality, but generally refers to a commercial establishment that purveys materials or services of a sexual nature." *Id.* at 312–13. For its purposes, the DCP Study defined an adult entertainment establishment as a business with "a commercial use that defines itself as such through exterior signs or other advertisements." *Id.* at 312. The definition did not distinguish between adult theaters, adult bookstores, or adult drinking and eating establishments.

As to historical trends, the DCP Study reported that, as of 1994, adult entertainment establishments were both more prevalent and more readily accessible than they had been ten years earlier. *Id.* at 309. It further reported that, consistent with responses from a similar national survey of real estate appraisers, "[m]ost real estate brokers report that adult entertainment establishments are perceived to negatively affect nearby property values and decrease market values. Eighty percent of the brokers responding to the DCP survey indicated that an adult use would have a negative impact on nearby property values." *Id.* at 379.

The DCP Study also summarized the results of studies from several other localities.  It reported that these studies "found that adult entertainment uses have negative secondary impacts such as increased crime rates, depreciation of property values, deterioration of property values, deterioration of community character and the quality of urban life."  *Id.* at 309–10.  DCP included in its Study a summary of studies and reports conducted by nine other local and state governments between 1977 and 1989—namely, Islip, New York; Los Angeles, California; Indianapolis, Indiana; Whittier, California; Austin, Texas; Phoenix, Arizona; Manatee County, Florida; New Hanover County, North Carolina; and the State of Minnesota.  *Id.* at 314–20. Although the studies varied in their analytic rigor as well as the conclusiveness of their results,[14] they generally found that districts in which adult entertainment uses were located were also areas with higher crime rates, lower property values and diminished quality of life.  *See id.*

The DCP Study also analyzed the adult entertainment business in New York City.  It found that there had been a rapid growth in the number of adult entertainment uses in New York City from 131 in 1984 to 177 in 1993, *id.* at 309, and that the boroughs seeing the greatest increases in the number of adult entertainment establishments over that decade were Manhattan and Queens—both of which had a 47% increase in adult uses (107 in Manhattan and 44 in Queens)—with far smaller increases in the other boroughs, *id.* at 331.  The specific types of adult entertainment establishments varied over that time, but most dramatic was the increase in adult

---

[14] As Plaintiffs highlight, some of the studies undertaken by other municipalities and summarized in the DCP Study are not particularly analytically rigorous.  One study, for example, relies on newspaper anecdotes covering hostility to adult entertainment establishments, rather than data. DCP Study at 314.  Moreover, some of the reports—those published by Manatee County, Florida, and New Hanover County, North Carolina, "relied exclusively on studies of adult uses performed by other municipalities."  Karnovsky Decl. ¶ 11 n.4.  Further, the Minnesota study found that adult establishments concentrated in relatively deteriorated areas, *refuting* the causal link that adult establishments caused a decrease in area property values.

bookstores and the decline of adult theaters, with the number of bookstores (including video

stores) consisting of 49[%] of the citywide total number of adult entertainment uses in 1993,"

and the proportion of adult theaters declining from 37% in 1984 to 13% in 1993.  *Id.* at 333.

The DCP Study also summarized the impacts of sex-related establishments identified by

two neighborhood-specific studies conducted in 1993 and 1994: (1) a study of area

businesspeople commissioned by the Chelsea Action Coalition and Community Board 4 in

Manhattan, which found that secondary harm from adult video establishments included a decline

in the overall reputation of the community, a reduction in the economic vitality of individual

businesses, a decline in the potential for businesses in the community, and an increase in concern

that businesses would leave Chelsea because of the adult video stores, *id.* at 350; and (2) a study

by the Times Square Business Improvement District Study regarding the impact of adult

entertainment on crime and on property values, *id.* at 353–54.

The DCP Study further summarized the results of the DCP's own community survey

aimed at assessing the adverse effects of adult entertainment establishments in New York City

specifically.[15]  *Id.* at 360–69.  The DCP surveyed local organizations and businesses, real estate

brokers, and police officers, and analyzed criminal-complaint and property-assessment data for

six study areas around the City.[16]  *Id.* at 360.  The study did not conclusively reveal links

between adult entertainment establishments and increased criminal complaints or decreased

---

[15] Plaintiffs also submit testimony that highlights the methodological imprecision of the DCP Study's own results, *see, e.g.*, Freeman Aff. ¶¶ 27–33, as well as their own evidence which, they contend, refutes the City's showing that the 1995 Regulations or their successor were sufficiently justified, *see* Dkt. No. 162-9, Ex. 63 ("Freeman Study"), at 1462–65.  As explained *infra*, however, these methodological issues are not a basis upon which the Court may find that the City's rationale for the 2001 Amendments to the 1995 Regulations was insufficient.

[16] Two of the study areas were in Manhattan, with each of the remaining four study areas in a different one of the other four boroughs.  DCP Study at 361.

property values, but did find that some groups—particularly real estate brokers and community organizations—perceived adult entertainment establishments to have such effects. *Id.* at 360–69. Businesses that responded to the survey, on the other hand, were nearly evenly split as to whether they perceived some sort of harm to their business from the presence of nearby adult entertainment establishments; about half of surveyed businesses either perceived no discernable impact of such establishments on surrounding businesses, or believed even that such establishments drove more traffic to their businesses.

Based on the adverse secondary effects identified in the DCP Study, the DCP filed an application with the CPC for a text change to the Zoning Resolution to establish a one-year moratorium on new adult establishments in November 1994. Dkt. No. 162-5, Ex. 41-3 ("1995 CPC Report"), at 401–02; *see also* Karnovsky Decl. ¶¶ 22–24. The CPC approved the application after determining that the adverse secondary effects identified in the DCP Study warranted regulation of adult establishments. 1995 CPC Report at 402. The moratorium was designed to provide sufficient time to develop and enact permanent zoning regulations for adult uses. *Id.*; Karnovsky Decl. ¶ 23. The City Council adopted the moratorium by approving the text changes to the Zoning Resolution in November 1994. 1995 CPC Report at 402.

Over the course of the following few months, the DCP formulated what it envisioned would be permanent zoning restrictions aimed at mitigating the secondary effects of adult entertainment establishments. In March 1995, the DCP, partnering with the City Council's Land Use Committee, formally filed an application with the CPC to amend the text of the Zoning Resolution to define the term "adult establishment" as a land use. 1995 CPC Report at 401–05; Karnovsky Decl. ¶ 25. That same year, the DCP conducted an analysis of potential development sites available for adult uses by studying maps of the zoning districts where adult uses were

permitted.  Karnovsky Aff. ¶ 74.  It concluded that there were nearly 5,000 acres of unencumbered land available for adult uses, allowing the operation of more than 500 adult establishments.  *Id.* ¶ 75.

The CPC preliminarily approved the 1995 Regulations with minor modifications that September.  1995 CPC Report at 478; Karnovsky Decl. ¶ 26.  At the same time, the CPC released a report describing the proposed regulations and explaining the planning considerations.  Karnovsky Decl. ¶ 26.  The CPC's 1995 Report explained that the CPC concluded that the 1995 Regulations were "an appropriate and necessary response to the adverse secondary effects stemming from adult establishments" based on the findings of the DCP Study, the Times Square Business Improvement District Study, and the Chelsea Business Survey, as well as on the findings of the Task Force on the Regulation of Adult Businesses and public testimony received by the CPC.  1995 CPC Report at 433.  The CPC summarized the "substantial adverse secondary effects stemming from the location and concentration of adult uses" as including:

> the negative impact adult establishments have on economic development and revitalization; their tendency to decrease property value, thereby limiting tax revenue; an impediment to economic activity; their tendency to encourage criminal activity, particularly when the establishments are located in concentration; the proliferation of illegal sex-related businesses; their damaging impact on neighborhood character and residents including children; and the costs associated with maintaining and patrolling areas.

*Id.* at 439.  While the 1995 Regulations were addressed to these secondary effects, they aimed to "continue[] to provide ample opportunity for adult establishments to locate and operate throughout New York City."  *Id.* at 433.  The CPC explained that "[a]dult uses would be able to locate in substantial numbers in all boroughs and in a variety of locations, assuring sufficient access to adult materials."  *Id.* at 444.  It added that, after taking into account that certain properties—such as wetlands and property occupied by public works or owned by the City— were unlikely to be developed with adult establishments, analyses by DCP staff made "clear that

the proposed regulations would allow the opportunity for all currently operating adult

establishments to relocate within the city as well as allowing for expansion of the adult market."

*Id.*

The CPC responded to concerns expressed during the public review process that the 1995

Regulations "could be interpreted to allow for enforcement against establishments not intended

to be covered" by the regulations, "such as art galleries, legitimate theaters, and book stores with

an emphasis on gay and lesbian themes." *Id.* at 448–49. It clarified that "'adult establishments'

are intended to be those establishments similar in nature to the types of enterprises described and

studied in the DCP Study, namely book and video stores, theaters, eating or drinking

establishments and other commercial enterprises with a predominant, on-going focus on sexually

explicit materials or activities," and not "general interest book or video stores with a selection of

adult materials that is modest in scale as compared to the overall size of the establishment." *Id*.

at 449. Foreshadowing a series of regulations, the CPC further explained that "guidelines should

direct the enforcement of the adult use regulations." *Id.* In deciding "whether a 'substantial'

portion of an establishment is occupied by an adult use or adult materials," the CPC suggested

that an enforcement agency should consider: "(1) the overall amount of floor area accessible to

customers devoted to adult purposes; (2) the amount of floor area devoted to adult purposes as

compared to the total commercial floor area of the establishment; and (3) the amount of stock of

a sexually explicit nature as compared to total stock." *Id.* at 450. "As a general guideline," the

CPC suggested "that an establishment would need to have at least 40 percent of its accessible

floor area used for adult purposes to make it similar to the establishments studied in the DCP

Study and thus be an 'adult establishment' or 'adult bookstore.'" *Id.* But the CPC added that

there might be exceptions to that guideline, such as if a bookstore moved "[a] disproportionately

large amount of adult materials, as compared to total stock, . . . into a smaller amount of floor

area," or where "10,000 or more square feet of commercial space [was] occupied by adult uses or

adult materials."[17]  *Id.* at 450–51.  In those cases, the CPC believed that the establishment would

qualify as an adult establishment as defined by the 1995 Regulations.  *Id.*

    After a further public hearing, the New York City Council gave final approval to the

1995 Regulations on October 25, 1995, at which time they were supposed to become effective.

1995 Z.R. at 34; Karnovsky Aff. ¶ 27.

## III.    Legal Challenges to the 1995 Regulations

    Dozens of businesses challenged the 1995 Regulations in state and federal court.  CSF

¶ 8.  State court challenges to the 1995 Regulations under the New York state constitution failed.

*Id.*  The state trial court, rejecting the adult entertainment establishments' claims, found that "the

City Council was justified in finding that the present configuration of adult use establishments

causes adverse secondary effects, a finding which demonstrates that the Amended Zoning

Resolution was based on a compelling state interest related to combating such effects, rather than

restricting speech."  *Stringfellow's of N.Y., Ltd. v. City of New York*, 653 N.Y.S.2d 801, 809

(N.Y. Sup. Ct. 1996).  It also found that the 1995 Regulations were no broader than necessary to

achieve their purposes and allowed reasonable alternative avenues of communication by leaving

open nearly 5,000 acres of unencumbered land available for the 148 adult uses that would have

to relocate.  *Id.* at 810–11.  On appeal, both the Appellate Division and, later, the New York

---

[17] The CPC found some modifications to the proposed text change warranted.  First, the CPC recommended modifications that would increase the area available in Manhattan as potential sites for adult establishments to locate, to account for Manhattan's greater proportion of adult establishments and larger audience.  1995 CPC Report at 445–47.  Second, the CPC recommended tweaks to the adult-use definitions to "tailor application of the regulations to the types of enterprises studied in the DCP Study."  *Id.* at 445; *see id.* at 451–57.

Court of Appeals unanimously affirmed the trial court's decision.  *Stringfellow's of N.Y., Ltd. v. City of New York*, 663 N.Y.S.2d 812 (1st Dep't 1997), *aff'd*, 694 N.E.2d 407 (N.Y. 1998).

Federal courts, which had held in abeyance the plaintiffs' federal constitutional claims pending resolution by state courts of the state constitutional claims, *see Hickerson v. City of New York*, 932 F. Supp. 550, 559 (S.D.N.Y. 1996), then began resolving the federal constitutional challenges to the 1995 Regulations, Karnovsky Aff. ¶ 39.  One such challenge, brought in *Amsterdam Video v. City of New York*, 96-cv-02204-MGC, contended that the failure of the 1995 Regulations to decisively define "substantial portion" as used in the definitions of "adult establishment" and "adult book store" rendered the 1995 Regulations unconstitutionally vague, CSF ¶ 9.

While *Amsterdam Video* was pending, DOB, the city agency responsible for issuing permits to build new and alter existing buildings in the City of New York, Dkt. No. 212-2 ("Gittens Decl.") ¶ 1,[18] issued in July 1998 Operations Policy and Procedure Notice ("OPPN")[19] 4/98, guidance which purported to clarify the meaning of the phrase "substantial purpose" as it was used in the 1995 Regulations.  CSF ¶¶ 10, 13; Dkt. No. 162-1, Ex. 11 ("DOB 1998 Guidance"), at 124–26.  With respect to the requirement that a "substantial portion" of a bookstore's stock-in-trade be adult materials, DOB adopted what became known as the "60/40 Rule," providing:

> An establishment shall be deemed a book store if its principal use is selling books, magazines, periodicals or other printed matter or photographs, films, motion

---

[18] Plaintiffs object to this Declaration and others on Rule 602, 701, and 802 grounds.  *See* Dkt. No. 246.  The objections are overruled.  The witness is competent to testify about the matters asserted which, for the most part, are based simply on a reading of the relevant regulations.  In any case, none of the evidence is critical to the Court's decision.

[19] DOB published "OPPNs" to represent official policies of the DOB and assist regulated groups in following operational procedures.  Gittens Decl. ¶¶ 15–16.  DOB renamed the OPPNs "Buildings Bulletins" in 2008.  CSF ¶ 73.

pictures, video cassettes, slides or other visual representations, regardless of floor area.  If at least 40 percent of the book store's total stock accessible or available ("accessible") for sale or rent to customers is comprised of adult materials, then the book store has a "substantial portion" of its stock in adult materials, and is therefore "an adult book store."

An establishment also includes an adult book store if 40 percent of the establishment's floor area and cellar space accessible to customers contains stock in adult materials.

If 10,000 of more square feet of an establishment is occupied by adult materials, the establishment is deemed to be an "adult book store" regardless of the overall size of the establishment.

General interest stores, including general interest book and video stores, with a section of adult materials that is modest in scale as compared to the overall size or stock of the store, are not intended to be covered by the adult establishment definition in [the 1995 Regulations].

DOB 1998 Guidance at 125.  In the same guidance document, DOB also provided guidance applicable to eating or drinking establishments, theaters, and other commercial establishments.

It stated:

The determination whether a "substantial portion" of an eating or drinking establishment, theater or other commercial establishment includes an adult use should include consideration of the amount of floor area and cellar space accessible to customers allocated to adult use for performance and viewing purposes as compared to total combined floor area and cellar space accessible to customers.

Thus, if an eating or drinking establishment, a theater or other commercial establishment, has at least 40 percent of the floor and cellar area that is accessible to customers, available for adult performance and viewing purposes, then a "substantial portion" of the establishment is devoted to an adult use and is an "adult eating or drinking establishment", an "adult theater" or an "other adult commercial establishment."

If 10,000 or more square feet of an eating or drinking establishment, a theater or other commercial establishment is occupied by an adult use, the establishment is deemed to be an "adult eating or drinking establishment", an "adult theater" or an "other adult commercial establishment" regardless of the overall size of the establishment.  Adult entertainment should be the principal form of entertainment at the establishment.

DOB 1998 Guidance at 125.

During argument on the vagueness challenge in *Amsterdam Videos*, the attorney for the City represented to the court that a commercial enterprise allocating less than forty percent of its accessible floor area to an adult use complied with the 1995 Regulations and that those guidelines should be read into the text of the 1995 Regulations.  *See City of New York v. Show World, Inc.*, 683 N.Y.S.2d 376, 381 (N.Y. Sup. Ct. 1998).  Based on that representation, the plaintiffs in *Amsterdam Video* withdrew their vagueness challenge to the 1995 Regulations.  CSF ¶ 12.

DOB revised this guidance less than one month later in OPPN 6/98.  *Id.* ¶ 13; Dkt. No. 162-1, Ex. 12, at 127–29.  OPPN 6/98 left unchanged the 60/40 Rule as applied to bookstores. *See* Dkt. No. 162-1, Ex. 12, at 128.  Perhaps in recognition of the fact that the term "substantial portion" was used in the general definition of "adult establishment" but not specifically in the definition of "adult eating or drinking establishment" in the 1995 Regulations, OPPN 6/98 revised the application of the 60/40 Rule with respect to multi-use establishments:

> The determination as to whether a "substantial portion" of a commercial establishment with two or more uses, at least one of which is not a book store, an eating or drinking establishment, a theater, or an "other adult commercial establishment," includes an adult use should include consideration of (1) the amount of floor area and cellar space accessible to customers allocated to adult use and (2) such amount of floor area and cellar space as compared to total combined floor area and cellar space accessible to customers.

> Thus, if a commercial establishment with two or more uses, at least one of which is not a book store, an eating or drinking establishment, a theater, or an "other adult commercial establishment," has at least 40 percent of the floor and cellar area that is accessible to customers, available for adult use, then a "substantial portion" of the establishment is devoted to an adult use and the commercial establishment is deemed to be an adult establishment.

> If 10,000 or more square feet of a commercial establishment with two or more uses, at least one of which is not a book store, an eating or drinking establishment, a theater, or an "other adult commercial establishment," is occupied by an adult use, the commercial establishment is deemed to be an "adult establishment" regardless of the overall size of the establishment.

*Id.* at 128–29.  OPPN 6/98 further stated that the 60/40 Rule "shall not apply to a commercial establishment that is entirely an eating or drinking establishment, a theater, an "other adult establishment," or any combination thereof, *id.*, sowing the seeds for further litigation.

By 1998, the legal challenges to the 1995 Regulations in federal court had failed as well.  CSF ¶ 8.  The district court denied the plaintiffs' motion for a preliminary injunction on collateral estoppel grounds, finding that plaintiffs were estopped from challenging the factual findings of the state court in the state challenges to the 1995 Regulations, *see Hickerson v. City of New York*, 997 F. Supp. 418, 423 (S.D.N.Y. 1998), and the Second Circuit affirmed on substantially the same grounds, 146 F.3d 99 (2d Cir. 1998).  The Supreme Court declined the plaintiffs' request to entertain an appeal.  *Amsterdam Video, Inc. v. City of New York*, 525 U.S. 1067 (1999).  Once the Supreme Court declined to weigh in, the stays that had enjoined enforcement of the 1995 Regulations pending determinations as to the constitutionality thereof were lifted.  CSF ¶ 14; *see City of New York v. Les Hommes*, 724 N.E.2d 368 (N.Y. 1999) ("The City's zoning resolution became enforceable on July 28, 1998, when the United States Supreme Court denied an application for a stay in a related case, ending a series of stays that had been in effect to that date.").

## IV.  Enforcement of the 1995 Regulations and the 60/40 Rule

With the constitutionality of the 1995 Regulations resolved in both state and federal court by 1998, the City took up the task of enforcement.  *See* Karnovsky Aff. ¶ 45.  Many adult entertainment businesses attempted to comply with the 1995 Regulations by reducing their floor space and stock-in-trade devoted to the sale or presentation of adult materials.  CSF ¶ 15.  But over the course of the following two years, from 1998 to 2000, the City launched a comprehensive enforcement initiative, an undertaking that involved "the commencement of civil enforcement actions against approximately 100 adult establishments operating at prohibited

locations."  Karnovsky Decl. ¶ 44; *see* Karnovsky Aff. ¶ 45.  The City was initially successful in

obtaining court orders requiring the closure of these establishments, having established that they

were "adult establishments" as defined in the 1995 Regulations.  Karnovsky Aff. ¶ 45.  Several

of the regulated businesses permanently closed.  CSF ¶ 14.

      In enforcing the 1995 Regulations, the City took the position that the "substantial

portion" analysis applied only to adult bookstores and multi-use commercial establishments, *i.e.*,

only to "a commercial establishment with two or more uses, at least one of which is not a book

store, an eating or drinking establishment, a theater," or an "other adult commercial

establishment," and that single-use adult eating or drinking establishments could not avail

themselves of the 60/40 Rule.  Karnovsky Aff. ¶¶ 42, 48.  But the New York state courts rejected

those arguments.  In particular, the New York Court of Appeals rebuffed the City's argument

that, in judging whether a "substantial portion" of a commercial establishment included adult

uses, the 60/40 Rule applied only to multi-use establishments.  *See City of New York v. Dezer

Props., Inc.*, 732 N.E.2d 943, 943 (N.Y. 2000) (finding no merit to the City's argument that the

1995 Regulations applied whenever it sold or presented any adult activity).

      Rather than relocating, several of the regulated businesses attempted to avail themselves

of the benefits of the 60/40 Rule by reducing their floor space or stock-in-trade devoted to the

sale or presentation of adult materials or entertainment, and by toning down the exterior signage

of their businesses.  CSF ¶¶ 15, 31; *see* Karnovsky Aff. ¶ 46.  In some instances, these

reconfigurations were costly.  For example, the owner of Club Plaintiff 725 Eatery Corp., known

at that time as "Lace," testified that he reconfigured the business premises such that live

entertainment could be observed by patrons in less than forty percent of its customer-accessible

space at a cost of $20,000; the remainder of the space was used as a liquor-licensed bar featuring

televised sports programming.  Dkt. No. 83 at 262–64 ("Capeci Decl.") ¶¶ 8–10.  Installation of

new subdued exterior signage which did not feature the term "XXX" or contain bright or

flashing lights cost an additional $5,000.  *Id.* ¶ 13.  Another one of the Club Plaintiffs, 59 Murray

Enterprises, Inc., reconfigured its interior space by erecting opaque partitions and installing

televisions viewable from more than 60% of the floor space at a cost of approximately $10,000

in order to conform to the spatial requirements of the 60/40 Rule and avoid enforcement of the

1995 Regulations.  Dkt. No. 83 at 265–73 ("Lipsitz Decl.") ¶¶ 7–10.  It too installed new

subdued exterior signage at a cost of approximately $2,500.  *Id.* ¶ 13.  Other clubs took similar

steps at similar or even greater expense.  *See* Lipsitz Decl. ¶¶ 20–23, 26; Dkt. No. 83 at 283–88

("D'Amico Decl.") ¶¶ 7–11; Dkt. No. 83 at 297–311 ("Kavanaugh Decl.") ¶¶ 8–13.  In addition

to reconfiguring their spaces to fall within the 60/40 Rule's safe harbor, and beyond merely

changing their floor space, stock percentages, and exterior signage, several of the Plaintiff

businesses made additional changes (in varying degrees).  CSF ¶ 16.  Nevertheless, the City

concluded that several of the businesses that attempted to comply with the 1995 Regulations by

modifying their floor space and stock percentages had engaged only in "sham" compliance

inconsistent with the spirit and intent of the 1995 Regulations.  *Id.* ¶ 17; Dkt. No. 162-6, Ex. 45

("2001 CPC Report"), at 692–94; Karnovsky Decl. ¶ 45 n.11; Dkt. No 162-4, Ex. 42 ("2001

DCP Application") at 484.  The City found that the businesses had no reasonable expectation

that the non-adult stock would attract customers.  Karnovsky Aff. ¶ 46.

## V.    The 2001 Amendments

In March 2001, the DCP filed an application to amend the 1995 Regulations, CSF ¶ 189,

by changing the definitional language to address what it contended were "attempts by adult

establishments to remain in operation through superficial measures which do not alter the

character of the establishments as enterprises with a 'predominant, on-going focus on sexually explicit materials or activities,'" 2001 DCP Application at 480; *see* Karnovsky Decl. ¶ 71 n.18.[20]

According to the DCP, the 1995 Regulations were intended to address "those establishments similar in nature as to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments, and other commercial enterprises with a 'predominant, on-going focus on sexually explicit materials or activities.'" 2001 DCP Application at 480 (quoting 1995 CPC Report at 449). The 60/40 Rule had proven ineffective at identifying enterprises fitting that definition, and the DCP did not anticipate that the Rule would be used by adult establishments to evade enforcement. Karnovsky Aff. ¶ 75 n.20. The DCP summarized the problem with the 60/40 Rule as to adult bookstores as follows:

> Enforcement efforts since 1998 have demonstrated that a focus on the relative amounts of adult and non-adult books or videos and a comparison of the amount of floor area devoted to each type of material are, alone, insufficient measures of whether a book or video store has a "predominant on-going focus" on sexually explicit materials. In response to enforcement efforts, adult establishment owners have expanded their inventory of non-adult videos in order to bring the adult stock below 40% of the total, in such a way that they cannot be viewed as having a reasonable expectation that patrons will purchase the non-adult materials. This has often been accomplished by buying carton-fulls [sic] of old instructional videos, kung-fu or karate films, cartoons and the like, which are inexpensive to purchase in bulk. Often, dozens of the same title are offered, another economizing measure which nevertheless assists in achieving a mathematical compliance. The cartoons have sometimes been left opened on the floor of the bookstore, and in other cases the non-adult titles are simply stacked haphazardly on shelves without any attempt at organization or categorization. A frequent observation of inspectors has been that the non-adult titles are gathering dust. At the same time, these establishments continue to have a physical lay-out or methods of operation which reflect a predominant focus on the sale of adult materials.

---

[20] The DCP's application was referred to the City's community boards and borough boards for review and comment in accordance with the procedure required by the City Charter in March 2001. Karnovsky Aff. ¶ 57. Of the three borough boards that responded, the Brooklyn and Queens Boards voted in favor of the proposal, and the Manhattan Board voted against. *Id.*

2001 DCP Application at 483–84. The DCP further explained that the proposed amendments were, with respect to adult bookstores, intended to "establish objective factors, relating principally to physical lay-out and method of operation, by which a bookstore which has achieved only a facial or superficial compliance with the 'substantial portion' test would be considered an 'adult bookstore.'" *Id.* at 484.

With respect to eating or drinking establishments, the DCP explained that the relevant issue was whether the establishment regularly featured adult entertainment, and not the amount of floor space devoted to adult entertainment, *id.* at 484–85: "there is no basis to conclude that the negative secondary effects of adult establishments are any less present where topless or nude dancers frequent only part of the customer-accessible floor space in an eating or drinking establishment," *id.* at 485. Unlike bookstores, which "were a type of use recognized by the CPC as sometimes having a mixed presentation of adult and non-adult materials" and thus required consideration of floor space devoted to adult entertainment specifically "to avoid forcing small neighborhood video or bookstores with only a minor amount of adult material to close or move," the amount of floor space that an eating or drinking establishment devoted to adult entertainment was simply not relevant to whether such an establish was properly characterized as an adult use. *Id.* Appropriation of the 60/40 Rule by non-bookstore establishments, the DCP explained, had "led to the artificial separation of adult eating or drinking establishments into purportedly 'adult' and 'non-adult' sections," a result DCP characterized as "absurd[]." *Id.*

The 2001 DCP Application triggered an environmental review pursuant to the New York State Environmental Quality Review Act and the City Environmental Quality Review ("CEQR"). CSF ¶ 190; *see* Dkt. No. 162-5, Ex. 43 ("City Environmental Assessment"). As part

of the CEQR, the City also considered whether there would be alternative sites to which such

establishments could relocate:

> Since 1995, there have been 11 rezonings which have reduced the amount of land
> area . . . in which adult establishments are permitted . . . . As a result of these
> rezonings, the estimated total number of acres in New York City where adult
> establishments are permitted has been reduced from 4,962 to 4,812, or a 3%
> reduction.  In addition, changes since 1995 in the number and location of "sensitive
> receptors" (houses of worship, schools and day care centers) from which adult
> establishments must be located at least 500 feet . . . have reduced the total number
> of acres in New York City where adult establishments are permitted by an estimated
> 66.26 acres, or a 1% reduction.  It is estimated that these rezonings and changes in
> the number and location of sensitive receptors have reduced the estimated number
> of potential sites for adult establishments in New York City from 514 to 466, a 9%
> reduction.  As indicated above, the number of adult establishments at prohibited
> locations which may seek to relocate to permitted locations has decreased from an
> estimated 148 in 1995 to 101 in 2000, a decline of 32%.

City Environmental Assessment at 529.  The City's environmental review concluded that

without the proposed amendments, the 101 60/40 adult establishments that were currently in

existence would likely remain at their current locations, and new 60/40 establishments could

open in locations prohibited by the 1995 Regulations, as 26 establishments had done between

1998 and 2001.  *Id.*; *see* Sec. Karnovsky Aff. ¶ 88 n.27.

The proposed changes to the 1995 Regulations, the DCP explained, would benefit the

City writ large:

> The proposed action is expected to result in beneficial land use effects and an
> improved quality of life throughout the city . . . . As a result of the proposed action,
> "60/40" adult establishments would be required to discontinue operations or face
> closure through enforcement.   Implementation of the proposed action could
> therefore result in discontinuance or closure of 101 of the 136 adult establishments
> at locations where they were not intended to be allowed under the 1995 Adult Use
> Regulations will remove the secondary effects of these establishments and is
> expected to have a revitalizing effect on the business climate as well as help
> promote an improved residential environment . . . . It is unlikely that all
> discontinued or closed "60/40" establishments would seek to relocate to
> permissible locations.  However, even if these were the case, there would be
> sufficient capacity and locational opportunities for these and future adult
> establishments in commercial and manufacturing areas in which adult
> establishments are allowed.  Assuming adopting of all of the potential rezoning

described above in the discussion of future no-action conditions, there would be 4,588 acres and 428 potential sites available for adult establishments at permissible locations.

City Environmental Assessment at 530–31. DCP also considered whether changes to the zoning map between 1995 and 2001 would affect the availability of space for adult entertainment establishments to relocate: as a result of changes to the zoning map between 1995 and 2001, DCP found that there remained approximately 4,800 acres of unencumbered land available for adult uses in New York City, Sec. Karnovsky Aff. ¶ 87, a minor decline from the 5,000 acres that DCP had determined were available to adult uses in 1995, *id.* ¶ 86. The City did not, however, undertake to conduct a new secondary effects study or update its 1995 study. CSF ¶ 188.

The CPC held a public hearing to consider the community's views on the proposed changes. *Id.* ¶ 193; *see* Dkt. No. 162-6, Ex. 44 ("May 2001 Hearing Transcript"). Most of those who spoke at the hearing—a group of people ranging from representatives of Borough Presidents to business owners—expressed support for the proposed amendments.[21] May 2001 Hearing Transcript at 563–638. One speaker in opposition argued that the 60/40 establishments, by reducing their stock of adult material and the floor space that could be used to offer sexually

---

[21] Many of those who spoke in favor of the proposed amendments nevertheless feared that the changes would not adequately safeguard against the "secondary effects" of adult establishments and would permit 60/40 establishments to continue operating in locations that, were they properly characterized as adult establishments, would be illegal. *See, e.g.*, May 2001 Hearing Transcript at 566–67 (representative of Brooklyn Borough President contending that the "benefits" of the proposed amendments would be "subject to the discretion of the Commissioner of Buildings in regard to the pursuit of effective inspections and adjudication" and thus recommending the addition of a provision that would require the DOB to conduct inspections of adult establishments within sixty days of the effective date of the law). Speakers in opposition generally invoked First Amendment principles—some speakers referred to the proposed amendments as "draconian restrictions" on fundamental free-speech rights, *see, e.g.*, *id.* at 581–82; *see also id.* at 583–90, 614, and some opposed the proposed amendments on grounds that they could be used to target LGBTQ+ establishments, *see id.* at 597–600, 610–12.

explicit material for sale, either eliminated secondary effects or reduced them to a level that was

acceptable.  *Id.* at 555.  Another speaker in opposition argued that the City had not addressed the

dispersal of adult businesses effected by the 1995 Regulations in proposing the 2001

Amendments.  *Id.* at 581; *see also id.* at 597.  The proposed changes were also subject to review

by the Community and Borough Boards, CSF ¶ 192; most of which that responded

recommended approval of the text changes, *see* 2001 CPC Report at 727–84.

On August 8, 2001, the CPC approved the DCP's application to amend the 1995

Regulations.  CSF ¶ 194; *see* 2001 CPC Report.  The 2001 CPC Report reiterated the motivating

factors for the DCP's application to amend the 1995 Regulations.  In its "Consideration" section,

it identified that "the principal purpose of the amendments" was "to clarify certain definitions in

the text, in order to effectuate the Commission's original intent in response to efforts by the

operators of adult establishments to undermine implementation of the 1995 Regulations."  2001

CPC Report at 688.  The CPC "reject[ed] the notion it was powerless to respond to pervasive

efforts by the operators of adult establishments to subvert the intent of the 1995 regulations"

without conducting new studies.  *Id.* at 694.  The 1995 Regulations, the CPC said, were intended

to apply different standards to adult bookstores than to adult nude dancing establishments based

on their different natures.  *Id.* at 684.  As common sense teaches, a general interest book or video

store's "sale of a small amount of adult materials . . . did not render these establishments the type

of establishment analyzed in the DCP Study."  *Id.* at 689.  Thus, to allow for unbiased, objective

enforcement of the laws against only those bookstores akin to those studied by the DCP rather

than general interest bookstores with small adult sections, the CPC came up with the "substantial

portion" test.  *Id.* at 689–90.  But, the CPC went on, the conduct that rendered an eating or

drinking establishment an adult use were different.  *Id.* at 690.  Unlike book and video stores,

which often sold both adult and non-adult media, adult eating or drinking establishments did not

generally present adult and non-adult materials. *Id.* The CPC noted that "the DCP Study did not

identify the existence of neighborhood bars or restaurants with only 'incidental' topless or nude

entertainment," which rendered baseless any conclusion "that the negative secondary effects of

adult establishments are any less present where topless or nude dancers frequent only part of the

customer-accessible floor space in an eating or drinking establishment." *Id.* at 690–91.

Accordingly, the CPC explained, the approach taken by some of the state courts to adult eating

or drinking establishments—requiring both a showing that such an establishment regularly

featured adult entertainment as well as a showing that a "substantial portion" of the floor area

was devoted to adult entertainment—was mistaken. *Id.* "This approach," the CPC explained,

"has led to the artificial separation of adult eating or drinking establishments into purportedly

'adult' and 'non-adult' sections," which, in turn, led to absurd results. *Id.* at 695. The proposed

changes to the 1995 Regulations would effectuate their original intent, by requiring the City, in

enforcing the 1995 Regulations against an eating or drinking establishment, to show only that the

establishment in question regularly featured adult entertainment.

   But the approach of the 1995 Regulations to adult book and video stores, the CPC said,

was also insufficient. *Id.* Although the 1995 Regulations properly contemplated the import of

differentiating between adult bookstores and general interest bookstores with small adult

sections, the 1995 Regulations as written had failed to capture bookstores with "a predominant

focus on the sale of adult materials." *Id.* at 692. It was "absurd," the CPC said, to suggest "that,

in adopting the 'substantial portion' definition of 'adult book store,' the Commission validated

superficial and sham compliance undertaken without any intent of making the non-adult aspect

of the business a truly functioning part of the operation." *Id.* at 694. The proposed changes, the

CPC explained, addressed this problem while still differentiating between adult and general interest bookstores by setting out more specific "objective factors, relating principally to physical lay-out and method of operation, by which a bookstore which has achieved only a facial or superficial compliance with the 'substantial portion' test would be considered an 'adult book store.'"  *Id*. at 693.

The 2001 CPC Report also discussed the amortization provisions of the proposed changes.  The CPC endorsed the DCP's proposal that "an amortization provision be added to the text to ensure that '60/40' establishments do not become permanent fixtures at locations where adult establishments were never intended to be."  *Id.* at 702.  Even though "the purpose of the current amendments is only to clarify the original intent of the 1995 regulations" and "adult establishments were never intended to be allowed to remain in place through superficial compliance measures," the CPC recognized that 60/40 establishments had been found by courts to constitute lawful uses under the 1995 Regulations and had made monetary investments into reconfiguring their spaces to comply with the 60/40 Rule.  *Id.* at 701–02.  The CPC thus adopted a one-year amortization period for any establishment in existence as of August 8, 2001 that had made an investment in reliance on the 60/40 Rule and was classified as an adult establishment at a prohibited location under the 2001 amendments.  *Id.* at 702.  The mandatory termination provision protected the adult establishments' investments into achieving 60/40 compliance for one year, while also ultimately effectuating the intent underlying the 1995 Regulations.

The proposed amendments were then referred to the City Council for review and action under the New York City Charter.[22]  The Council's Subcommittee on Zoning and Franchises conducted a public hearing on the proposed amendments on October 1, 2001, Dkt. No. 162-6, Ex. 47, at 855, and approved the amendments on October 25, CSF ¶ 196.  On October 31, 2001, the City Council approved the CPC's proposal.  *Id.* ¶ 198; Karnovsky Decl. ¶ 3; *see* Dkt. No. 162-7, Ex. 51 ("2001 City Council Meeting Transcript").

### A.      The 2001 Amendments' Definitional Changes

In their final form, the 2001 Amendments change the definition of "adult establishment" and the definitions of the three types of establishments.  *See* Dkt. No. 162-1, Ex. 3 ("2001 Z.R.") § 12.10(1).  In short, the 2001 Amendments clarify that the 60/40 Rule "is not applicable to adult eating or drinking establishments," and amends its application to adult bookstores.  *See* Karnovsky Decl. ¶ 5.  For adult eating and drinking establishments and adult theaters, the 2001 Amendments replace the test that—as interpreted by the state courts—focused in part on the amount of floor space devoted to adult uses, with one that focused only on the frequency with which the establishment offered adult entertainment (*i.e.*, whether the establishment "regularly featured" adult entertainment).  2001 Z.R. § 12.10(1)(b), (c).  For bookstores, the 2001 Amendments retain the notion that a bookstore is an "adult bookstore" only if a "substantial portion" of the store's stock-in-trade is adult printed or visual material, *id.* § 12.10(1)(a), with the added proviso addressed to the characteristics of a business that the CPC had considered to be emblematic of sham compliance, *id.* § 12.10(2).

The 1995 Regulations had defined an "adult establishment" as any commercial

---

[22] Section 197-d(b)(1) of the New York City Charter provides that changes in zoning resolutions pursuant to sections 200 and 201 are subject to review and action by the City Council.  N.Y. City Charter ch. 8 § 197-d(b)(1).  The City Council received the 2001 CPC Report, as well as the City Environmental Assessment.  CSF ¶ 191.

establishment a substantial portion of which was an adult bookstore, an adult eating or drinking establishment, or an adult theater. *See* 1995 Z.R. § 12.10. The courts interpreted the "substantial portion" language in the 1995 Regulations to subject to the zoning restrictions only those adult establishments that devoted more than 40% of their floor space or stock-in-trade to adult content. The 2001 Amendments, however, define an adult eating or drinking establishment or adult theater by the fare that it regularly features by changing both the definition of "adult establishment" generally and the specific definitions of adult eating or drinking establishments. The 2001 Amendments define an "adult establishment" as "a commercial establishment which is or includes an adult bookstore, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof." 2001 Z.R. § 12-10(1).

The 2001 Amendments then define an "adult eating or drinking establishment" as:

[A]n eating or drinking establishment which *regularly features* in any portion of such establishment any one or more of the following:

> 1. Live performances which are characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; or

> 2. Films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or

> 3. Employees who, as part of their employment, regularly expose to patrons "specified anatomical areas"; and

which is not customarily open to the general public during such features because it excludes or restricts minors.

*Id.* § 12-10(1)(b) (emphasis added).[23]  The 2001 Amendments thus clarify that establishments

that regularly feature adult entertainment may not evade regulation by relying on the 60/40 Rule.

*See, e.g.*, *id.*; Karnovsky Aff. ¶ 5; Sec. Karnovsky Aff. ¶ 90.  "Specified sexual activities" and

"specified anatomical areas" retained their preexisting definitions from the 1995 Regulations.

*See* 2001 Z.R. § 12-10(2)(b).

    The 2001 Amendments changed the definition of "adult book store," but retained the use

of the "substantial portion" language from the 1995 Amendments.

> An adult book store is a book store that offers "printed or visual material" for sale
> or rent to customers where a "substantial portion" of its stock-in-trade or "printed
> or visual material consists of adult printed or visual material," defined as "printed
> or visual material" characterized by an emphasis upon the depiction or description
> of "specified sexual activities" or specified anatomical areas."

*Id.* § 12-10(1)(a).

    Unlike its predecessor law, the 2001 Amendments specify what constitutes a "substantial

portion" of a bookstore's stock-in-trade.  To determine whether a "substantial portion" of a

bookstore's stock-in-trade of "printed or visual material" consists of "adult printed or visual

material," the following factors are considered:

> (i) the amount of stock of "adult printed or visual material" accessible to customers
> as compared to the total stock of "printed or visual material" accessible to
> customers in the establishment; and (ii) the amount of *floor area* and *cellar* space
> accessible to customers containing stock of "adult printed or visual material"; and
> (iii) the amount of *floor area* and *cellar* space accessible to customers containing
> stock "of adult printed or visual material" as compared to the amount of *floor area*
> and *cellar* space accessible to customers containing "printed or visual material"
> which is not "adult printed or visual material."

---

[23] The 2001 Amendments define an "eating or drinking establishment" generally as an
establishment that "includes: (i) any portion of a commercial establishment within which food or
beverages are offered for purchase, or are available to or are consumed by customers or patrons;
and (ii) any portion of a commercial establishment from which a portion of a commercial
establishment described in (i) above is accessible by customers or patrons."  2001 Z.R. § 12-
10(2)(e).

*Id.* § 12-10(2)(d) (emphasis in original). But the 2001 Amendments include an important proviso—a list of eight additional factors—to remedy the superficial compliance that City regulators witnessed:

> "[P]rinted or visual material" which is not "adult printed or visual material" . . . shall not be considered stock-in-trade for purposes of this paragraph where such store has one or more of the following features:
>
> (aa) An interior configuration and lay-out which requires customers to pass through an area of the store with "adult printed or visual material" in order to access an area of the store with "other printed or visual material";
>
> (bb) One or more individual enclosures where adult movies or live performances are available for viewing by customers;
>
> (cc) A method of operation which requires customer transactions with respect to "other printed or visual material" to be made in an area of the store which includes "adult printed or visual material";
>
> (dd) A method of operation under which "other printed or visual material" is offered for sale only and "adult printed or visual material" is offered for sale or rental;
>
> (ee) A greater number of different titles of "adult printed or visual material" than the number of different titles of "other printed or visual material";
>
> (ff) A method of operation which excludes or restricts minors from the store as a whole or from any section of the store with "other printed or visual material";
>
> (gg) A sign that advertises the availability of "adult printed or visual material" which is disproportionate in size relative to a sign that advertises the availability of "other printed or visual material," when compared with the proportions of adult and other printed or visual material offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;
>
> (hh) A window display in which the number of products or area of display of "adult printed or visual material" is disproportionate in size relative to the number of products or area of display of "other printed or visual material," when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;
>
> (ii) Other features relating to configuration and lay-out or method of operation, as set forth in rules adopted by the commissioner of buildings, which the commissioner has determined render the sale or rental of "adult printed or visual material" a substantial purpose of the business conducted in such store.

*Id.* § 12-10(2)(d).

### B.    The 2001 Amendments' Substantive Restrictions on Adult Establishments

In substance, the 2001 Amendments are not significantly different from the 1995

Regulations.  Like the 1995 Regulations, the 2001 Amendments permit adult establishments in

some commercial zoning districts and most manufacturing zoning districts, but not residential

districts.  *Id.* § 32-01; Amron Decl. ¶ 6.  Adult establishments are prohibited in manufacturing

and most commercial districts in which residential uses are permitted.  2001 Z.R. § 42-01;

Amron Decl. ¶ 6.  Also like the 1995 Regulations, the 2001 Amendments prohibit adult

entertainment establishments from locating within 500 feet of a church, school, residential

district, or of another adult establishment.  2001 Z.R. § 32-01(b), (c); Dkt. No. 80 ("Berzak

Decl.") ¶ 9.  And adult establishments were still not permitted to locate on more than one zoning

lot and were bound to limit their floor space to less than 10,000 square feet.  2001 Z.R. § 32-

01(d), (e); Berzak Decl. ¶ 10.  An exception is contemplated for bookstores without private

booths, which were permitted to remain at locations where adult establishments are prohibited,

subject to compliance with the eight additional factors.  CSF ¶ 172.

Like the 1995 Regulations, *see* 1995 Z.R. § 52-77, the 2001 Amendments include an

"amortization" or "mandatory termination" provision that requires non-conforming adult uses to

terminate within one year of the date of City Council adoption, 2001 Z.R. § 72-41.  However,

adult establishments that made financial expenditures in the wake of the 1995 Regulations to

avoid being subject to the substantive provisions of the Regulations were, per the 2001

Amendments, given the opportunity to apply to the Board of Standards and Appeals to operate

for a limited time beyond the one-year amortization period.  *Id.*; Dkt. No. 162-7, Ex. 53 ("Second

Karnovsky Aff.") ¶ 9.

Lastly, the 2001 Amendments addressed the priority between competing uses that are

located within 500 feet of each other in violation of the ordinance—*i.e.*, they addressed which of two uses should enjoy priority when an adult establishment and a sensitive use seek to locate within 500 feet of one another including the ability (or lack thereof) of a sensitive use to dislodge an adult entertainment use for which a permit had already been granted.  Sections 32-01 and 42-01 of the Zoning Resolution provide that an adult establishment is deemed to be in existence "upon the date of a permit issued by the [DOB] therefor, or in the case of an adult establishment in existence prior to August 8, 2001, as determined by the [DOB], subject to rules as the department of buildings may prescribe regarding the failure to perform work authorized under a permit or to commence operation pursuant to a permit and the discontinuance of an adult establishment."  2001 Z.R. §§ 32-01, 42-01.  Under New York City Rules (R.C.N.Y.) Section 9000-01, vesting priority is established by which of an adult use or a sensitive use first obtains "an appropriate Department permit."  1 R.C.N.Y. § 9000-01.  Under the rule, either a building permit or a "no work" permit constitutes an "appropriate Department permit."  *Id.* § 9000-01(b).  An adult use cannot prevent a school or house of worship from opening nearby; by contrast, if a school or house of worship obtains priority, it can prevent an adult use from opening within 500 feet of its location.

In sum, the 2001 Amendments principally repeal the 60/40 method of compliance, rendering at least some of the 60/40 businesses non-conforming uses that must either move to an area where they are allowed, or close down in accordance with the one-year mandatory termination requirement.  Restaurants and bars that "regularly feature" adult entertainment are subject to the Zoning Resolution's restrictions, regardless of the amount of floor space used for adult purposes.  2001 Z.R. § 12-10.  As to bookstores, the 2001 Amendments clarify that all stores with peep booths are governed by the Zoning Resolution; bookstores without peep booths

that do not have adult-printed or visual materials comprising a substantial portion of their stock-in-trade, and that otherwise do not have any of the indicia set forth in the definition of "adult establishment," are not considered adult establishments within the meaning of the Zoning Resolution and are not required to comply therewith. *Id.*

## VI.    Legal Challenges to the 2001 Amendments

Like the 1995 Regulations, the 2001 Amendments were challenged in both state and federal court as unconstitutional.[24] *See* CSF ¶ 20.  Lengthy litigation ensued in the state courts. There, several 60/40 establishments contended that the City had not adequately justified the 2001 Amendments because it had not studied whether 60/40 establishments specifically had the same adverse secondary effects as 100% adult establishments.

In September 2003, the New York State Supreme Court granted summary judgment to a theater and video store offering adult materials on the basis that the 2001 Amendments were unconstitutional, finding that the City had failed to show a correlation between 60/40 establishments and adverse secondary effects, and failed to show that the 2001 Amendments were narrowly tailored to address the secondary effects created by those institutions. *See For the People Theatres of N.Y., Inc. v. City of New York*, 768 N.Y.S.2d 783, 785–86 (N.Y. Sup. Ct. 2003).  On appeal, the Appellate Division reversed and deemed the 2001 Amendments constitutional.  *For the People Theatres of N.Y., Inc. v. City of New York*, 793 N.Y.S.2d 356, 371 (1st Dep't 2005).  The court rejected the plaintiffs' argument that the City was required to conduct a new study demonstrating the secondary effects of 60/40 establishments in particular,

---

[24] The new wave of constitutional challenges to the 2001 Amendments includes the three federal actions brought by Club Plaintiffs at issue here.  The federal cases were stayed pending resolution of the constitutional challenges brought in the state courts.  Dkt. Nos. 43, 46.  The 2001 Amendments have not been enforced since they were enacted due to a combination of court orders and litigation agreements.  CSF ¶ 21.

and found that "a review of the legislative record indicates that the [City] Council reasonably believed that the nature of the 60/40 establishments, with a predominant focus on sexually explicit materials and/or featuring topless or nude women, remained unchanged, and that the 2001 amendments were necessary to effectuate the original legislative purpose." *Id.* at 368. It added that the City "need not distinguish between different types of adult uses, or a new type of adult use, so long as the evidence relied upon the by the municipality is reasonably believed to be relevant to the problems addressed by the ordinance." *Id.* The plaintiffs appealed to the New York Court of Appeals, which reversed and held that issues of fact remained outstanding. *For the People Theatres of N.Y., Inc. v. City of New York*, 843 N.E.2d 1121, 1131 (N.Y. 2005). The Court of Appeals, like the Appellate Division, rejected the notion that the City needed to conduct a new secondary effects study concerning the impact of 60/40 establishments specifically.[25] *Id.* at 1132–33; *see also id.* at 1133 (holding that the City did not have a constitutional obligation "to perform a formal study or statistical analysis, or to establish that it has looked at a representative sample of 60/40 businesses in the city"). The Court of Appeals found that the City had "satisfied its burden to justify a secondary-effects rationale for the City's 2001 Amendments," which moved the burden to the plaintiffs to refute the evidence. *Id.* at 1131. The Court of Appeals found that the plaintiffs furnished enough evidence disputing the City's rationale to shift the burden back to the City to supplement the record with evidence supporting the zoning resolution. *Id.* at 1132. It accordingly remanded for a factual determination as to whether the City had fairly supported its position on sham compliance and whether "despite formal compliance with the

---

[25] But in dissent, Chief Judge Kaye took the opposing view that the 2001 Amendments constituted an entirely new law rather than merely a fix of the loophole left open by the 1995 Regulations, and reasoned on that basis that the City would not, on remand, be able to provide additional facts that could substantiate the law that it had not already been given the opportunity to present. 843 N.E.2d at 1134 (Kaye, C.J., dissenting).

60/40 formula, these businesses display a predominant, ongoing focus on sexually explicit

materials or activities, and thus their essential nature has not changed." *Id.* at 1133.

Following remand and a bench trial, in 2010 the New York Supreme Court upheld the

constitutionality of the 2001 Amendments as they related to adult bookstores and adult eating

and drinking establishments. *For the People Theatres of N.Y. Inc. v. City of New York*, 897

N.Y.S.2d 618, 625 (N.Y. Sup. Ct. 2010).[26]  The court found that the City had "provided

substantial evidence that [the 60/40 businesses'] dominant, ongoing focus is on adult matters."

*Id.*  On appeal one year later, the Appellate Division reversed, this time finding that the trial

court's "extremely terse decision" did not sufficiently resolve "whether the 60/40 establishments

are similar in nature to adult establishments that have been shown by means of empirical data to

cause negative 'secondary effects.'" *For the People Theatres of N.Y. Inc. v. City of New York*,

923 N.Y.S.2d 11, 17–18 (1st Dep't 2011).  It therefore returned the case to the state trial court

for a decision setting forth its findings of fact. *Id.* at 18.

On second remand, the trial court struck down the 2001 Amendments as facially

unconstitutional under both the federal Constitution and its state analogue.  *For the People

Theatres of N.Y., Inc. v. City of New York*, 954 N.Y.S.2d 801, 809 (N.Y. Sup. Ct. 2012).  The

court found "significant and distinct differences between the 1994 adult entities and the 60[/]40

entities," such that "the current establishments no longer resemble their 1994 predecessors." *Id.*

at 810.  A divided panel of the Appellate Division affirmed, reasoning that, as an evidentiary

matter, the City had not satisfied criteria that the court had previously identified for assessing

---

[26] The trial court found the 2001 Amendments unconstitutional with respect to adult theaters.
897 N.Y.S.2d at 625.

whether a 60/40 establishment retained a predominant ongoing sexual focus.  *For the People Theatres of N.Y. Inc. v. City of New York*, 14 N.Y.S.3d 338, 346 (1st Dep't 2015).

In 2017, the case was again appealed to the Court of Appeals.  It was only then, after nearly two decades of litigation, and three trips through New York's state courts, however, that the state high court upheld the 2001 Amendments as constitutional.  *See For People Theatres of N.Y., Inc. v. City of New York*, 79 N.E.3d 461 (N.Y. 2017).  In a unanimous decision, the Court of Appeals held that, contrary to determination of the Appellate Division, the City had adequately demonstrated that the 60/40 establishments retained a predominant focus on sexually explicit materials or activities.  *Id.* at 463.  It determined that the lower court had erroneously held the City to a higher burden of proof than required under existing Supreme Court case law regarding the focus of 60/40 establishments.  *Id.* at 475.

On February 20, 2018, the United States Supreme Court denied the plaintiffs' petition for a writ of certiorari from the decision of the New York Court of Appeals.  *Ten's Cabaret, Inc. v. City of New York*, 538 U.S. 1118 (2018).  With the state cases resolved, the federal litigation, proceeding in this Court, was free to move forward.  *See* Dkt. No. 51.

## VII.  The Decline in the Number of Adult Establishments in New York City

Since New York City began subjecting adult entertainment establishments to zoning limitations in 1995, the number of adult establishments in New York City has dramatically decreased.  In 1993, there were 177 known adult establishments operating in New York City, each of which was considered to be a 100% adult establishment as the law made no distinction between 100% adult establishments and establishments that devoted less than all of their floor space or stock-in-trade to adult entertainment.  CSF ¶ 160.  68 of those establishments were what would now be called an "adult eating and drinking establishment" and 86 were described as adult bookstores or video stores.  *Id.*  The remaining 23 adult establishments were categorized as adult

"movie and live theaters." *Id.* By 2000, after the adoption of the 1995 Regulations, there were 136 known adult establishments in New York City, 35 of which were "100% adult establishments" and the remaining 101 of which were "60/40 establishments." *Id.* ¶ 161. Of the 136 known adult establishments, 57 were eating or drinking establishments, 35 were bookstores, and 44 were theaters. *Id.* The majority in each category were 60/40 establishments. *Id.*

There has been an even more dramatic decrease in the number of adult establishments in Manhattan specifically. *See* Sec. Karnovsky Aff. ¶ 88 n.28. In 1993, there were 107 known 100% adult establishments operating at locations in Manhattan alone, of which 21 were what would, under the 1995 Regulations, be deemed an "adult eating or drinking establishment" and 69 were adult bookstores (including video stores) or peep shows. CSF ¶ 166. By 2000, there were 69 adult establishments in Manhattan. *Id.* ¶ 162. 14 of the adult establishments in Manhattan were adult eating and drinking establishments (of which 11 were 60/40 eating and drinking establishments), *id.* ¶ 163, and the remaining 55 were adult bookstores, 31 of which had private booths (of which 26 were known 60/40 establishments), and 24 of which did not have private booths (of which 19 were 60/40 bookstores), *id.* ¶¶ 164–65.

The record is silent as to the reasons why the number of adult establishments decreased citywide, including whether the decrease was attributable to the 1995 Regulations, to a decrease in the demand for adult entertainment, or to the presence of alternative avenues for obtaining adult entertainment such as through the internet, to none of those factors or to a combination of those factors. It is fair to assume, given the dramatic decrease in establishments in Manhattan and the operation of the zoning regulations in Manhattan, that at least a portion of the decrease in the number of adult establishments in Manhattan is attributable to the 1995 Regulations, although some of the decline was also driven by external factors such as redevelopment of Times

Square.  Karnovsky Aff. ¶ 77 n.23.

The decline of adult entertainment establishments has continued into the twenty-first century.  As of February 1, 2019, there were 45 known 60/40 businesses in New York City that would have needed to relocate under the 2001 Amendments, reflecting a marked decrease from the number of 60/40 establishments known in 2000.  CSF ¶ 169.  As of May 23, 2022, there were 32 known 60/40 businesses in New York City which would have to relocate if the 2001 Amendments were allowed to take effect, of which 19 were located in Manhattan.  *Id.* ¶¶ 170, 173.  Of the 19 60/40 businesses in Manhattan, 5 are known adult eating and drinking establishments and 14 are known 60/40 bookstores with or without video booths.  *Id.* ¶ 174. Plaintiffs assert that there are 9 lots in Manhattan to which adult establishments can simultaneously relocate and that at least 10 of the 60/40 businesses currently in Manhattan would need to relocate from the borough.  *Id.* ¶ 175.  As of the same May 2022 date, there were 4 known 100% adult businesses operating in permissible locations in Manhattan, of which 3 were adult eating and drinking establishments and one was an adult bookstore without private video booths.  *Id.* ¶ 168.  It thus is possible that the number of establishments in Manhattan offering predominantly sexual fare will decrease from 23 to 13 if the 2001 Amendments become effective.

## PROCEDURAL HISTORY

The Club Plaintiffs—adult establishments that would not have been considered adult establishments under the prevailing interpretation of the 1995 Regulations, but would be so classified under the 2001 Amendments—filed their actions in 2002 and moved for preliminary injunctive relief and summary judgment in late 2002 and early 2003.  *See, e.g.*, Dkt. Nos. 13, 14. Following the state trial court's initial invalidation of the 2001 Amendments in late 2003, however, Judge Pauley, the judge then assigned to the federal actions, administratively closed the

46

cases on consent of the parties while the state court litigation was proceeding.  Dkt. No. 43.

In April 2018, after the United States Supreme Court denied the petition for a writ of certiorari to the New York Court of Appeals, the Court reopened the Club Plaintiffs' actions following a request by the Club Plaintiffs for a conference.  Dkt. No. 51.  Days later, the Bookstore Plaintiffs filed their Complaint.  *See* CM-ECF 18-3732, Dkt. No. 1.  After several extensions, Plaintiffs in all four actions simultaneously moved for preliminary injunctive relief in late 2018 to enjoin enforcement of the 2001 Amendments pending a final disposition of the case on the merits.  *See, e.g.*, CM-ECF 02-cv-4431, Dkt. No. 78.  Plaintiffs contended, in arguments partially echoed now, that the 2001 Amendments improperly burdened their speech in violation of the First Amendment.  Dkt. No. 79 at 24–30.  Noting the myriad tests that the Supreme Court has articulated at various times and with varying degrees of agreement, Plaintiffs asserted that regardless of which test the Court deemed applicable, the 2001 Amendments failed to pass constitutional muster and warranted injunctive relief.  *Id.* at 13–16.

On September 30, 2019, Judge Pauley granted Plaintiffs' motion for preliminary injunctive relief and enjoined Defendants from enforcing the 2001 Amendments.  *725 Eatery Corp.*, 408 F. Supp. 3d at 424.[27]  Applying the three-step test that the Supreme Court articulated

---

[27] Judge Pauley's conclusions are generally not binding on this Court by the law of the case. "The law of the case doctrine . . . holds thatwhen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case," absent "cogent and compelling" reasons to the contrary.  *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002), *cert. denied*, 539 U.S. 902 (2003) (internal citations quotation marks omitted).  However, the Court is not now "bound by its conclusions at the preliminary injunction stage, particularly given that a preliminary injunction focuses on the interim time period before trial, and usually is determined on a less developed record."  *Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 337 n.13 (S.D.N.Y. 2020); *see also Garten v. Hochman*, 2010 WL 2465479, at *3 n.1 (S.D.N.Y. June 16, 2010) ("[T]he law of the case doctrine is not typically applied in connection with preliminary determinations, such as a ruling for a preliminary injunction.:).

in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), Judge Pauley found at step one

that the 2001 Amendments were appropriately considered time, place, and manner regulations

because they did not categorically ban adult establishments, 408 F. Supp. 3d at 460–61, and at

step two, that the 2001 Amendments were content-neutral in that they were justified by the aim

to reduce the adverse secondary effects of adult establishments rather than the speech itself, *id.* at

461–62.  Accordingly, the Court applied intermediate scrutiny to the 2001 Amendments at

*Renton*'s third step.  *Id.* at 462–63.  The Court found that the City's "stated interest of reducing

the negative secondary effects of establishments with predominant, ongoing focus on adult-

oriented expression certainly qualifie[d] as a 'substantial governmental interest,'" and that the

City had met its "burden of providing evidence that support[ed] a link between the regulated

speech and the asserted secondary effects," satisfying the first requirement of intermediate

scrutiny.  *Id.* at 465.  But the City had failed to satisfy the second requirement—showing that

reasonable alternative sites for relocation of the 60/40 establishments existed in 2019.  *Id.* at

468–69.  Judge Pauley "reject[ed] Plaintiffs' unsupported contention that the availability of

adequate sites must, as a categorical matter, be considered on a county-by-county basis," and

specifically that "Defendants must demonstrate alternative channels for adult expression in

Manhattan."  *Id.* at 467.  However, Defendants had submitted only the DCP's analyses of

available city lots from 1995 and 2001, and had not supplemented it with any more current

information.  *See id.* at 468–69.  And the information that Defendants did submit did not account

for how the amount of available land would be affected by the 2001 Amendments' requirements

that adult establishments be located at least 500 feet from sensitive receptors or other adult

establishments.  *Id.* at 469–70.  Plaintiffs' evidence showing that the potential alternative sites

for adult businesses had substantially diminished since 1995 bolstered Judge Pauley's conclusion

that Defendants had not met their burden of showing that reasonable alternative sites were available.  *Id.*

Following Judge Pauley's decision granting preliminary injunctive relief, the parties proceeded through discovery.  *See* Dkt. No. 120.  In May 2023, Defendants moved for summary judgment, and Plaintiffs cross-moved for partial summary judgment.  *See* Dkt. Nos. 219–223. The parties agreed to a bench trial on the written record, in lieu of resolving the motions for summary judgment.[28]  The parties filed a Consolidated Statement of Stipulated Facts.  Dkt. No. 216-1.  Plaintiffs designated as the directed testimony upon which they intended to rely at trial: (1) the declarations and affidavits (including reply declarations) submitted in connection with their preliminary injunction motion, which included testimony by Michael Berzak, a licensed architect, Hugh Kelly, Lance Freeman, and the establishment owners; (2) the declarations and affidavits submitted in connection with their motion for partial summary judgment which included further declarations of Berzak and the establishment owners; and (3) a supplemental declaration of Berzak.  Dkt. Nos. 211, 214.  For their part, Defendants designated: (1) the declaration of Frank Ruchala, the DCP Zoning Director, submitted in connection with Defendants' summary judgment motion; and (2) the declarations of three City employees— Susan E. Amron, DCP General Counsel, Rodney Gittens, the Bronx Borough Commissioner of DOB, and Matthew Croswell, a Geographic Information Systems Team Lead and Open Data Coordinator at DCP—and the exhibits offered through those witnesses.  Dkt. Nos. 211, 212.

---

[28] So long as all parties consent, a district court may make findings of fact and conclusions of law on the written record alone.  *See, e.g.*, *Pristine Jewelers NY, Inc. v. Broner*, 567 F. Supp. 3d 472, 474 n.1 (S.D.N.Y. 2021); *see also Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142–43 (2d Cir. 1998).  The parties agreed to the Court's consideration of written submissions in lieu of direct testimony, Dkt. No. 211, and have waived their right to cross-examine witnesses, Dkt. No. 243.

Both sides eschewed cross-examination and agreed that the case could be decided on the papers

and oral argument.  11/9/2023 Minute Entry.[29]  The Court has considered the parties' briefs on

the motions for summary judgment as addressing the issues presented for trial.

## CONCLUSIONS OF LAW

Plaintiffs bring suit under 42 U.S.C. § 1983 for alleged deprivations of their First and

Fourteenth Amendment rights, and seek permanent injunctive relief enjoining enforcement of the

amortization provision and the vesting and permitting provision of the 2001 Amendments.  *See,*

*e.g.*, Dkt. No. 77 ¶¶ 178, 197, 205, 221; Dkt. No. 222 at 17, 50.  The operative complaint in each

action advances materially the same theories, on the view that the 2001 Amendments, if

enforced, would decimate—and already have dramatically reduced—adult-oriented expression in

violation of the First Amendment Free Expression Clause and the Fourteenth Amendment's

Equal Protection Clause.  *See* Dkt. No. 77; CM-ECF 02-cv-4432, Dkt. No. 26; CM-ECF 02-cv-

8333, Dkt. No. 42; CM-ECF 18-cv-3732, Dkt. No. 78.  Plaintiffs principally assert that the 2001

Amendments violate their First Amendment free expression rights by suppressing protected

expression without any concomitant reduction in secondary effects and by failing to provide

sufficient alternative avenues for adult expression.  Dkt. No. 222 at 36.  Plaintiffs claim that the

number of adult establishments that would need to relocate is greater than the number of

potential permissible sites for adult establishments that the regulations leave open.

Plaintiffs specifically allege that, by singling out non-conforming adult establishments for

termination, the City's mandatory termination provisions violate the Fourteenth Amendment's

equal protection guarantee and constitute an invalid content-based restriction in violation of the

---

[29] The parties have stipulated that Plaintiffs' various complaints in all of the suits should be
deemed conformed to include allegations that DOB's permitting procedures are more onerous for
adult establishments.  Dkt. No. 208 at 2.

First Amendment. *See, e.g.*, *id.* at 31–49. Plaintiffs also challenge the permitting provisions of the 2001 Amendments, claiming that by imposing more onerous permitting rules on adult establishments, the Amendments afford sensitive receptors such as houses of worship and schools a virtual "heckler's veto" over an adult use because such sensitive receptors would be able to establish priority ahead of an adult establishment that began the process earlier while the adult establishment is required to wait for approval of its application. *See, e.g.*, *id.* at 51–60. Plaintiffs further contend that the permitting scheme constitutes an impermissible prior restraint on speech in violation of the First Amendment and deprives them of equal protection of laws under the Fourteenth Amendment. *Id.* at 60–71.

The Bookstore Plaintiffs add that the 2001 Amendments deprive them of procedural and substantive due process in violation of the Fourteenth Amendment. CM-ECF 18-3732, Dkt. No. 78 ¶¶ 179, 184, 188; Dkt. No. 178 at 9–17. Specifically, they contend that the 2001 Amendments deprive them of a constitutionally protected property interest and ignore intervening changes to both the City and the bookstores arbitrarily. CM-ECF 18-3732, Dkt. No. 178 at 9–17.

To warrant permanent injunctive and declaratory relief, Plaintiffs "must succeed on the merits and 'show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.'" *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (Sotomayor, J.) (quoting *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989)); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

public interest would not be disserved by a permanent injunction.").  The Court thus begins with

the merits.  The Court first summarizes the legal standards against which the 2001 Amendments

must be measured.  It then analyzes each of Plaintiffs' merits arguments in turn.  Because the

Court ultimately concludes that Plaintiffs have not succeeded on the merits, the Court has no

occasion to address the questions of adequate remedy at law and irreparable harm.

## I.  Constitutional Standards Applicable to Zoning Regulations That Target Adult Establishments

The First Amendment provides, in relevant part, that "Congress shall make no

law . . . abridging the freedom of speech."  U.S. Const. amend I.  The Free Speech Clause has

been incorporated against the States through the Fourteenth Amendment.  *Gitlow v. New York*,

268 U.S. 652, 666 (1925).  "The First Amendment generally prevents government from

'proscribing speech . . . because [it] disapproves of the ideas expressed,' or mandating speech

because it seeks to promote particular views."  *Brokamp v. James*, 66 F.4th 374, 390–91 (2d Cir.

2023) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)).  "As a general matter, the

First Amendment means that government has no power to restrict expression because of its

message, its ideas, its subject matter, or its content."  *Ashcroft v. ACLU*, 535 U.S. 564, 573

(2002).  "Sexual expression which is indecent but not obscene is protected by the First

Amendment."  *Sable Commc'ns v. F.C.C.,* 492 U.S. 115, 126 (1989).  Not all expression,

however, is entitled to the same level of constitutional protection.[30]  Political speech, because it

is essential to a free and democratic society, enjoys the greatest constitutional protection.  *See,*

---

[30] Commercial speech, for example, enjoys "only 'a limited measure of protection,' commensurate with its subordinate position in the scale of First Amendment values.'"  *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)).

*e.g.*, *Burson v. Freeman*, 504 U.S. 191, 198 (1992). Although the First Amendment's protection extends to sexually explicit films, presentations, and printed material,[31] *see, e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565 (1991) ("[N]ude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment."); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211–12 (1975) (motion pictures portraying nudity are protected); *Kois v. Wisconsin*, 408 U.S. 229, 231–32 (1972) (sexually explicit poetry is protected), "the High Court has often treated adult entertainment establishments and the activities they support as different from 'core' First Amendment speech," and has upheld against constitutional challenge "restrictions that would almost certainly be unconstitutional if applied to pure political speech." *TJS of N.Y., Inc. v. Town of Smithtown*, 598 F.3d 17, 21 (2d Cir. 2010); *see Buzzetti v. City of New York*, 140 F.3d 134, 138 (2d Cir.), *cert. denied*, 525 U.S. 816 (1998) (noting that a plurality of the Supreme Court had concluded that erotic materials are far from the "core" of First Amendment protections).[32] In particular, in a trilogy of cases beginning in the mid-1970s, the Supreme Court upheld against constitutional challenge zoning restrictions that single out adult entertainment establishments for differential treatment on the basis of their purported secondary effects on the neighborhoods in which they are located.

---

[31] Adult entertainment is distinct from obscenity, which is, broadly speaking, a category of speech that does not receive First Amendment protection. *See, e.g.*, *Miller v. California*, 413 U.S. 15 (1973) (holding that the government may regulate speech as obscene if it (1) under community standards, appeals to the prurient interest; (2) taken as a whole, is a patently offensive depiction or description of sexual conduct; and (3) lacks serious literary, artistic, political, or scientific value). The parties here do not dispute that the entertainment at issue in this case is not obscene.

[32] One might imagine a constitutional vision in which the celebration of the naked body enjoys greater protection than the Supreme Court now accords it. *See Miller v. Civil City of South Bend*, 904 F.2d 1081, 1090–1104 (7th Cir. 1990) (Posner, J., concurring). But, as discussed *infra*, that is not the interpretation that the Supreme Court has adopted.

In its first decision on the subject in 1976, *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, the Supreme Court upheld, against free expression and equal protection challenges, a Detroit zoning provision that attempted to disperse adult entertainment establishments by prohibiting new adult theaters from locating within 1,000 feet of any two other adult uses, or within 500 feet of a residential area. *Id.* at 52, 63. The provision was an amendment to the city's "Anti-Skid Row Ordinance," which had been adopted ten years earlier based on findings by the Detroit Common Council that some uses of property, when concentrated, were especially injurious to their surrounding neighborhoods. *Id.* at 52–53. Five Justices agreed that the ordinance was constitutional, but no one rationale garnered the assent of a majority.

In his plurality opinion, Justice Stevens concluded that the zoning regulation was constitutional after concluding that it addressed only "where sexually explicit films may be exhibited" and did not totally suppress erotic materials, *id.* at 70, and that it was not directed at avoiding the dissemination of "offensive" speech but to the "secondary effect" of adult movie theaters in "caus[ing] the [surrounding] area to deteriorate and become a focus of crime," *id.* at 71 n.34. The plurality believed that the differential treatment accorded to speech of an erotic nature was "justified by the city's interest in preserving the character of its neighborhoods" and that, on the record before it, there was a "factual basis" for concluding that the ordinance would "have the desired effect." *Id.* at 71. Justice Stevens noted that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech," highlighting that the district court found that the burden on First Amendment rights would be "slight" because the zoning restrictions only applied to *new* businesses, not existing ones, and, in any case, there remained "myriad locations" in Detroit in which new adult movie theaters could operate. *Id.* at 71 n.35.

Justice Powell, concurring, reached the same conclusion that the ordinance was constitutional, but through a different doctrinal route. Assessing the constitutionality of the ordinance under the test articulated in *United States v. O'Brien*, 391 U.S. 367, 377 (1968), for regulation of conduct that only incidentally burdens speech,[33] Justice Powell concluded that the interests furthered by the ordinance were "both important and substantial"—"[w]ithout stable neighborhoods, both residential and commercial, large sections of a modern city quickly can deteriorate into an urban jungle with tragic consequences to social, environmental, and economic values." *Young*, 427 U.S. at 80 (Powell, J., concurring in the judgment). Justice Powell agreed with the plurality that the governmental interest in regulating adult establishments was "wholly unrelated to any suppression of free expression," and concluded that "the degree of incidental encroachment upon such expression was the minimum necessary to further the purpose of the ordinance." *Id.* at 80–82. And while the constraints of the ordinance with respect to location "may indeed create economic loss for some who are engaged in this business" and "some prospective patrons may be inconvenienced by th[e] dispersal" required by the ordinance, Justice Powell concluded that the First Amendment "is not concerned with economic impact" but rather with "the effect of th[e] ordinance upon freedom of expression." *Id.* at 78–79. Justice Powell stressed that there was no indication in the record that application of the ordinance "to adult theaters has the effect of suppressing production of, or, to any significant degree, restricting

---

[33] *O'Brien* was not an adult entertainment case; it involved instead a Vietnam War protestor who claimed that the act of burning a draft card was constitutionally protected expression. 391 U.S. at 369–70. The Supreme Court rejected his claim, explaining that regulation of expressive conduct is sufficiently justified if (1) it is "within the constitutional power of the Government"; (2) "it furthers an important or substantial governmental interest"; (3) the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 376–77.

access to adult movies." *Id.* at 77. A majority of Justices thus endorsed the proposition that zoning ordinances restricting where adult entertainment businesses are located could be justified by reference to its unwanted effects.[34]

The Supreme Court next confronted zoning ordinances regulating sexually oriented businesses ten years later in 1986, in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, which ultimately built the reference to "secondary effects" from a footnote of the plurality opinion in *American Mini Theatres* into an analytical framework used to determine whether zoning ordinances that restrict the locations that adult establishments may operate comport with the First Amendment. The ordinance challenged in *Renton* resembled the ordinance at issue in *American Mini Theatres*—Renton, a small town in Washington, passed a zoning law preventing adult movie theaters from locating within 1,000 feet of any residential area, park, or church, or within one mile of a school.[35] *Id.* at 44. But, unlike in *American Mini Theatres*, Renton city leaders enacted the law without conducting any research to determine the alleged harmful impact of adult businesses in their jurisdiction, and instead relied on the experience and studies of other cities, such as nearby Seattle. *Id.* at 44–45.

Then-Justice Rehnquist, writing for the majority, upheld the zoning ordinance and articulated a three-step framework for reviewing the validity of a municipal zoning ordinance regulating adult entertainment establishments under the First Amendment. Step one of *Renton*'s test instructs courts reviewing zoning regulations of adult entertainment establishments to

---

[34] In a decision five years after *American Mini Theatres*, the Supreme Court held that outright bans on adult entertainment establishments *did* violate the First Amendment. *See Schad v. Mount Ephraim*, 452 U.S. 61 (1981).
[35] Although the Renton ordinance did not, by its terms, exempt existing adult businesses from its zoning rules as in the ordinance challenged in *American Mini Theatres*, it functioned that way, because at the time that it was enacted, Renton had no adult establishments. *See Renton*, 475 U.S. at 44.

consider first whether the challenged rule constitutes an all-out ban on adult commercial activity. *Id.* at 46.  If an ordinance "does not ban adult theaters altogether" but merely bans them from locating in certain parts of a municipality, the ordinance is properly understood as a time, place, and manner restriction.  *Id.*  Second, the court must determine whether the ordinance should be considered content-neutral or content-based.  *Id.* at 46–47.  To do so, the court must examine the municipality's purpose in enacting the ordinance.  *Id.* at 47–48; *see Buzzetti*, 140 F.3d at 139 (holding that step two of *Renton* looks "to the overall purpose of the ordinance").  If the municipality justifies the ordinance by reference to the secondary effects caused by the adult entertainment establishments and not by reference to the content of the regulated speech, then the ordinance is appropriately judged as a content-neutral regulation.  *Renton*, 475 U.S. at 48.  At the third step, the court reviews the ordinance under either intermediate scrutiny or strict scrutiny.  If the ordinance is deemed content-neutral at step two, the court, at step three, applies intermediate scrutiny and considers whether the "ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication."  *Id.* at 50.  But if the law is deemed content based, the court applies strict scrutiny, under which the ordinance is presumptively invalid.  *See id.* at 46–47; *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 817 (2009) ("Content-based regulations are presumptively invalid." (quoting *R.A.V.*, 505 U.S. at 382)).

Applying this test, the Supreme Court concluded that Renton's ordinance did not run afoul the First Amendment.  At step one, the Court concluded that, because the ordinance did not ban adult theaters altogether, it was properly treated as a time, place, and manner restriction.  *Renton*, 475 U.S. at 46.  Turning to whether the ordinance was content-neutral at step two, the Court examined the motive underlying the ordinance.  *Id.* at 46–47.  Finding that the city's

"predominate intent" in enacting the law was to pursue valid interests unrelated to the

suppression of expression, such as preventing crime, the Court deemed the law content-neutral.

*Id.* at 47–48.  Justice Rehnquist rejected the lower court's position that if "a motivating factor in

enacting the ordinance was to restrict . . . First Amendments rights[,] the ordinance would be

invalid."  *Id.* at 47 (internal alterations and quotation marks omitted).  So long as the

municipality's predominate intent was not to suppress speech, other subordinate motivating

factors were not fatal to the law.  Satisfied that the law was content-neutral, the *Renton* Court

found that the law survived both prongs of intermediate scrutiny at step three: it was narrowly

tailored to serve a substantial government interest and allowed for reasonable alternative avenues

of communication.  *See id.* at 47.  Reciting from the *American Mini Theatres* plurality opinion,

the *Renton* Court reiterated that "a city's 'interest in attempting to preserve the quality of urban

life is one that must be accorded high respect,'" and, further, deemed that government interest

"vital."  *Id.* at 50 (quoting *Am. Mini Theatres*, 427 U.S. at 71 (plurality opinion)).  The fact that

Renton had not undertaken its own study assessing the secondary effects of the adult

establishments did not, on its own, diminish that substantial interest—"[t]he First Amendment

does not require a city, before enacting . . . an [adult zoning] ordinance, to conduct new studies

or produce evidence independent of that already generated by other cities, so long as whatever

evidence the city relies upon is reasonably believed to be relevant to the problem that the city

addresses."  *Id.* at 51–52.  The Court further found that the ordinance at issue was "'narrowly

tailored' to affect only that category of theaters shown to produce the unwanted secondary

effects."  *Id.* at 52 (quoting *Schad*, 452 U.S. at 75).  Finally, the *Renton* majority concluded that

the ordinance satisfied the second prong of intermediate scrutiny analysis.  Because the

ordinance left 520 acres, or approximately five percent of Renton's land area, open to use as

adult theater sites, the Court found that the ordinance left available reasonable alternative avenues for communication. *Id.* at 53. It was irrelevant that the land was already occupied by existing businesses and that, in general, there were "no commercially viable adult theater sites within the 520 acres left open by the Renton ordinance." *Id.* (internal quotation marks omitted). The First Amendment, the Court resolved, did not require cities to make available sites only "at bargain prices." *Id.* at 54. Rather, "the First Amendment requires only that Renton refrain from effectively denying [adult entertainment establishments] a reasonable opportunity to open and operate an adult theater within the city." *Id.* The Renton ordinance, the Court resolved, "easily meets this requirement." *Id.*

Nearly two decades passed after *Renton* before the Supreme Court next addressed the constitutionality of adult zoning restrictions.[36] In 2002, the Supreme Court addressed the specific evidentiary burden that a municipality would have to shoulder to sustain a zoning ordinance directed at adult entertainment in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), the last in its trilogy of adult entertainment zoning cases. At issue was the constitutionality of a Los Angeles ordinance that prohibited more than one adult entertainment business from operating in the same building or structure. *Id.* at 429. In 1978, the city passed an ordinance aimed at dispersing adult entertainment establishments by requiring, *inter alia*, any such business to be at least 1,000 feet from another such business. *Id.* at 430. The law was based on a study that Los Angeles had conducted in 1977, which found that concentrations of adult businesses were associated with higher rates of crime. *Id.* But, as adopted, the ordinance permitted multiple adult enterprises to locate in a single structure. *Id.* at 431. Concerned that

---

[36] Between its decisions in *Renton* and *Alameda Books*, the Supreme Court did reference the secondary effects doctrine in other opinions. *See, e.g.*, *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000); *Reno v. Am. Civ. Lib. Union*, 521 U.S. 844 (1997).

allowing multiple adult businesses to congregate in one building could defeat the goal of the original ordinance, the city closed this apparent loophole by amending the ordinance to prohibit the operation of more than one adult entertainment business in the same building or structure. *Id.* at 429, 431. The Supreme Court rebuffed a First Amendment challenge to the amended ordinance based on the fact that the city had not conducted a study of the alleged harmful secondary effects of such multiple-use establishments specifically, holding that Los Angeles had proffered sufficient evidence to avoid summary judgment. As in *American Mini Theatres*, however, no line of reasoning garnered a majority of the votes.

Writing for the plurality, Justice O'Connor focused primarily on step three of the *Renton* analysis, and undertook "to clarify the standard for determining whether an ordinance serves a substantial government interest under *Renton*." *Id.* at 433. The plurality concluded that it was "reasonable[] for Los Angeles to suppose [from the 1977 study] that a concentration of adult establishments is correlated with high crime rates because a concentration of operations in one locale draws, for example, a greater concentration of adult consumers to the neighborhood, and a high density of such consumers either attracts or generates criminal activity." *Id.* at 436. It was thus "rational for the city to infer that reducing the concentration of adult operations in a neighborhood, whether within separate establishments or in one large establishment, will reduce crime rates." *Id.* Below, the Ninth Circuit had held that the Los Angeles ordinance flunked the third step of the *Renton* test because the study upon which Los Angeles relied, which supported the original ordinance, could not support the logic upon which the amended ordinance was based—that the combination of adult businesses in one building specifically was associated with the harmful secondary effects that the study identified. *Id.* at 435. But, in reversing, the Supreme Court found that the Ninth Circuit set too high an evidentiary bar for the city. *Id.* at

438.  To show a substantial government interest, it is sufficient, the Court said, that the

"municipality's evidence . . . fairly support the municipality's rationale for its ordinance."  *Id.*  If

the municipality does so, the burden shifts to the law's challengers to "cast direct doubt on this

rationale, either by demonstrating that the municipality's evidence does not support its rationale

or by furnishing evidence that disputes the municipality's factual findings."  *Id.* at 438–39.  "If

plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden

shifts back to the municipality to supplement the record with evidence renewing support for a

theory that justifies its ordinance."  *Id.* at 439.

      Justice Kennedy, concurring in the judgment, agreed with the plurality that the central

holding of *Renton* was "sound" and that "[a] zoning restriction that is designed to decrease

secondary effects and not speech should be subject to intermediate rather than strict scrutiny."

*Id.* at 448 (Kennedy, J., concurring in the judgment).  But the Justice wrote separately to clarify

the second step of the three-step *Renton* test.  Specifically, he agreed with the dissent of Justice

Souter, on behalf of himself and three other Justices, that zoning ordinances regulating adult

entertainment are in fact content based, and that *Renton*'s categorization to the contrary was a

legal "fiction."  *Id.*; *see also id.* at 455 (Souter, J., dissenting).  But, despite being content based,

an adult zoning restriction "that is designed to decrease secondary effects and not speech,"

Justice Kennedy explained, was properly reviewed under intermediate, not strict, scrutiny.  *Id.* at

448–49.  Justice Kennedy went on to identify the showing he believed that a municipality must

make at *Renton* step two in order to be entitled to the more deferential intermediate scrutiny

review at step three.  *See id.* at 449 (addressing the question of "what proposition [must] a

city . . . advance in order to sustain a secondary-effects ordinance?").  He opined that "in order to

justify a content-based zoning ordinance, . . . a city must advance some basis to show that its

regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." *Id.* at 449. "A city may not assert that it will reduce secondary effects by reducing speech in the same proportion." *Id.* It was insufficient in his view that a zoning ordinance would cause inconvenience that would "reduce demand and fewer patrons will lead to fewer secondary effects." *Id.* at 450. While agreeing with the plurality's assessment of the weight of the evidence that a municipality must show to support a substantial government interest at step three, Justice Kennedy explained that the plurality omitted the threshold question, at step two of the *Renton* framework, into "how speech will fare." *Id.* at 449–50. In order to enjoy intermediate scrutiny in the first place, the zoning ordinance must be designed to "reduce the costs of secondary effects without substantially reducing speech." *Id.*

The Second Circuit's most recent post-*Alameda* opinion on the standards to be applied to zoning restrictions on adult businesses is *TJS of New York, Inc. v. Town of Smithtown*, 598 F.3d 17 (2d Cir. 2010). There, the Second Circuit addressed the standards to be applied to a First Amendment challenge to a zoning ordinance that limited adult entertainment businesses to three kinds of zoning districts (shopping center business, light industry, and heavy industrial), that set a four-year amortization period, and that required adult entertainment uses to be located at least 500 feet from each other and from any residential district, park, playground, school, church, or similar place of public assembly. *Id.* at 19–20. The Circuit, recognizing that adult entertainment establishments are accorded "differential treatment" under the First Amendment, held that "if a zoning ordinance serves 'a substantial governmental interest *and allows for reasonable alternative avenues of communication,*' the First Amendment is satisfied." *Id.* at 21 (emphasis in original) (quoting *Renton*, 475 U.S. at 50). Addressing the third part of the three-part *Renton* test, Judge Calabresi then held that "in assessing the adequacy of alternative sites left open by a

zoning ordinance, courts must consider the adequacy of alternatives available at the time the ordinance is challenged" and that "[t]his evaluation should account for circumstances as they exist at the time the court issues its judgment, or as close as is practicable to that time in light of the need for discovery and the presentation of evidence, as managed by the district court." *Id.* at 22–23. The court also addressed the standards to be applied in determining the adequacy of alternative sites. "[W]hether the acquisition or use of land [is] unprofitable or commercially impracticable [is] not relevant to [the] concept of availability." *Id.* at 27. In particular, "whether or not sites fit the specific needs of adult businesses—or any other precise type of commercial enterprise—is constitutionally irrelevant." *Id.* at 28. The availability inquiry turns upon "whether proposed sites are physically and legally available, and whether they are part of an actual commercial real estate market in the municipality." *Id.* at 27. "Sites that meet these criteria can qualify as available, even if they are in industrial and manufacturing zones." *Id.* at 28.

The parties spar over the standards to be applied to zoning ordinances directed to adult entertainment. In Plaintiffs' view, Dkt. No. 222 at 39, under Justice Kennedy's opinion and the Supreme Court's later decision in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the 2001 Amendments are properly categorized as content based and thus subject to strict scrutiny, under which commercial practicability *is* relevant. On that view, as further expressed at oral argument, the Plaintiffs argue that the Second Circuit's *TJS* decision that commercial practicability is irrelevant did not take sufficient account of Justice Kennedy's plurality opinion and, in any case, that it cannot stand in light of *Reed*. Dkt. No. 222 at 39; Dkt. No. 229 at 22. Plaintiffs further contend that the appropriate question for the Court is how their protected speech will fare in fact based upon market conditions today if the 2001 Amendments are permitted to go into effect and

whether that restriction on their speech can be justified today based upon any benefits the 2001 Amendments will have in reducing secondary effects.  Plaintiffs argue that the 2001 Amendments flunk that test—speech will in fact be reduced and that reduction is disproportionate to any secondary effects that will be redressed.  *See, e.g.*, Dkt. No. 222 at 34–39.

In this Court's view, Plaintiffs misread the law and the applicable precedents.  As Justice Kennedy's vote was essential to the Court's judgment and as his opinion concurring in the judgment ruled on the narrowest grounds, it is entitled to controlling weight.  *See Marks v. United States*, 430 U.S. 188, 193 (1977) (explaining the significance of opinions concurring in the judgment and providing that "[w]hen a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds"); *see also Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County*, 630 F.3d 1346, 1354 n.7 (11th Cir.), *cert. denied*, 563 U.S. 1033 (2011); *Fantasyland Video, Inc. v. County of San Diego*, 505 F.3d 996, 1002 n.3 (9th Cir. 2007); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 722 (7th Cir. 2003).  But neither Justice Kennedy's concurrence in *Alameda Books* nor the Supreme Court's decision in *Reed* require a zoning ordinance directed at sexually explicit expression to satisfy strict scrutiny, or otherwise alter the third step of the *Renton* test, and the law does not require the municipality to show commercial practicability at step two.  In fact, Justice Kennedy noted several times that, so long as the municipality had the appropriate rationale and designed the ordinance to address the secondary effects, intermediate scrutiny applied.  *Alameda Books*, 535 U.S. at 448 ("A zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict

scrutiny."); *id.* at 449 ("[W]e apply intermediate rather than strict scrutiny.").  Nor did *TJS*

disregard Justice Kennedy's concurrence (and, in any event, this Court is not permitted to

indulge the assumption that the Second Circuit did not take sufficient account of the current

Supreme Court jurisprudence).  *TJS* specifically took account of Justice Kennedy's *Alameda*

*Books* concurrence.  Citing to Justice Kennedy's concurrence, the *TJS* Court stated that

determining whether zoning ordinances that target adult uses "are in fact content neutral is a

tricky question," and noted that "[t]he Court's assertion of the time, place, and manner test in

[*American Mini Theatres*] notably omitted that test's traditional content-neutrality requirement."

598 F.3d at 22 n.5.  Notwithstanding that it was "by no means clear whether or how the content-

neutrality requirement that is central in time, place, and manner cases applies in adult

entertainment cases," *id.* at 22, the court subjected the ordinance before it to the intermediate

scrutiny test of *Renton*, *id.* at 22 n.5, under which the relevant question at step three was physical

and legal availability rather than commercial practicability, *id.* at 27.

The Supreme Court's decision in *Reed* does not change that analysis or subject the 2001

Amendments to any greater scrutiny than that required by *TJS*.  In *Reed*, in addressing a

municipal sign code that treated certain signs differently from others depending on the category

into which the sign fell (ideological, political, or temporary directional), the Supreme Court held

that the sign code was "content based on its face" because the code's restrictions applied

differently to different signs "depend[ing] entirely on the communicative content of the sign."

576 U.S. at 164.  The Court explained that "[g]overnment regulation of speech is content based *if*

*a law applies to particular speech because of the topic discussed* or the idea or message

expressed," *id.* at 163 (emphasis added), and that "[a] law that is content based on its face is

subject to strict scrutiny regardless of the government's benign motive, content-neutral

justification, or lack of animus toward the ideas contained in the regulated speech," *id.* at 165.

Plaintiffs reason that while it might have been unclear at the time of *TJS* whether strict scrutiny

applied to a zoning ordinance targeted at adult entertainment, that ambiguity was eliminated by

*Reed*.  Dkt. No. 222 at 33 n.27.  Because the 2001 Amendments require the City to examine the

content of the fare offered by Plaintiffs (and other like businesses) in determining where they are

permitted to locate, Plaintiffs contend they are content based on their face and thus subject to

strict scrutiny; the "reasonable alternatives" test of *TJS* and *Renton* is no longer sufficient.  *Id.* at

38–41.

  To the contrary, the Supreme Court has recently rejected an expansive reading of *Reed*,

overruling a decision by an appellate court that read *Reed* broadly.  In *Reagan National*

*Advertising of Austin, Inc. v. City of Austin*, 972 F.3d 696 (5th Cir. 2020), the Fifth Circuit,

deciding a case that, like *Reed*, involved restrictions on signage, read *Reed* as stating a

categorical rule wherein the designation of a law as content based or content-neutral necessarily

determines the degree of scrutiny applied: "[i]f [a law] is content neutral, then it is subject to

intermediate scrutiny," but if it "is content based, then it is . . . subject to strict scrutiny."  *Id.* at

702.  From that, the Fifth Circuit decided that *Reed* abrogated much of its own First Amendment

precedent that extended well beyond sign restrictions, including several of its previous

secondary-effects decisions.  *Id.* at 703 n.3.  But the Supreme Court rejected the Fifth Circuit's

approach as "too extreme" and reversed, finding that "restrictions on speech may require some

evaluation of the speech and nonetheless remain content neutral."  *City of Austin v. Reagan Nat'l*

*Advert. of Austin, LLC*, 596 U.S. 61, 69, 72 (2022).  And, more fundamentally, Justice Breyer,

who joined the majority opinion in full but also wrote separately, pointed out in his concurring

opinion that the formalistic treatment of content-based laws as automatic triggers for strict

scrutiny may well disserve First Amendment values.  *Id.* at 78 (Breyer, J., concurring).  As the

Third Circuit noted in interpreting *City of Austin*, the decision simply "reaffirmed that

classifications that consider function or purpose are not always content based."  *Mazo v. N.J.*

*Sec'y of State*, 54 F.4th 124, 149 (3d Cir. 2022), *cert. denied*, 144 S. Ct. 76 (2023).

Judge Pauley, evaluating Plaintiffs' motion for a preliminary injunction, considered the

same arguments Plaintiffs raise here, and concluded that "irrespective of the precise label that

applies to adult-use zoning ordinances," the 2001 Amendments should be analyzed "through the

lens of intermediate scrutiny."  *725 Eatery Corp.*, 408 F. Supp. 3d at 463.  The Court agrees.  In

the first instance, the Court "must follow a precedential opinion of the Second Circuit 'unless

and until it is overruled . . . by the Second Circuit itself or unless a subsequent decision of the

Supreme Court so undermines it that it will almost inevitably be overruled by the Second

Circuit.'"  *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 653 (S.D.N.Y. 2021) (quoting *United States*

*v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015), *aff'd*, 854 F.3d 197 (2d Cir. 2017)); *see also*

*DoorDash, Inc. v. City of New York*, 2023 WL 6118229, at *14 n.3 (S.D.N.Y. Sept. 19, 2023)

("[D]istrict courts are bound to follow controlling Second Circuit precedent unless that precedent

is overruled or reversed." (internal quotation marks omitted)); *Medwig v. Long Island R.R.*, 2007

WL 1659201, at *4 (S.D.N.Y. June 6, 2007) ("[E]ven if the [defendant's] prognostication as to

the Supreme Court's thinking were correct, existing Second Circuit case law is squarely to the

contrary.  It is settled law that a district court in this Circuit is bound by such decisions unless

and until they have been overruled by the Supreme Court or the law is otherwise changed."

(internal citations omitted)).  The Court is thus bound by the Second Circuit's decision in *TJS*.

And even the Second Circuit is limited with respect to how it must treat Supreme Court

precedent: "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears

to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

 *Reed* did not effect a sea change in the First Amendment law to be applied to zoning ordinances directed at adult entertainment or undermine the foundations of *TJS*.[37]  Well before *Reed* and before *TJS*, a majority of the Supreme Court recognized that to call zoning ordinances directed to adult entertainment content neutral was something of a misnomer.  *See Am. Mini Theatres*, 427 U.S. at 67 (plurality opinion); *id.* at 76 (Powell, J., concurring).  The Second Circuit itself recognized that point in *TJS*.  598 F.3d at 22 n.5.  The *American Mini Theatres* plurality studiously avoided justifying its decision on grounds of content neutrality.  The plurality opinion recognized that the ordinance at issue discriminated on the basis of the content of speech, reasoning that "a difference in content may require a different governmental response," *Am. Mini Theatres*, 427 U.S. at 66, but nonetheless concluded that the appropriate questions were whether the ordinance was supported by a substantial governmental interest and provided alternative avenues for communication.  In *Alameda Books* also, a majority of the Court—the dissent and Justice Kennedy in his concurrence—concluded that zoning ordinances addressed to adult entertainment are content based.  *Cf. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16–17 (1983) (looking to the votes of dissenting Justices, combined with votes from the concurring opinion, to determine the applicable legal rule).  In his dissent in *Alameda Books*, Justice Souter, joined by three other Justices, recognized that an adult zoning

---

[37] Indeed, the Second Circuit has read *Reed* narrowly not to upset "well settled precedent that 'restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral.'"  *Brokamp*, 66 F.4th at 396 (quoting *Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. at 72).

law has an "obvious relationship" to the content expressed by the adult business and that "while it may be true that an adult business is burdened only because of its secondary effects, it is clearly burdened only if its expressive products have adult content," that thus should be considered "content correlated." 535 U.S. at 456–57 (Souter, J., dissenting).  Justice Kennedy agreed with the four dissenters, calling *Renton*'s step-two designation of the law at issue there as content-neutral a "fiction" that had only inconsistently been adhered to, and stating that, facially, regulations that targeted adult entertainment establishments "are content based, and we should call them so." *Id.* at 448 (Kennedy, J., concurring).  Nonetheless, five Justices—the plurality and Justice Kennedy—concluded that intermediate scrutiny was appropriately applied to the ordinance.  *Id.* at 440 (plurality opinion); *id.* at 447 (Kennedy, J., concurring).

Thus, *Reed* did not change the law applicable to adult entertainment zoning ordinances. Although *Reed* may well have disclaimed the reasoning underlying the secondary effects doctrine, *Flanigan's Enters., Inc. v. City of Sandy Springs*, 703 F. App'x 929, 935 (11th Cir. 2017), *cert. denied*, 138 S. Ct. 2623 (2018); *Free Speech Coal., Inc. v. Att'y Gen.*, 825 F.3d 149, 160–61 (3d Cir. 2016), because *Reed* did not address the secondary-effects doctrine outright, the Court cannot now read it to abrogate any secondary-effects precedent, *see, e.g.*, *BBL, Inc. v. City of Angola*, 809 F.3d 317, 326 n.1 (7th Cir. 2015) ("We don't think *Reed* upends established doctrine for evaluating regulation of businesses that offer sexually explicit entertainment."); *see also Ass'n of Club Execs. of Dall., Inc. v. City of Dallas*, 83 F.4th 958, 964 (5th Cir. 2023).

But even accepting Plaintiffs' position that *Reed* changed the applicable law as to whether ordinances are properly considered content neutral or content based, their argument still ultimately fails.  Even if, under *Reed*, zoning laws such as the 2001 Amendments are not content neutral, a majority of the Supreme Court previously presupposed in *Alameda Books* that such

69

zoning amendments are not content neutral and nonetheless held that they are subject to more

relaxed scrutiny than that applied to, for example, content-specific laws directed at political

speech.  Indeed, in her concurrence in *Reed*, Justice Kagan, joined by Justices Ginsburg and

Breyer, recognized that the Court has sometimes been "less rigid . . . in applying strict scrutiny to

facially content-based laws," and specifically cited *Renton* as one of those cases which involved

a content-based law but to which the Court applied intermediate scrutiny.  *Reed*, 576 U.S. at

183–84 (Kagan, J., concurring).  And Justice Breyer, in his solo concurrence, noted persuasively

that "content discrimination, while helping courts to identify unconstitutional suppression of

expression, cannot and should not *always* trigger strict scrutiny."  *Id.* at 176 (Breyer, J.,

concurring).  Plaintiffs' argument that *Reed* effectively overruled *TJS* or requires the Court to

examine the commercial practicability of the alternative sites in assessing whether or not speech

is content-neutral is thus without merit.

Justice Kennedy's concurrence in *Alameda Books* articulated different tests than that

articulated by the plurality.  But those tests do not require this Court to consider the current

commercial practicability of alternative sites or how Plaintiffs' protected speech currently would

fare in New York City relative to the benefits of the 2001 Amendments in addressing secondary

effects.  In his *Alameda Books* concurrence, Justice Kennedy addressed the second, not the third,

step of the *Renton* test: specifically, "the claim a city must make in order to justify a content-

based zoning ordinance," 535 U.S. at 449, or in other words, "what is the necessary rationale for

applying intermediate scrutiny," *id.* at 450; *see also Peek-A-Boo Lounge of Bradenton, Inc. v.

Manatee County*, 337 F.3d 1251, 1264 (11th Cir. 2003), *cert. denied*, 541 U.S. 988 (2004)

(holding that, under *Alameda Books*, the reviewing court must determine whether the ordinance

is a time, place, and manner regulation; whether it should be subject to intermediate or strict

70

scrutiny; and whether, if subject to intermediate scrutiny, it is designed to serve a substantial

government interest and allows for reasonable alternative channels of communication).  His

concurrence can only be understood in the context of the opinion to which he was responding.

The *Alameda Books* plurality believed that the claim necessary to establish content neutrality and

to justify intermediate scrutiny was a relatively modest one.  It stated that an ordinance would be

deemed content neutral so long as it "was aimed not at the content of the films shown at adult

theaters but rather at the secondary effects of such theaters."  *Alameda Books*, 535 U.S. at 434

(citing *Renton*, 475 U.S. at 47–49).  Nothing more was necessary.  It is this proposition that

Justice Kennedy took aim at in his opinion concurring in the judgment.  In his view, the

plurality's analysis "fail[ed] to capture an important part of the inquiry."  *Id.* at 450.  On its face,

labeling as content neutral an adult entertainment zoning ordinance because it is aimed at the

secondary effects of adult theaters could "justify a content-based tax: Increased prices will

reduce demand, and fewer customers will mean fewer side effects."  *Id.*; *see also id.* at 445 ("[A]

city may not regulate the secondary effects of speech by suppressing the speech itself.").  It could

be said that such a tax was content neutral and, on the plurality's understanding, would support

intermediate scrutiny because it was aimed at secondary effects.  Indeed, on the plurality's

reasoning, an absolute ban could be said to be aimed at secondary effects.  But in Justice

Kennedy's view, more was necessary to justify applying intermediate scrutiny: "the necessary

rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one

may reduce the costs of secondary effects without substantially reducing speech."  *Id.* at

450.  The aim had to be to reduce secondary effects without substantially reducing speech and

not just to reduce secondary effects, *vel non*.

Plaintiffs would have it that the effect of the ordinance in reducing secondary effects as well as its impact on speech is judged after the fact—at the time the ordinance is challenged—and that if the ordinance is ineffective at addressing secondary effects or if the burden on speech outweighs its amelioration of secondary effects at the time of the litigation, then the ordinance is subject to strict scrutiny, a rigorous standard that the City cannot meet.  Dkt. No. 222 at 35–36, 42; Dkt. No. 225 at 19; Dkt. No. 226 at 5–6.  They assert that Defendants must show "a net gain in reduction of secondary effects which *substantially* outweighs any impact in reducing expression."  Dkt. No. 226 at 6.  Justice Kennedy's opinion in *Alameda Books*, however, cannot bear the weight Plaintiffs place on it.  In Justice Kennedy's view, the relevant question at step two of the *Renton* test is not how speech fares in fact at the time of the litigation, but the rationale of the municipality for the ordinance in the first place, and the municipality's consideration of how speech will fare.  Step two of *Renton* looks to the municipality's justification and whether there is some evidence to support it.  Just as the municipality must have some pre-enactment evidence of secondary effects, *see White River Amusement Pub., Inc. v. Town of Hartford*, 481 F.3d 163, 171 (2d Cir. 2007), so too must it have some pre-enactment information regarding how speech will fare under the ordinance, *see Tollis, Inc. v. County of San Diego*, 505 F.3d 935, 940 (9th Cir. 2007), *cert. denied*, 553 U.S. 1066 (2008).  If the municipality's rationale is one to redistribute the locations where speech occurs without reducing its volume or quantity in order to address secondary effects and not simply to ban or reduce speech outright, then the ordinance is subject to intermediate scrutiny and the alternative avenues for communication are judged at step three of *Renton* based on physical and legal availability at the time of the litigation.

This conclusion is supported by a close reading of Justice Kennedy's opinion in *Alameda Books*. The Justice himself recognized that the exercise was a predictive one. He stated: "A zoning measure can be consistent with the First Amendment if it is *likely* to cause a significant decrease in secondary effects and a trivial decrease in the quantity of speech." *Alameda Books*, 535 U.S. at 445 (emphasis added). The question, Justice Kennedy explained, is "how speech *will* fare," not how it has fared. *Id.* at 450 (emphasis added). The opinion is replete with references to the purpose of the ordinance, its design, and its underlying motive. *Id.* at 447 ("[A] zoning law need not be blind to the secondary effects of adult speech, so long as the purpose of the law is not to suppress it."); *id.* at 448 (describing the purpose of the ordinance in *Renton*); *id.* ("A zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny."); *id.* at 449 ("[Z]oning regulations do not automatically raise the specter of impermissible content discrimination, even if they are content based, because they have a prima facie legitimate purpose."); *id.* ("The zoning context provides a built-in legitimate rationale."); *id.* at 449–50 ("The rationale of the ordinance must be that it will suppress secondary effects—and not by suppressing speech."). This reading  also is consistent with the notion in Justice Kennedy's opinion, expressed with respect to the third step, that "a city must have latitude to experiment, at least at the outset." *Id.* at 451. Although there is some ambiguity in that latter statement, it suggests—as common sense does—that a municipality need not know the result of its experiment before the ordinance it has adopted is entitled to intermediate scrutiny. *See Imaginary Images, Inc. v. Evans*, 612 F.3d 736 (4th Cir. 2010) (finding that a municipality "may demonstrate the efficacy of its method of reducing secondary effects 'by appeal to common sense,' rather than 'empirical data'" (quoting *Alameda Books*, 535 U.S. at 439–40 (plurality opinion))). Thus, the relevant question here is the City's rationale at

the time of adoption and whether at the time of adoption there is "sufficient evidence to support the proposition," *Alameda Books*, 535 U.S. at 451 (Kenendy, J., concurring), and not any post-hoc analysis of either the effectiveness in reducing secondary effects or the impact in fact on speech.

This reading of *Renton* and of Justice Kennedy's concurrence in *Alameda Books* is also not inconsistent with *TJS*. It simply adds another layer to the analysis. The *TJS* Court assumed that an ordinance targeting adult uses would satisfy "whatever content-neutrality requirement may apply to adult entertainment zoning ordinances." 598 F.3d at 22 n.5. It stated broadly that "if a zoning ordinance serves 'a substantial governmental interest *and allows for reasonable alternative avenues of communication*,' the First Amendment is satisfied." *Id.* at 21 (emphasis in original) (quoting *Renton*, 475 U.S. at 50). It then addressed the third part of the *Renton* test and what specifically is required by the "reasonable alternative avenues of communication" requirement and when it should be measured, concluding that it should be measured at or as near as possible to when the court issues its judgment. *Id.* at 23. *TJS* left open the question whether the adequacy of the sites left available by an ordinance at the time of the ordinance's passage was relevant to the constitutional analysis. 598 F.3d at 24. In this Court's view, Justice Kennedy's concurrence in *Alameda Books* answers that question, but with a twist. The question is relevant, but it is relevant to step two of the *Renton* analysis (which looks to expectations at the time of passage), and is part of a broader inquiry into the municipality's reasonable expectations regarding how speech will fare when the ordinance is given effect. The municipality cannot know for sure how an ordinance will affect speech before the ordinance is adopted.

The Court's interpretation that *Alameda Books* requires consideration, at step two, of whether the municipality considered how speech would fare under its contemplated ordinance also gives independent meaning to Justice Kennedy's opinion concurring in the judgment. The Court thus respectfully disagrees with the opinions of other courts to the extent that they suggest that the Kennedy concurrence did not add anything to the analysis of the majority in *Alameda Books* and *Renton*. *See, e.g.*, *Ctr. for Fair Pub. Pol'y v. Maricopa County,* 336 F.3d 1153, 1162 (9th Cir. 2003), *cert. denied*, 541 U.S. 973 (2004) ("Given his emphatic reaffirmance of *Renton,* we are not persuaded that Justice Kennedy meant to precipitate a sea change in this particular corner of First Amendment law."). The Court does not assume that an opinion concurring in the judgment adds nothing to the reasoning expressed in the plurality opinion. Justice Kennedy concurred in the judgment without joining the plurality opinion. The Court also disagrees with those courts that have concluded that Justice Kennedy's opinion concerns step three of the *Renton* analysis.[38] *See, e.g.*, *Ass'n of Club Execs. of Dall.*, 83 F.4th at 969 ("It is mostly [with respect to the alternative avenues of communication part of *Renton*] that Justice Kennedy's controlling opinion in *Alameda Books* differs from the plurality."); *World Wide Video of Wash., Inc. v. City of Spokane*, 368 F.3d 1186, 1195 (9th Cir. 2004) (holding that Kennedy inquiry "dovetails with the requirement that an ordinance must leave open adequate ample alternatives of communication" at step three of *Renton*); *R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402, 409

---

[38] There is one part of Justice Kennedy's concurrence in *Alameda Books* that does appear to speak to the results of the ordinance. In laying out the general principles applied before a zoning ordinance is given intermediate scrutiny, Justice Kennedy announced that "[t]he purpose *and effect* of a zoning ordinance must be to reduce secondary effects and not to reduce speech." *Alameda Books*, 575 U.S. at 445 (emphasis added). That dictum, however, cannot be read in context to require the municipality to show at the time of challenge that the ordinance has not, in fact, resulted in any decrease in adult speech. Immediately after that sentence, Justice Kennedy makes clear that the inquiry is prospective and looks to the effect that the ordinance is "likely" to have. *Id.*

n.4 (7th Cir. 2004). *Renton*'s third step concerns the government's interest in enacting the law,

and whether, as a legal matter, the zoning ordinance leaves open alternative avenues for

communication—an inquiry that, as *TJS* establishes, is measured at the time of the litigation.

Collapsing Justice Kennedy's opinion into step three would deprive it of any force—while

Justice Kennedy asked about how speech would fare under an adult zoning ordinance, *Renton*

step three, at least as articulated in *TJS*, is directed to reasonable alternatives in fact and does not

require commercial practicability. In the Court's judgment, Justice Kennedy's opinion goes to

an issue different but no less important than whether the law leaves reasonable alternatives—the

City's motivation at the time of the ordinance's passage at *Renton*'s second step. Before a

zoning ordinance is entitled to intermediate scrutiny at all, the ordinance must be based on a

reasoned judgment based on fact that its effect will not be to substantially reduce the quantity

and accessibility of protected speech. *See Tollis,* 505 F.3d at 940 (holding that Justice

Kennedy's requirement that the quantity of speech not be substantially undiminished requires the

municipality "at the time of enactment" to have "some reasonable basis to believe that interested

patrons would, for the most part, be undeterred by the geographic dispersal of the adult

establishments").

     With the relevant legal framework and standards in hand, the Court turns to Plaintiffs'

claims that the 2001 Amendments violate the First Amendment. The Court first analyzes

whether the 2001 Amendments are unconstitutional on their face. Concluding that the 2001

Amendments do not run afoul the First Amendment, the Court turns next to the definitional

portions of the whether the definitional provisions of the 2001 Amendments or the amortization

provisions of the 2001 Amendments render the 2001 Amendments unconstitutional, before

turning to Plaintiffs' challenges to the permitting and vesting requirements.

## II.     Plaintiffs' Challenge to the Definitional Portions of the 2001 Amendments

Plaintiffs challenge the constitutionality of the definitional change contemplated by the

2001 Amendments, which, by eliminating the 60/40 exemption, would place 60/40 businesses

within the purview of the adult-specific zoning restrictions.  Dkt. No. 225 at 3–33.  But the

Court, applying the *Renton* test as clarified by Justice Kennedy's concurrence in *Alameda Books*,

finds that the definitional portions of the 2001 Amendments do not violate the First Amendment.

The 2001 Amendments do not ban protected speech, are properly deemed content-neutral, are

supported by a substantial governmental interest, and leave available ample alternative avenues

for speech.

### A.     *Renton* Step One: Time, Place, and Manner Restriction

The Court's first inquiry under *Renton*'s test, left untouched by *Alameda Books*, is

whether the 2001 Amendments constitute a time, place, and manner restriction.  *Renton*, 475

U.S. at 46.  There is no dispute that the 2001 Amendments do not impose an all-out ban on

protected speech.  The 2001 Amendments are zoning rules that function to exclude adult

entertainment establishments from operating in certain locations in New York City while

permitting them elsewhere.  They are exactly the type of restriction that *Renton* and lower courts

have uniformly found to constitute time, place, and manner restrictions.  *See, e.g.*, *id.*; *Daytona*

*Grand, Inc. v. City of Daytona Beach*, 490 F.3d 860, 870 (11th Cir. 2007), *cert. denied*, 552 U.S.

1183 (2008); *D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 58 (1st Cir. 1999), *cert. denied*,

529 U.S. 1110 (2000).  In other words, the 2001 Amendments regulate where such speech can be

delivered within the City of New York but not whether it can be delivered at all.  The 2001

Amendments thus constitute a time, place, and manner restriction under the first part of the

*Renton* test.

**B.**     ***Renton* Step Two: Content Neutrality**

The second step of *Renton*, as refined by Justice Kennedy's concurrence in *Alameda Books*, looks to the overall purpose of the zoning ordinance rationale of the municipality in enacting the ordinance and whether the regulation is "targeted not at the activity, but at its side effects." *Alameda Books*, 535 U.S. at 447 (Kennedy, J., concurring in the judgment). Under the *Renton* test, the 2001 Amendments are properly considered content-neutral.

As Justice Kennedy instructed in *Alameda Books*, step two of the *Renton* test requires the municipality to demonstrate that it targeted the side effects of adult entertainment and has made a reasoned judgment that its ordinance will address the secondary effects caused by sexually explicit speech without substantially decreasing the quantity or accessibility of such speech. 535 U.S. at 448–49 (Kennedy, J., concurring in the judgment); *see Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006) ("Regulations that target 'only [the] potentially harmful secondary effects of speech' are . . . content-neutral and trigger intermediate, rather than strict, scrutiny." (quoting *Hobbs v. County of Westchester*, 397 F.3d 133, 148 (2d Cir.), *cert. denied*, 546 U.S. 815 (2005))); *see also Alameda Books*, 535 U.S. at 440–41 (plurality opinion) (explaining that *Renton*'s inquiry at step two "requires courts to verify that the 'predominate concerns' motivating the ordinance 'were with the secondary effects of adult [speech], and not with the content of adult [speech]'" (quoting *Renton*, 475 U.S. at 47)). As the Court reads Justice Kennedy's test, it also requires the municipality to show that it had a sufficient basis to support its beliefs both that the adult entertainment businesses are associated with negative secondary effects, and that its ordinance would leave the quantity of the speech of the adult businesses substantially undisturbed and available. *See Alameda Books*, 535 U.S. at 448–49.

In adopting the 2001 Amendments, the CPC and the City Council sought to regulate the locations where sexually explicit speech would be available in New York City, not the amount of

sexually explicit speech that would be available.  The record establishes that the City acted, not
out of hostility toward the content of the speech purveyed by vendors of adult entertainment, but
out of concern for the secondary effects of that speech.  The DCP Study, the 1995 CPC Report,
and the 2001 CPC Report, individually and together reflect a reasoned view by the City that
adult entertainment as then currently zoned created pernicious secondary effects on the urban
environment and an effort by the City to address those secondary effects by changing the
locations where adult entertainment could be seen rather, than by reducing the volume of adult
entertainment.  The DCP Study recited that numerous studies in other localities found that adult
entertainment uses have negative secondary effects.  DCP Study at 302.  That finding was
repeated in the 1995 CPC Report.  *See* 1995 CPC Report at 433–39.  As the CPC explained, each
provision of the 1995 Regulations was "designed to minimize the potential for adverse secondary
effects throughout the city and provide additional protection to . . . uses particularly vulnerable to
the negative effects of adult uses."  *Id.* at 442.  Specifically, the anti-concentration provision,
requiring adult uses to maintain at least 500 feet of distance between each other, "guarantee[d]
that no community will see a concentration of adult uses."  *Id*.  The size limitation, restricting the
maximum size of adult entertainment establishments to 10,000 square feet, further ensured,
according to CPC, that no community would "see a 'de facto' concentration of adult uses within
a single establishment."  *Id*.  And the requirement that adult establishments maintain at least 500
feet of distance from residential areas and sensitive receptors such as schools "protects sensitive
residential areas" as well as "families and children from the detrimental effects of adult
establishments."  *Id.* at 442–43.  But, the CPC explained, "the regulations continue to provide
ample opportunity throughout the city for the location and relocation of adult uses" to sites easily
accessible by public transportation.  *Id.* at 444.  The 2001 Amendments are, in substance, nearly

identical to the 1995 Regulations.  There was little reason to think, then, that the 2001

Amendments would burden speech in a way that the 1995 Amendments did not.  But Defendants

nevertheless undertook studies and hearings in 2001 to evaluate the effect of the 2001

Amendments.  For example, in its environmental review, the City found that the 2001

Amendments would "remove the secondary effects of these establishments and is expected to

have a revitalizing effect on the business climate as well as help promote an improved residential

environment."  City Environmental Assessment at 530.  These studies reflect that the City had a

basis for believing that establishments that regularly offer predominantly sexually explicit fare

foster urban delay and generate pernicious side effects, including crime, reduced real estate

values, and decreased quality of living.  The City also confirmed that there was adequate space

for adult entertainment establishments that would be forced to relocate under the 2001

Amendments.  *See, e.g.*, Sec. Karnovsky Aff. ¶ 87.

The CPC and the City Council were not oblivious to the effects of the 2001 Amendments

on the amount and accessibility of sexually explicit speech.  In the course of proposing the

amendments, the City expressly considered whether there would be alternative sites to which

adult establishments could relocate if the ordinance were passed, and concluded that there would

be; of the 101 60/40 establishments operating in prohibited locations, the City estimated that

there were over 400 sites to which they could relocate.  *Id.*  It concluded that even if all 101 adult

establishments sought to relocate, "there would be sufficient capacity and locational

opportunities for these and future adult establishments in commercial and manufacturing areas in

which adult establishments are allowed," even accounting for potential rezoning.  *Id.* at 531.  The

City thus was cognizant of the First Amendment interests at stake and sought to protect them.

Plaintiffs complain that the 2001 CPC Report in particular did not contain any independent findings regarding the secondary effects of adult entertainment establishments generally and 60/40 establishments specifically. Dkt. No. 225 at 13, 17; Dkt. No. 253 ("Nov. 29 Oral Arg. Tr.") at 12–13. The argument echoes those presented at the CPC hearings regarding the 2001 Amendments. Plaintiffs reason that, had the City looked at the 60/40 clubs in particular, it would have found that they were fewer in number, Dkt. No. 222 at 5–7, and "not creating the kinds of problems that they had in mind when they did the 1995 ordinance," Nov. 29 Oral Arg. Tr. at 12–13; *see* Dkt. No. 226 at 11. In short, Plaintiffs assert that the 60/40 businesses "were not causing significant problems for the City." Dkt. No. 222 at 7. That argument, however, holds the City to an improperly high burden and is effectively foreclosed by *Renton* and *Alameda Books*. *Renton* established that cities may rely on the studies, reports, and experiences of other cities "that [are] reasonably believed to be relevant to the problem." 475 U.S. at 51–52; *see Exec. Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 796 (6th Cir. 2004). By extension, then, *Renton* forecloses any argument that a municipality is obligated to find a link between the *specific* adult entertainment establishments that it seeks to regulate and negative secondary effects. The City was not required to update the 1994 and 1995 findings in order to remedy what it concluded was a loophole in the 1995 Regulations in 2001, just as Los Angeles was not required to update its study to justify its zoning amendment in *Alameda Books*. In *Alameda Books*, the plurality and Justice Kennedy agreed that a five-year-old study that did not study the exact type of regulated business could be used to draw inferences to support the amended ordinance, 535 U.S. at 436 (plurality opinion); *id.* at 451 (Kennedy, J., concurring in the judgment). Lower courts have reached the same conclusion. *See, e.g.*, *Richland Bookmart, Inc. v. Knox County*, 555 F.3d 512, 522–23 (6th Cir. 2009); *Gammoh v. City of La Habra*, 395

F.3d 1114, 1127 (9th Cir. 2005); *G.M. Enters., Inc. v. Town of St. Joseph*, 350 F.3d 631, 639 (7th

Cir. 2003), *cert. denied*, 543 U.S. 812 (2004).

    Here, the evidence that Defendants relied on to justify the zoning law is sufficient to meet

their burden.  The studies summarized by the DCP and relied upon to justify the 1995

Regulations, including the studies of other municipalities, supported the inclusion of 60/40

establishments within the definition of an adult establishment.  *Cf. Andy's Rest. & Lounge, Inc.*

*v. City of Gary*, 466 F.3d 550, 555 (7th Cir. 2006) (concluding that the municipality had met its

burden by asserting "numerous studies evidencing the secondary effects of sexually oriented

businesses").  Those studies did not limit themselves to adult establishments that devoted more

than 40% of its floor space to an adult use—"[f]or purposes of the DCP survey, an adult

entertainment establishment is a commercial use that defines itself as such through exterior signs

and other advertisements."  DCP Study at 312.  The DCP Study acknowledged that "[t]here is a

vast array of businesses that may be considered 'adult,'" and that "'adult use' is technically

defined differently from municipality to municipality, but generally refers to a commercial

establishment that purveys materials or services of a sexual nature."  *Id.* at 312–13.  But the DCP

nonetheless concluded from the studies, including those of other municipalities, which spanned

over a decade, that businesses that predominantly offered sexually explicit fare generated

secondary effects that could be addressed through zoning that supported the 1995 Regulations.

*See id.* at 314–20, 370–72; *see also* 1995 CPC Report at 449 ("[C]ommercial enterprises with a

predominant, on-going focus on sexually explicit materials or activities [which] were analyzed in

the DCP Study and found to have adverse secondary effects.").  The City was no less entitled to

rely on the same studies to reach the same conclusion just a few years later in 2001 that those

types of businesses generated secondary effects that could be productively addressed through zoning.

The City also was not required, in 2001, to analyze the secondary effects of 60/40 businesses in particular to make out the showing necessary to trigger intermediate scrutiny.  Just as Los Angeles could rely on evidence from its study, conducted five years before the ordinance at issue was enacted and not addressed to the specific type of adult use, to justify its law, *Alameda Books*, 535 U.S. at 440 (plurality opinion), the City here may rely on the DCP Study, conducted seven years before the 2001 Amendments were enacted, to justify its law.  The 1995 CPC Report, summarizing the DCP Study, explained that the DCP had concluded that establishments "with a predominant, on-going focus on sexually explicit materials or activities," including book and video stores, theaters, eating or drinking establishments and other commercial enterprises, generated negative secondary effects.  1995 CPC Report at 449.  The DCP's conclusion was based on a review of studies in other jurisdictions that were not particular to the floor space devoted to sexually explicit fare or the portion of the enterprise that sold sexually explicit material relative to the portion that did not.  DCP Study at 314–22.  It also was based on reviews of the effects of adult establishments in Times Square and Chelsea that were indifferent to the portion of floor space addressed to adult entertainment.  *Id.* at 372–73.  Although the CPC opined that "[a]s a general guideline, . . . an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the DCP Study and thus be an 'adult establishment' or 'adult bookstore,'" that was only as an attempted refinement of the point that it was establishments with a "predominant, on-going focus" on sexually explicit materials specifically that created secondary effects.  1995 CPC Report at 449–50.  The studies of other municipalities and the

City's own examination support the reasonable judgment that 60/40 establishments—no less than 100% adult establishments—generated secondary effects. *Cf. Zibtluda, LLC v. Gwinnett County*, 411 F.3d 1278, 1286 (11th Cir. 2005) (finding that the county sufficiently supported its ordinance by citing to studies from different locations, conducting a public hearing, and collecting testimony from law enforcement and economics experts); *Gammoh*, 395 F.3d at 1126 (finding that municipality had met its initial burden by relying upon judicial decisions in other cases, reports and studies from other jurisdictions, and testimony by municipality employees and people affected by the regulations); *Ben's Bar*, 316 F.3d at 725–26 (holding that city had met its initial burden by relying upon studies, reports and judicial decisions from other locations); *McKibben v. Snohomish County*, 72 F. Supp. 3d 1190, 1196 (W.D. Wash. 2014) (where regulatory body "held at least ten meetings; reviewed studies of the secondary effects of adult entertainment, sample ordinances from other jurisdictions, and federal and state court decisions; heard testimony from law enforcement officers and community members regarding the effects of adult entertainment businesses' held a public hearing; and authored a final report proposing certain regulations of adult businesses," it has met its constitutional obligation to link its ordinance with the negative secondary effects it sought to eradicate).

The City thus was within its rights to determine that the 2001 Amendments were necessary to patch the loophole created by the 1995 Regulations and by the two DOB guidance documents. The 1998 DOB OPPNs were not themselves based on any judgment by DOB or the CPC or City Council that 60/40 establishments did *not* generate negative secondary effects. The OPPNs were addressed to a different issue—the concern that the zoning regulations as drafted in 1995 were vague and might inadvertently draft in non-adult establishments that offered some small portion of adult fare, *i.e.*, establishments that would not be considered to be adult

bookstores even under the 2001 Amendments.  *See, e.g.*, Dkt. No. 162-1, Ex. 12, at 128
(providing that "[g]eneral interest stores, including general interest book and video stores, with a
section of adult materials that is modest in scale as compared to the overall size or stock of the
store, are not intended to be covered by the adult establishment definition" in the 1995
Regulations).  In fact, the DCP Study, conducted in 1994, flagged that "newsstands, bookstores
and many general interest video stores also provide adult viewing material."  DCP Study at 370.
And the 1995 CPC Report said expressly stated that "adult sections in general interest video and
bookstores will be unaffected by the regulations and will provide an additional outlet for adult
materials.  1995 CPC Report at 445.  As the CPC later summarized, "[a]doption of the
'substantial portion' floor area test . . . was . . . considered important to avoid forcing small
neighborhood video or bookstores with only a small amount of adult material to close or move."
2001 CPC Report at 690.  The  City consistently took the view that establishments that
predominantly offered sexual fare, if not zoned, would generate negative secondary effects.  *See,
e.g.*, Karnovksy Aff. ¶¶ 36, 48.

New York City's judgment in 2001 to regulate 60/40 establishments was based upon on a
nearly 200-page report in 2001 addressed almost entirely to the effects of those establishments.
*See generally* 2001 CPC Report.  In addition to the conclusions from the DCP Study and 1995
CPC Report, the City relied upon additional data collected beginning in 1998, when enforcement
of the 1995 Regulations went into place.  The 2001 CPC Report concluded that "[e]nforcement
efforts . . . since 1998 have demonstrated a need to amend" the 1995 Regulations, explaining that
"[i]n the case of book and video stores," a law "which emphasizes the relative amounts of adult
and non-adult books or videos and a comparison of the amount of floor area devoted to each type
of material is, alone, an insufficient measure of whether a book or video store has a 'predominant

on-going' focus on sexually explicit materials." *Id.* at 691.  The CPC recounted evasion
measures that 60/40 businesses took that revealed the inadequacy of the 60/40 rule.  Adult eating
and drinking establishments—seemingly never intended to fall within the 60/40 exemption—
"erected partitions so as to limit their regularly features adult entertainment to less than 40
percent of the total floor area accessible to customers."  Karnovsky Aff. ¶ 47.  60/40 bookstores
had, for example, purchased inexpensive books and videos, sometimes dozens of the same title,
which were stacked haphazardly around the stores or simply left unopened in their boxes on
store floors.  2001 CPC Report at 691–92.  The CPC found that adult eating and drinking
establishments had also evaded the spirit and intent of the 1995 Regulations and the 60/40 Rule,
with clubs claiming compliance through "artificial separation of adult eating or drinking
establishments into purportedly 'adult' and 'non-adult' sections."  *Id.* at 695.

In *Alameda Books*, five Justices—whether addressing the point at step two or step
three—agreed that the City of Los Angeles was justified in reasoning that evidence that the high
concentrations of adult establishments within a particular geographic area was associated with
high crime rates in that area to the conclusion that the concentration of adult operations within a
single large establishment would also be associated with high crime rates.  535 U.S. at 436
(plurality opinion); *id.* at 451 (Kennedy, J., concurring in the judgment).  The plurality clarified
that it was "rational for the city to infer that reducing the concentration of adult operations in a
neighborhood, whether within separate establishments or in one large establishment, [would]
reduce crime rates."  *Id.* at 436.  It was not necessary for the city to analyze the secondary effects
created specifically by adult businesses in one large establishment.  That judgment sufficiently
satisfied Justice Kennedy that he joined in the conclusion of the plurality.  *Id.* at 449 (stating that
"[t]he plurality . . . gives the correct answer" to the question).

The same logic applies here. It was rational for the City to conclude that, if a business exclusively devoted to sexually explicit materials would be associated with negative secondary effects, so would a business predominantly focused on sexually explicit materials. The City need not have conducted an analysis of the effects of the 60/40 establishments in particular.

For the foregoing reasons, the Court finds that the City has sufficiently shown that the purpose of the 2001 Amendments was to address secondary effects rather than suppress speech, and that it accounted for how the 2001 Amendments would affect speech. Accordingly, the 2001 Amendments are subject to intermediate scrutiny.

### C. *Renton* Step Three: Intermediate Scrutiny

Finally, the 2001 Amendments satisfy the third step of the *Renton* test. "[I]f a zoning ordinance serves 'a substantial governmental interest and allows for reasonable alternative avenues of communication,' the First Amendment is satisfied." *TJS*, 598 F.3d at 21 (quoting *Renton*, 475 U.S. at 50). Unlike *Renton* step two, step three calls for the Court to make an objective inquiry into whether the ordinance in fact serves a substantial governmental interest and whether, at the time of adjudication, there are alternative avenues of communication. Defendants have met their burden to show both. Plaintiffs' studies do not cast doubt on the City's rationale.

#### 1. Substantial Government Interest

The Supreme Court has repeatedly held that "a city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.'" *Renton*, 475 U.S. at 50 (quoting *Am. Mini Theatres*, 427 U.S. at 71); *see Buzzetti*, 140 F.3d at 140 ("[T]he Supreme Court has made clear that concerns similar to those advanced by New York City, such as preventing crime, maintaining property values, and preserving the quality of urban life and the character of city neighborhoods, constitute 'substantial governmental interest[s].'" (quoting

*Renton*, 475 U.S. at 48, 50)).  In order to withstand constitutional scrutiny under step three of the

*Renton* test, it thus is sufficient that a municipality "demonstrate a connection between the

speech regulated by the ordinance and the secondary effects that motivated the adoption of the

ordinance."  *Alameda Books*, 535 U.S. at 441 (plurality opinion).  "[A] municipality may rely on

*any* evidence that is 'reasonably believed to be relevant' for demonstrating a connection between

speech and a substantial, independent government interest."  *Id.* at 438 (emphasis added)

(quoting *Renton*, 475 U.S. at 51–52).  If the municipality offers evidence that "fairly support[s]

the municipality's rationale for its ordinance," the burden falls to the plaintiff "to cast direct

doubt on this rationale, either by demonstrating that the municipality's evidence does not support

its rationale or by furnishing evidence that disputes the municipality's factual findings."  *Id.* at

438–39.  If the plaintiff succeeds, the burden shifts back to the municipality "to supplement the

record with evidence renewing support for a theory that justifies its ordinance."  *Id.* at 439.

In making its case at the outset, "[a] city need not prove that . . . a link exists [between

sexually explicit speech and secondary effects] or prove that its ordinance will be effective in

suppressing secondary effects."  *White River Amusement Pub*, 481 F.3d at 171.  The zoning

ordinance is reviewed under intermediate scrutiny.  Under intermediate scrutiny, although the

City may not "get away with shoddy data or reasoning," *Alameda Books*, 535 U.S. at 438

(plurality opinion), it also need not rule out every other theory that would plausibly explain its

data, *id.* at 437–38.

Defendants have satisfied this test.  The City has presented evidence, which is not

contradicted here, that "despite formal compliance with the 60/40 formula, [the 60/40]

businesses display a predominant, ongoing focus on sexually explicit materials or activities, and

thus their essential nature has not changed."  *People Theatres*, 79 N.E.3d at 468.  Defendants

have also presented evidence from the DCP Study that adult uses generally and those businesses with a predominant on-going focus on sexually explicit materials in particular have negative secondary effects such as increased crime rates, depreciation of property values, deterioration of community character, and the quality of urban life.  It also has presented and considered evidence from New York City that areas where adult uses are most concentrated have a higher incidence of criminal activity.  DCP Study at 309–10.  It further presented evidence that the growth of adult businesses was accompanied by a decline in the overall economic vitality of the community.  *Id.* at 360–69.  As noted, in 2001, DCP reviewed enforcement efforts since 1998 and found that "a focus on the relative amounts of adult and non-adult books or videos and a comparison of the amount of floor area devoted to each type of material are, alone, insufficient measures of whether a book or video store has a 'predominant on-going' focus on sexually explicit materials."  2001 DCP Application at 483–84; *see also* 2001 CPC Report at 691.  That evidence is sufficient to show a connection between the explicit speech to be regulated and a substantial, independent government interest.  *See People Theatres*, 79 N.E.3d at 474–75; *White River Amusement Pub*, 481 F.3d at 171 (municipality must rely on some evidence reasonably believed to be relevant); *see also DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 410 (6th Cir. 1997) (finding that a city's experience with crime-ridden adult cabaret fifteen years before enactment of adult entertainment zoning ordinance was sufficient evidence of secondary effects).

Plaintiffs have not met the high standard established by *Alameda Books* to rebut that showing.  Plaintiffs argue that there is no evidence that 60/40 businesses in particular and viewed in isolation caused secondary effects as to 2001 and that the City conducted no studies of 60/40 businesses.  Dkt. No. 222 at 15, 37–39.  They point to the fact that the number of adult businesses in New York decreased from 177 in 1994 to 136 in 2000, Dkt. No. 225 at 5, and to

evidence from independent studies of 60/40 businesses specifically conducted after the 2001

Amendments were enacted, which assert that (1) after controlling for demographic features of

blocks known to be related to crime, "60/40 businesses are a very insignificant source . . . of

crime events within their neighborhood in New York City," Dkt. No. 162-9, Ex. 62, at 1424;

(2) "there is no consistent significant difference in the assessed values of properties near a 60/40

businesses [sic] and those further away," Freeman Study at 1466; and (3) that residents preferred

neighborhoods with subdued facades over neighborhoods with "loud facade" clubs and believed

that the former had a better quality of life, Dkt. No. 162-9, Ex. 64, at 1477.[39]  But that evidence

does not "cast[] doubt on the municipality's rationale."  *Alameda Books*, 535 U.S. at 439

(plurality opinion).  "Requiring local governments to produce evidence of secondary effects for

all categories created by every articulable distinction is a misapprehension of the [*Alameda*

*Books* plurality opinion] that governments may rely on any evidence 'reasonably believed to be

relevant.'"  *Richland Bookmart*, 555 F.3d at 525; *see Gammoh*, 395 F.3d at 1127 ("No precedent

requires the City to obtain research targeting the exact activity it wishes to regulate.").  The City

here need not have proved that 60/40 businesses in isolation created secondary effects any more

than it would have had to prove that businesses that devoted 35% of its floor space created

---

[39] The parties agree that, following enactment of the 1995 Regulations, "the vast majority, if not all, of the businesses which switched to the 60/40 model, also made changes in toning down their signage in compliance with the requirements of that ordinance, even though they did not then consider themselves 'adult' establishments as defined in the ordinance."  CSF ¶ 31.  Club Plaintiffs argue that their establishments did not use the "gaudy lighting and graphic signage [that] were identified as significant problems addressed by the 1995 Amendments."  Dkt. No. 222 at 6.  And there is indeed evidence in the record that many establishments "toned down" their signage.  *See, e.g.*, CSF ¶ 200.  But while the CPC and City Council identified graphic signage as one problem created by adult establishments, it did not limit its conclusions to the signage used by the adult establishments; it also addressed the fare offered by those establishments.  As the New York Court of Appeals concluded in *People Theatres*, "[w]hether signs are garish has little bearing on whether a business retains a sexual focus."  79 N.E.3d at 476.

secondary effects.  *See, e.g., G.M. Enters.*, 350 F.3d at 639 ("The plurality [in *Alameda Books*]

did not require that a regulating body rely on research that targeted the exact activity it wished to

regulate, so long as the research it relied upon reasonably linked the regulated activity to the

adverse secondary effects.").  *Alameda Books* teaches that the City was entitled to consider

whether businesses with a predominant, ongoing focus on sexually explicit materials created

secondary effects and, if so, whether the businesses operating under the 60/40 exception had

such a focus.

Nor is Plaintiffs' post-enactment evidence sufficient to "cast[] doubt on a municipality's

rationale." *Alameda Books*, 535 U.S. at 439 (plurality opinion).  The Fourth Circuit, declining to

consider "post-enactment data" that adult businesses had submitted, explained that "when cities

exercise their power to zone the location of adult establishments, they need not show that each

individual adult establishment actually generates the undesired secondary effects." *Indep. News,*

*Inc. v. City of Charlotte*, 568 F.3d 148, 156 (4th Cir.), *cert. denied*, 558 U.S. 992 (2009).  It

follows that the City "does not have to show that a particular adult establishment generates

adverse secondary effects each time it seeks to enforce" its zoning law. *Id.*; *see also BZAPs, Inc.*

*v. City of Mankato*, 268 F.3d 603, 607 (8th Cir. 2001), *cert. denied*, 536 U.S. 904 (2002)

("[O]nce a city has validly forbidden adult uses within a particular area, it may enforce that

ordinance against all adult uses in that area without showing that a particular use will produce

secondary effects."); *David Vincent, Inc. v. Broward County*, 200 F.3d 1325, 1332 n.11 (11th

Cir. 2000) ("Courts have frequently upheld the application of new zoning regulations to existing

adult businesses with an amortization period.").

Plaintiffs cannot satisfy their burden or overcome the City's evidence by showing that the

number of adult establishments has decreased from 1994 to 2001.  Plaintiffs offered no evidence

that the decrease was a function of the City's zoning regulations. They offered no evidence as to

why any adult business closed. Moreover, the City did not conclude in 1994 that the problem

with adult establishments was that they, for example, exceeded 150 in total; it concluded that, in

whatever number, they led to decreased property values, decreased quality of urban life, and

increased levels of crime. The fact that 40 establishments closed after the 1995 Regulations thus

does not demonstrate that the City's evidence fails to support its rationale or undermine its

factual findings. Nor does it speak to the more pertinent question: whether, if 60/40

establishments are exempted from the zoning regulations imposed on other businesses that

predominantly offer sexually explicit fare on an ongoing basis, the effect of those zoning

regulations will be undermined and the secondary effects they generate will be left unaddressed.

In particular, it is not the existing 60/40 establishments alone that the City was permitted to

consider; it was also permitted to consider adult establishments as a class, including 60/40

establishments, and to reach the reasoned judgment that if it created an exception for adult

establishments based on the floor space devoted to adult entertainment that exception would

thwart the otherwise beneficial effects of its regulation. And, as to the studies, while they

present some evidence that, for a limited period of time, that the 60/40 businesses then in

operation in New York City did not provably generate adverse secondary effects, the question "is

not whether the [zoning] requirement is perfectly tailored to" Plaintiffs' business model. *Isbell v.*

*City of San Diego*, 258 F.3d 1108, 1115 (9th Cir. 2001). It is whether the requirement "generally

serves a substantial government interest." *Id.* Any adult entertainment business, any business at

all for that matter, will always be able to contend that as to its particular configuration, the

municipality has not generated evidence that it causes secondary effects. It could be argued that

evidence that an establishment that offered predominantly explicit sexual fare on an ongoing

basis on 40% of its floor space generated negative secondary effects would not prove that an establishment that offered such fare on only 35% of its floor space would generate those same effects. The municipality is not required to prove its case at that specific level of detail. The City has demonstrated that the 60/40 businesses retain a predominant, ongoing focus on sexually explicit activities and materials and that businesses with a predominant, ongoing focus on sexually explicit activities and materials cause secondary effects that can be addressed by zoning. The City thus has met its burden to show that, even if the City cannot prove that the zoning requirements are necessary to address secondary effects in every particular application, the zoning requirement "generally serves a substantial government interest." *Id.*; *see also Tollis*, 505 F.3d at 940 (rejecting expert challenge to county's evidence of secondary effects).

Plaintiffs also argue that whatever secondary effects might have justified the zoning regulations in 2001, those effects would have significantly ameliorated by now. Dkt. No. 222 at 37–39. There are even fewer adult establishments that would justify zoning regulation today than in 2001: in 2000, there were 136 known adult establishments and in 2023, there were only 42. Dkt. No. 225 at 6. "[T]he applicable standard as it relates to the secondary effects rationale requires only that a city show that, 'in *enacting* its adult [establishment] zoning ordinance,' the city relied on evidence that is 'reasonably believed to be relevant to the problem [of secondary effects] that the city addresses.'" *Indep. News*, 568 F.3d at 156  (quoting *Renton*, 475 U.S. at 51–52). The relevant question, thus, is not whether the City continues in 2023 to have a substantial interest in regulating adult entertainment establishments or whether the grounds that existed for regulating those businesses in 1995 or 2001 have abated by present day. Those are political questions, more appropriately addressed to the City Council. From a legal perspective, so long as the City preserves adequate alternative avenues for the communication of sexually

explicit fare to the residents of and visitors to New York City, it need not periodically renew or update its findings that the zoning of such businesses serves a substantial governmental interest to satisfy the First Amendment. The plurality opinion in *Alameda Books* permits a plaintiff challenging a zoning regulation to offer evidence that "cast[s] doubt on the municipality's rationale" for adopting an ordinance, not on the continued effectiveness of the ordinance. 535 U.S. at 439 (plurality opinion).

Moreover, even if Plaintiffs were allowed to avoid the effect of the 2001 Amendments and to rebut the City's showing of a substantial governmental interest by showing that the interest that justified the zoning regulations in 1995 and 2001 were no longer substantial in 2023, Plaintiffs have made no such showing. Plaintiffs highlight that they themselves, in the time from 2001 to today, have not been subject to nuisance lawsuits and have not generated negative secondary effects. Dkt. No. 222 at 15. But the question before the Court is not whether each individual business has generated a nuisance. It is whether 60/40 establishments generally, if allowed to operate without zoning restrictions (or without being subject to the regulations applicable to other adult establishments), will generate secondary effects. Plaintiffs have not demonstrated that there is anything different about the nature of their businesses that would cause the City to believe that the effects generated by a business that on an ongoing basis devotes 40% or more of its floor space to predominantly adult entertainment would not also be generated by a business that on an ongoing basis devotes 39% of its floor space to such entertainment.

The Court nevertheless assumes, without deciding, that Plaintiffs are correct that they have shown that their businesses, if left alone, would not undermine the quality of urban life or that the zoning of them to locations other than their present ones would not improve the quality of urban life. But that showing hardly "demonstrate[es] that the municipality's evidence does

not support its rationale or . . . furnish[] evidence that disputes the municipality's factual

findings." *Alameda Books*, 535 U.S. at 438–39 (plurality opinion). "[W]hen cities exercise their

power to zone the location of adult establishments, they need not show that each individual adult

establishment actually generates the undesired secondary effects." *Indep. News,* 568 F.3d at 156.

Defendants relied on evidence from a number of studies of a number of different municipalities

over an extended period of time that showed that businesses that predominantly offer sexually

explicit fare on an ongoing basis generate negative secondary effects. From that evidence, the

City formulated zoning regulations that apply to adult establishments generally, including those

that devote less than all of their floor space and stock-in-trade to adult material. It is sufficient

that those regulations are supported by the evidence cited by the City and satisfy a substantial

governmental interest. It is not necessary that the City demonstrate that each establishment to

which its regulations would apply alone generates a secondary effect. Nor is any particular

establishment entitled to an exemption on the grounds that if the City permitted it to stay in

place, and no other similarly designed establishment to do so, the secondary effects the City

reasonably fears would not ensue.  The City may regulate with respect to the class of adult establishments.[40]

Finally, the 2001 Amendments are narrowly tailored to serve this substantial government interest in combating the secondary effects of adult businesses.  *Cf. Bronco's Ent., Ltd. v. Charter Township of Van Buren*, 421 F.3d 440, 451 (6th Cir. 2005).  The *Renton* Court asked whether the ordinance at issue was "'narrowly tailored' to affect only that *category* of theaters shown to produce the unwanted secondary effects."  475 U.S. at 52 (emphasis added).  The Supreme Court concluded that it was.  *Id.*  The same conclusion follows for the New York City zoning law at issue here.[41]  As amended in 2001, the zoning ordinance is limited to that category

---

[40] Plaintiffs rely, Dkt. No. 225 at 6–8, on two decisions of the Supreme Court interpreting the Voting Rights Act: *Northwest Austin Municipal Utility District v. Holder*, 557 U.S. 193 (2009) and *Shelby County v. Holder*, 570 U.S. 529 (2013), for the proposition that a law that was constitutional when adopted may become unconstitutional when the evil to which it was addressed no longer supports the law's enforcement.  But that misreads the decisions.  Both cases involved Congress's powers to enact the Voting Rights Act under the Fifteenth Amendment.  Soon after the Voting Right Act was enacted, in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), the Supreme Court upheld Congress's powers to pass Sections Four and Five of the Voting Rights Act after concluding that "exceptional conditions [could] justify legislative measures not otherwise appropriate."  *Id.* at 334–35.  In *Northwest Austin*, the Supreme Court called into question whether in light of changing conditions since 1965, Congress exceeded its Fifteenth Amendment enforcement powers.  557 U.S. at 203–04.  And in *Shelby County*, the Supreme Court concluded that Section Five of the Voting Rights Act fell outside Congress's enforcement powers on the grounds that the statistics that Congress relied upon to reauthorize that law's preclearance formula and requirement in 2006 did not support what the Court believed to be the Act's "extraordinary departure from the traditional course of relations between the States and the Federal Government."  *Id.* at 545 (quoting *Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 500–01 (1992)).  The test for whether Congress had the power to adopt a federal statute that infringed on the principle of "equal sovereignty" has nothing to do with the test for whether a local ordinance violates the First Amendment.

[41] To the extent that Plaintiffs assert that the law is under inclusive under the banner of an equal protection claim by averring that the legislation singles out adult entertainment establishments while leaving other establishments that cause adverse secondary effects, such as bars, free to operate without limitation, this too is unpersuasive.  "[I]t is of no constitutional consequence that other unregulated activities may produce similar secondary effects."  *801 Conklin St. Ltd. v. Town of Babylon*, 38 F. Supp. 2d 228, 240 (E.D.N.Y. 1999).  As the Supreme Court has long recognized, "[i]t is of no requirement of equal protection that all evils of the same genus be

96

of entertainment that was shown to produce unwanted secondary effects, *viz* those establishments
that offer predominantly sexually-explicit fare.

Having found that the City has demonstrated that the 2001 Amendments are narrowly
tailored to serve its substantial interest in avoiding the adverse secondary effects associated with
adult entertainment establishments, the Court turns, finally, to whether the Amendments "allow[]
for reasonable alternative avenues of communication." *Renton*, 475 U.S. at 50, 53.

### 2.        Reasonable Alternative Avenues for Communication

"The overarching question . . . in many First Amendment zoning challenges . . . is
whether the challenged zoning ordinance preserves 'reasonable alternative avenues of
communication' for adult-oriented businesses." *TJS*, 598 F.3d at 21 (quoting *Buzzetti*, 140 F.3d
at 140–41). "[T]he reasonableness inquiry requires an assessment of available other locations
and whether these alternatives afford a reasonable opportunity to locate and operate such a
business." *Id.* The Second Circuit has suggested that "[t]o decide whether constitutionally
sufficient alternatives exist, [a court should] first . . . determine how many sites are available and
then determine whether that number is sufficient to afford adult establishments a reasonable
opportunity to locate." *Id.* at 21–22 (quoting *Isbell*, 258 F.3d at 1112). "The burden of
persuasion is on the City to demonstrate that its ordinance provides reasonable alternative
avenues of communication." *Isbell*, 258 F.3d at 1112.

In *TJS*, the Second Circuit explained that in "[f]ollowing *Renton*, federal courts have
based the availability inquiry on whether proposed sites are physically and legally available, and
whether they are part of an actual commercial real estate market in the municipality." 598 F.3d
at 27. *TJS* instructs the Court to consider such factors as the pragmatic likelihood of a site

---

eradicated or none at all." *Ry. Express Agency v. New York*, 336 U.S. 106, 110 (1949).

becoming available to a generic commercial enterprise and the site's physical characteristics, including their accessibility to the general public, the surrounding infrastructure, and whether the site is suitable for some generic commercial enterprise.  *Id.* at 27–28.

Courts employ a variety of approaches in determining whether there are reasonable alternative avenues available.  The *Renton* Court itself appeared to consider both the acreage and the percentage of the city's total land area that was available to adult establishments, but did not foreclose other methods.  *See* 475 U.S. at 53.  The approach of lower courts has been varied. Some lower courts consider the proportion of sites or amount of land area available relative to the municipality at large, among other factors.  *See, e.g.*, *Lund v. City of Fall River*, 714 F.3d 65, 72 (1st Cir. 2013) (Souter, J.) (examining "multiple factors," including "the percentage of acreage within the zone for adult business use compared with the acreage available to commercial enterprises and the number of sites available to adult entertainment businesses, there being no single dispositive evaluative consideration" (internal alterations, citations, and quotation marks omitted)).  Some courts consider other factors as well, such as the number of sites available in relation to the population, community needs, and other factors.  *See, e.g.*, *Young v. City of Simi Valley*, 216 F.3d 807, 822 (9th Cir. 2000), *cert. denied*, 531 U.S. 1104 (2001); *Int'l Food & Bev. Sys. v. City of Fort Lauderdale*, 794 F.2d 1520, 1526 (11th Cir. 1986); *Little Mack Ent. II, Inc. v. Township of Marengo*, 625 F. Supp. 2d 570, 584 (W.D. Mich. 2008).  Other courts employ an analysis that primarily considers the number of sites available relative to the number of establishments which will have to relocate as a result of the ordinance.  *See, e.g.*, *Allno Enters., Inc. v. Baltimore County*, 10 F. App'x 197, 201 (4th Cir. 2001) ("[T]he [C]onstitution does not mandate that any minimum percentage of land be made available for certain types of speech." (quoting *N. Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445

(7th Cir. 1996), *cert. denied*, 519 U.S. 1056 (1997))).  *But see Diamond v. City of Taft*, 215 F.3d 1052, 1056–57 (9th Cir. 2000), *cert. denied*, 531 U.S. 1072 (2001).  Of the courts that consider the number of sites available, many will examine only whether the number of sites equals or exceeds the number of businesses that the ordinance requires to relocate.  Courts have not agreed on a precise ratio of establishments that need to relocate and available sites that satisfies the alternative avenues inquiry.  That said, some courts have found a 1:1 ratio sufficient—that is, if there are adequate alternative sites to accommodate the existing affected businesses, the ordinance satisfies the First Amendment.  *See, e.g.*, *World Wide Video of Wash.*, 368 F.3d at 1195; *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1310–11 (11th Cir. 2003).

The Second Circuit's only decisions that touch on this question, *Buzzetti*, decided in 1998, and *TJS*, decided in 2010, did not definitively address this question.  *Buzzetti* found that the lower court's reliance, as in *Renton*, on the percentage of total available land area was permissible, and further relied on a comparison between the number of adult establishments then operating and the number of available sites.  140 F.3d at 140–41; *see* Sec. Karnovsky Aff. ¶ 86.  With nearly three times as many sites as establishments, the Circuit found there were reasonable alternatives.  *TJS*, for its part, primarily addressed itself to the secondary question of which sites were *legally* available.  Accordingly, even within this Circuit, courts have taking varying approaches.  *See, e.g.*, *Giggles World Corp. v. Town of Wappinger*, 341 F. Supp. 2d 427 (S.D.N.Y. 2004) (considering the percentage of the acreage available to adult entertainment establishments relative to the municipality's total land area) *801 Conklin St.*, 38 F. Supp. 2d at 242 (considering, *inter alia*, the percentage of the town's total land area available to adult uses excluding land unlikely to be developed).  If the question to be answered is whether, at the time of the litigation, there exist reasonable alternative avenues for speech, the answer, it seems,

should rest upon a comparison of the number of establishments to be displaced with the number of sites to which those establishments can be placed. Any other numerator (say, the expected future number of establishments) likely would rest upon speculation. And, with respect to the denominator, the number of sites to which the establishments could relocate, a ratio of 1:1 seems to read out of the law the requirement that the alternative avenues for speech be reasonable, by giving each landlord for each site in effect the power to charge whatever it wants to an adult establishment that needs to relocate. But whether the ratio should be 1:1.5 or 1:4 or some other different and more generous proportion, on the facts here, the City has demonstrated that there are reasonable alternative avenues for the existing communication. *See, e.g.*, *MJ Ent. Enters., Inc. v. City of Mount Vernon*, 328 F. Supp. 2d 480 (S.D.N.Y. 2004); *Casanova Ent. Grp., Inc. v. City of New Rochelle*, 375 F. Supp. 2d 321 (S.D.N.Y. 2005), *aff'd*, 165 F. App'x 72 (2d Cir. 2006) (summary order); *Woodall v. City of El Paso*, 49 F.3d 1120, 1126 (5th Cir.), *cert. denied*, 516 U.S. 988 (1995).

The parties jointly identify 32 60/40 establishments presently operating in New York City, including 19 in Manhattan (5 eating and drinking establishments and 14 bookstores), 3 in the Bronx, and 5 in each of Brooklyn and Queens. CSF ¶¶ 167, 170, 174; Nov. 29 Oral Arg. Tr. at 184. Of the 5 60/40 eating and drinking establishments in Manhattan, each "would have to close or relocate if the 2001 Amendments are allowed to take effect." CSF ¶ 174. Similarly, each of the 14 60/40 bookstores in Manhattan "would have to close, relocate, or conform to the eight factors" outlined in the 2001 Amendments. *Id.*

DCP estimates that there are 1,275 lots in New York City that would be available for use by the 60/40 establishments as adult establishments should the 2001 Amendments go into effect. *Id.* ¶ 243. These include 10 lots in Manhattan and 1,265 in the other boroughs. *Id.* ¶ 244. Of the

1,275 total lots available, 360—more than a quarter of the available sites—are in the Bronx, 240

sites are in Brooklyn, 458 of the 1,275 sites are in Queens, and one in six of the City's proposed

alternative sites are on Staten Island.  Nov. 29 Oral Arg. Tr. At 187–88.  Given that each adult

establishment also cannot be within 500 feet of another, up to 204 of those 1,275 lots could be

simultaneously occupied by adult establishments (including 110 lots that could be occupied by

adult bookstores if, as the Bookstore Plaintiffs assert, adult bookstores are not permitted in M2 or

M3 districts).  CSF ¶ 245.  Of the 204 simultaneously occupiable lots, 5 are in Manhattan and the

remainder are in the other boroughs.  *Id.* ¶ 246.

Plaintiffs, noting that there are over 850,000 lots in New York City, *see, e.g.*, Gittens

Decl. ¶ 3, assert that the potentially available adult sites amount to .5% of city lots, Dkt. 229 at

26.  They also argue that the 204 simultaneously occupiable lots represent a "vanishingly small

number" compared to the total lots in New York City.  *Id.*  But Plaintiffs fail to articulate why

the ratio of the number of sites available to adult uses relative to the total number of lots in New

York City is relevant.  A business—any business—is not entitled to a particular percentage of

lots in a municipality in which to relocate; cities are permitted to zone and rezone.  And the ratio

here of adult establishments to sites to which the adult establishments can relocate far exceeds

what is necessary to satisfy constitutional standards.

Plaintiffs challenge DCP's figures on a number of grounds.  First, they attempt to

underline the reliability of the numbers themselves.  They argue that (1) the figures are unreliable

because DCP's estimates have changed from 2,800 early in the case, to 1,703 alternative sites at

the time summary judgment was briefed, to 1,275, Nov. 29 Oral Arg. Tr. At 48–49; Dkt. No. 229

at 34; (2) the figures are not reliable because they were generated on the basis of building code

classifications generated by the tax department that are not binding on the zoning department,

Nov. 29 Oral Arg. Tr. At 181; and (3) there are only 3 (and not 5) sites in Manhattan that would

be commercially viable and could be simultaneously occupied by adult eating and drinking

establishments, Dkt. No. 222 at 34–35; Nov. 29 Oral Arg. Tr. At 182–83.

Plaintiffs' arguments are not persuasive.  DCP's numbers are the product of an extensive

and rigorous process.  The analysis was overseen by the Geographic Information Systems Team

Lead and Open Data Coordinator at the DCP, who has worked at that agency since September

2005 and has a bachelor's degree in Urban Planning and Geography and a Graduate Certificate

in Geographic Information Systems; the analysis involved eight staff members as well as DCP's

data engineering team.  Dkt. No. 212-3 ("Croswell Decl.") ¶¶ 1, 10, 12 n.4.  More importantly,

the analysis itself was thorough.  Beginning in December 2019, DCP undertook a lot-by-lot

analysis to determine the sites in the City to which adult establishments could relocate, using a

geospatial dataset of tax lot data from various source data files.  *Id.* ¶ 3; *see* CSF ¶ 226.  That

data set identified 857,298 lots in New York City.  Croswell Decl. ¶ 3,  DCP then identified adult

establishment exclusion areas by creating 500-foot buffer areas around zoning districts where

adult establishments are not allowed and schools and houses of worship.  *Id.* ¶ 4; Amron Decl.

¶ 10; *see* Dkt. No. 220 at 13.  After creating a 500-foot buffer around those zoning districts

where adult establishments are not allowed, the agency then established 500-foot buffers around

the 72 lots that appeared to be adult establishments, as well as two districts in Brooklyn that were

proposed for rezoning.  Amron Decl. ¶ 8.  At that point, 5,009 potential lots remained.  *Id.* ¶¶

8, 10.  From there, DCP removed lots that were parks, publicly owned, or that were identified as

being used for transportation or utility purposes, as well as lots that were smaller than 5,000

square feet.  *Id.* ¶ 10; Dkt. No. 220 ¶ 9.  DCP staff then manually reviewed the remaining 2,217

lots, checking the ownership and use of each lot and using various computer programs and their

knowledge of the areas to exclude lots that (1) were publicly owned or (2) appeared to contain a

sensitive receptor or utility that would render development for an average commercial use

improbable; and (3) lacked street frontage or that appeared too irregular to develop.  Croswell

Decl. ¶ 10; Amron Decl. ¶ 12.[42]  This stage resulted in exclusion of an additional 514 lots,

leaving 1,703 lots.  Croswell Decl. ¶ 10.

The analysis also was conservative.  DCP excluded all lots that it considered to be

questionable and all lots less than 5,000 square feet,[43] and it based the analysis on measurements

of the 500-foot buffer from the lot line of the 72 lots that appeared to be adult establishments

rather than from the principal entrances of the establishments.  Amron Decl. ¶ 13.  There is no

basis to challenge the accuracy of the DCP's figures or the rigor with which they were

calculated.

Plaintiffs' argument that the City's numbers should not be credited because they changed

lacks merit.  The 2,800 figure cited by Plaintiffs is based on the DCP's analysis in connection

---

[42] Plaintiffs object to certain statements made in the declarations submitted by Defendants.  Dkt.
No. 246-1.  The Court overrules the objection to Dkt. No. 212-1 ¶¶ 11–14 based on lack of
personal knowledge under Federal Rule of Evidence 602.  The witness has set forth the basis for
her personal knowledge, including her over three decades of experience working for DCP.
Plaintiffs' remaining objections are moot as the Court has not considered and does not rely upon
the challenged paragraphs.
As to Defendants' objections, the objections to the following paragraphs of declarations
submitted by Plaintiffs are sustained and, where the paragraphs contain hearsay, the content of
those paragraphs will not be received for the truth of the matter asserted.  CM-ECF 02-cv-8333,
Dkt. No. 62 ¶¶ 28, 38; Dkt. No. 157 ¶ 15; Dkt. No. 72 ¶¶ 14, 26–27, 29, 49 (except to the extent
the witness is opining about his own business) 66, 69 (except to the extent the witness is opining
about his own business), 70, 73 (except to the extent he is opining about his own business), 74-
75; Dkt. No. 72 ¶ 15 (except to the extent he is opining about his own business), 26 (except to
the extent he is opining about his own business), 33; Dkt No. 190 ¶ 8.  The remainder of the
objections are overruled.
[43] This is not to say, however, that at least some adult entertainment establishments could not
relocate to lots less than 5,000 square feet.  Some adult bookstores are located in buildings that
are less than 5,000 square feet.  *See* Laremont Decl. Ex. A.

with Plaintiff's motion for a preliminary injunction in 2018. *See 725 Eatery Corp.*, 408 F. Supp.

3d at 468; *see generally* Laremont Decl. But, as the Court noted in its decision on the motion for

a preliminary injunction, there was reason to question those figures. They were based on dated

analyses from 1995 and 2001 and they did "not seem to indicate how the amount of available

land would be affected by the requirement that adult establishments be located at least 500 feet

from sensitive receptors or other adult establishments." 408 F. Supp. 3d at 468–69. At that early

stage in the proceedings, DCP had completed a lot-by-lot analysis of the available areas in

Manhattan only. Dkt. No. 176 at 2. The figure of 1,703 lots was proffered by the City, much

later, in its summary judgment briefing. Dkt. No. 173 at 2–3. As indicated above, it was the

product of the DCP's detailed lot-by-lot analysis City wide. The figure of 1,275 lots was the

product of further analysis by DCP, based on issues identified by Plaintiffs. Specifically, in

Plaintiffs' opposition to Defendants' motion for summary judgment, Plaintiffs identified what

they claimed were "two fatal flaws": (1) in the "manual review" process of DCP's analysis

during which DCP eliminated an additional 514 lots, the DCP staff excluded the sites that

contained a sensitive receptor without also drawing a 500-foot buffer around those sites; and

(2) in the sensitive receptors phase of the analysis, the City did not buffer around mixed-use lots

that had houses of worship. Dkt. No. 225 at 25–31. After the summary judgment briefing and in

connection with the bench trial, DCP addressed this critique and drew the requested buffers. The

result was to eliminate 428 lots, leaving 1,275 available lots across the City. Croswell Decl.

¶ 12.

       In short, what Plaintiffs criticize as changing figures is, in fact, the product of a careful

process to refine the numbers to make them ever more accurate. That Defendants responded to

Plaintiffs' prior criticisms and have made the figures more conservative provides no basis to attack the City's processes or the figure of 1,275 available lots that was the result of that process.

Plaintiffs also criticize the DCP for using building codes generated by New York City Department of Finance's tax categorizations and not by the Zoning Department in its analysis, CSF ¶ 231, contending that the tax categorizations are not necessarily controlling on the zoning question of whether a use is a house of worship, Dkt. No. 225 at 22–23.  But Plaintiffs do not identify any other way that DCP could have done its study other than by using the building codes or any respect in which the use of such codes makes DCP's study unreliable.

Plaintiffs submitted an expert report in November 2018 concluding that the 2001 Amendments would leave only 5 individual sites in Manhattan that would be both legally permissible and commercially viable for the establishment of any eating or drinking establishment featuring live adult entertainment, and only 3 of those could be used by adult businesses simultaneously.  Berzak Decl. ¶¶ 6(g), 37.  But Plaintiffs' analysis is inconsistent with *TJS* and *Renton*.  Plaintiffs' expert excluded sites that were on unimproved land or that required extensive structural modification without considering whether the sites could be developed for a commercial use.  *Id.* ¶ 38.  "[T]he need for a site to be developed before an adult entertainment business can relocate does not render the site unsuitable."  *TJS*, 598 F.3d at 28; *see also Alexander v. City of Minneapolis*, 928 F.2d 278, 284 (8th Cir. 1991) ("That [the plaintiff] could not secure property meeting his economic or commercial criteria does not render [the zoning ordinance] invalid."); *Daytona Grand*, 490 F.3d at 871 ("[T]he economic feasibility of relocating to a site is not a First Amendment concern." (quoting *David Vincent*, 200 F.3d at 1334)).

Finally, Plaintiffs argues that the City "did not analyze whether the presence of wetlands and/or flood plains precluded a site from being commercially developed."  CSF ¶ 145(e); Dkt.

No. 225 at 12. While it is true that "land under the ocean, airstrips of international airports, etc.," are not relocation sites likely to ever become available, *TJS*, 598 F.3d at 23, Plaintiffs do not show that any of the lots are actually located on wetlands. Nor do Plaintiffs allege that wetlands and flood plains cannot be developed. And the City has long maintained records of space that is threatened by climate change, and noted the operation of commercial establishments there. *See, e.g.*, Dkt. No. 162-3, Ex. 30, at 214–17.

The remainder of Plaintiffs' challenges to the availability of sites is qualitative and not quantitative. Plaintiffs argue that: (1) the City did not conduct any analysis of commercial practicability; (2) there are insufficient alternative locations in Manhattan; and (3) the City did not conduct a specific transportation analysis to determine the accessibility of each or any site, nor relate each or any mode of transportation to each or any site," CSF ¶ 145(a), nor did it conduct a basic infrastructure analysis for each site other than to observe that all of the listed sites have street frontage, *id.* ¶ 145(b).[44]

There is no doubt that the implementation of the 2001 Amendments will cause a relocation of 60/40 enterprises within the City of New York. That is the aim of the zoning regulations. There are 6 100% adult establishments and 19 60/40 establishments in Manhattan.

---

[44] Defendants object to the relevance of a number of paragraphs in the CSF, as well as to the corresponding evidence. *See* Dkt. No. 244-1 at 7. Those objections are overruled. "[T]he definition of relevance under Fed. R. Evid. 401 is very broad," *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 90 (2d Cir. 2014), and as a result, the standard for relevance is "very low," *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008); *see United States v. Litvak*, 889 F.3d 56, 68 (2d Cir. 2018). "[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." *United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006). "While standards for admissible evidence are not out the window entirely in a bench trial, all doubts at a bench trial should be resolved in favor of admissibility." *Com. Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, 2004 WL 1970144, at *5 (S.D.N.Y. Sept. 3, 2004) (internal quotation marks omitted omitted).

CSF ¶ 173.  Of the 60/40 establishments, 5 are clubs and 14 are adult bookstores with or without private video booths.  *Id.* ¶ 174.  All of the clubs would have to close or relocate if the 2001 Amendments go into effect.  *Id*.  But there are only between 3 and 5 alternative sites in Manhattan to which they could relocate.  More than a quarter of the available sites are in the Bronx, where there are only 3 60/40 businesses at present.  Nearly 20% of the available sites are in Brooklyn, where there are presently only 5 60/40 businesses at present.  And another third of the potential sites are in Queens, where there are only 5 60/40 businesses at present.  Nov. 29 Oral Arg. Tr. at 140.  If the 60/40 businesses choose to relocate rather than to close, the practical effect of the 2001 Amendments will be to move the adult enterprises out of Manhattan and to the other boroughs.[45]

Plaintiffs' qualitative arguments, however, are unavailing.  The "preference for [operating in a specific location] bears no nexus to whether there are adequate alternative avenues of expression."  *McDoogal's E., Inc. v. Cty. Comm'rs of Caroline Cty.*, 341 F. App'x 918, 930 (4th Cir. 2009).  The Second Circuit has held that the availability inquiry centers "on whether proposed sites are physically and legally available, and whether they are part of an actual real estate market in the municipality."  *TJS*, 598 F.3d at 27.  "[W]hether the acquisition and use of land might be unprofitable or commercially impracticable [is] not relevant to [the] concept of availability."  *Id.*  "[T]he First Amendment [does not] compel[] the Government to

---

[45] There is evidence that certain of the Plaintiffs are unwilling to relocated outside of Manhattan and also have been unable to locate available space outside of Manhattan to which they could immediately relocate.  *See, e.g.,* Dkt. No. 171 ("Warech Aff.") ¶¶ 14; Dkt. No. 226 at 9.  A number of owner operators have testified that they have been advised by local real estate brokers and others in the industry that no locations that contain the minimum of 2,500 square feet which is necessary to realistically conduct business as an adult eating and drinking establishment are currently available and it is likely that it would take a year or more to find and convert a space for use as a club.  Warech Aff. ¶ 14; *see also* Lipsitz Decl. ¶ 32 (same); D'Amico Decl. ¶ 16 (same).

ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices." *Renton*, 475 U.S. at 54.[46]  "[W]hether or not sites fit the specific needs of adult businesses—or any other precise type of commercial enterprise—is constitutionally irrelevant." *TJS*, 598 F.3d at 28.  A site is available even if it is in an industrial or manufacturing zone and even if the site needs to be "developed before an adult entertainment business can relocate." *Id.*  Rather, "whether the challenged restriction leaves open adequate alternative avenues of communication" requires "an assessment of available other locations, and whether those alternatives afford a reasonable opportunity to locate and operate such a business." *Id.* at 21–22.  "One factor is 'the pragmatic likelihood of [sites] ever actually becoming available' to a generic commercial enterprise." *Id.* at 27 (quoting *Hickerson*, 146 F.3d at 106). As noted, "[o]ther significant factors relating to sites' physical characteristics include their 'accessibility to the general public, the surrounding infrastructure, . . . and . . . whether the sites are suitable for some generic commercial enterprise.'" *Id.* at 27–28 (quoting *Hickerson*, 146 F.3d at 106).  The adequacy of alternatives is assessed at the time that the court is adjudicating the dispute, *id.* at 23, and a municipality need not "identify the exact locations to which adult

---

[46] Plaintiffs cannot succeed on their argument that "the evidence of the past 27 years makes clear that the sites in the other boroughs would *not*, in fact, be reasonable sites for adult club businesses because there have been 27 years to see if any entrepreneurs would find those sites a 'reasonable opportunity' for establishing an adult club, and instead of a growing number of such clubs in those supposedly reasonable sites, the evidence shows only drastically declining numbers, notwithstanding all those supposedly reasonable relocation sites."  Dkt. No. 225 at 34; *see also* Dkt No. 226 at 10.  The Constitution prohibits the City from cutting sexually explicit speech off from all reasonable avenues of communication.  *See Renton*, 475 U.S. at 50.  It does not require the City to subsidize Plaintiffs' speech or to guarantee that such speech will find a successful home in the commercial marketplace.  *See id.* at 53–54.  "The requirement that 'ample alternative channels exist does not imply that channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed 'ample.'" *Mastrovincenzo*, 435 F.3d at 101.

establishments may locate, 'as opposed to identifying the general areas that remain available and

proving that such areas contain enough potential relocation sites that are physically and legally

available to accommodate the adult establishments,'" *id.* at 22 n.4 (quoting *Hickerson*, 146 F.3d

at 107).

The City's analysis is current and is based on the *TJS* standard regarding availability.

The fact that the City "did not determine for each or any of the sites on its list of legally

permissible alternative sites the economic burdens which would be incurred in order to use the

site as an adult establishment," and "did not determine for each or any site on its list of legally

permissible alternative sites how much it would cost to convert the site into what is required for

either (1) an adult establishment, or (ii) a commercial use, generally" is irrelevant.  CSF

¶¶ 145(c), (d).  The City was not required to identify the exact locations to which the 60/40

businesses could relocate, *TJS*, 598 F.3d at 22 n.4, or to determine the "commercial viability" of

those sites, much less their viability for an adult establishment, *id.* at 29; *see also David Vincent*,

200 F.3d at 1334 ("[C]ommercial viability is not an appropriate consideration.").  In *Renton*, for

example, the Supreme Court examined the amount of land, including roads undeveloped land,

that the city left available for adult uses overall.  475 U.S. at 53.  The 520 acres of land, slightly

more than five percent of the city's total land area, was sufficient, regardless of the fact that the

vast majority of it was unavailable.  *Id.* at 53–54.  Indeed, the Court held that it was irrelevant

that there were "no 'commercially viable' adult sites within the 520 acres left open by the Renton

ordinance."  *Id.* at 53; *see also McDoogal's E., Inc.*, 341 F. App'x at 930 ("A plaintiff must show

something greater than mere inconvenience or economic undesirability.").  "That [the plaintiffs]

must fend for themselves in the real estate market, on an equal footing with other prospective

purchasers and lessees, does not give rise to a First Amendment violation."  *Renton*, 475 U.S. at

54; *see also David Vincent*, 200 F.3d at 1335 ("[T]he First Amendment is not concerned with restraints that are not imposed by the government itself.").

Plaintiffs maintain that the 2001 Amendments will not leave the accessibility of adult entertainment "substantially intact." *Alameda Books*, 535 U.S. at 449 (Kennedy, J. concurring in the judgment), because five of the six adult eating or drinking establishments are located in Manhattan and their owners or operators have submitted sworn declarations that they would not relocate out of Manhattan because their clientele would not visit them elsewhere and because Manhattan is "unique" as the "central business and tourist" sector in New York and "an island of superlatives." Dkt. No. 225 at 14–15 (internal quotation marks omitted). That argument, however, reads Justice Kennedy's concurrence out of context. As discussed above, in the portion of the opinion from which Plaintiffs draw their argument Justice Kennedy referred to the "rationale" that the City must have in order to justify a content-based zoning ordinance and to enjoy intermediate scrutiny. Justice Kennedy was not discussing the impact the ordinance would have years later—that is a question that is tested by the third step of the *Renton* test, not the second part, and it requires only that there be alternative avenues for communication and not that they be in the central business and tourist sector of any city. *See PAO Xiong v. City of Moorhead*, 641 F. Supp. 2d 822, 830 (D. Minn. 2009) ("[C[ourts do not measure the reasonableness of an adult use ordinance based upon the economic impact relocation will cause."). It is inherent in every zoning regulation that it does not leave the existing businesses in their existing locations "substantially intact." Leaving aside amortization provisions (discussed *infra*), that is the purpose of every zoning regulation that addresses existing business—to require them to move for the greater benefit of the community. It may be that "some prospective patrons" of Plaintiffs "may be inconvenienced" by the requirement that they move. "But other

patrons, depending on whether they live or work, may find it more convenient to view an adult movie [or visit an adult establishment] after the establishments move." *Am. Mini Theatres*, 427 U.S. at 79 (Powell, J., concurring).  So long as the new sites are reasonably accessible, the fact that some existing patrons may be inconvenienced is of no constitutional moment.

Plaintiffs have not shown that the relative shortage of locations in Manhattan relative to other boroughs will deprive them specifically and adult entertainment generally of reasonable alternative avenues for communication.  It is true that Manhattan constitutes the City's central business district, home to 2.2 million—59.5%—of New York City's 3.8 million jobs, and further contains many of the City's attractions, including Central Park, the Empire State Building, and the High Line.  Kelley Decl. ¶¶ 10–11.  Some of the owners of the adult entertainment establishments have stated that they are unwilling to move from Manhattan.  *See, e.g.*, Kavanaugh Decl. ¶ 18 & Ex. A.  Those adult establishments have established goodwill in Manhattan and derive a substantial portion of their income from domestic and international tourists who book accommodations in Manhattan.  *See, e.g.*, *id.* Ex. A ¶ II(a).  They point out that there is a high economic value of being located in Manhattan, including the borough's proximity to other entertainment and nightlife venues, high pedestrian traffic, and strong tourism and business markets.  *See, e.g.*, *id.* Ex. A ¶ II(B).  Many of their patrons work in Manhattan or are there only temporarily on business and find it easy to access businesses in Manhattan.  *Id.* Ex. A ¶ II(C); *see also* Dkt. No. 83 at 227–47 ("Talla Decl.") ¶ 35; Dkt. No. 83 at 248–61 ("Warech Decl.") ¶ 14.  Accepting Plaintiffs' arguments, should some of the 60/40 businesses choose to stay in Manhattan, there will be 9 adult establishments on the island after the 2001 Amendments go into effect: 6 100% adult establishments and 3 60/40 enterprises.  Plaintiffs claim that because, before the zoning regulations required the adult establishments to move, the majority of

111

adult establishments were located in New York, "demand for adult establishments has always been primarily located in Manhattan." Dkt. No. 229 at 31.

However, the First Amendment test looks to whether there will be alternative avenues for communication within the confines of the municipality and not within any particular district, whether or not it is a tourist, commercial, or business attraction. *Renton* itself approved an ordinance that concentrated businesses in one part of the city. 475 U.S. at 51. Drawing from *Renton*, circuit courts have concluded that precluding adult establishments from operating in commercial areas is also permissible under the First Amendment. *See, e.g.*, *Tollis*, 505 F.3d at 942 (ordinance requiring adult entertainment businesses to disperse to industrial areas of the county not zoned for other commercial uses was constitutional as long as those areas were reasonably accessible to the general public, had a proper infrastructure, and were suitable for some generic commercial enterprise); *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358 (11th Cir. 1999), *cert. denied*, 529 U.S. 1053 (2000) (bans on adult entertainment establishments in residential districts permissible); *BZAPs*, 268 F.3d 603 (same); *Indep. News*, 568 F.3d at 154 (same); *Cheshire Bridge Holdings*, 15 F.4th at 1362 (same); *see also Wolfe v. Village of Brice*, 997 F. Supp. 939, 943–44 (S.D. Ohio 1998). And the Second Circuit has expressly held that the First Amendment does not require "proof of adequate available sites on a borough-by-borough basis." *Hickerson*, 146 F.3d at 108 n.5. "[T]he fact that a site may not be commercially desirable does not render it unavailable. It is not relevant that a relocation site will result in lost profits, higher overhead costs, or even prove commercially unfeasible for an adult business." *Woodall*, 49 F.3d at 1124; *Alexander*, 928 F.2d at 283 (finding that 6.6% of the city's land area, or 120 sites, was sufficient). "The ideal lot is often not to be found." *David Vincent*, 200 F.3d at 1334; *see also Mastrovincenzo*, 435 F.3d at 102 ("[T]he First Amendment does not

require that New York City permit plaintiffs to sell their work directly to the public in an ideal venue."); *D.G. Rest. Corp. v. City of Myrtle Beach*, 953 F.2d 140, 147 (4th Cir. 1991) ("The decision to restrict adult businesses to a specific area does not oblige the city to provide commercially desirable land."); *Allno Enters.*, 10 F. App'x at 202 ("Examples of impediments to the relocation of an adult business that may not be of constitutional magnitude include having to build a new facility instead of moving into an existing building; having to clean up waste or landscape a site; bearing the costs of generally applicable lighting, parking, or green space requirements; making due with less space than one desired; or having to purchase a larger lot than one needs.").  As one district court summarized, "numerous courts have rejected the notion that time, manner, and place restrictions are unconstitutional because they damage the economic viability of adult businesses." *MJJG Rest. LLC v. Hoory County*, 102 F. Supp. 3d 770, 789 (D.S.C. 2015).

Moreover, Plaintiffs have not proved their case that the areas to which the adult establishments will be forced to relocate under the 2001 Amendments are not reasonably accessible.  The areas in Manhattan permitting adult establishments, such as the Hudson Yards, Meatpacking and Hell's Kitchen neighborhoods, are zoned for and developed with a wide variety of commercial uses and are largely accessible by public transportation.  Amron Decl. ¶ 15.  The available lots in Brooklyn are in various neighborhoods such as Sunset Park, Coney Island, East New York, Downtown Brooklyn, and Red Hook, that also are zoned for a wide variety of commercial uses and are largely accessible by public transportation; certain of the areas have developed hotels with over 2,000 rooms.  *Id.* ¶ 16.  The available lots in Queens are located in various neighborhoods, including Long Island City, Sunnyside, Maspeth, and College Point, that provide access to the city's broad customer base through their proximity to multiple subway lines

and bus routes.  *Id.* ¶ 17.  So too the available lots in the Bronx neighborhoods, such as Hunts

Point, Port Morris/Mott Haven, and Eastchester.  *Id.* ¶ 18.  And although the lots in Staten Island

are not easily accessible by public transportation, they are accessible by car.  *Id.* ¶ 19.  Indeed,

the record reflects that more than eighty percent of New York City is within a ten-minute walk of

one or more subway stations or bus routes.  Karnovsky Aff. ¶ 38.  But even putting aside New

York City's mass public transit system, courts have recognized that the draw of sexually explicit

speech is so strong that, even where the alternative locations are located in industrial zones that

are not heavily trafficked, patrons will nevertheless visit.  *See Tollis*, 505 F.3d at 940.

Many owners of the Plaintiff businesses assert that, should the 2001 Amendments

become effective, they will not relocate but will instead shut down.  *See, e.g.*, Talla, Warech,

Lipsitz, D'Amico and Kavanaugh Declarations; CM-ECF 18-cv-3732 Dkt. Nos. 132 ("Zazzali

Decl."), 133 ("Knecht Decl."); Dkt. No. 255 ("Nov. 28 Oral Arg. Tr.") at 117.  But these

attestations do not undermine the City's showing that reasonable alternative avenues for

communication will exist after the 2001 Amendments go into effect.[47]  Those declarations are,

for the most part, conclusory and self-serving.  *See, e.g.*, *District of Columbia v. Murphy*, 314

U.S. 441, 456 (1941) ("One's testimony with regard to his intention is of course to be given full

and fair consideration, but is subject to the infirmity of any self-serving declaration, and may

frequently lack persuasiveness or even be contradicted or negatived by other declarations and

inconsistent acts.").  They are inconsistent with the fact that some of the business owners either

expanded or attempted to expand their businesses after the 2001 Amendments were enacted.

*See, e.g.*, Talla Decl. ¶¶ 26–30.  But even insofar as the statements are credible, the statements by

---

[47] It is apparently on the basis of these assertions that Club Plaintiffs contend that if the
mandatory termination requirements go into effect, only the 10 existing 100% adult businesses
will remain in all of New York City.  Dkt. No. 222 at 5.

Club owners were made in 2018, before DOB changed its permitting and vesting rules.[48]  Only

one club owner has renewed his statement that he would not relocate since.  *See* Warech Aff.

¶¶ 6–7.  And while some declarations note that the majority of Club patrons are "tourists and

business people visiting the Times Square area of Manhattan," *id.* ¶ 14, none of the declarations

make more than conclusory statements that it would be uneconomic for the businesses to

relocate.  Nor do any of the submissions indicate that if these particular owner-operators do not

relocate, others will not choose to take advantage of the extant demand for adult entertainment.

But even if the declarations *did* establish an economic burden so onerous that it would both result

in existing adult businesses shutting down and disincentivize any potential participant from

entering into the adult entertainment market, it follows from *Renton* and *TJS* that the alternative

sites need not be as economically advantageous as previous locations to satisfy the Constitution,

so long as they are reasonably accessible.  *TJS*, 598 F.3d at 30 (describing the "legal irrelevance

of commercial viability concerns"); *see also Topanga Press, Inc v. City of Los Angeles*, 989 F.2d

1524, 1531 (9th Cir. 1993), *cert. denied*, 511 U.S. 1030 (1994) ("[I]t is constitutionally irrelevant

whether relocation sites located in industrial or manufacturing zones suit the *particular* needs of

an adult business.").  And "*Renton* does not require relocation sites to be actually—as opposed to

potentially available."  *TJS*, 598 F.3d at 27; *see, e.g.*, *Kaye v. N.Y.C. Health & Hosps. Corp.*,

2023 WL 2745556 (S.D.N.Y. Mar. 31, 2023).

       Plaintiffs further complain that Defendants "did not conduct a specific transportation

analysis to determine the accessibility of each or any site, nor relate each or any mode of

transportation to each or any site," CSF ¶ 145(a), "did not conduct a basic infrastructure (or

---

[48] Although some of the Bookstore Owners resubmitted their declarations in 2022, after DOB
updated its permitting scheme, the Court finds them unpersuasive.

equivalent) analysis for each or any site other than to observe that all of the listed sites have street frontage," *id.* ¶ 145(b), "did not specifically analyze every listed site as to whether it is suitable for some generic commercial enterprise," *id.* ¶ 145(g), "did not confirm that the listed sites would not be rendered unavailable by virtue of any pending proposed text amendments to the Zoning Resolution," and did not exclude lots that ranged to a maximum of more than seven million square feet, *id.* ¶ 145(i). None of those points is persuasive. The City was not required to identify each or any site specifically to which an adult establishment could move. *See TJS*, 598 F.3d at 22 n.4. Thus, the City was not required to determine separately for each site whether and how it was accessible by transportation or what basic infrastructure existed. As noted, the City did consider that numerous forms of transportation exist within the City of New York. CSF ¶ 145(a). In particular, it has submitted evidence that the zoning districts permitting adult uses are zoned for and developed with a wide variety of commercial uses and are largely accessible by public transportation. Karnovsky Aff. ¶ 78; Amron Decl. ¶¶ 15–18. Plaintiffs have not rebutted that showing. *See Topanga Press*, 989 F.2d at 1531 (holding that it is sufficient that "relocation sites [be] reasonably accessible to the general public," without a case-by-case assessment of the transportation options available). As to infrastructure, the City did conduct visual confirmation of each site using imagery and excluded those sites that appearance unlikely to be available for development. CSF ¶ 145(e). Although it is true that a site that "lacks the basic infrastructure that is a precondition to private development . . . should not be considered part of the relevant real estate market for purposes of determining availability," *TJS*, 598 F.3d at 28, it also is true that the site need not have been already developed to be "available for development," *see, e.g.*, *McDoogal's E., Inc.*, 341 F. App'x at 930; *Bronco's Ent., Ltd.*, 421 F.3d at 452. In *Renton*, the Court considered raw land to be part of the available market and to be a

potential relocation site because it could be developed.  475 U.S. at 53; *see also David Vincent*,
200 F.3d at 1334 ("[T]he land deemed available for adult businesses in *Renton* included acreage
in all stages of development form raw land to developed, industrial, warehouse, office, and
shopping space.").  Plaintiffs here do not allege that any of the lots lack proper infrastructure
such as sidewalks, roads and lighting.  And given the dense population and lack of undeveloped
land within New York City generally and in particular in the commercial and manufacturing
districts to which adult entertainment establishments will be limited under the 2001
Amendments, there is every reason to believe that the vast majority, if not all, of the 1,745 non-
exclusive and 245 exclusive lots that DCP identifies will have the basic infrastructure necessary
for private development.  Although Defendants did not analyze each site specifically as to
whether it would be suitable for a generic commercial enterprise, all of the sites of the City's list
of alternative sites are zoned for use by commercial enterprises.  CSF ¶ 145(g).

Plaintiffs point out, Dkt. No. 225 at 13, that Defendants did not exclude lots over 10,000
square feet, CSF ¶ 145(i).  *TJS* holds that it was not required to do so.  Even if "certain identified
sites [are] better suited to large businesses, like automobile dealerships, than they were to small
retail stores, it would not follow that these sites would not be part of a general commercial real
estate market.  It would mean only, and quite unremarkably, that there are site that would be
more profitable for some commercial businesses than for others." *TJS*, 598 F.3d at 29.  The *TJS*
Court held that "obstacles such as the possibility of 'making due with less space than one
desired,' or 'having to purchase a larger lot than one needs,' do not render property unavailable
for the purpose of constitutional analysis." *Id.* (quoting *David Vincent*, 200 F.3d at 1335).

Finally, Plaintiffs' suggestion that the 2001 Amendments fail to leave sufficient
alternative avenues of communication because "pending proposed text amendments to the

Zoning Resolution" may further limit alternative sites, CSF ¶ 145(f), is without merit.  The City

did exclude sites from its list of available alternative sites that it anticipated would be rendered

unavailable by virtue of proposed text amendments.  *Id.*  Plaintiffs' expert submitted a

declaration in November 2018 in which he asserted that the number of available locations for

adult entertainment would be reduced as a result of planned rezoning for the Gowanus Canal

area in Brooklyn.  Berzak Decl. ¶ 34.  In its later analysis, DCP addressed the issue and

eliminated an M3-1 district in the Brooklyn core covering parts of Greenpoint and Williamsburg

along Newtown Creek that was proposed for rezoning (even though the zoning proposal was not

adopted) and the manufacturing districts that were proposed to be rezoned in the Gowanus area

of Brooklyn.  Amron Decl. ¶ 10.  In any event, the question for the Court is not whether in the

future there will be available alternative sites; it is whether "at the time the court issues its

judgment, or as close as is practicable to that time in light of the need for discovery and the

presentation of evidence," there are alternative avenues for communication.  *TJS*, 598 F.3d at 23.

Defendants have thus satisfied their burden.

## III.    Mandatory Amortization Provisions of the 2001 Amendments

Plaintiffs also bring First Amendment and Fourteenth Amendment challenges to the

amortization or "mandatory termination" provision of the 2001 Amendments specifically on the

grounds that the provision burdens protected speech and because the provisions treat them

differently from other non-conforming uses by requiring them to close or move within one year

of the 2001 Amendments.  Dkt. No. 222 at 31–50.  Both fail.

### A.    First Amendment Challenge

Plaintiffs contend that, even if the 2001 Amendments facially satisfy *Renton*, they should

be deemed unconstitutional as applied to them specifically because the amortization or

"mandatory termination" provision of the 2001 Amendments will require the Plaintiffs to

terminate or move within one year of the date that the 2001 Amendments go into effect without

any showing that Plaintiffs specifically contribute to secondary effects or will be able to find a

home elsewhere in New York City.  Dkt. No. 222 at 4, 31–37; Dkt. No. 225 at 6.  In other words,

they suggest that the City was required by *Renton* as clarified by *Alameda Books* to study the

secondary effects of 60/40 businesses specifically, *see, e.g.*, Dkt. No. 222 at 37, and their

similarity to other non-conforming uses, *see, e.g.*, *id.* at 35.

Plaintiffs appear to invoke the constitutional avoidance doctrine.  *See* Dkt. No. 222 at 18–

19.  They assert that their argument is "very limited" as it would seek relief "only for those 60/40

eating or drinking establishments which could validly claim lawful nonconforming use status

because they operate on sites which lawfully converted to 60/40 businesses prior to the 2001

Amendments."  Dkt. No 222 at 7–8.  In short, they ask the Court to "grandfather" them into their

current locations without permitting any other businesses that would like to adopt the 60/40

model to take advantage of the same rule.  Dkt. No. 222 at 18; Dkt. No. 225 at 2.  Plaintiffs'

invocation of the constitutional avoidance doctrine, however, is mistaken.  The constitutional

avoidance doctrine provides that the court should "not decide a constitutional question if there is

some other ground upon which to dispose of the case."  *Nw. Austin*, 557 U.S. at 205 (quoting

*Escambia County v. McMillan*, 466 U.S. 48, 51 (1984)).  For example, it "comes into play only

when, after the application of ordinary textual analysis, [a] statute is found to be susceptible of

more than one construction."  *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018); *see City of

Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985); *Brockett v. Spokane Arcades, Inc.*,

472 U.S. 491, 501 (1985).  The doctrine at once reflects respect for the political branches and the

presumption that they will not act in violation of the Constitution and expresses judicial restraint,

calling on courts to decide questions of constitutional moment only when the case requires a

constitutional decision.  Stated more broadly, the doctrine goes to the grounds of a court's

decision and not alone to the scope of its relief.  *See Zobrest v. Cataline Foothills Sch. Dist.*, 509

U.S. 1, 7 (1993) ([F]ederal courts will not pass on the constitutionality of an Act . . . if a

construction of the Act is fairly possible by which the constitutional question can be avoided.").

Here, the Court is not tasked with choosing between two ambiguous interpretations of the 2001

Amendments, one that implicates the Constitution and one that does not.  Plaintiffs do not offer a

non-constitutional grounds for deciding the case; they raise a First Amendment question.  *Cf.*

*Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 298 (6th Cir. 2008).  They ask the Court

to determine, and the Court is obligated to address, the claim that the mandatory termination

provision of the 2001 Amendments violates the First Amendment.  *See, e.g.*, *United States v.*

*Martinez*, 525 F.3d 211, 216 (2d Cir.), *cert. denied*, 555 U.S. 924 (2008) ("Because resolution of

these issues does not require this Court to interpret any statute, this case does not invite the

application of the doctrine of constitutional avoidance.").  Plaintiffs would have the Court

declare as a matter of constitutional law that, because they were in operation before the 2001

Amendments, they must be permitted to continue in operation after the law, *i.e.*, that the City is

without constitutional power to require them to move.  Plaintiffs do not identify any law that

would require that result.[49]  Plaintiffs' proposed resolution—grandfathering—still requires the

Court to reach the constitutional question and answer it in their favor.  The constitutional

question presented is no narrower, and no broader, than the question whether the 2001

Amendments, as a whole, violate the First Amendment.  The argument merely seeks relief that is

---

[49] Plaintiffs insist that the harm to the City would be minimal if equitable relief were granted.
Dkt. No. 222 at 15–17.  The Court need not consider that issue—or the other factors of injunctive
relief—because Plaintiffs have not established a claim that prevails on the merits.  *Cf. N.B. v.*
*United States*, 552 F. Supp. 3d 387, 404 (E.D.N.Y. 2021).

"narrower" in that it is less disruptive to the present status quo.  Thus, because all of Plaintiffs'

claims are constitutional ones that require the Court to address their merits, the doctrine of

constitutional avoidance has no application here.  *See, e.g.*, *Zobrest*, 509 U.S. at 7–8.

The remainder of Plaintiffs' challenges to the mandatory termination provision are

unavailing.  As the Eleventh Circuit has explained, "[c]ourts have frequently upheld the

application of new zoning regulations to existing adult businesses with an amortization period."

*David Vincent*, 200 F.3d at 1332.  The amortization provision provides a limited window for

60/40 adult establishments to remain in business at their current locations after the 2001

Amendments go into effect.  Adult businesses existing as of the date of the CPC proposal on

August 8, 2001, but that made financial expenditures to avoid becoming subject to the 1995

Regulations and prior to the CPC decision are permitted to remain in place for one year

following the City Council's adoption of the 2001 Amendments, or to October 31, 2002.

Karnovsky Aff. ¶ 74.  There is one proviso: a business can appeal to the Board of Standards and

Appeals for permission to continue in place for a limited period beyond one year.  *Id.*  Non-

conforming adult establishments and certain non-conforming signs are the only uses that are

required to terminate as early as one year from the date it becomes non-conforming.  CSF ¶ 42.

And many non-conforming uses are not subject to mandatory termination provisions at all, *id.*

¶ 40; only non-conforming adult establishments, non-conforming signs, certain non-conforming

uses in residential districts, and some non-conforming uses which may remain in place only if

walls are built around them (for example, salvage yards), have mandatory termination periods.

All other non-conforming uses in New York City must terminate "only if they have been

discontinued for two years or expanded or increased in intensity."  *Id.* ¶ 43; *see* Z.R. § 52-73 (in

residential districts the following uses that are not in a completed enclosed building below a

certain assessed valuation must have terminated within ten years of December 15, 1961, or when the use became non-conforming: "coal storage; dumps, marine transfer stations for garbage, or slag piles; junk or salvage yards . . . ; lumber yards . . . ; manure, peat, or topsoil storage; [and] scrap metal, junk, paper or rages storage, sorting or bailing").

New York law provides constitutional protection to nonconforming uses that predate the enactment of a restrictive zoning ordinance. *See Edelhertz v. City of Middletown*, 943 F. Supp. 2d 388, 394 (S.D.N.Y. 2012), *aff'd*, 714 F.3d 749 (2d Cir. 2013).  Where an owner has made an investment in a use of property that subsequently has become non-conforming, the owner's right to use that property may not be terminated unless he is given "a reasonable period, during which the owner may have a fair opportunity to amortize his investments and to make future plans." *Harbison v. City of Buffalo*, 176 N.Y.S.2d 598, 561 (N.Y. 1958); *see Town of Islip v. Caviglia*, 540 N.E.2d 215, 224 (N.Y. 1989) ("The intractable problem of eliminating nonconforming uses, however, has led [New York] courts . . . to sustain amortization provisions if the period allowed to recapture the investment in the use is reasonable."); *Modjeska Sign Studios, Inc. v. Berle*, 373 N.E.2d 255, 261–62 (N.Y. 1977) ("[B]y permitting a limited period during which an existing nonconforming use may be continued, rather than requiring its termination immediately, amortization provides an owner with an opportunity to recoup his investment and avoid substantial financial loss.").  This rule is codified in the Zoning Resolution, which permits the City to set "a reasonable statutory period of life . . . in order to permit the owner gradually to make his plans for the future during the period when he is allowed to continue the non-conforming uses of his property, thereby minimizing any loss."  Dkt. No. 201 ¶ 6 (quoting Z.R. § 51-00).

Plaintiffs do not claim that they have been denied a reasonable period of time to recoup their investment.  Nor could they.  The 2001 Amendments required non-conforming adult entertainment establishments to terminate by October 31, 2002.  Karnovsky Decl. ¶ 5.  As a result of the injunction that has prevented the 2001 Amendments from being applied to them, Plaintiffs have had over twenty years to recoup their investment.  Courts have consistently found time periods far shorter sufficient to recoup losses.  *See, e.g.*, *Cricket Store 17, L.L.C. v. City of Columbia*, 676 F. App'x 162, 165 (4th Cir.), *cert. denied*, 583 U.S. 822 (2017) (two years); *Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cty.*, 492 F.3d 1164, 1169 (10th Cir. 2007), *cert. denied*, 552 U.S. 1296 (2008) (two years); *David Vincent*, 200 F.3d at 1328 (five years); *Ambassador Books & Video v. City of Little Rock*, 20 F.3d 858 (8th Cir. 1994) (three years); *Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 820 (4th Cir. 1979), *cert. denied*, 447 U.S. 929 (1980) (six months).  Rather, Plaintiffs claim that the amortization provisions of the 2001 Amendments, because they apply only to adult entertainment and not to other non-conforming uses, violate the First Amendment under *Reed*, *Renton*, and the guarantee of the Fourteenth Amendment to equal protection of the laws.  Dkt. No. 77 ¶¶ 189–94.

Plaintiffs' arguments fail for the same reason that Plaintiffs' arguments regarding the unconstitutionality of the 2001 Amendments at large fail.  If New York City can, with proper justification, treat adult establishments differently from other establishments for zoning purposes, it follows that New York City can require adult establishment businesses to move when it does not require other businesses to move.  *See, e.g.*, *TJS*, 598 F.3d at 21.  In fact, the ordinance at issue in *Alameda Books* "force[d] certain adult businesses to relocate," as the plurality opinion expressly noted.  535 U.S. at 438.  Contrary to Plaintiffs' argument, Dkt. No. 226 at 14, the Court need not measure the relative noxious effects of each other business that either is

considered to be conforming or that is non-conforming but that is grandfathered into its current

location.  *See, e.g.*, *Imaginary Images*, 612 F.3d at 742 ("[O]fficials 'need not show that each

individual adult establishment actually generates the undesired secondary effects.'" (quoting

*Indep. News*, 568 F.3d at 156)); *MJJG Rest.*, 11 F. Supp. 3d at 568.  That is a judgment for the

CPC and for the City Council.  *Renton* teaches that a zoning regulation can treat adult

entertainment different from other commercial uses under the First Amendment if the zoning

regulation does not entirely ban adult entertainment expression, it is deemed content-neutral, it is

supported by a substantial governmental interest, and it permits reasonable alternative avenues

for communication.  Plaintiffs' argument to the contrary notwithstanding, Dkt. No. 222 at 40, the

City has demonstrated that there will be alternative avenues for the communication of Plaintiffs'

speech even if the 2001 Amendments are applied to them.

      The fact that a particular adult entertainment business might be grandfathered may bear

on the question of whether reasonable alternative avenues for communication are preserved by

the zoning regulation.  *See Am. Mini Theatres*, 427 U.S. at 70 n.35 (plurality opinion) (noting

that the Detroit ordinance did not have the effect of suppressing or "greatly restricting access to"

lawful speech because the ordinance did not affect the operation of existing businesses but only

the location of new ones).  Indeed, an amortization period may be insufficient "if it puts a

business in an impossible position due to a shortage of relocation sites." *World Wide Video of

Wash.*, 368 F.3d at 1200.  But, in that instance, the zoning law would fail the *Renton* test for the

absence of reasonable alternative avenues of communication.  The City is neither required to

grandfather existing businesses in order to comply with the First Amendment nor is it required to

show that it has a compelling interest with respect to Plaintiffs' particular businesses.  *Daytona

Grand*, 490 F.3d at 872 n.17 ("The Constitution does not require a 'grandfathering' provision for

existing non-conforming businesses.").  A municipality need not show that adult eating and drinking establishments "have greater secondary effects beyond their property line than . . . traditional bars and nightclubs," before singling out adult eating and drinking establishments for zoning and not traditional eating and drinking establishments.  Dkt. No. 226 at 16.  It follows that the City can also require non-conforming adult entertainment businesses to move within one year without imposing a similar requirement on non-adult businesses.  In short, the "issue is conceptually indistinguishable from the First Amendment requirement of alternative avenues of communication."  *Id.*; *see, e.g.*, *Indep. News*, 586 F.3d at 156–57 (upholding zoning regulation with amortization provision); *Jake's Ltd., Inc. v. City of Coates*, 284 F.3d 884, 889 (8th Cir.), *cert. denied*, 537 U.S. 948 (2002) (same).  If the City can satisfy the constitutional requirements with respect to future businesses, the Constitution does not require it to make an exception for existing businesses.  "The Constitution . . . does not require [a] 'grandfathering' clause for existing non-conforming businesses."  *David Vincent*, 200 F.3d at 1332.[50]

### B.       Fourteenth Amendment Challenge

Plaintiffs further assert that the mandatory termination provision of the 2001 Amendments is also invalid under the Equal Protection Clause of the Fourteenth Amendment, Dkt. No. 222 at 47–49, which commands that the government not "deny to any person within its jurisdiction the equal protection of laws," U.S. Const. amend. XIV, § 1.  Specifically, Plaintiffs contend that the mandatory termination provision treats adult entertainment businesses

---

[50] For the reasons stated *supra*, the Court rejects the arguments, Dkt. No. 222 at 39–42, that *Reed* and *Austin* require the City to satisfy a test different from what the City must satisfy under *Renton* for existing businesses, and that the Constitution prohibits the City from subjecting adult establishments to zoning requirements not applicable to other non-conforming uses.  *American Mini Theatres*, *Renton*, and *Alameda Books* all permit municipalities to subject adult establishments to zoning requirements not applicable to other businesses that do not generate the same secondary effects.  *See, e.g.*, *Andy's Rest. & Lounge*, 466 F.3d at 555–56.

differently from other establishments by requiring adult establishments that do not conform to

the 2001 Amendments to close within one year of the date that the law goes into effect, while

allowing other non-conforming uses to operate indefinitely or for longer periods of time.  Dkt.

No. 222 at 47–49.

The Equal Protection Clause does not outright prohibit government classifications but

"simply keeps governmental decisionmakers from treating differently persons who are in all

relevant respects alike."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  The degree of scrutiny a

court must apply turns on the rights at issue and the nature of the classification, *Winston v. City

of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018), with the government receiving wide discretion in

fashioning acceptable classifications, *Suffolk Parents of Handicapped Adults v. Wingate*, 101

F.3d 818, 824–25 (2d Cir. 1996), *cert. denied*, 520 U.S. 1239 (1997).  A law that neither burdens

a fundamental right nor targets a suspect class is subject only to rational basis review.  *Romer v.

Evans*, 517 U.S. 620, 631 (1996).  Although the right to freedom of speech protected by the First

Amendment is a fundamental right, *see Williams v. Rhodes*, 393 U.S. 23, 30 (1968), because

Plaintiffs fail to demonstrate that the zoning regulations impinge their First Amendment rights,

and because adult entertainment establishments "are obviously not a suspect class entitled to

heightened protection," *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir. 2002),

*cert. denied*, 537 U.S. 823 (2002), the regulations are subject only to rational basis review,

*Heller v. Doe*, 509 U.S. 312, 320 (1993); *see Lederman v. N.Y.C. Dep't of Parks & Recreation*,

2010 WL 2813789, at *11 (S.D.N.Y. July 16, 2010).

Under rational basis review, the law at issue "'is presumed constitutional' and 'the

burden is on the one attacking the legislative arrangement to negative every conceivable basis

which might support it."  *Winston*, 887 F.3d at 560 (quoting *Lehnhausen v. Lake Shore Auto

*Parts Co.*, 410 U.S. 356, 364 (1973)).  Rational basis review "is not a license for courts to judge

the wisdom, fairness, or logic of legislative choices."  *Heller*, 509 U.S. at 319 (quoting *F.C.C. v.*

*Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  Rather, the Court must uphold the

classification "if there is any reasonably conceivable state of facts that could provide a rational

basis for the classification."  *Id.* at 320 (citing *Nordlinger*, 505 U.S. at 11).

      The City not only has a rational basis for its decision, it has, as noted *supra*, a substantial

interest in that decision—to limit what it has determined are the secondary effects of adult

establishments.  *See, e.g.*, *LaTrieste Rest. v. Village of Port Chester*, 188 F.3d 65 (2d Cir. 1999),

*cert. denied*, 528 U.S. 1187 (2000); *see also Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d

951 (8th Cir. 2019); *Stardust, 3007 v. City of Brookhaven*, 899 F.3d 1164 (11th Cir. 2018); *SDJ,*

*Inc. v. City of Houston*, 837 F.2d 1268, 1272 (5th Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989);

*Bigg Wolf Disc. Video Movie Sales, Inc. v. Montgomery County*, 256 F. Supp. 2d 385, 400 (D.

Md. 2003).  The Zoning Resolution's differential treatment of adult entertainment

establishment—mandating non-conforming uses to terminate within one year while permitting

other establishments to continue operating indefinitely or terminate within ten years—is thus

justified by reference to the secondary effects.  *See, e.g.*, *Lim v. City of Long Beach*, 217 F.3d

1050, 1056 (9th Cir. 2000), *cert. denied*, 531 U.S. 1191 (2001); *Hart Book Stores*, 612 F.2d at

831 ("Special regulation of one commercial enterprise with particular externalities but not of

other enterprises lacking those secondary effects has long been recognized not to violate equal

protection, precisely because the enterprises are not similarly situated and the differential

treatment is warranted by the different secondary effects." (internal citations omitted)).  And

because "limiting secondary effects" is as a substantial government interest, the amortization

provision readily satisfies the Equal Protection Clause.  *See DLS, Inc.*, 107 F.3d at 411 n.7 ("[I]f

a sufficient rationale exists for the ordinance under the First Amendment, then the City has demonstrated a rational basis for the alleged disparate treatment under the Equal Protection Clause."); *see also Maages Auditorium v. Prince George's County*, 681 F. App'x 256 (4th Cir. 2017). Although *Renton* "dealt with a First Amendment challenge to a separation ordinance, its speech-neutral reason for permitting adult businesses to be treated differently from others also refutes an equal protection challenge." *Isbell*, 258 F.3d at 1116.

The amortization period for adult entertainment uses in New York City is shorter than that for other uses that either have a longer period of amortization, *see* 2001 Z.R. § 52-74 (requiring amortization within ten years of enactment of uses such as open-air dumps, lumber yards, manure storage, and scrap metal heaps), or that need not relocate at all.  But the City has articulated a rational basis for that distinction: adult establishments generate different secondary effects than, for example, open-air dumps.  The City need do no more to satisfy the Equal Protection Clause.

## IV.    Permitting Provisions of the 2001 Amendments

In the alternative to their mandatory termination challenge, Plaintiffs claim that the permitting procedures necessary to obtain an alternative location are unconstitutional or render the 2001 Amendments unconstitutional.  Dkt. No. 222 at 50–72.  In particular, Plaintiffs assert that the process for obtaining building permits from DOB—a prerequisite to construction, renovation, and occupancy—constitutes an unconstitutional prior restraint on expression in violation of the First Amendment and discriminates against adult establishments in violation of the Fourteenth Amendment.  *See, e.g.*, Dkt. No. 77 ¶¶ 112–26; Dkt. No. 222 at 41–45.

Defendants respond that Plaintiffs "lack standing to facially challenge the applicable permitting procedures as they are content neutral and applied to adult and nonadult-establishments alike, and not specific to expressive activity," and cannot bring an as-applied

challenge until they have applied for a permit.  Dkt. No. 220 at 5, 51.  To the extent that

Plaintiffs do have standing, Defendants assert that on the merits, the permitting restrictions pass

constitutional muster because they are content-neutral and provide reasonably specific and

objective standards that DOB must consider in reviewing a permitting application.  Dkt. No. 220

at 45–49; Dkt. No. 224 at 19–21.  Defendants contend that, although there are "no specific time

limits for [the DOB] . . . to review applications," the City's administrative code limits the amount

of time DOB may take to approve construction documents specifically.  Dkt. No. 224 at 20.

### A.      DOB's Permitting Rules

The dimensions of the City's permitting have changed significantly over the years this

case has been pending.  In the first case filed, Plaintiffs raised several challenges to both the

procedure that adult entertainment establishments must follow in order to obtain zoning

approval, and the City's rules that determine whether an adult establishment was "established"

before a sensitive use and thus permitted to remain within 500 feet of the sensitive use

notwithstanding the 2001 Amendments.  *See* Dkt. No. 77 ¶¶ 112–126.  But not all of these

provisions still present "live controversies" adjudicable by the Court under Article III of the

Constitution.  *See, e.g.*, *Stafford v. Int'l Bus. Machs. Corp.*, 78 F.4th 62, 66–67 (2d Cir. 2023)

(explaining that Article III's limitation of judicial power to "Cases" and "Controversies"

prevents federal courts from adjudicating disputes that are no longer live).

### 1.      Permit Applications

In their operative complaints, filed in 2018, Plaintiffs contested the constitutionality of

the procedures an adult entertainment establishment must follow to obtain zoning approval.  *See,*

*e.g.*, Dkt. No. 77 ¶ 112–26.  Plaintiffs contended that the permitting procedure differed "in two

key respects" from those required of non-adult businesses: (1) architects for building permit

applicants for non-adult uses could self-certify zoning compliance, whereas under DOB OPPN

7/02, no permit could be issued to serve as priority for an adult establishment based on a professionally certified application; and (2) all zoning permit applications for adult establishments were required to be reviewed by the City's legal counsel for zoning compliance, a requirement that did not apply to non-adult businesses. Dkt. No. 77 ¶ 116. Plaintiffs complained that the lack of any time limits for final approval by the City's legal counsel, and the open-ended zoning approval procedures that were applicable to *only* adult entertainment establishments but not to non-adult establishments constituted a content-based prior restraint on expression. *Id.* ¶ 118.

But in 2020, DOB changed its permitting procedure so that it no longer differentiated between adult entertainment establishments and non-adult uses. After the New York Court of Appeals' final decision in *For the People Theatres* definitively resolved the constitutionality of the 2001 Amendments, DOB issued Buildings Bulletin 2020-005,[51] Dkt. No. 162-2, Ex. 17 ("2020 Rule"), at 157, which prospectively and partially superseded OPPN 7/02, CSF ¶ 72. The 2020 Rule specifies that, once the 2001 Amendments become enforceable, the use of self-certification will not be prohibited solely because the applications propose adult establishments, and applications by adult entertainment establishments will not be subject to additional legal review by DOB. 2020 Rule at 157; *see* Gittens Decl. ¶ 14. Currently, DOB prohibits adult establishments from professionally certifying construction documents, citing the need to independently verify the layouts of 60/40 establishments. Gittens Decl. ¶ 8. Professional certification, as opposed to permitting for plans that are not professionally certified, generally

---

[51] DOB replaced OPPNs with "Buildings Bulletins" in 2008. CSF ¶ 73. Whatever the name, the functional effect of these rules is the same, *id.* ¶ 74, to "set[] forth new policies and procedures related to operations to assist DOB customers and employees," Gittens Decl. ¶ 15.

allows faster final completion of a building permit application.[52]  CSF ¶¶ 76, 82–83.  Once the

2001 Amendments are in place, obviating the 60/40 Rule, DOB plan examiners will not have to

undertake to review the layout of adult establishment construction plans in order to determine

compliance with the Zoning Resolution, unless the applicant chooses to seek such review.[53]

Gittens Decl. ¶ 13.  DOB also dispensed with the legal review of the plans of only adult

entertainment establishments.  DOB has formally changed its procedures such that its applicable

rule no longer requires adult entertainment establishments seeking permits to gain approval by

the agency's legal counsel.  CSF ¶¶ 84–86; Nov. 28 Oral Arg. Tr. at 98.  As the Bronx Borough

Commissioner of the DOB testified, "adult establishment applications are no longer subject to

routine review by the [DOB's] General Counsel's Office."  Gittens Decl. ¶ 14.

Plaintiffs' challenge to these two key aspects of the permitting procedures is now moot,

as Defendants argue.  *See* Dkt. No. 220 at 40–42; Dkt. No. 224 at 16.  "A case becomes

moot . . . 'when the issues presented are no longer live or the parties lack a legally cognizable

interest in the outcome.'"  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v.

Hunt*, 455 U.S. 478, 481 (1982) (per curiam)); *see also Haley v. Pataki*, 60 F.3d 137, 141 (2d

Cir. 1995) ("[I]t is axiomatic that there must be a continuing controversy capable of redress by

this Court.").

---

[52] Sensitive uses such as schools and houses of worship are allowed, under DOB's rules, to seek permits through professional certification by their architects.  CSF ¶ 96.

[53] After any professional certification, DOB conducts "a zoning audit of each application . . . prior to acceptance," CSF ¶ 210, and "[a]dditional targeted audits are performance of professionally certified applications pursuant to Buildings Bulletin 2016-010-4-A-1 based on receipt of a complaint . . . or at the discretion of the Commissioner," *id*. ¶ 213.

As Plaintiffs themselves appear to recognize at least in part, DOB's 2020 Rule remedies the problems protested in the operative complaints.[54]  *See* Dkt. No. 225 at 59 ("[T]he City's repeal of that . . . provision has removed the [self-certification] issue from the case."); *id.* at 61 (acknowledging that the 2020 Rule "states that 'routine' review by DOB's general counsel is no longer 'required'").  "Constitutional challenges to statutes are routinely found moot when a statute is amended."  *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 59 (2d Cir. 1992) (citing *Massachusetts v. Oakes*, 491 U.S. 576, 582 (1989)).  The Second Circuit has expressly extended this rule to zoning ordinances.  *Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 376–77 (2d Cir. 2004) (Sotomayor, J.) ("Mindful of the deference due the legislative body, we are hesitant to hold that a significant amendment or repeal of a challenged provision that obviates the plaintiff's claims does not moot a litigation, absent evidence that the defendant intends to reinstate the challenged statute after the litigation is dismissed, or that the municipality itself does not believe that the amendment renders the case moot."); *see also Chrysafis*, 15 F.4th at 213 ("The argument for mootness would seem to be even stronger when the challenged statute has expired and a new statute, endeavoring to remedy the defect of the old one, has been enacted.").

Plaintiffs nevertheless invoke the voluntary-cessation doctrine, submitting that "voluntarily ceasing any type of constitutionally challenged procedure during litigation does not moot constitutional claims."  Dkt. No. 229 at 29.  However, "[t]he voluntary cessation of allegedly illegal activities will usually render a case moot if the defendant can demonstrate that

---

[54] For Plaintiffs' challenge to be moot, the Court must determine whether the 2020 Rule leaves "open the possibility that new and related claims might arise under the new [regulatory] scheme."  *Chrysafis v. Marks*, 15 F.4th 208, 214 (2d Cir. 2021).  Here, as discussed *infra*, the 2020 Rule does not.

(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002)).

Both elements are met here: the City "has taken official action to rescind the [alleged] unlawful policy," and the evidence reveals that any effects of the alleged violation have abated.

*Saba v. Cuomo*, 535 F. Supp. 3d 282, 296 (S.D.N.Y. 2021).[55]  Although the City may still

subject adult entertainment establishments to additional legal review, there is no reasonable

---

[55] Plaintiffs argue that their challenge to the permitting procedure by DOB is not moot because (1) under the 2020 Rule, DOB's General Counsel retains discretionary authority to review building applications, Dkt. No. 226 at 27–33; and (2) the cessation of DOB's preexisting policy is a change in the face of litigation rather than a *bona fide* change in law, *id.* 29 n.28.  As to Plaintiffs' first contention, that even DOB's 2020 Rule singles out adult entertainment establishments by stating that "Adult Establishments need not be subject to routine review" by DOB's General Counsel, Dkt. No. 226 at 29–30, the Rule, as noted above, was promulgated to "prospectively and partially supersede" DOB's preexisting rule, CSF ¶ 72; Dkt. No. 162-2, Ex. 17, at 157, which expressly subjected adult entertainment establishments to more burdensome permitting requirements, *see* Dkt. No. 162-1, Ex. 14, at 136–38.  It stands to reason then, that the superseding rule would also single out adult entertainment establishments as *not* subject to more onerous requirements.  Plaintiffs' view that the 2020 Rule gives DOB the power to engage in discretionary delays is pure speculation.  Plaintiffs submit no evidence that, once the 2001 Amendments become effective and the 2020 Rule applies, DOB will treat adult entertainment establishments differently from any other type of establishment.  Indeed, the fact that review of construction documents (including review by the General Counsel) is limited to 40 days undermines any claim that, going forward and under the new rules, the General Counsel nonetheless will subject adult establishments to any greater review than that to which any other business might be subjects.  CSF ¶ 104 (citing N.Y.C. Admin. Code § 28-104.2.7).  As to Plaintiffs' second argument, it is not surprising that DOB promulgated the 2020 Rule only in 2020.  It was not until 2018 that the United States Supreme Court denied the petition for certiorari on the state-court challenge to the 2001 Amendments.  538 U.S. 1118 (2018).  The following year, Judge Pauley suspended the effects of the 2001 Amendments.  408 F. Supp. 3d at 424.  There would have been no reason for the City to creates rules that for the administration of its zoning regulations after the 2001 Amendments went into effect when there was, at that time, no certainty as to when and whether those amendments would go into effect.  Indeed, since the first suit in this case was instituted in 2002, DOB has amended its review procedures several times, *see, e.g.*, Dkt. No. 162-1, Ex. 13, at 130–35 (detailing DOB's 2005 rule clarifying procedures for professional certification), and the changes did not "appear to track the development of this litigation."  *Mhany Mgmt., Inc.*, 819 F.3d at 604.  Moreover, DOB officials testified that DOB's practice, if not its written policy, changed in 2016—while this case was stayed pending resolution of parallel claims in state court.  *See Dean v. Blumenthal*, 577 F.3d 60, 64–65 (2d Cir. 2009), *cert. denied*, 559 U.S. 1058 (2010) (relying partially on changes in government's practice to support mootness claim).  "Since February 2016, DOB's General Counsel [has] no longer review[ed] permit applications that propose adult establishments." Gittens Decl. ¶ 14.  The fact that DOB did not formally amend its permitting scheme until 2020 does not establish that the change was made in order to guard against the "threat of liability" reemerging from this case, *Mhany Mgmt., Inc.*, 819 F.3d at 604, but rather only the fact that the case was nearing resolution and that the City was looking ahead to possible enforcement of the 2001 Amendments, under which routine DOB General Counsel review was no longer necessary.

expectation that the City will revert to its previous differential treatment of adult establishments. Plaintiffs withdrew their argument that "there is no guarantee that removal of the professional-certification bar for adult business applicants will ever actually happen should the 2001 Amendments become enforceable." Dkt. No. 228 at 1–2. And, Defendants represented in their brief, Dkt. No. 220 at 40–41, and at oral argument, Nov. 28 Oral Arg. Tr. at 98, that they have no intention to subject adult business applicants to differential treatment. Of course, the Court need not unquestionably accept Defendants' representations. *Saba*, 535 F. Supp. 3d at 297. However, such a representation, when combined with the government's "voluntary practice of not enforcing" for several years—as DOB did here by not enforcing its previous rule requiring General Counsel review beginning in 2016—supports a finding of mootness. *See, e.g.*, *Dean v. Blumenthal*, 577 F.3d 60, 64–65 (2d Cir. 2009), *cert. denied*, 559 U.S. 1058 (2010). Indeed, Defendants' representations "in [their] brief and confirmed . . . at oral argument . . . . are entitled to some deference." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 110 (2d Cir. 2016) (per curiam). Even if the City "had an incentive to revert to" its previous differential treatment of adult entertainment establishments, "there would still be no reasonable expectation" that it would do so. *Id.* Plaintiffs put forth no evidence suggesting that the City intends to reinstate the challenged permitting provisions. *See Lamar Advert. of Penn*, 356 F.3d at 377. In particular, the City has gone a step further than merely stopping the challenged conduct, it has affirmatively replaced its previous rule subjecting adult entertainment establishments to additional legal review with a rule that states that, when the 2001 Amendments go into effect, "[a]pplications that propose Adult Establishments need not be subject to routine review by the [DOB's] General Counsel's Office." 2020 Rule at 157. Unlike instances in which the government has allegedly "ceased" its conduct by issuing a non-binding announcement which

have been held insufficient to moot a claim, *Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F. Supp. 3d 211, 248–49 (S.D.N.Y. 2020), here DOB has issued an official rule using the proper procedures.  "The fact that the government has taken official action to rescind the unlawful policy means that under current law the violation cannot occur and lends force to the representation that in the future the violation will not recur." *Saba*, 535 F. Supp. 3d at 296.  Defendants also meet the second element of the voluntary cessation doctrine by showing that the interim relief has eradicated the effect of the alleged violation.  To return to its previous rule, DOB will have to undertake to promulgate a new rule.  The Court is convinced that Defendants have "altered [their] conduct in a manner sufficient to present a fundamentally different controversy." *Am. Freedom Def. Initiative*, 815 F.3d at 109.  Accordingly, Plaintiffs' present challenge to DOB's requisite legal review of permitting applications by adult entertainment establishments is moot.

Should Defendants revert to the permitting provision in effect when Plaintiffs brought this suit, either formally or in practice, Plaintiffs are not without recourse.  "Where, as here, a[n] [intervening] regulation moots an action, the challenger can 'cure[] its mootness problem by simply starting over again—by challenging the regulation currently in force.'" *New York v. Raimondo*, 2021 WL 1339397, at *3 (S.D.N.Y. Apr. 9, 2021) (quoting *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir 2016)).

## 2.    Vesting Provisions

Separately, Plaintiffs also objected to the Defendants' process for determining whether an adult entertainment establishment was established before a nearby sensitive use.  Dkt. No. 77 ¶ 119.  Plaintiffs complain that DOB's rules for determining the establishment date for adult businesses and sensitive uses—which, for both, is tied to the date of the issuance of a building permit—provide "an easy avenue for any sensitive use, adult business competitor, or any other

person or entity who may be staunchly opposed to the establishment of a new adult eating or drinking establishment to block it from opening." *Id.* ¶ 125. A later-arriving sensitive user could achieve priority even though the permit application of the adult entertainment establishment was filed first by the expedient of obtaining a building permit—a "sensitive use veto." *Id.*

As noted, the City's adult zoning provisions prohibit adult entertainment establishments from locating within 500 feet of any existing sensitive uses and gave DOB rule-making authority to determine the priority of rights as between an adult establishment that located in a particular lot and a sensitive use such as a school or house of worship. CSF ¶¶ 95–99; Dkt. No. 162-1, Ex. 3, at 68. Under DOB's rules, the right of an establishment to locate on a given lot turn upon the date of establishment. 1 R.C.N.Y. § 9000-01. If an adult business's date of establishment precedes that of the school or house of worship, the school or house of worship cannot divest the adult establishment of its rights by locating within 500 feet of the adult establishment. *See id.* But, if the school or house of worship's date of establishment precedes that of the adult establishment, an adult business must maintain at least 500 feet of distance. *See id.* Adult establishments, houses of worship, and schools not in existence and operating prior to August 8, 2001, are "established" by "the date of issuance of an appropriate department permit" provided that (1) "significant progress [is] shown toward completion of the work under the permit"; and (2) "the use or operation for which the building is constructed or altered must commence within six months after the issuance of a temporary certificate of occupancy or, if applicable, within six months after a department signoff has been completed," with the further provision that the Commissioner of DOB may extend that six-month period for an additional six months. *Id.*

§ 9000-01(b)(1).[56]  The Commissioner of DOB has the authority to rescind a building permit or

construction document approval "based on receipt of a complaint" or at her discretion, CSF

¶ 214, but only on limited prescribed bases and, generally, only after notice and the opportunity

for a hearing, *id.* ¶ 218.  In particular, on written notice to the permit holder, the Commissioner

may revoke a permit for failure to comply with the provisions of the building code "or other

applicable laws or rules . . . or whenever there has been any false statement or any

misrepresentation as to a material fact in the application or submittal documents upon the basis

of which . . . approval was issued; or whenever a permit has been issued in error and conditions

are such that the permit should not have been issued."  N.Y.C. Admin. Code § 28-105.10.1.  In

such an instance, the permit holder is entitled to notice and the right to present to the

Commissioner "information as to why the permit should not be revoked" before any action is

taken.  *Id.*  It is only when "an imminent peril to life or property" presents itself that the

Commissioner may immediately suspend a permit or application without prior notice.  N.Y.C.

Admin. Code § 28-105.10.2.  And even then, the permit holder must be afforded notice and

opportunity to be heard after the permit has been suspended.  *See id.*

Focusing on the effect of the City's permitting scheme on new establishments, Plaintiffs

allege that they will be chilled from relocating.  *See* Dkt. No. 222 at 51–60.  Since building

permit applications are public records readily available online, CSF ¶¶ 97–98, in the interim time

between when an adult entertainment establishment applies for a building permit and the time

---

[56] DOB has promulgated different rules for institutions that existed before August 8, 2001—the
date that CPC approved the 2001 Amendments, *see* CSF ¶ 194—and institutions that only came
into existence after, *see* Gittens Decl. ¶ 23.  For adult establishments, houses of worship, or
schools in existence and operating prior to August 8, 2001, the date of establishment is defined to
be the date of issuance of an appropriate department permit or, if no permit was required, the
date that it commenced operation as determined by DOB.

such permit is granted, a sensitive use can learn of an adult establishment's plan and effectively

veto their application by obtaining a building permit before they do.  Dkt. No. 222 at 51–60; Dkt.

No. 225 at 75–78.  Plaintiffs worry that, without a time limit for the issuance of a building

permit, DOB can prolong the permitting process for an adult use while accelerating review of a

sensitive-use application.  Dkt. No 222 at 69–71.  Plaintiffs contend that DOB will grant the

sensitive user a building permit once an adult entertainment establishment has filed an

application, even if the sensitive user's application for a permit postdates that of the adult

establishment.  Dkt. No. 222 at 51–59.  Running vesting rights from the date of permit *issuance*

rather than from the date of permit *application*, Plaintiffs say, "is a fatal defect which renders the

mandatory termination provisions unenforceable because it denies the Club Plaintiffs a

reasonable opportunity to relocate."  Dkt. No. 222 at 52.  Under the City's current vesting rules,

Plaintiffs state that "any nearby sensitive use could defeat the prospective adult use's application

if it gets its permit granted first, even if it filed its application long after the adult business did."

*Id.*

## B.    Standing

As Defendants argue, Dkt. No. 224 at 9–15, Plaintiffs have not established that they have

standing to challenge the permitting procedures on a standalone basis.  Standing—"the personal

interest that must exist at the at commencement of the litigation," *Davis v. Fed. Election*

*Comm'n*, 555 U.S. 724, 732 (2008)—"is the threshold question in every federal case,

determining the power of the court to entertain the suit," *Warth v. Seldin*, 422 U.S. 490, 499

(1975).  "[A] plaintiff must demonstrate standing for each claim he seeks to press."

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

The "irreducible constitutional minimum" of standing contains three elements: (1) "the

plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is

(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted). As the party seeking the federal court's jurisdiction, Plaintiffs bear the burden of establishing each step of the tripartite standing inquiry. *See id.* at 561. At the trial stage of litigation, to establish standing, a plaintiff must set forth by affidavit or other evidence specific facts which must be supported adequately by the evidence adduced. *Id.*; *see also Carter v. HealthPort Techs.*, *LLC*, 822 F.3d 47, 56 (2d Cir. 2016). To the extent that Plaintiffs challenge provisions of the permitting scheme that operate in different ways, Plaintiffs must establish standing to challenge each provision. *Brokamp*, 66 F.4th at 389; *see also Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 892 (9th Cir. 2007) (finding that the plaintiff "must meet all three [standing] requirements for any claim it wishes to make").

### 1. Injury In Fact

Plaintiffs here fail to establish the first element of standing—injury in fact—which requires that the plaintiff be "the proper party to bring th[e] suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

What a plaintiff must prove to establish standing depends on the nature of the claim. *See, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 309 (2d Cir. 2023). Where, as here, a plaintiff brings a facial challenge to the permitting procedure under the First Amendment, the standing requirements have been given a specific gloss. *See Beal v. Stern*, 184 F.3d 117, 125 (2d Cir. 1999) ("Although facial challenges are generally disfavored, they are more readily accepted in the First Amendment context."). In *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), the Supreme Court held that a business engaged in protected expression does have standing to challenge a licensing statute before it is applied "when a licensing statute allegedly

vests unbridled discretion in a government official over whether to permit or deny expressive

activity." *Id.* at 755.  In that limited circumstance, "one who is subject to the law may challenge

it facially Without the necessity of first applying for, and being denied, a license." *Id.* at 755–56.

The Court explained the dual reasons for allowing this type of facial challenge: "[f]irst, the mere

existence of the licensor's unfettered discretion, coupled with the power of prior restraint,

intimidates parties into censoring their own speech, even if the discretion and power are never

actually abused." *Id.* at 757.  "Second, the absence of express standards makes it difficult to

distinguish, 'as applied,' between a licensor's legitimate denial of a permit and its legitimate

abuse of censorial power." *Id.* at 758.  "Standards," the Supreme Court explained, "provide the

guideposts that check the licensor." *Id.*

Importantly, *City of Lakewood* did not abrogate or undermine any of the traditional three

elements required by Article III to establish standing, including the injury in fact requirement.

*See, e.g.*, *Members of City of Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984);

*Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1020 (9th Cir. 2009),

*cert. denied*, 559 U.S. 936 (2010); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d

1257, 1269–72 (11th Cir. 2006); *Obsediacz v. City of Cranston*, 414 F.3d 136, 141 (1st Cir.

2005).  *City of Lakewood* itself recognized that a purely theoretical threat of self-censorship was

not alone sufficient injury within the meaning of Article III.  Instead, the Justices stressed that a

plaintiff had to show that the law "pose[d] a real and substantial threat to *identified* censorship

risks."  486 U.S. at 759.

To have standing to mount a facial challenge, *City of Lakewood* requires Plaintiffs to

establish that (1) the law that they challenge confers "unbridled discretion in the hands of a

government official or agency" and that the discretion has "a close enough nexus to expression,

or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks,"; and (2) the challenged provision applies to their conduct. 486 U.S. at 757, 759; *see also Lebron v. Nat'l R.R. Passenger Corp.*, 69 F.3d 650, 658 (2d Cir. 1995); *Kaahumanu v. Hawaii*, 682 F.3d 789, 802 (9th Cir. 2012).

### a.  Discretion

Plaintiffs do not satisfy the *City of Lakewood* test for standing. In the first place, the permitting scheme does not give the City "unbridled discretion," nor is it "directed narrowly and specifically at expression or conduct commonly associated with expression." *City of Lakewood*, 486 U.S. at 760. It is rather a "law[] of general application . . . not aimed at conduct commonly associated with expression and do[es] not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken." *Id.* at 760–61. The mere existence of some measure of discretion does not itself render a licensing scheme constitutionally suspect. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("[P]erfect clarity and precise guidance have never been required."); *Turley v. Police Dep't of City of New York*, 167 F.3d 757, 762 (2d Cir. 1999). Indeed, "'flexible' standards granting 'considerable discretion' to public officials can pass constitutional muster." *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 179 (2d Cir. 2006) (quoting *Ward*, 491 U.S. at 794).

In determining whether a permitting scheme vests a government official with "unfettered discretion," courts weigh various elements of government decision-making: if and how the challenged law or regulation places restraints on government action, whether there are temporal limits on the action, and whether the action requires justification. *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 801–03 (1988) (striking down state law that required professional fundraisers to obtain a license before engaging in solicitation because there were no express or well-established customary time limits constraining the decision-maker); *Atlanta J. &*

*Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1310–11 (11th Cir. 2003) (en banc) (invalidating licensing scheme which allowed a government agency to "cancel a publisher's license for any reason whatsoever"); *Desert Outdoor Advert., Inc. v. City of Moreno Valley*, 103 F.3d 814, 819 (9th Cir. 1996), *cert. denied*, 522 U.S. 912 (1997) (finding unconstitutional an ordinance that employed broad and abstract language in structuring the government's discretion and that lacked any requirement that officials provide some "evidence to support the conclusion that a particular structure . . . is detrimental to the community").[57]  The Court may "not simply presume that an agency or official will adhere to standards not evident on the regulation's face or embodied in authoritative decisions or practice," *Beal*, 184 F.3d at 127 n.7, rather, the limits of government authority must "be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice," *City of Lakewood*, 486 U.S. at 770.

The City's permitting scheme sets limits on DOB's discretion to approve or deny permits. The City Administrative Code requires a permit to perform certain work on all building or structures in New York City without a written permit.  Prior to the issuance of a permit, which is required to perform certain work on buildings or structures in New York City, N.Y.C. Admin. Code § 28-105.1; Gittens Decl.¶ 3, Section 28-104.1 of the New York City Administrative Code requires DOB approval of *all* construction documents, not just those for adult establishments, N.Y.C. Admin. Code § 28-104.1; Gittens Decl. ¶ 4.  To do so, DOB must employ "qualified registered design professionals, experienced in building construction and design" to "examine the construction documents promptly after their submission . . . . for compliance with the provisions of th[e] [Administrative Code] and other applicable laws and rules."  N.Y.C. Admin.

---

[57] Many courts that have addressed this issue have rejected similar First Amendment challenges on their merits, rather than on standing grounds.  Accordingly, the Court's analysis is also relevant to its discussion of the merits section *infra*.

Code § 28-104.2.  The applicable laws and rules that DOB's plan examiners assure compliance

with do not allow for consideration of the content of expressive activity.  Gittens Decl. ¶ 5.

Rather, DOB reviews construction documents for compliance with the applicable use regulations

under the Zoning Resolution, including requirements related to signs and proximity regulations,

and for compliance with the Construction Codes.  *Id.*; *see* Nov. 28 Oral Arg. Tr. at 96–98.  This

is far from the expansive, permissive, or abstract statutory language that courts rightfully find

raises the specter of censorship.  *See, e.g.*, *Moreno Valley*, 103 F.3d at 819 (language that

required government officials to find structure would not "have a harmful effect upon the health

or welfare of the general public" vested unfettered discretion in officials); *Redner v. Dean*, 29

F.3d 1495, 1501 (11th Cir. 1994), *cert. denied*, 514 U.S. 1066 (1995) (finding ordinance

unconstitutional on its face because its use of the word "may" rather than "shall" did not impose

an actual requirement on government Officials); *Epona v. County of Ventura*, 876 F.3d 1214,

1224 (9th Cir. 2017) (language that required a permit for a proposed use must be "consistent

with the intent and provisions" of the municipality's general zoning law and "compatible with

the character of surrounding, legally established development" conferred unbridled discretion on

government officials).  The City's permitting requirements, by contrast, contain appropriate

standards cabining the City's discretion.  *See, e.g.*, *Desert Outdoor Advert., Inc. v. City of*

*Oakland*, 506 F.3d 798, 807 (9th Cir. 2007).

Further, DOB's decision-making process is not opaque and unreviewable.  If DOB rejects

an application, it is required to provide written notice "stating the grounds of rejection" to the

applicant.  N.Y.C. Admin. Code § 28-104.2.7.  The scheme's meaningful reason-giving

requirement facilitates effective review and protects against arbitrary decision-making.  *See, e.g.*,

*G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1083 (9th Cir.), *cert. denied*, 549 U.S.

822 (2006) (upholding sign code that required officials to "state the reasons for [each] decision to either grant or deny a permit so as to facilitate effective review"). Although DOB is not required to give reasons "with any degree of specificity," *City of Lakewood*, 486 U.S. at 771, the law itself imposes standards and Plaintiffs' own evidence shows that DOB has an established practice of giving specific reasons, *see* Dkt. No. 172-7 (listing reasons for revocation of adult entertainment establishment's permit).

The City's permitting scheme also sets temporal limits on DOB's authority. Relying on the Supreme Court's plurality opinion in *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990), that "a scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech" and thus is a species of unbridled discretion sufficient to confer standing to bring a facial challenge, Plaintiffs make the faulty assertion that there are no time limits for the issuance of a building permit. Dkt. No. 222 at 64–66; Dkt. No. 225 at 64–65. But the permitting scheme is not as Plaintiffs describe. The Administrative Code does place time limits for the approval of construction documents and the issuance of objections if construction documents do not meet all requirements. Gittens Decl. ¶ 6. In addition to the requirement that DOB review construction documents "promptly" after submission, N.Y.C. Admin. Code § 28-104.2, Section 28-104.2.7 of the Administrative Code provides, in relevant part, as follows:

> **§ 28-104.2.7 Time period for review.** Completed construction documents complying with the provisions of this code and other applicable laws and rules shall be approved by the [C]ommissioner [of DOB] and written notice of approval shall be given the applicant promptly and no later than 40 calendar days after the submission of a complete application.
> Exception[]:
> On or before the fortieth day, the commissioner may, for good cause shown and upon notification to the applicant, extend such time for an additional 20 calendar days.

N.Y.C. Admin. Code § 28-104.2.7; *see also* CSF ¶¶ 104–105; Gittens Decl. ¶ 6.

Plaintiffs cannot rescue their standing argument by alleging that their willingness to relocate as required by the 2001 Amendments has been chilled by the risk of sensitive-use veto that the permitting provisions allegedly put forth, Dkt. No. 222 at 59–60, because they do not substantiate this claim with sufficient objective evidence of harm or threat of specific future harm. *See Brokamp*, 66 F.4th at 387–88. Although Plaintiffs submit evidence of burdensome delay owing to Defendants' *preexisting* permitting scheme, *see* Dkt. No. 172, they submit no evidence that DOB's new permitting scheme—which removes the previous barriers impeding speedy approval of permitting applications—will have the same effects. As the Supreme Court has explained, "subjective chill [of First Amendment rights] are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). "Rather, to establish standing . . . , a plaintiff must proffer some objective evidence to substantiate his claim that the challenged [regulation] has deterred him from engaging in protected activity." *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 170 (2d Cir. 1999) (quoting *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1060–61 (2d Cir. 1991)). Plaintiffs rely specifically on the experience of one adult establishment, known as "Sapphire 2," that applied for a permit in 2014 but was beset by numerous delays totaling over two years—partially the result of a purported sensitive use obtaining a permit before Sapphire even though the adult use had filed an application months before the sensitive use. Dkt. No. 222 at 53–55; Dkt. No. 172. As Sapphire 2's architect testified, however, at least some of the delays that Sapphire 2 faced were caused by errors that DOB made rather than DOB policy. Dkt. No. 172 ¶¶ 7–8. Moreover, as the City points out, Sapphire 2 underwent the permitting process in 2014—when DOB rules barred adult uses from utilizing the speedier professional-certification application process and

146

uniformly subjected adult uses to review by DOB's General Counsel.  Dkt. No. 224 at 13–14.

DOB's revised rule, promulgated in 2020, will not subject adult uses to the delays that Sapphire

2 experienced.  *Id.* at 14.  DOB will be bound to the same time limit for permitting all

establishments.  Nov. 28 Oral Arg. Tr. at 98.

### b.      Nexus to Expression

Nor does the regulated conduct here—generally applicable permitting of buildings—bear

"a close enough nexus to expression, or to conduct commonly associated with expression, to

pose a real and substantial threat of the identified censorship risks."  *City of Lakewood*, 486 U.S.

at 759.  "In determining whether expressive conduct is at issue" the Court examines "whether the

activity in question is commonly associated with expression."  *Id.* at 769; *see also Spirit of Aloha*

*Temple v. County of Maui*, 49 F.4th 1180, 1188 (9th Cir. 2022) (explaining that facial First

Amendment challenges "are allowed against laws aimed at expressive conduct but disallowed

against laws of general application not aimed at conduct commonly associated with expression").

The fact that expression is sold, rather than given away, does not itself reduce the degree of First

Amendment protection.  *City of Lakewood*, 486 U.S. at 756 n.5; *see Mastrovincenzo*, 435 F.3d at

92–93.  Courts have found the requisite association with expression in a wide range of activities:

parades, *MacDonald v. Safir*, 206 F.3d 183, 189 (2d Cir. 2000); the business of tattooing,

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010); and the sale of books,

*Weinberg v. City of Chicago*, 310 F.3d 1029, 1044–45 (7th Cir. 2002), *cert. denied*, 540 U.S. 817

(2003).  In fact, a plurality of the Supreme Court has itself found that the adult entertainment

establishments could facially challenge a general business licensing scheme because it was

"more onerous" on sexually oriented businesses than others.  *FW/PBS, Inc. v. City of Dallas*, 493

U.S. 215, 225 (1990) (plurality opinion); *see also H.D.V.-Greektown, LLC v. City of Detroit*, 568

F.3d 609, 617 (6th Cir. 2009) ("Where . . . businesses protected by the First Amendment must

apply for special zoning approval as a condition of operating, this renders the zoning scheme equivalent to a licensing process that effectuates a prior restraint upon protected expression."). But, as here, where a permitting scheme is equally applicable to all establishments, courts have declined to find such a nexus, finding that "laws of general application that are not aimed at conduct commonly associated with expression—such as laws requiring building permits—'carry with them little danger of censorship' and are thus 'too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse.'" *Spirit of Aloha Temple*, 49 F.4th at 1189 (quoting *City of Lakewood*, 486 U.S. at 761); *see, e.g.*, *Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 410 (E.D.N.Y. 2021) (finding that the plaintiffs, there, adult cabaret establishments, lacked standing to challenge a generally applicable zoning ordinance); *The Tool Box v. Ogden City Corp.*, 355 F.3d 1236, 1242–43 (10th Cir. 2004).

Once the 2001 Amendments go into effect, adult establishments will be subject to the same permitting requirements and procedures to which all other establishments are subject. Gittens Decl. ¶ 24. Accordingly, the City's permitting scheme is not one that "permit[s] communication in a certain manner for some but not for others." *City of Lakewood*, 486 U.S. at 761. Here, although the adult entertainment itself offered is associated with expression, because the permitting rules are applicable to all establishments—including those that are not associated with expression—the provisions are not closely associated with expression.

### c. "Subject To"

Several Plaintiffs also fail to satisfy the second part of *Lakewood*'s test—that they are "subject to" the law. 486 U.S. at 755. Plaintiffs do not produce evidence that they were denied a permit or that they spent money and time trying to obtain a permit, as plaintiffs in other cases have. *See, e.g.*, *Simi Valley*, 216 F.3d at 815. That is for an understandable reason—the law that they challenge is not yet in effect. *FW/PBS* recognized that the future threat of enforcement of a

regulation may satisfy Article III's injury in fact requirement.  Accordingly, "there is no need for

a party actually to apply or to request a permit in order to bring a facial challenge to an

ordinance," *MacDonald v. Safir*, 206 F.3d 183, 189 (2d Cir. 2000); the challenging party must

merely be "subject to" to the ordinance, *see City of Lakewood*, 486 U.S. at 755; *see also Van

Wagner Bos., LLC v. Davey*, 770 F.3d 33, 37–38 (1st Cir. 2014) (collecting cases).  Many of the

Plaintiffs have testified that, if the 2001 Amendments become enforceable, they would close

rather than attempt to relocate.  Warech Decl. ¶ 13; Lipsitz Decl. ¶ 31; D'Amico Decl. ¶ 15;

Kavanaugh Decl. ¶ 18; Zazzali Decl. ¶ 10; Knecht Decl. ¶ 7.  By these Plaintiffs' own evidence,

then, they are not subject to the permitting rules.  *See Cayuga Nation v. Tanner*, 824 F.3d 321,

331 (2d Cir. 2016) ("'The identification of a credible threat sufficient to satisfy the imminence

requirement of injury in fact necessarily depends on the particular circumstances at issue,' and

will not be found where 'plaintiffs do not claim that they have ever been threatened with

prosecution, that prosecution is likely, or even that a prosecution is remotely possible.'" (quoting

*Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015))); *cf. Nat. Res. Def. Council, Inc. v.

U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) ("[A] plaintiff may not establish

injury for standing purposes based on a 'self-inflicted' injury.").  In other words, these Plaintiffs

are not "[o]nes who might have had a license for the asking." *Thornhill v. Alabama*, 310 U.S.

88, 97 (1940).  Those Plaintiffs are not "threatened by the enforcement" of the permitting rules.

*Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019), *cert. denied*, 140 S. Ct.

2508 (2020); *see Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274

F.3d 377, 390 (6th Cir. 2001), *cert. denied*, 535 U.S. 1073 (2002).  As to these Plaintiffs, any

injury is purely hypothetical.

2.        **Causation**

Further, Plaintiffs here lack the second requirement of standing: causation.  As

Defendants point out, Nov. 28 Oral Arg. Tr. at 117, none of the challenged permitting provisions

themselves require Plaintiffs to move or relocate, and Plaintiffs cannot assert injury on that basis.

*See, e.g.*, *Casanova*, 375 F. Supp. 2d at 335.  In other words, Plaintiffs have not sufficiently

alleged causation because their inability to operate in their present locations cannot be traced to

the procedures for obtaining a special-use permit.  *See, e.g.*, *id.*; *cf. Advantage Media, L.L.C. v.

City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) ("Since most of the content[-]based

restrictions and procedural mechanisms which [plaintiff] claims violate the First Amendment

rights . . . were not factors in the denial of its own permit applications, it cannot show causation

with respect to them.").  Rather, Plaintiffs' compulsory relocation is mandated by the 2001

Amendments.  Plaintiffs may not disguise their arguments as opposition to the permitting

provisions in order to level another challenge against the 2001 Amendments.  Nor can Plaintiffs

trace any of their other alleged injuries to the permitting scheme specifically.

**C.        First Amendment Merits**

In any event, even if Plaintiffs did have standing, Plaintiffs have failed to identify a

constitutional defect in the City's permitting provisions on the merits.[58]  *Cf. Prayze FM v.*

*F.C.C.*, 214 F.3d 245, 252 (2d Cir. 2000) ("Of course, to say that [a party] has standing to assert

---

[58] Although Plaintiffs' lack of standing necessarily deprives the Court of subject-matter
jurisdiction, and, by extension, power to adjudicate the merits of the case, *Carter*, 822 F.3d at
54–55, this case has been pending for over two decades and may be subject to further review.  In
similar situations, courts have reviewed the merits of a claim for the sake of judicial economy.
*See, e.g.*, *D.H. v. City of New York*, 309 F. Supp. 3d 52, 69 n.1 (S.D.N.Y. 2018); *"Q"-Lungian
Enters., Inc. v. Town of Windsor Locks*, 272 F. Supp. 3d 289, 295 (D. Conn. 2017); *cf.
Clementine Co., LLC v. Adams*, 74 F.4th 77, 83 (2d Cir. 2023).  The Court's conclusion that
Plaintiffs do not succeed on the substance of their permitting challenges serves as an alternate
basis for its ruling.

a facial challenge is not to say that the facial challenge is meritorious.").  Plaintiffs level two

distinct challenges at those provisions.  They argue that the provisions (1) establish a sensitive-

use veto in violation of the First and Fourteenth Amendments contrary to *Young v. City of Simi

Valley*, 216 F.3d 807, 814 (9th Cir. 2000); Dkt. No. 222 at 51–60; and (2) lack the necessary

procedural safeguards to prevent censorship by delay under *Freedman v. Maryland*, 380 U.S. 51

(1965), Dkt. No. 222 at 60–73.  Neither argument has merit.

### 1.      Sensitive Use Veto

Plaintiffs contend that Defendants' vesting provisions are facially unconstitutional as they

allow for a "sensitive use veto."  Dkt. No. 222 at 51–56.  Specifically, Plaintiffs state that "the

applicable procedures insure[] that the time needed to be issued the permit which provided

vesting would be substantially greater for an adult use than a sensitive use," thus allowing a

sensitive use to obtain vesting priority by virtue of having their permitting applications approved

more quickly.  Dkt. No. 222 at 55.  The Court disagrees, and finds that the permitting provisions

challenged in this case do not establish a sensitive use veto.

The concept of a sensitive use veto—that disfavored speech may be unconstitutionally

barred by proximity to certain establishments—is drawn from *City of Simi Valley*, which,

Plaintiffs urge, presents identical issues.  Dkt. No. 222 at 52–56.  In *Simi Valley*, the Ninth

Circuit invalidated on First Amendment grounds an ordinance that required an adult business to

obtain a special-use permit before opening and required the adult business to maintain a certain

amount of distance between itself and various sensitive receptors like houses of worship and

other religious organizations, as well as schools, playgrounds, and youth-oriented businesses.

216 F.3d at 812.  The plaintiff, who sought to open an adult establishment, chose a site and was

preliminarily informed by the city that a specific site did not, at that time, violate the distance

requirements set forth in the ordinance.  *Id.* at 812–14.  The plaintiff then began a yearlong effort

to comply with the city's special-use permit requirements that cost him thousands of dollars, only to be informed that his application was denied for violating the law's distance requirements in two ways: it was too close to both a newly established religious organization and a karate school.  *Id.*  The religious organization, which opposed the adult establishment, had filed an application to operate an adult bible study class in a nearby building the day before the plaintiff's application was deemed complete, and the city had granted it the next day—the same day that the plaintiff's application was completed after a yearlong process.  *Id.* at 813.  The karate school that the adult site was too close to had already existed when the city initially informed plaintiff that the site was not within the buffer zone barred by the ordinance, but a subsequent city investigation revealed that the school constituted a youth-oriented business.  *Id.*  Both the preexisting karate school and the religious organization, which gained approval the same day as plaintiff's application was completed, would have independently foreclosed an adult business at the site that plaintiff had chosen.  *Id.*  In litigation concerning the matter, testimony by a city official indicated that, at any point during the application process, a sensitive use "could apply for and receive an over-the-counter zoning approval and block [the plaintiff] from completing his project."  *Id.* at 814.  The court concluded that the ordinance was unconstitutional because it "delegate[d] to certain favored private parties the unfettered power to veto, at any time prior to governmental approval [of the adult uses] and without any standards or reasons, another's right to engage in constitutionally protected freedom of expression."  *Id.* at 817.

By its terms, however, *Simi Valley* is distinguishable.  First, the provisions here do not functionally delegate authority to third parties to determine where adult uses may locate.  As the Ninth Circuit later summarized, *Simi Valley* "condemned a 'sensitive use veto' . . . because of the potential for third parties to invoke it arbitrarily."  *Teixeira v. County of Alameda*, 822 F.3d

152

1047, 1062 n.8 (9th Cir. 2016), *rev'd on other grounds*, 873 F.3d 670 (9th Cir. 2017) (en banc).

But here, the vesting provisions do not delegate any *authority*—either formal or ad hoc—to

private parties.  As Plaintiffs themselves recognize, the vesting provisions do not distinguish

between adult uses and sensitive uses—"whenever an adult use or a sensitive use obtains 'an

appropriate [DOB] permit,' that qualifies to establish its vesting authority."  Dkt. No. 222 at 51

(quoting 1 R.C.N.Y. § 9000-1(b)).  The second key differentiating factor between the

unconstitutional zoning scheme in *Simi Valley* and the scheme before the Court is that the

process by which one use or another obtains priority is not standardless.  *Simi Valley*'s scheme

allowed "at any point during the [adult use] application process" a sensitive-use establishment to

"apply for and receive an over-the-counter zoning approval and block [the adult use] from

completing [the] project."  216 F.3d at 814.  But the challenged provisions here do not permit a

sensitive use to receive a permit as a matter of course while subjecting adult uses to more

onerous requirements.  An application obtains priority only after it is reviewed by DOB and after

the planning examiners have determined that submitted construction documents meet applicable

zoning and construction standards.  *See* 1 R.C.N.Y. § 9000-01(b).  Thus, while it is true, as

Plaintiffs argue, that "any nearby sensitive use could defeat the prospective adult use's

application if it gets its permit granted first," Dkt. No. 222 at 53, it also is true that if the adult

use gets its permit first, the sensitive use will have no right to bar the adult use, even if it opens

next door.  And, whether it is a sensitive use or an adult use, the business will have priority only

if it is able to satisfy an independent decisionmaker on the basis of regulations that are both

content-neutral and generally applicable.  *See* 1 R.C.N.Y. § 9000-01(b).  If, in the future, the

Defendants apply those content-neutral rules in a way that discriminates impermissibly against

protected speech, a club or bookstore owner who has been deprived a permit may bring a

challenge based on its individual facts.  *See, e.g.*, *Field Day*, 463 F.3d 167.  But on these facts, Plaintiffs have not, at this point, established a basis to challenge the permitting provisions on their face.[59]

Tellingly, Plaintiffs' only evidence of the "sensitive use veto" is the experience of Sapphire 2, the adult use that was blocked from operating for two years partially due to a sensitive use which opposed Sapphire 2 and received a permit before Sapphire 2 despite applying for one well after Sapphire 2 had.  Dkt. No. 222 at 55–59.  However, as noted above, the regulations in effect at the time that Sapphire 2 applied for a permitting application that functionally afforded a sensitive use veto power—which, concededly, resemble the ones at issue in *Simi Valley*—are no longer in effect.  Accordingly, the permitting scheme before the Court today does not pose the same problems.  Plaintiffs' "sensitive use" challenge fails.

### 2.    Prior Restraint

Plaintiffs argue that the permitting scheme, as a prior restraint, fails the demanding scrutiny to which it is necessarily subject.  Because, however, the Court finds that the permitting procedures are content-neutral and provide reasonably specific and objective standards for DOB to grant a permit, they do not violate the First Amendment.

The Supreme Court has long held that a prior restraint exists when a law gives "public officials the power to deny use of a forum in advance of actual expression."  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).  Plaintiffs are, of course, correct that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), subject to exacting judicial scrutiny, *Lusk v. Village of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007).  The precise

---

[59] For those reasons, Plaintiffs' argument that the permitting procedures deny them a reasonable opportunity to relocate, Dkt. No. 226 at 21, is without merit.

degree of scrutiny, however, depends on whether the law is content-based or content-neutral. *Citizens United v. Schneiderman*, 882 F.3d 374, 386–87 (2d Cir. 2018).  The Second Circuit has explained "[a] 'prior restraint' on speech is a law, regulation or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression." *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (Sotomayor, J.).  The Circuit's definition "reflects the two traditional types of prior restraint: (1) preventing the printed publication of disfavored information, and (2) a facially-neutral law that sets up an administrative apparatus with the power and discretion to weed out disfavored expression before it occurs." *Schneiderman*, 882 F.3d at 386–87.  The first type of prior restraint is content based, while the second is not.  *See id.* at 387; *see also Beal*, 184 F.3d at 124 ("A regulation may constitute a prior restraint even if it is not content[ ]based.").

In *Freedman v. Maryland*, 380 U.S. 51, the Supreme Court held that a prior restraint must contain certain procedural protections in order to comport with the dictates of the First Amendment.  *Id.* at 60.  Deciding the constitutionality of a licensing scheme that required the government licensor to pass judgment on the content of speech, the Court articulated three specific procedural safeguards: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *FW/PBS,* 493 U.S. at 227 (citing *Freedman,* 380 U.S. at 58–60).

But, the Supreme Court later clarified that not all prior restraints need meet all three of *Freedman*'s requirements.  In *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), the Court

decided that *Freedman*'s procedural protections did not apply to content-neutral time, place, and manner restrictions.  In *Thomas*, groups that had sought permits from the city of Chicago to hold rallies sued on the basis that the city's regulations governing rallies in city parks were facially unconstitutional under the First Amendment for failing to meet *Freedman*'s procedural requirements.  *Id.* at 320.  The Supreme Court rejected the challenge, explaining that *Freedman* was not applicable because Chicago's licensing scheme was a content-neutral time, place, and manner restriction.  Such restrictions do "not raise the censorship concerns that prompted [the *Freedman* Court] to impose the extraordinary procedural safeguards [that were imposed] on the film licensing process," and therefore need not satisfy *Freedman*'s procedural requirements.  *Id.* at 322–23.  Instead, it is sufficient that they provide "reasonably specific and objective" standards for the licensing authority "and do not leave the decision 'to the whim of the administrator.'"  *Id.* at 324 (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992)); *see Field Day*, 463 F.3d 167.[60]

*Thomas* thus supports Defendants' position that certain government regulation of adult entertainment establishments—that which is content-neutral—does not present the grave "dangers of a censorship system" confronted in *Freedman*.  *See, e.g.*, *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 617 (6th Cir. 2009); *Granite State Outdoor Advert., Inc. v. City of St. Petersburg*, 348 F.3d 1278, 1282 (11th Cir. 2003), *cert. denied*, 541 U.S. 1086 (2004); *Gold Diggers, LLC v. Town of Berlin*, 469 F. Supp. 2d 43, 56 (D. Conn. 2007).  So long as the government regulation is not content based, and is rather a content-neutral time, place, and

---

[60] In addition, "the permit scheme 'must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives to communication.'"  *Thomas*, 534 U.S. at 322 n.2 (quoting *Forsyth County*, 505 U.S. at 130).

manner restriction, the restrictions need only (1) adequately limit the decision-maker's

discretion, *Thomas*, 534 U.S. at 323; and (2) satisfy the traditional First Amendment test applied

to time, place, and manner rules: narrowly tailoring to serve a significant government interest

and leave open ample alternatives for expression, *id.* at 323 n.3.

There is no serious dispute that the DOB permitting scheme is content-neutral and

provides reasonably specific and objective standards for DOB.  On its face, the permitting

scheme is content-neutral.  Plaintiffs contend that the permitting procedures are content based,

underscoring the fact that DOB's permitting procedures require adult establishments to submit an

area diagram showing all existing uses within 500 feet of the adult establishment and that DOB

engages in "exhaustively long examinations" of such diagrams.  Dkt. No. 222 at 64.  However,

the diagram requirement is merely a function of the zoning regulations.  *Cf. McCullen v.*

*Coakley*, 573 U.S. 464, 480 (2014) ("It is true, of course, that by limiting the buffer zones to

abortion clinics, the Act has the inevitable effect of restricting abortion-related speech more than

speech on other subjects.  But a facially neutral law does not become content based simply

because it may disproportionately affect speech on certain topics." (internal citations and

quotation marks omitted)).  "Whether [the regulated parties] violate the [scheme] 'depends' not

'on what they say,' but simply on where they say it."  *Id.* at 479 (quoting *Holder v.*

*Humanitarian L. Project*, 561 U.S. 1, 27 (2010)).  The incidental burden that the buffer zone and

the related permitting diagrams have on adult speech does not render the permitting scheme

content based.  *See Madsen v. Women's Health Ctr.*, 512 U.S. 753, 762–63 (1994).  If the

disparate treatment of adult establishments is itself constitutional, the fact that the City enforces

that disparate treatment is constitutional.  *See Stringfellow's*, 694 N.E.2d at 412–13.  The DOB is

to review construction documents against the Zoning Resolution and against the Construction

Codes.  Gittens Decl. ¶ 5.  If the applicant satisfies the Resolution and the Construction Codes, the construction documents will be approved and a building permit will be issued.  Nov. 28 Oral Arg. Tr. at 99–100.  In other words, once the construction documents are approved, DOB issues a permit strictly as a "ministerial matter."  *Id.*  If the applicant does not satisfy the law, then, regardless of whether the establishment is an adult establishment or a non-adult establishment, no building permit will issue.

Plaintiffs further contend that the regulations are defective because they do not provide time limits for the issuance of a permit needed to vest an adult use and do not provide an effective remedy for enforcement of any time limits.  Dkt. No. 222 at 67.  The argument lacks merit several times over.  As a threshold matter, under *Thomas*, there need be no time limits. *See, e.g.*, *Granite State Outdoor Advert.*, 348 F.3d at 1282 ("[T]he lack of time limits is constitutionally acceptable."); *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1138 (9th Cir. 2003), *cert. denied*, 546 U.S. 826 (2005); *Covenant Media of S.C., LLC v. City of North Charleston*, 493 F.3d 421, 435 (4th Cir. 2007), *cert. denied*, 552 U.S. 1100 (2008); *Advantage Media*, 456 F.3d at 804; *H.D.V.-Greektown*, 568 F.3d at 624–25.  But even if *Thomas* did require time limits, the administrative rules provide just that.  Under Administrative Code § 28.104.3.7, DOB must render a decision on an applicant's construction plans "no later than 40 calendar days after the submission of a complete application."  CSF ¶ 104.  Whether or not it takes DOB longer to review the application for an adult use than for a non-adult use, *see* Dkt. No. 226 at 36–38, all are subject to the same 40-day period.  Plaintiffs' only evidence that the Defendants will fail to comply with the requisite time limit as to adult establishments is the experience of Sapphire 2 in 2014, in which DOB took more than two months to address the submission.  *Cf. Big Dipper Ent., L.L.C. v. City of Warren*, 641 F.3d 715, 720–21 (6th Cir. 2011) ("That the city took 24 days

rather than 20 to act on [the adult entertainment business's] is immaterial for constitutional

purposes."). But this one instance does not constitute "a pattern of unlawful favoritism" by

Defendants. *Thomas*, 534 U.S. at 325; *see also Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209,

1222 (11th Cir. 2017) (upholding constitutional validity of ten-day generally applicable time

limit). "[I]f and when [such] a pattern of unlawful favoritism appears," Plaintiffs may bring an

as-applied challenge. *Thomas*, 534 U.S. at 325; *see Long Beach Area Peace Network*, 574 F.3d

at 1043. Plaintiffs next claim that the lack of time limits on permit issuance specifically renders

the scheme invalid. Dkt. No. 222 at 50. While some courts have invalidated zoning laws that

required partial or preliminary approval within a specific period of time for failing to require a

deadline for the "final decision," *see Lady J. Lingerie*, 176 F.3d at 1361–62, Defendants here

have represented without contradiction that the permit issues immediately upon approval of the

construction documents,[61] so there is no risk that DOB's issuance of a final permit is delayed by

the lack of express time limit in the provision. Plaintiffs further complain about the lack of

administrative remedies should DOB not meet the time limit on DOB's review of construction

documents. Dkt. No. 222 at 70; Nov. 28 Oral Arg. Tr. at 96. But if DOB fails to act within the

requisite forty days, Plaintiffs are entitled, as a matter of course, to expeditious judicial review

under state law—namely, Article 78. Under Article 78, if DOB fails to meet those time limits, or

---

[61] When evaluating a First Amendment facial challenge, the Second Circuit has instructed courts "to consider the well-established practice of the authority enforcing the ordinance," in addition to the text and agency interpretation of the challenged provision. *MacDonald*, 206 F.3d at 191.

otherwise fails to meet its express obligations, the remedy of mandamus readily applies.[62]  N.Y.

C.P.L.R. Art. 78; *see N.Y. C.L. Union v. State*, 824 N.E.2d 947, 953 (N.Y. 2005); *Katz v.*

*Klehammer*, 902 F.2d 204, 207 (2d Cir. 1990); *see also Nenninger v. Village of Port Jefferson*,

509 F. App'x 36, 39 (2d Cir. 2013) (summary order); *Infinty Outdoor, Inc. v. City of New York*,

165 F. Supp. 2d 403, 430 (E.D.N.Y. 2001); *Gasparo v. City of New York*, 16 F. Supp. 2d 198,

213 (E.D.N.Y. 1998).  Unlike instances in which the aggrieved applicants may proceed to court

only with the court's discretionary permission, *Deja Vu of Nashville*, 274 F.3d at 401, there is

thus opportunity for "prompt judicial review," *Essence, Inc. v. City of Federal Heights*, 285 F.3d

1272, 1290 (10th Cir.), *cert. denied*, 537 U.S. 947 (2002).

      In sum, the permitting provisions thus satisfy *Thomas* and are constitutional.  *See, e.g.*,

*GEFT Outdoor, LLC v. Monroe County*, 62 F.4th 321, 330 (7th Cir.), *cert. denied*, 144 S. Ct. 96

(2023) ("A wholly non-discretionary land-use permit scheme that moves quickly to provide

---

[62] Plaintiffs insist that the availability of Article 78 relief cannot substitute for a strict limit on the time between approval of construction documents and permit issuance, citing to *City of Lakewood*, 486 U.S. at 771.  But that misreads *Lakewood*.  The flaw of the ordinance in *Lakewood* was that the ordinance at issue accorded the City "unbridled discretion" to prohibit conduct with a close nexus to speech or commonly associated with expression.  *Id.* at 759–61, 764.  It was in that context that the Court rejected the availability of mandamus if the City did not act with reasonable dispatch in not reviewing a permit application.  The Court held that judicial review was insufficient because (1) it was not available until *after* the City denied a permit and (2) there were no "concrete standards to guide the decision-maker's discretion."  *Id.* at 771.  Here, judicial review is available to compel the DOB to act on a permit even before a final decision is made, including, as here, where the agency fails to act within specified time limits.  *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 168 (2d Cir. 2001), *cert. denied*, 534 U.S. 1128 (2002); *Long Island Pine Barrens Soc'y, Inc. v. Plan. Bd. of Town of Brookhaven*, 585 N.E.2d 778, 781 (N.Y. 1991); *see also King v. Chmielewski*, 556 N.E.2d 435, 437 (N.Y. 1990) (explaining that an agency's "failure to act within the tightly prescribed time limits itself results in approval by operation of law").  "[T]he First Amendment does not require special 'adult business' judicial review rules."  *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 781 (2004); *see Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 787 (6th Cir. 2005), *cert. denied*, 546 U.S. 1089 (2006).  And, as detailed *supra*, there are standards for a reviewing court to apply.

applicants with permits (and, thus, an opportunity to speak) is unlikely to pose constitutional problems even when operating alongside a variance scheme that affords limited discretion to local officials.").

Having established that the permitting scheme constitutes a content-neutral time, place, and manner restriction that limits government decision-makers' discretion, the Court turns to the intermediate scrutiny test. *Thomas*, 534 U.S. at 323 n.3. For substantially the same reasons that the 2001 Amendments serve a narrowly tailored substantial government interest, the permitting scheme does as well. And, as noted above, the permitting provisions, in conjunction with the 2001 Amendments, leave open 204 simultaneously occupiable lots in the City. CSF ¶ 246.

### D.    Fourteenth Amendment Merits

To the extent Plaintiffs maintain that Defendants' permitting scheme is violative of the Equal Protection Clause of the Fourteenth Amendment, Dkt. No. 222 at 50; Dkt. No. 225 at 80–81, that too fails. The Court's conclusion that the permitting provisions do not violate the First Amendment forecloses the Plaintiffs' other facial attacks on the statute. *See, e.g.*, *Young v. Ricketts*, 825 F.3d 487, 494–95 (8th Cir. 2016); *Brown v. City of Pittsburgh*, 586 F.3d 263, 283 (3d Cir. 2009); *McGuire v. Reilly*, 260 F.3d 36, 49–50 (1st Cir. 2001); *Fisher v. King*, 232 F.3d 391, 395 (4th Cir. 2000); *Hoover v. Morales*, 164 F.3d 221, 227 n.3 (5th Cir. 1998); *DLS, Inc.*, 107 F.3d at 411 n.7. "The fact that the [permitting scheme] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the Supreme Court has] not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

### V.    Bookstore Plaintiffs' Due Process Challenge

Finally, Bookstore Plaintiffs argue that the 2001 Amendments deprive them of their property rights in violation of their rights to due process under the Fourteenth Amendment. *See*

CM-ECF 18-3732, Dkt. No. 178 at 9, 15.  Whether viewed as a procedural due process challenge or as a substantive due process challenge, the challenge falls short.

### A.    Procedural Due Process

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012), *cert. denied*, 569 U.S. 958 (2013).  The Bookstore Plaintiffs' procedural due process claim fails at the first step because the Bookstore Plaintiffs have not established that they have a protectable property right to purvey sexually explicit materials in the places where they currently are located.  "Property rights . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  The rights asserted may not be *de minimis*; rather, it must "rise[] to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Harrington v. County of Suffolk*, 607 F.3d 31, 34 (2d Cir. 2010).

Bookstore Plaintiffs opened their establishments in the face of a provision of the New York City Zoning Resolution that explicitly gives the CPC the authority to propose changes to zoning regulations "upon its own initiative at any time."  N.Y. City Charter § 200.a.1.  Thus, they enjoyed no property right to be free from such zoning regulations.  In fact, the Second Circuit has held that "New York zoning law appears to take into account the somewhat intuitive concept that 'a property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 130 (2d Cir. 1998). When a government body exercises significant discretion in enacting zoning regulations, the Circuit has

162

rejected due-process challenges where the government has significant discretion to enact zoning regulations. *See, e.g.*, *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 504 (2d Cir. 2001). It can hardly be said, then, that Bookstore Plaintiffs had a protectable interest that rose to the level of entitlement to being free of regulation.

**B.     Substantive Due Process**

The 2001 Amendments also did not violate Bookstore Plaintiffs' rights to substantive due process. Substantive due process "is the right to be free of arbitrary government action *that infringes a protected right*." *O'Connor v. Pierson*, 426 F.3d 187, 200 n.6 (2d Cir. 2005) (emphasis in original). In examining whether a government rule or regulation infringes a substantive due process right, "the first step is to determine whether the asserted right is 'fundamental,'" meaning the right is "implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003). When the right infringed is fundamental, the Court must apply strict scrutiny to the challenged law, but where a claimed right is not fundamental, the Court applies rational basis review, under which the government regulation need only be reasonably related to a legitimate state objective. *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1020 (2023).

**1.     Step One: Fundamental Right**

As with their procedural due process challenge, Plaintiffs' substantive due process challenge fails at the first step of the inquiry. There is no substantive due process right to operate a business, much less a substantive due process right to operate a business free from government regulation. The Supreme Court has held that "*the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (emphasis in original). And [t]he

right to conduct a business, or to pursue a calling may be conditioned." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 107 (1978); *see Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 488 (1955) ("The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial coalitions, because they may be unwise, improvident, or out of harmony with a particular school of thought."). "The right to conduct a business or engage in a chosen profession does not entitle plaintiff to operate its business free from government regulation." *Columbus Ale House, Inc. v. Cuomo*, 495 F. Supp. 3d 88, 94 (E.D.N.Y. 2020).

Plaintiffs nevertheless contend that this view "loses sight of the reality that bookstores do more than endeavor to make a profit—they employ workers, pay taxes, and disseminate constitutionally protected expression and information to the public." CM-ECF 18-cv-3732 Dkt. No. 178 at 15. But Plaintiffs may not circumvent the due-process inquiry by simply claiming that the individual components inherent in running a business, such as paying taxes and employing workers, are fundamental rights. And Plaintiffs cite no support for their position that the traditional functions of a business—employing workers and paying taxes—are entitled to different constitutional treatment than the standard applied to all businesses operating to make a profit. In fact, courts have found that "[a]ction that merely harms one's professional or business interests does not, alone, infringe a federally-protected right, and thus does not implicate due process." *Montalbano v. Port Authority of N.Y. & N.J.*, 843 F. Supp. 2d 473, 483 (S.D.N.Y. 2012) (quoting *Giammatteo v. Newton*, 452 F. App'x 24, 30 (2d Cir. 2011) (summary order)), *see also Everest Foods Inc. v. Cuomo*, 585 F. Supp. 3d 425, 439 (S.D.N.Y. 2022) (no property interest protected by substantive due process in right to earn a living). Bookstore Plaintiffs have

"no absolute right to continue to operate [their] business at the same location." *Ambassador Books*, 20 F.2d at 865.

And although freedom of expression certainly is a fundamental right, *see, e.g.*, *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939), the appropriate vehicle for challenging a law that allegedly infringes on that right is through the First Amendment, not the Fourteenth.  Because the Supreme Court has "always been reluctant to expand the concept of substantive due process," it has held that "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analysis these claims." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998).  The 2001 Amendments would not constitute "complete prohibition" of a substantive due process right. *Conn v. Gabbert*, 525 U.S. 286, 291–92 (1999).  The 2001 Regulations, as detailed at length, do not completely prohibit Plaintiffs from partaking in any of the activities—they may still employ workers, pay taxes, and disseminate constitutionally protected expression.

To the extent Plaintiffs assert a property interest in the 1995 Regulations remaining in place without amendment, or a property interest in the zoning law generally, this argument also fails.  "The Second Circuit uses a 'strict entitlement test to determine whether a party's interest in land-use regulation is protectable under the Fourteenth Amendment.'" *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995)).  And "[i]n assessing a substantive due process claim in the context of land use regulation, this Court is always 'mindful of the general proscription that 'federal courts should not become zoning boards of appeal to review no constitutional land-use determinations by . . . local legislative and administrative agencies.'" *Crowley v. Courville*, 76 F.3d 47, 52 (2d

Cir. 1996) (quoting *Zahra*, 48 F.3d at 679–80).  Plaintiffs had no protectible interest in a zoning regulation that advanced their interests relative to establishments that offered 100% adult entertainment.  Nor did they have a protectible interest in being free from zoning regulation going forward.  While there exists a property right in land ownership, there is no substantive due process right against enforcement of a zoning law.  *See RRI Realty Corp. v. Incorporated Village of Southhampton*, 870 F.2d 911, 915–16 (2d Cir.), *cert. denied*, 493 U.S. 893 (1989).  To the contrary, it is well-established that state and local governments have wide latitude to exercise their police power to enact zoning regulations.  *See, e.g.*, *Goldblatt v. Town of Hempstead*, 369 U.S. 590 (1962); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926).

### 2.  Step Two: Rational Basis Review

Because Bookstore Plaintiffs have failed to assert a cognizable fundamental right that is implicated by the 2001 Amendments, the Court applies rational basis review—considering whether the law is reasonably related to a legitimate state objective—in assessing its constitutional validity.  *Goe*, 43 F.4th at 30.  The 2001 Amendments easily clear that standard.  As detailed exhaustively above, the prevention of secondary effects is more than a legitimate interest—it is a substantial interest.  *See, e.g.*, *Renton*, 475 U.S. at 50; *Pap's A.M.*, 529 U.S. at 296 ("The asserted interest[] of . . . combating the harmful secondary effects associated with nude dancing are undeniably important.").  And the law, which aims to reduce those secondary effects while still permitting adult entertainment establishments to operate, is reasonably related to Defendants' interest.

**CONCLUSION**

The Court finds in favor of Defendant on each of Plaintiffs' claims and directs judgment in favor of Defendant, dismissing Plaintiffs' claims. The Court will stay the effect of this ruling for a period of fourteen days for the parties to consider next steps.


SO ORDERED.


Dated: February 9, 2024
   New York, New York       _____
                                    LEWIS J. LIMAN
                             United States District Judge