# 24-621-cv(L),
## 24-623(CON), 24-636(CON), 24-640(CON)

# United States Court of Appeals
*for the*

# Second Circuit

557 ENTERTAINMENT INC., DCD EXCLUSIVE VIDEO INC., VIDEO
LOVERS INC., JAYSARA VIDEO, INC., VISHARA VIDEO, INC., RAINBOW
STATION 7 INC., CLUB AT 60TH STREET, INC., a Delaware corporation,
JACARANDA CLUB, LLC, a New York limited liability company, DBA
Sapphire, 59 MURRAY ENTERPRISES, INC., AKA 59 Murray Corp., DBA
New York Dolls, AAM HOLDING CORP., DBA Private Eyes, JNS VENTURES
LTD, DBA Vixen, TWENTY WEST PARTNERS, INC., d/b/a Wonderland,
689 EATERY, CORP., DBA Satin Dolls, 725 EATERY, CORP., Substituting for
MLB Enterprises, Corp., DBA Platinum Dolls,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## CONSOLIDATED BRIEF FOR PLAINTIFFS-APPELLANTS

EDWARD S. RUDOFSKY, ESQ.
ZANE AND RUDOFSKY
*Attorney for Plaintiffs-Appellants*
   *59 Murray Enterprises, Inc., et al.*
Five Arrowwood Lane
Melville, New York 11747
(917) 913-9697

JEROME MOONEY, ESQ.
G. RANDALL GARROU, ESQ.
WESTON, GARROU & MOONEY
*Attorneys for Plaintiffs-Appellants*
   *Club at 60th Street, et al.*
12121 Wilshire Boulevard
Los Angeles, California 90025
(310) 442-0072

*(For Continuation of Appearances See Inside Cover)*

 COUNSEL PRESS   (800) 4-APPEAL • (329368)

---

336 LLC, DBA The Erotica, CHELSEA 7 CORP., 725 VIDEO OUTLET INC.,
GOTHAM VIDEO SALES & DISTRIBUTION INC., VISHANS VIDEO, INC.,
EXPLORE DVD LLC,

*Plaintiffs,*

— v. —

CITY OF NEW YORK, HON. BILL DE BLASIO, as mayor of the City of New
York, MELANIE E. LA ROCCA, as Commissioner of Buildings,
DEPARTMENT OF BUILDINGS OF THE CITY OF NEW YORK, RICK D.
CHANDLER, as Commissioner of Buildings, DEPARTMENT OF
BUILDINGS OF THE CITY OF NEW YORK,

*Defendants-Appellees.*

---

ERICA T. DUBNO, ESQ.
FAHRINGER & DUBNO
*Attorney for Plaintiffs-Appellants*
   *557 Entertainment Inc., et al.*
43 West 43rd Street
New York, New York 10036
(212) 319-5351

JEFFREY M. NYE, ESQ.
STAGNARO, SABA & PATTERSON
*Attorney for Plaintiffs-Appellants*
   *689 Eatery, et al.*
7373 Beechmont Avenue
Cincinnati, Ohio 45230
(513) 533-6714

---

## RULE 26.1 DISCLOSURE STATEMENT

Each of Appellant 557 Entertainment Inc., Rainbow Station 7 Inc., Video Lovers Inc., Vishara Video, Inc., Jaysara Video, Inc., DCD Exclusive Video Inc., Club at 60th Street, Inc., 59 Murray Street Enterprises, Inc., AAM Holding Corp., JNS Ventures, Ltd., Twenty West Partners, Inc., 689 Eatery Corp. and 725 Eatery Corp. is a corporation; each of these Appellants has no parent corporation; and there is no publicly held corporation that owns 10% of more of the stock of any of these Appellants.

Appellant Jacaranda Club, LLC is a limited liability company. It has no parent corporation and no publicly held corporation owns a 10% or more interest in this Appellant.

### TABLE OF CONTENTS

Rule 26.1 Disclosure Statement .................................................................. i

Table of Contents ...................................................................................... ii

Table of Authorities ...................................................................................v

Jurisdictional Statement ............................................................................1

Statement of the Issues Presented For Review .........................................2

Statement of the Case................................................................................4

    History of NYC adult zoning.................................................................4

    The 2001 Amendments, enacted without a study of the regulated
        businesses, treat eating and drinking establishments with *any*
        adult entertainment the same as eating and drinking
        establishments that have *entirely* adult entertainment................8

    Adult businesses are subject to unique (and stringent) mandatory
        termination requirements...........................................................11

    Adult establishments are uniquely subject to a sensitive-use "veto." .................12

    The number of adult establishments has plummeted since 2001 and
        1995, and NYC has drastically changed. ..................................16

    The public's access to expression will be severely diminished...........19

    Summary judgment motions are filed, but the case is tried to the
        bench on a written evidentiary record. ......................................22

Summary of the Argument........................................................................23

Argument.................................................................................................28

    The Standard of Review........................................................................28

    Point I: Whether the Zoning Amendment serves a substantial
        governmental interest should be considered when the
        Amendment is challenged—not just when it was enacted.........................29

        A.    The 2001 Amendments Impose "Current Burdens and Must
            be Justified by Current Needs" ...............................................33

        B.    "The Times They Are A-Changin'".......................................34

    Point II: The District Court failed to correctly interpret the meaning
        and application of the "how speech will fare" test as

articulated by Justice Kennedy's controlling concurrence in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440 (2002) ................................................................................37

   A.   *Renton* analysis ..........................................................37

   B.   The City's conceded failure to provide sufficient alternative locations for existing businesses in Manhattan chills access to free expression. ...................................................47

   C.   The Kennedy Test: how speech will fare ................................57

Point III: The District Court erred in concluding that a finding of the constitutionality of adult zoning amendments automatically requires a finding of the constitutionality of discriminatory provisions requiring termination of only adult nonconforming commercial uses, but of no other nonconforming commercial uses. .........................................................................64

Point IV: The District Court erred in using the test for truly content neutral time, place and manner restrictions to evaluate the validity of the 2001 Amendments. ..........................................68

Point V: The District Court erred in its application of the three-part test for evaluating adult zoning ordinances required by a majority in *Alameda* by considering only the evidence presented by the City in the first part of that test and not evaluating the evidence presented by plaintiffs which a court is required to consider under the second part of that test. ..........................75

Point VI: The District Court erred in concluding that the standards for evaluating adult zoning ordinances articulated in *Renton* were not modified by *Reed* and *City of Austin*, which rejected the "content neutral purpose" basis for upholding otherwise content-based time, place and manner restrictions on expression. ................................................................80

Point VII: The District Court erred in failing to find that the zoning restrictions fail, on their face, to allow a reasonable opportunity to relocate, due to their authorization of a sensitive use veto which created a well-documented chilling effect on the Plaintiffs' willingness to relocate. .........................84

A.    The sensitive use threat here is both "real" and "substantial." ..............................................................91

B.    Chilling Effect ......................................................92

C.    The District Court's Errors..................................94

Point VIII: The District Court erred in concluding that the zoning ordinances allowed a reasonable opportunity to relocate, given that the permitting scheme fails to comply with the prior restraint procedural requirements of *FW/PBS v. City of Dallas,* 493 U.S. 215 (1990), and in further concluding that *Thomas v. Chicago Park District,* 534 U.S. 316 (2002), applies here rather than *FW/PBS.*..............................100

A.    DOB's permitting scheme constitutes an invalid prior restraint of expression because it does not contain a fixed time period for granting or denying an adult use permit. .....................100

B.    DOB's permitting scheme also constitutes an invalid prior restraint of expression because it does not provide any effective remedy in the event it violates any of its own time limits ......................................................115

C.    DOB's permitting scheme also constitutes an invalid prior restraint of expression because it confers unbridled substantive discretion on DOB officials to institute time-consuming permit revocation proceedings against adult use permit applicants based on othing more than unsubstantiated or even frivolous complaints received on DOB's website. ...................................................116

Point IX: To the extent the City justified the elimination of its original exemption of so-called 60/40 businesses based on some examples of sham compliance, its ordinance is not "narrowly tailored" because the City should have merely amended the ordinance to prohibit defined forms of sham compliance rather than eliminating all lawfully compliant pre-existing 60/40 Clubs. ...................................................120

Conclusion ..............................................................123

Certificate of Compliance .......................................125

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*725 Eatery Corp. v. City of New York*,
    408 F. Supp. 3d 424 (S.D.N.Y. 2019) .................................................... 16, 34

*Abie State Bank v. Weaver*,
    282 U.S. 765 (1931)..................................................................................31

*Abusaid v. Hillsborough County Bd. of County Comm'rs*,
    637 F. Supp. 2d 1002 (M.D. Fla. 2007) .....................................................116

*Artistic Entertainment, Inc. v. City of Warner Robins*,
    223 F.3d 1306 (11th Cir. 2000) ................................................................116

*Barnes v. Glen Theatre, Inc.*,
    501 U.S. 560 (1991)..................................................................................37

*Bellanca v. NYS Liquor Authority*,
    54 N.Y.2d 228 (1981), *on remand* from 452 U.S. 714 (1981).....................38

*Bose Corp v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984)............................................................................ 23, 28

*Buzzettii v. City of New York*,
    140 F.3d 134 (2nd Cir. 1998) ...................................................................38

*California v. LaRue*,
    409 U.S. 109  (1972)................................................................................40

*Chesapeake B & M v. Harford*,
    58 F.3d 1005 (4th Cir. 1995) ............................................................ 106, 113

*City of Austin v. Reagan Nat'l Advertising*,
    596 U.S. 61 (2022)............................................................................ *passim*

*City of Erie v. Pap's A.M.*,
    529 U.S. 277 (2000)..................................................................................37

*City of Los Angeles v. Alameda Books, Inc.*,
    535 U.S. 425 (2002)......................................................................... *passim*

*City of New York v. Dezer Properties*,
    95 N.Y.2d 771 (2000)....................................................................... *passim*

*City of New York v. Dezer Props.*,
259 AD.2d 116 (N.Y. App. Div., 1st Dist. 1999)......................................121

*City of New York v. Les Hommes*,
94 N.Y.2d 267 (1999)............................................................. *passim*

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986)................................................................ *passim*

*Defiance Milk Products Co. v. DuMond*,
309 N.Y. 537 (1956)..................................................................31

*Doran v. Salem Inn*,
422 U.S. 922 ................................................................... 38, 40

*Café Erotica, et al. v. St. Johns County*,
143 F. Supp. 2d 1331 (M.D. Fla. 2001) ....................................116

*For The People Theatres of NY, Inc. v. City of New York*,
38 Misc. 3d 663 (Sup. Ct. N.Y. Co. 2012), *aff'd*,
131 A.D.3d 279 (1st Dep't 2015)................................ 40, 65, 121

*Freedman v. Maryland*,
380 U.S. 51 (1965)...................................................................108

*FW/PBS v. City of Dallas*,
493 U.S. 215 (1990)............................................................ *passim*

*Gold Diggers, LLC v. Town of Berlin*,
469 F. Supp. 2d 43 (D. Conn. 2007) ................................ 110, 111

*Granite State Outdoor Advertising Inc. v. City of St. Petersburg*,
348 F.3d 1278 (11th Cir. 2003) ................................................110

*H.D.V. – Greektown, LLC v. City of Detroit*,
568 F.3d 609 (6th Cir. 2009) ...................................................109

*Heffron v. Int'l Soc'y for Krishna Consciousness*,
452 U.S. 640 (1981).....................................................................57

*Hickerson v. City of New York*,
146 F.3d 99 (2d Cir. 1998) ................................................. 40, 49

*Kravetz v. Plenge*,
84 A.D.2d 422 (4th Dep't 1982)................................................31

*Lusk v. Village of Cold Spring*,
  475 F.3d 480 (2d Cir. 2007) ...................................................... 111, 112, 113

*Northwest Austin Municipal Utility District Number One v. Holder*,
  557 U.S. 193 (2009)...................................................................................33

*NYS Rifle & Pistol Association, Inc. v. Bruen*,
  597 U.S. 1 (2022)........................................................................................46

*People v. Maney*,
  37 N.Y.2d 229 (1975)..................................................................................42

*Police Dept. of Chicago v. Mosley*,
  408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ....................................81

*Powell v. Jones-Soderman*,
  849 Fed.Appx. 274  (2nd Cir. 2021) ...........................................................28

*Public Citizen, Inc. v. Pinellas County*,
  321 F. Supp. 2d 1275 (M.D. Fla. 2004) ....................................................116

*Quaglia v. Incorporated Village of Munsey Park*,
  54 A.D.2d 434 (2d Dep't 1976), *aff'd*, 44 N.Y.2d 772 (1978) ............. 31, 36

*Redner v. Dean*,
  29 F.3d 1495 (11th Cir. 1994) ...................................................................116

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015).......................................................................... *passim*

*Reno v. A.C.L.U.*,
  521 U.S. 844 (1997)....................................................................................49

*Salamar Builders Corp. v. Tuttle*,
  29 N.Y.2d 221 (1971) .................................................................................31

*Salem Inn, Inc. v. Frank*,
  522 F.2d 1045 (2nd Cir. 1975), *aff'g*, 381 F. Supp. 859
  (E.D.N.Y 1974).........................................................................................37

*Schad v. Borough of Mt. Ephraim*,
  452 U.S. 61 (1981)............................................................................... 49, 54

*Schneider v. State of New Jersey*,
  308 U.S. 147 (1939)....................................................................................49

vii

*Shelby County v. Holder*,
570 U.S. 529 (2013)................................................................33

*Southeastern Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975)................................................................49

*Stringfellow's of N.Y., Ltd. v. City of New York*,
91 N.Y.2d 382 (1998)..............................................................40

*Ten's Cabaret, Inc. v. City of New York*,
1 Misc. 3d 399 (N.Y. County Sup. Ct. (Index No. 121197/02,
Sept. 9, 2003).......................................................................121

*Thomas v. Chicago Park District*,
534 U.S. 316 (2002)..................................................... *passim*

*TJS of New York, Inc. v. Town of Smithtown*,
598 F.3d 17 (2d Cir. 2010) .......................................... *passim*

*Tollis Inc. v. County of San Diego*,
505 F.3d 935 (9th Cir. 2007) ...............................................60

*Tunick v. Safir*,
209 F.3d 67 (2d Cir. 2000) ...................................................28

*U.S. v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000)..................................................... 23, 46, 120

*U.S. v. Stevens*,
599 U.S. 460 (2010)..............................................................114

*U.S. v. U.S. Gypsum Co.*,
333 U.S. 364 (1948)................................................................28

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)..............................................................122

*White River Amusement Pub. Inc. v. Town of Hartford*,
481 F.3d 163 (2d Cir. 2007) .................................................60

*Young v. American Mini Theatres, Inc.*,
427 U.S. 50 (1976).................................................... 32, 38, 86

**Statutes & Other Authorities:**

28 U.S.C. § 1291 .......................................................................1

28 U.S.C. § 1331 .......................................................................1

28 U.S.C. § 1343 .................................................................................1

N.Y. Const., Art. VI, § 3(a) ...............................................................42

Fed. R. Evid. P. 201 ..........................................................................34

Fed. R. Civ. P. 52(a)(6).....................................................................28

Fed. R. Civ. P. 52(a).........................................................................28

1 Am. Law Zoning § 2:25 ..................................................................32

1 N.Y. Zoning Law & Prac. § 4:02.....................................................31

101A C.J.S. Zoning and Land Planning § 18 .....................................30

AZR § 12-10 .....................................................................................41

Z.R. § 103-00 ...................................................................................52

Z.R. § 32-01(b).................................................................................85

Z.R. § 42-01(b).................................................................................85

RCNY § 9000-01 ....................................................................... 86, 101

RCNY § 9000-01(b)............................................................ 86, 88, 89, 92

1995 City Planning Commission Report ............................................70

Dallas City Code § 51-1.104 (1988)..................................................104

Buildings Bulletin 2020-005..............................................................97

James Buchwalter, Validity of Zoning Laws and Ordinances as Dependent
on Conditions, Circumstances, and Particular Property, 101A C.J.S.
Zoning and Land Planning § 18.....................................................30

Patricia E. Salkin, A Comprehensive or Well-Considered Plan—Historical
Development, 1 N.Y. Zoning Law & Prac. § 4:02.............................30

Patricia E. Salkin, Constitutionality of New Regulations Applied to Specific
Property, 1 Am. Law Zoning § 2:25 ...............................................30

Darrell M. West & Nicol Turner Lee, How Technology and the World Have
Changed Since 9/11, Brookings TechTank, Aug. 27, 2021, available at
https://www.brookings.edu/blog/techtank/2021/08/27/how-technology-and-the-
world-have-changed-since-9-11/........................................................35

<u>**JURISDICTIONAL STATEMENT**</u>

Each of the actions giving rise to this consolidated appeal challenge sections of the New York City Amended Zoning Resolution on Federal constitutional grounds, as depriving Appellants of their civil rights in violation of the First and Fourteenth Amendments to the Constitution of the United States.

The District Court had original jurisdiction of each of these actions pursuant to 28 U.S.C. §§ 1331 (Federal question) and 1343 (civil rights).

The appeals seek review of an Opinion and Order of February 9, 2024 (Dkt 228[1]) and the final judgments dismissing these actions, entered February 23, 2024, in the United States District Court for the Southern District of New York as directed in the Opinion and Order. The Court of Appeals has jurisdiction over these appeals pursuant to 28 U.S.C. § 1291.

The Notices of Appeal were filed in each action on March 1, 2024.

The Opinion and Order of February 9, 2024 and final judgments dispose of all parties' claims.

---

[1] Unless otherwise noted, all District Court docket number references will be to the documents filed in 02-cv-8333 (*Club at 60th v. NYC*) as identical copies of most documents below were filed in all four actions.  Where documents were filed in only one case, the citation will reference that case.

1

### STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Point I: Whether the Zoning Amendment serves a substantial governmental interest should be considered when the Amendment is challenged—not just when it was enacted.

Point II: The District Court failed to correctly interpret the meaning and application of the "how speech will fare" test as articulated by Justice Kennedy's controlling concurrence in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440 (2002).

Point III: The District Court erred in concluding that a finding of the constitutionality of adult zoning amendments automatically requires a finding of the constitutionality of discriminatory provisions requiring termination of only adult nonconforming commercial uses, but of no other nonconforming commercial uses.

Point IV: The District Court erred in using the test for truly content neutral time, place and manner restrictions to evaluate the validity of the 2001 Amendments.

Point V: The District Court erred in its application of the three-part test for evaluating adult zoning ordinances required by a majority in *Alameda* by considering only the evidence presented by the City in the first part of that test and not evaluating the evidence presented by plaintiffs which a court is required to consider under the second part of that test.

Point VI: The District Court erred in concluding that the standards for evaluating adult zoning ordinances articulated in *Renton* were not modified by *Reed* and *City of Austin*, which rejected the "content neutral purpose" basis for upholding otherwise content-based time, place and manner restrictions on expression.

Point VII: The District Court erred in failing to find that the zoning restrictions fail, on their face, to allow a reasonable opportunity to relocate, due to their authorization of a sensitive use veto which created a well-documented chilling effect on the Plaintiffs' willingness to relocate.

Point VIII: The District Court erred in concluding that the zoning ordinances allowed a reasonable opportunity to relocate, given that the permitting scheme fails to comply with the prior restraint procedural requirements of *FW/PBS v. City of Dallas,* 493 U.S. 215 (1990), and in further concluding that *Thomas v. Chicago Park District,* 534 U.S. 316 (2002), applies here rather than *FW/PBS*.

Point IX: To the extent the City justified the elimination of its original exemption of so-called 60/40 businesses based on some examples of sham compliance, its ordinance is not "narrowly tailored" because the City should have merely amended the ordinance to prohibit defined forms of sham compliance rather than eliminating all lawfully compliant pre-existing 60/40 Clubs.

<u>S<small>TATEMENT OF THE</small> C<small>ASE</small></u>

This civil rights action challenges the constitutionality of the 2001 amendments to New York City's Zoning Resolution ("ZR"), which—if they are allowed to go into effect—will drastically reduce the public's access to constitutionally protected adult entertainment by forcing all the appellants to close or relocate.

This appeal is taken from the judgment of the Southern District of New York (Judge Lewis J. Liman) that found in favor of the defendants and dismissed the plaintiffs' claims for declaratory and injunctive relief, following a bench trial that consisted of evidence submitted in writing and closing argument presented in briefs and orally by counsel. Judge Liman's Opinion and Order (doc. 228, often cited as the "Decision," or "Dec.") has not yet been published in the Federal Supplement, but it is available at 2024 U.S. Dist. LEXIS 23372 and at 2024 WL 519967.

By "So Ordered" Stipulation, enforcement of ZR §§ 12-10, 32-01, 42-01, 52-77, 72-40, and 72-41 was stayed as to Appellants pending appeal, conditioned on Appellants agreeing to an expedited filing of this brief.  Doc. 231.

**History of NYC adult zoning**

New York City enacted its first zoning restrictions specifically for "adult establishments" in 1995 by adopting the "1995 Amendments" to its Zoning Resolution. Consolidated Statement of Stipulated Facts, doc 193-1 ("CSF") ¶1.

4

The 1995 Amendments were based on the Department of City Planning's 1994 "DCP Study" (Dkt. 162-4, Ex. 41), which itself was based in part on studies other cities had conducted about whether or how adult establishments created negative secondary effects in their neighborhoods between 1977 and 1989. *See* DCP Study at 314-20.

Broadly speaking, the 1995 Amendments prohibited adult establishments from being located in residential zoning districts or in certain commercial and manufacturing districts, within 500 feet of those districts, or within 500 feet of schools, churches, and other adult establishments. CSF ¶3. The 1995 Amendments also imposed size limitations and signage restrictions on adult establishments. CSF ¶3. (Gaudy lighting and graphic signage had been complaints of the proponents of the 1995 Amendments. CSF ¶32.)

When the 1995 Amendments were enacted, there were 177 adult businesses in all of New York City (of which 107 were in Manhattan). CSF ¶160, ¶166.

The 1995 Amendments applied to and regulated the location of only "adult establishments." In the main, they defined adult establishments as businesses of which a "substantial portion" was dedicated to adult entertainment or materials— but the 1995 Amendments did not define "substantial portion." Several years of litigation ensued over that issue. During (and in part because of) that litigation, the City's Department of Buildings ("DOB") issued a notice, OPPN 4/98, which defined

"substantial portion" for adult eating and drinking establishments as devoting at least 40% of the customer-accessible floor area to regularly featuring adult entertainment,[2] and for bookstores as, in essence, either at least 40% of the customer-accessible floor space featuring adult materials or at least 40% of the stock available for sale or rent being adult materials.[3] CSF ¶10 and ZR 12-10.

This became known as the "60/40 Rule," and it went into effect in 1998, after the litigation over the meaning of "substantial portion" concluded. CSF ¶8, ¶10. Any establishment with 40% or more of its floor space or stock dedicated to adult entertainment or materials *was* by definition an "adult" establishment that was subject to the 1995 Amendments. (The parties to this litigation generally refer to the latter as "100%" establishments.)

The 60/40 Rule was a key component of the 1995 Amendments as it mitigated the adverse effect of the 1995 Amendments on free expression, permitting adult entertainment to continue throughout the City as long as the intensity of the use was reduced (i.e., <40% versus 100%).

---

[2] The full definition for adult eating and drinking establishments is "at least 40 percent of the floor and cellar area that is accessible to customers [is] available for adult performance and viewing purposes[.]"

[3] The full definition for bookstores is "at least 40 percent of the book store's total stock accessible or available ('accessible') for sale or rent to customers is comprised of adult materials," or "if 40 percent of the establishment's floor area and cellar space accessible to customers contains stock in adult materials[.]"

Once the 60/40 Rule went into effect, a small number of then-existing "100%" adult establishments were located in places where that use was permissible under the 1995 Amendments. But a far greater number of the City's adult businesses were in areas that no longer allowed adult establishments, and many of those establishments simply closed. Others invested substantial sums in complying with the 60/40 Rule by reconfiguring spaces and operations. CSF ¶15. The latter includes all the appellants (or their predecessors in interest), which have been operating as 60/40 businesses since at least the time the 1995 Amendments went into effect in 1998.[4] CSF ¶38-39. Most, if not all, of the businesses which complied with the new 60/40 model also toned down their signage in compliance with the requirements of that ordinance, even though they were not "adult" establishments as defined in the ordinance. CSF ¶31, ¶200.

The City then did an about-face, claimed that compliance with the 60/40 Rule was "sham" compliance, and brought nuisance or other enforcement actions against them. None of the appellants were the subject of these nuisance or other enforcement actions. CSF ¶17, ¶36. Ultimately the New York state courts determined that establishments that had complied with the 60/40 Rule—which, after all, the City had invented—were not "adult establishments" subject to the 1995 Amendments. *See*

---

[4] The appellants' operations were briefly dormant during the pandemic, as required by the Mayor's Emergency Executive Order.

*City of New York v. Dezer Properties*, 95 N.Y.2d 771 (2000); *City of New York v. Les Hommes*, 94 N.Y.2d 267 (1999). CSF ¶17-18.

> **The 2001 Amendments, enacted without a study of the regulated businesses, treat eating and drinking establishments with *any* adult entertainment the same as eating and drinking establishments that have *entirely* adult entertainment.**

By 2000, two years after the 1995 Amendments took effect, what had been 177 adult establishments in the City (including 107 in Manhattan) had been reduced to 136 adult establishments (69 in Manhattan). Of those 136 adult establishments, 35 were "100%" establishments, and 101 were 60/40 establishments. CSF ¶161.

Notwithstanding that substantial reduction, following the New York Court of Appeals' rejection of the City's plainly bad faith "sham compliance" arguments, in *Dezer* and *Les Hommes, supra,* the City acted to amend the ZR again, adopting the "2001 Amendments" on October 31, 2001.

The 2001 Amendments eliminated the 60/40 Rule for eating and drinking establishments, and significantly modified it for bookstores. CSF ¶19. For eating and drinking establishments, *anything more than 0% allocated to regularly featured adult entertainment* made the business an "adult establishment" subject to the locational restrictions first adopted in the 1995 Amendments.

For bookstores, the 2001 Amendments nominally retained the 60/40 Rule (continuing to measure relative floorspace and stock), but added new considerations, the presence of which would render a store that complies with the 60/40 Rule to be

a non-compliant "sham." These new considerations regarding the operation of the business include whether certain types of videotapes are offered for rental (not just sale), the variety of adult and non-adult titles, and where the cash register can be located in the store.

The 2001 Amendments, *in toto*, were reactive and in response to cases litigated during enforcement proceedings of the 1995 Amendments, rather than related to any alleged adverse secondary effects, governmental interest, or legitimate zoning concerns. Unlike the 1995 Amendments, which were supported by the DCP Study, the 2001 Amendments were not supported by any new study of any kind. CSF ¶34. The City did not study 60/40 businesses in 1994 (60/40 businesses did not exist at that time, see CSF ¶188) and did not study 60/40 businesses in 2001. *See* CSF ¶34 and ¶188. There is no evidence in the record that the City has studied 60/40 businesses since that time, either.  Nor was there any claim or evidence that the 60/40 business form exists or has been regulated in any other jurisdiction; thus there was no experience base for the City to draw upon.

Among other things, in adopting the 2001 Amendments, the City did not conduct any infrastructure or transportation analyses to assess the viability of the anticipated "alternative available sites" for either businesses or patrons, did not consider any economic burdens to development, and did not consider the cost to create an adult establishment at any site. Despite having multiple years of real-world

experience to draw from, the City did not consider or study whether the toned-down or "subdued" signage that predominated from and after 1998 (as opposed to the loud or "garish" facades common prior to the 1995 Amendments) had reduced negative secondary effects in the neighborhood around adult establishments. Most importantly, the City did not investigate or consider what effect the amendments would have on the public's access to the protected expression then-available in existing adult establishments. CSF ¶31-34, ¶145(a)-(d), 188, 200.

In other words, in 2001 there was no evidence from which the City could have modified the conclusion it had made in 1995 that businesses that did not devote a "substantial portion" of their establishment to adult uses could not be shown to be associated with (let alone the cause of) negative secondary effects in their neighborhoods, especially taking into account the subdued signage following the enforcement of the 1995 Amendments.

Worse still, while the City *now* justifies the 2001 Amendments by reference to the supposed need to ameliorate negative secondary effects, the record evidence (and the lived experience of the two decades during which the 2001 Amendments were enjoined) shows that there was no such need (as further discussed below).

In addition to the definitional changes that affect permissible locations, as explained below, two other aspects of the City's zoning scheme are challenged in this case.

**Adult businesses are subject to unique (and stringent) mandatory termination requirements.**

The 2001 Amendment's mandatory termination requirements provided that 60/40 establishments operating in locations that would be impermissible under the 2001 Amendments would be required to shut down or relocate within one year of the date they became non-conforming.[5] CSF ¶41. That descriptor applies to all the appellants (or their predecessors in interest), all of which would have been forced to close at their current locations if not for consensual stays, preliminary injunctions or the current stay pending appeal.

Mandatory termination for non-conforming uses is the exception rather than the rule under the City's ZR—only a few types of non-conforming uses are subject to mandatory termination at all. CSF ¶43. Adult use is one of them. CSF ¶43. Most non-conforming uses must terminate only if they have been discontinued for two years (or have expanded or increased in intensity). For example, non-conforming *non*-"adult" bars are not subject to mandatory termination. CSF ¶43.

Under the 2001 Amendments, an adult establishment must also terminate if any land within 500 feet of it is rezoned such that adult establishments are prohibited from being within 500 feet. CSF ¶45, ¶49. This includes all residential and certain commercial and manufacturing districts. CSF ¶3.

---

[5] The 2001 Amendments provided limited temporary hardship exceptions, upon application to the Board of Standards and Appeals. *See* ZR 72-41, doc. 199-2.

Adult uses are the only uses which are subject to mandatory termination based on the rezoning of land that the use does not even occupy. CSF ¶50. Every other use which becomes non-conforming on the basis of other land being rezoned may continue its use indefinitely (subject to termination only through discontinuance or an increase in use intensity). CSF ¶43, ¶51.

**Adult establishments are uniquely subject to a sensitive-use "veto."**

When an adult establishment of any kind seeks a building permit, it is required to submit with its application an area diagram that shows all other uses within a 500-foot radius, to permit the DOB to determine whether the establishment will be in a permitted location. CSF ¶223. Non-adult uses are not required to submit an area diagram with their building permit applications. CSF ¶223.  While since March 23, 2022, DOB's Legal Counsel no longer *routinely* reviews permit applications that propose 60/40 Establishments, CSF ¶87, 91, 92, 115, neither are those applications exempt from that review, and there is no published time limit for the review of the application, CSF ¶93, ¶116, nor for issuance of a building permit. CSF ¶103.

This is of particular concern to adult establishments because the vesting priority for building permits is the date of issuance, not the date of application. This means that when an application is submitted for an adult use, anyone can see it (applications are public records), then apply for a permit for a sensitive use (e.g., a church, school, etc.), obtain their permit before the adult-use application review is

completed (due to faster application-to-issuance time frames for non-adult uses), and effectively "veto" the adult establishment's application. CSF ¶95-99.

The record establishes that this is not a speculative risk. Architect Michael Berzak avers in his September 2022 declaration that his firm was hired by a new tenant to obtain a "no-work" building permit for an adult establishment to be called "Sapphire 2" at 20 W. 39th Street in Manhattan. Berzak 2022 Decl., doc. 172, at ¶5. After Berzak submitted the application and area diagram in February 2014, id. at ¶6, DOB's General Counsel incorrectly objected to the application on the ground that a "house of worship" was within 500 feet. Id. at ¶9. Sapphire 2 was able to obtain the permit only after convincing DOB that the "house of worship" did not have a DOB-issued permit, id. at ¶11-12, and a no-work permit was finally issued about two and a half months after application. Id. at ¶13-14.

That was not the end of the matter though. Less than three weeks after the permit was issued, DOB received an anonymous "complaint"—almost certainly submitted by a competitor of Sapphire 2, id. at ¶16, 26-27—based on the same supposed "house of worship." Id. at ¶16. This caused the DOB to issue a notice of intent to revoke Sapphire 2's permit, and the permit was in fact revoked about five months after issuance, id. at ¶18-21 (though the revocation was then rescinded about three weeks later, id. at ¶25).

Meanwhile, the supposed "house of worship" applied in October 2014 for its own no-work permit to establish a church house of worship. Unlike Sapphire 2, which did not receive even an initial approval for several months, that applicant received a permit in just three days. *Id.* at ¶28.

DOB then issued *another* notice of revocation of Sapphire 2's permit in November, *id.* at ¶29, which was not resolved until May of the following year. *Id.* at ¶32. During that time Sapphire 2 could neither lawfully operate nor continue with its plans to renovate the space (due to the significant time, effort, and expense of doing so, and the uncertainty hanging over the business because of the repeated delays in permitting). *Id.* at ¶32. Sapphire 2 was not able to submit those additional applications until December. *Id.* at ¶34.

In January of the following year, *yet another set of objections* was raised based on the supposed nearby "church" or "house of worship," which had applied for its permit many months after Sapphire 2 had applied for and received its permit. *Id.* at ¶36-39. Those objections were overruled, and Sapphire 2 finally obtained its initial DOB no-work permit in March of 2016—more than 5 ½ months after applying. *Id.* at ¶41.

Sapphire 2 prevailed in its effort to obtain its no-work permit, but it was a 5 ½-month ordeal, and it could have been ended at any time if the "house of worship"—which received its permit in just three days—had succeeded in its efforts

14

to have Sapphire 2's permit revoked, even though Sapphire 2 both applied for and received the permit first. And it took two *years* to get its *building* permit, needed to allow new construction to commence.

This sensitive-use veto creates a tremendous chilling effect on owners and operators of adult establishments. The owner of Sapphire 2, David Talla, avers that while he desires to acquire additional legally permissible establishments and believes there is demand for it, Talla Decl., doc. 157 at ¶5, he is dissuaded by the "huge hurdles" they faced with Sapphire 2. *Id.* at ¶9-14 (affirming Berzak's description of events). He says that the process was "financially devastating" and that they "lost *very* substantial amounts of *both* time and money" on the project, *id.* at ¶16. He concludes, "For this reason, unless and until the City changes its rules governing vesting priority, I would never again seek to establish an adult establishment in New York City on a site which had not previously been approved for adult use." *Id.* at ¶18.

The applicant for the "house of worship" never obtained a permanent certificate of occupancy and apparently abandoned the effort to create a "house of worship" after they were unsuccessful in stopping Sapphire 2 from opening. Berzak 2022 Decl., doc 143, at ¶43.

15

**The number of adult establishments has plummeted since both 1995 and 2001, and NYC has drastically changed.**

The 2001 Amendments were challenged soon after their adoption in both state and federal court. The cases from which these appeals were taken were stayed while state court litigation proceeded. After the 2001 Amendments were upheld as constitutional under the New York State Constitution, these actions resumed—and the 2001 Amendments were promptly preliminarily enjoined by District Judge William H. Pauley in 2019. Judge Pauley concluded that "Plaintiffs are more likely than not to succeed on the merits of their First Amendment free speech claims." *725 Eatery Corp. v. City of New York*, 408 F.Supp.3d 424, 459 (S.D.N.Y. 2019). He also recognized that

> the adult-use regulations that are the subject of these now-revived constitutional challenges are a throwback to a bygone era. The City's landscape has transformed dramatically since Defendants last studied the secondary effects of adult establishments twenty-five years ago. As Proust might say, the 'reality that [the City] had known no longer existed,' and 'houses, roads, [and] avenues are as fugitive, alas, as the years.' Marcel Proust, Swann's Way, in Remembrance of Things Past (C.K. Scott Moncrieff trans., 1922) (1913).

408 F.Supp.3d at 470.

After the 1995 Amendments went into effect in 1998, and the number of adult establishments quickly fell from 177 to 136 in 2000 (35 were "100%" establishments, and 101 were 60/40 establishments). CSF ¶161. This litigation continued after Judge Pauley's preliminary injunction order, and by 2022 the number

16

had fallen all the way to 42 adult establishments in the entire City (ten "100%" establishments and 32 60/40 establishments). CSF ¶167, ¶170.

Manhattan saw a drastic drop in the number of adult establishments. From 107 adult establishments in 1993, that number had fallen to 69 by the year 2000 (of which 24 were "100%" and 45 were 60/40 establishments). CSF ¶162. In 2022, there were just 23 adult establishments in Manhattan—less than a quarter of the number extant when the 1995 Amendments were adopted. Four of those were 100% establishments. Nineteen were 60/40 establishments that must relocate if the 2001 Amendments are upheld. CSF ¶167-68, ¶173; doc 147-10 (JNR) Ex 73.

Judge Pauley was also referring to drastic change in New York City overall, and especially (though not only) in Times Square, which had a reputation as the "red light district" of New York as early as the 1920s.  Dkt. no. 62 at ECF 182–200 ("Freeman Aff.") ¶11-12.  A majority of the City's adult establishments were located in or around Times Square (and Chelsea) by 1993. DCP Study at 332, 335.

But while many (including Judge Pauley) remember the crime-ridden city of the 1970s, the record evidence shows that both violent crime and property crime had steadily fallen since that time, through the time the 1995 Amendments were adopted, and up until the 2001 Amendments were adopted. Freeman Aff. ¶20-21 & Fig. 1. By 2001, the occurrence of seven major categories of felonies (murder, rape, robbery, felonious assault, burglary, grand larceny, and grand larceny auto) in Manhattan had

fallen by more than two thirds from the levels at the start of the prior decade. *Id.* Those rates continued to fall through 2016 (the latest data available in the record), when they were less than 20% of 1990 levels. *Id.* Incomes and property values showed the same positive trends (though not surprisingly, they trail behind the crime data somewhat). *Id.* at ¶22-23 & Fig. 2-3. Meanwhile, surveys show a direct correlation between neighborhood quality and the replacement of "garish" signage with the "subdued" signage adopted by 60/40 businesses in the late 1990s. *See* CSF ¶31, ¶200 (DOB's former Building Inspector testifying to changed signage conditions); Focus Probe study, JNR Ex. 64 (linking neighborhood conditions to types of signage).

The net result is that crime has never been lower, and income and property values have never been higher—and none of these conditions have anything to do with the 2001 Amendments, which have never gone into effect.

To put it differently, if the purpose of the 1995 Amendments was to ameliorate the secondary effects caused by the 100% adult establishments, it was working—the number of 100% establishments had fallen from 177 in 1993 to 10 in 2022, and over the same time period the secondary effects disappeared, even while the number of 60/40 establishments has see-sawed from 0 in 1993 to a high of 101, to just 32 in 2022. The *1995 Amendments* were—and are—achieving their stated purpose. The *2001 Amendments* do not *have* a purpose.

**The public's access to expression will be severely diminished.**

At the time the preliminary injunction was issued, the City estimated that there were about 2800 sites available for 60/40 establishments to relocate to. Doc. 84 ("Laremont Decl."), ¶11.

When pressed on the issue during the proceedings below, the City revised its estimate downward to 1703 available sites. Dkt. No. 191-3 ("Croswell Decl.") ¶¶10.

After the plaintiffs identified flaws in the City's methodology, the City revised its number downward again, to 1275 sites. CSF ¶244. Just 10 of the sites on the City's list are in Manhattan, *id.*—but three of those sites are in fact not available. One is a ferry terminal (and thus the type of "infrastructure" site that does not qualify as a legally available alternative site), *see* Declaration of architect expert Michael Berzak (part one), Doc 98 at ECF p. 12-14, ¶7(1), and two are within 500 feet of other sensitive receptors and thus should be excluded. *See* Berzak Declaration (part two), Doc 99 at ECF p. 21-27, ¶7(11) and 7(12).

Because adult establishments are themselves sensitive receptors that preclude another adult establishment within 500 feet, not all those sites can be simultaneously occupied. The City contends that 204 sites city-wide and 5 sites in Manhattan can be simultaneously occupied. CSF ¶245-246. But again, at least two of the five Manhattan sites on that list are in fact not available, because they are within 500 of a sensitive receptor, as described in the preceding paragraph.

While 204 sites may at first blush seem to be a substantial number, it is not. It represents a vanishingly small portion of the 857,298 lots in New York. CSF ¶231. On its face, that small number of legally permissible alternative sites does not ensure that the quantity and the public's accessibility of the protected speech remains "substantially intact," as *City of Los Angeles v. Alameda Books*, 535 U.S. 425 (2002) ("*Alameda*"), requires.

The best evidence that these locations would not preserve the public's access to the speech is simply that none of the 60/40 establishments in New York are located at any of those addresses now. CSF ¶170. All 32 60/40 businesses would have to relocate if the 2001 Amendments went into effect. *See also* Doc. 147-10 (JNR) Ex 73 (list of 60/40 addresses). If those locations (all of which are *legally* available) were sites where the public would demand and support adult establishments, the market would have provided for those establishments at some point in the last two and a half decades. It has not.

One reason is that the demand for adult entertainment is primarily in Manhattan, and the clientele for adult entertainment (particularly adult eating and drinking establishments) is largely young professionals and business executives with disposable incomes (who are disproportionately represented in Manhattan, *see* DCP Study at 330) and tourists; New York City in general (and Manhattan in particular) is a "travel/tourism mecca" rivaled only by London. Doc. 62 at  ECF 143 (Hugh

Kelly Decl.), ¶18. Some 83% of all hotel rooms in New York City are in Manhattan. *Id.* at ¶67. The adult establishments operators themselves have explained that this is one reason that most of alternative sites on the City's list aren't actually viable alternatives. Doc. 62 at ECF 222-36 (Warech Decl.) ¶13; *id.* at ECF 239-56 (Lipsitz Decl.) ¶31; *id.* at ECF 257-96 (D'Amico Decl.) ¶15; *id.* at ECF 271-85 (Kavanaugh Decl.) ¶18; Doc. 132 in case no. 18-cv-3732 ("Action 4") (Zazzali Decl.) ¶10; Doc. 133 Action 4 (Knecht Decl.) ¶7.

Moving adult establishments from Manhattan primarily to the other boroughs would effectively eliminate them. Dr. Hugh Kelley, a professor of real estate and economics at the Fordham University Real Estate Institute, modeled trips of hypothetical tourists attempting to visit adult establishments in the other boroughs. He concluded that the combination of travel infrastructure and schedules meant that the trip would take drastically longer than it would today and be drastically more expensive—to the point that the overwhelming majority of people simply would not make the trip at all. Kelly Decl. ¶63-67.

There are nineteen 60/40 establishments in Manhattan as of the most recent record evidence. If the 2001 Amendments go into effect, there would be only three. The public's access to this protected expression would not be "substantially undiminished"; in fact, it would be decimated.

**Summary judgment motions are filed, but the case is tried to the bench on a written evidentiary record.**

Following the preliminary injunction, the parties continued informal discovery—largely through stipulations of fact and requests for judicial notice of documents (the "JNR," doc 147), but also through declarations and affidavits. The parties filed cross-motions for summary judgment in 2022, but when the parties alerted the district court to a factual issue they were attempting to resolve, the district court denied those motions without prejudice and ordered re-briefing after resolution of the factual dispute. *See* doc. 184.

The district court at the same time advised the parties of its intent to take direct testimony via written submissions and ordered the parties to designate witnesses for cross-examination and exhibits for submission. Doc. 204. The parties made those designations of direct testimony and documents, doc. 189, 190, 191, 192, 193, and later agreed to forego cross-examination, doc. 220. The evidence was thus submitted. The summary judgment briefs were treated as trial briefing and were supplemented by two days of live closing arguments by counsel, which were held in late November 2023.

The district court issued its Opinion and Order finding in favor of the defendants on all claims in February 2024, doc. 228, and declared the motions for summary judgment to be moot, doc. 229. The clerk's judgment was thereafter entered, doc. 233, and these timely appeals followed.

22

SUMMARY OF THE ARGUMENT

In this challenge to the 2001 Amendments to, and other aspects of, the New York City Zoning Resolution, the City has the burden of proving the constitutionality of the challenged provisions, *U.S. v. Playboy Entertainment Group, Inc.,* 529 U.S. 803 (2000), and the Court must make a *de novo* "independent examination of the whole record" to determine whether the challenged provisions "constitute a forbidden intrusion on the field of free expression." *Bose Corp v. Consumers Union of U.S., Inc.,* 466 U.S. 485 (1984). In fact, that is exactly the case.

New York City enacted its initial adult zoning regulations as 1995 amendments to its Zoning Resolution. The 1995 Amendments exempted businesses that, although they had some adult features, were not "substantially" adult. What was necessary to be substantially adult was not defined by the 1995 Amendments but was later defined, for the purposes of eating and drinking establishments, to mean at least 40% of the business space that was open to the public being utilized for adult entertainment. The exempted entities became known as "60/40" businesses, i.e., eating and drinking establishments that utilize less than 40% of their space for adult use.[6]

---

[6] The 60/40 rule for Bookstores was based on their allocation of floor space and stock. See the Supplemental Brief concurrently filed by the Bookstore Appellants ("Bookstores' Brief").

Many establishments that would have ceased to exist under the 1995 Amendments invested sizable expense and energy redesigning their business model and space to comply with the 1995 law as 60/40 businesses. This included renovations to separate the "adult" and "non-adult" space and new, "toned down" signage.

After the 60/40 business model was upheld by the New York Court of Appeals, the City passed the "2001 Amendments" removing the "substantial portion" requirement as to bars and cabarets (collectively "Clubs") and suddenly thrusting businesses with "any" adult component into the adult category. The result was a requirement that these businesses close or relocate.[7]

For the reasons set forth herein the 2001 Amendments are unconstitutional and should not be enforced. Alternately, even if valid, their enforcement should be enjoined until the City cures various constitutional defects in its vesting and permitting procedures which deny Appellants a reasonable opportunity to relocate.

The 1995 Amendments, created to solve problems attributed to adult uses, have been in place for nearly 30 years. The evidence is that they did exactly what they were intended to do, and the secondary effects attributed to the Clubs pre-1995 have been substantially mitigated or eliminated. The 2001 Amendments, which have

---

[7] For Bookstores, the revised definition dealt with the nature and placement of the inventory, as well as other considerations, described in detail in the Bookstores' Brief.

not gone into effect, are not only unnecessary, but they would also have a disastrous impact on the availability of speech.

Because the 2001 Amendments are "content based" they are subject to strict scrutiny under the most recent Supreme Court precedents *Reed v. Town of Gilbert,* 576 U.S. 155 (2015) (*"Reed"*); *City of Austin v. Reagan Nat'l Advertising,* 596 U.S. 61 (2022) (*"City of Austin"*), however, the City made no attempt to defend them on this basis, and the record is barren of any claim or evidence of a "compelling government interest" or "narrow tailoring" that could possibly pass muster under judicial "strict scrutiny."

However, even if subject only to heightened intermediate scrutiny, they are nonetheless unconstitutional. In *Alameda, supra*, 535 U.S. 425, Justice Kennedy, in a controlling concurrence, held that "adult entertainment zoning ordinances" are "content based" and must not only satisfy the traditional *Renton* test of the constitutionality of such provisions, but, in addition, must not disproportionately reduce protected speech, and that judicial review of such ordinances must include consideration of "how speech will fare" if they are allowed to take effect.

At bar, the number of adult businesses in the City has been dramatically reduced from 1995 to present, and if the 2001 Amendments are allowed to be implemented, it is clear that speech will not fare well. The number of already few remaining existing businesses will be decimated. This is especially true for the

25

borough of Manhattan, the tourist capital and central business district of New York City, which is unique.

Under the terms of the 2001 Amendments, all the existing 60/40 businesses were made nonconforming uses and, unlike any other commercial non-conforming use, were denied grandfather status.  And even adult businesses properly located are not safe.  Any time in the future that the City changes a zone such that an adult use, then legal, becomes non-conforming, it would suddenly be subject to a one-year termination requirement.  This discriminatory treatment violates the First and Fourteenth Amendments because it treats specific expressive conduct, i.e., adult speech, far more harshly than other (far more noxious) nonconforming uses.

The 2001 Amendments fail for the additional reason that there is no reasonable opportunity for the current 60/40 establishments to relocate to parcels that "common experience" teaches (a) a reasonable business owner would be willing to move to, and (b) the consuming public will patronize, i.e., that are "commercially viable."

Additional deterrents to relocating these businesses comes from the fact that the City's procedures for the vesting and permitting of adult uses constitute impermissible prior restraints. For example, an adult business applying for a permit must demonstrate that there is no "sensitive use" or other adult use within the restricted distance from its proposed location but has far more time-consuming

procedures for adult uses to get permitted than others, giving rise to what is known as a "sensitive use veto," something that was already attempted in connection with a prior filing.

Additionally, there are no time limits for DOB to issue any of the necessary permits, and applicants are further hampered because they are subject to unfettered discretion by DOB officials to revoke any permits upon receiving even totally groundless complaints about their use (including from a competing sensitive use) which can drastically further delay permit issuance.

## <u>ARGUMENT</u>

### The Standard of Review

This Court has "an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp.*, 466 U.S. at 499.[8]  As this Court further explained in *Tunick v. Safir*, 209 F.3d 67, 70 (2nd Cir. 2000): "Because this case involves First Amendment rights, this Court must make an independent examination of the record as a whole, and *cannot defer to the factual findings of the court below*" (emphasis added).[9]

---

[8] The *Bose* Court took pains to explain that this "independent examination" is not precluded by the "clearly erroneous" standard of FRCivP 52(a)(6): "The *New York Times* rule emphasizes the need for an appellate court to make an independent examination of the entire record; Rule 52(a) never forbids such an examination, and indeed our seminal decision on the Rule [*U.S. v. U.S. Gypsum Co.*, 333 U.S. 364 (1948)] expressly contemplated a review of the entire record, stating that a "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  The Court went on to emphasize that: "the rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge."

[9] See also *Powell v. Jones-Soderman,* 849 Fed.Appx. 274, 277 (2nd Cir. 2021); *Alameda,* 535 U.S. at 440 ("obligation to exercise independent judgment when First Amendment rights are implicated").

**Point I: Whether the Zoning Amendment serves a substantial governmental interest should be considered when the Amendment is challenged—not just when it was enacted.**

In assessing the constitutionality of an adult zoning ordinance, courts must consider, at a minimum, if (1) it serves a substantial governmental interest and (2) it allows for reasonable alternative avenues of communication.[10] If a zoning ordinance meets both prongs of this test, the "First Amendment is satisfied." *TJS of New York, Inc. v. Town of Smithtown*, 598 F.3d 17, 21 (2d Cir. 2010) ("*TJS*").

In *TJS* only the second prong of the test—alternative avenues—was at issue. *Id.* (it is "the latter prong of this test with which we are concerned here"). This Court held that judges "must consider the adequacy of alternatives available at the time the ordinance is challenged." *Id.* at 23. The Court left open the unasked question of whether courts should also consider the first prong—substantial governmental interest—at the time the ordinance is challenged, or only when it was enacted.

The time at which the continuing constitutionality of a zoning ordinance can be assessed is extremely significant here because the 2001 Amendments were enacted more than 20 years ago. Judge Liman, relying on *TJS*, considered the

---

[10] As discussed later in this brief, Justice Kennedy's controlling concurring opinion in *Alameda*, 535 U.S. at 449, added an additional test for such ordinances that impact free expression. Specifically, at the outset courts "must identify the claim a city must make in order to justify a content-based zoning ordinance." A "city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact."

adequacy of alternative sites at the time the ordinance was challenged. Dec. at 62-63, 100. But he erred in finding that "so long as the City preserves adequate alternative avenues for the communication of sexually explicit fare to the residents of and visitors to New York City, it need not periodically renew or update its findings that the zoning of such businesses serves a substantial governmental interest to satisfy the First Amendment." Dec. at 93-94.

Sound planning requires consideration and review to ensure that it is accommodating the current reality. As recognized by the Department of City Planning, "[t]ime passes, land uses change, and zoning policy accommodates, anticipates and guides these changes. In a certain sense, zoning is never final; it is renewed constantly in response to new ideas—and to new challenges." Doc. 147-2 .

Since issues with land use are constantly fluid, the constitutionality and necessity for specific zoning are always subject to renewal and reconsideration. Indeed, "ordinarily the validity of a zoning regulation depends on the facts *existing at the time such validity is questioned*." James Buchwalter, *Validity of Zoning Laws and Ordinances as Dependent on Conditions, Circumstances, and Particular Property*, 101A C.J.S. Zoning and Land Planning § 18 (emphasis added). This is, in part, because "zoning is not static; the obligation is the support of comprehensive planning with recognition of the dynamics of change, not a slavish servitude to any

particular plan." Patricia E. Salkin, *A Comprehensive or Well-Considered Plan—Historical Development*, 1 N.Y. Zoning Law & Prac. § 4:02.[11]

"Zoning regulations, as an exercise of the police power, are subject to the fundamental rule regarding the exercise of that power: that there is *some evil extant* or reasonably to be apprehended which the police power may be invoked to prevent." *Salamar Builders Corp. v. Tuttle*, 29 N.Y.2d 221, 226 (1971) (emphasis supplied). A substantial governmental interest may have existed in the past but no longer exists. A "police regulation, although valid when made, may become, by reason of later events, arbitrary and confiscatory in operation." *Abie State Bank v. Weaver*, 282 U.S. 765, 772 (1931). *See also Defiance Milk Products Co. v. DuMond*, 309 N.Y. 537, 541 (1956) (a law must be "reasonably related and applied to some actual and manifest evil").

In New York, the courts recognize that "certain kinds of ordinances, and in particular zoning ordinances, may be rendered invalid by changes in circumstances subsequent to their adoption." *Quaglia v. Incorporated Village of Munsey Park*, 54 A.D.2d 434, 439-440 (2d Dept. 1976) (finding that the execution of a land use resolution 40 years after its enactment was "improper in light of changed circumstances, and was an unreasonable interference" with plaintiffs' property

---

[11] Quoting *Kravetz v. Plenge*, 84 A.D.2d 422 (4th Dept. 1982).

rights), *aff'd*, 44 N.Y.2d 772 (1978). *See also* Patricia E. Salkin, *Constitutionality of New Regulations Applied to Specific Property*, 1 Am. Law Zoning § 2:25.

Courts have historically focused on the "practical and continuing impact of zoning regulations on adult entertainment uses *as applied*, rather than on their facial constitutionality when passed." *TJS*, 598 F.3d at 23, citing *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976) and *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ("*Renton*") (emphasis in original). As recognized by this Court in *TJS*, the "*Renton* Court repeatedly phrased its inquiry in the present tense, thereby suggesting that it considered the significant time to be that of the challenge, not of the law's passage." 598 F.3d at 17-18.

Based on that, this Court recognized that ordinances may be subject to post enactment challenges "if there were significant changes in the surrounding community." 598 F.3d at 26. The *TJS* Court—addressing the specific issue before it—found that the First Amendment does "not allow courts to ignore post-enactment, extralegal changes and the impact they have on the sufficiency of alternative avenues of communication." *Id.* at 23. Similarly, courts should not ignore post-enactment, extralegal changes and the impact they have on the governmental interest.

All of the pragmatic and equitable arguments that supported this Court's determination in *TJS* regarding alternative avenues apply equally to whether this restriction on land use and expression serves a substantial governmental interest. As

such, *both* prongs of that test must look at the circumstances that exist when the ordinance is *challenged*.

### A. The 2001 Amendments Impose "Current Burdens and Must be Justified by Current Needs"

The Supreme Court endorses the approach of allowing courts to revisit the justification for existing laws, and to examine whether a potentially stale law is still needed. For example, in two relatively recent cases—*Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009), and *Shelby County v. Holder*, 570 U.S. 529 (2013)—the Court looked at current conditions in evaluating the justification for the Voting Rights Act of 1965. The Court recognized that the Act "imposes current burdens and must be justified by current needs." 557 U.S. at 203. The voting statute's formula is "based on data that is now more than 35 years old, and there is considerable evidence that it fails to account for current political conditions." *Id.* The Court noted that in part "due to the success of that legislation, we are now a very different nation." 557 U.S. at 211.

In *Shelby County*, the Court considered whether older measures "continue to satisfy constitutional requirements," and struck down a provision of the Voting Rights Act. 570 U.S. at 536. The Court noted that our country "has changed" and that legislation to remedy problems must speak "to current conditions." 570 U.S. at 556. The same is true in the current case, where the only justification for this zoning

33

regulation of existing 60/40 adult businesses derives from studies conducted back in 1994—30 years ago—of exclusively adult businesses.

Judge Liman relegates to a footnote his suggestion that this recent authority from the Supreme Court has been "misread[]" and is not apt. Doc. 228 at 96 n.40. However, it makes no difference that those cases involve an analysis under the Fifteenth Amendment, rather than the First Amendment. The crux and rationale remain the same—when constitutional rights are implicated, legislatures must ensure that laws passed to remedy a specific problem speak to current conditions. And, stale unnecessary laws that restrict rights can and should be revisited.

### B. "The Times They Are A-Changin'"

It is constitutionally intolerable to now enforce, *in 2024*, zoning amendments that were enacted in *2001*, based on a study completed back in *1994*. New York City's "landscape has transformed dramatically since Defendants last studied the secondary effects of adult establishments twenty-five years ago." *725 Eatery Corp., 408 F. Supp. 3d at 470*. These regulations are a "throwback to a bygone era." *Id.* And, the "reality that [the City] had known no longer exists." *Id.* Judge Pauley made those observations in 2019. It is now *30 years* since the alleged negative secondary effects associated with adult establishments were studied in New York.

The Court can take judicial notice, pursuant to Fed.R.Evid. 201, that New York City today bears little resemblance to what it was like back in October of 2001,

during the Giuliani era and just weeks after the September 11th terrorist attack. *See,*
*e.g.* Darrell M. West & Nicol Turner Lee, *How Technology and the World Have*
*Changed Since 9/11*, Brookings TechTank, Aug. 27, 2021, available at
https://www.brookings.edu/blog/techtank/2021/08/27/how-technology-and-the-
world-have-changed-since-9-11/ ("From a virtual standpoint, so many things have
shifted over the last two decades that it is hard to imagine the world as it existed in
2001").

These differences include but are not limited to the loss of adult businesses,
significant development, changes in tourism and crime statistics, technology, as well
as extensive rezonings.[12] In part due to the success of the 1995 Amendments, as well
as significant technological, zoning, and other changes, New York is now a very
different city.  While there were 177 known adult establishments in New York 1994,
and then only 136 known adult establishments in 2000, today there are only 32
known 60/40 businesses and 10 known 100% adult businesses in the entire City.

---

[12] Between 2002 and 2012, nearly 40% of the City was rezoned. Much of that rezoning
was in Manufacturing areas, which include many of the limited permissible areas for adult
uses. *See* Preliminary Injunction Joint Appendix ("PJA") at 1486-1487, 1561-1574. A
"hallmark of Mayor Michael Bloomberg's administration was to 'remake the city's
landscape for the 21st century, pushing for higher-density development and higher-quality
design and opening up the city's vast waterfront to new residential, recreational and
commercial uses.'" PJA.1486. The intensive rezoning continued after 2012. Between
January 2002 and September 2018, there were "509 adopted rezonings." PJA.1489.
Approximately one third of those rezonings involved a conversion of Manufacturing to
another form of use. PJA.1489, 1597. This constant rezoning shows one of the many ways
that the City no longer resembles what it was back in 2001.

CSF ¶167, 170. The concentration of such businesses is dramatically less than it was when the 2001 Amendments were enacted and even more so compared to when the original provisions were enacted in 1995. The constitutional inquiry in this case must be attuned to the reality that access to adult expression in New York City, as well as it's the City's landscape, are constantly changing. The justification and need for zoning regulations must be reviewable and cannot endure in perpetuity. Even a zoning ordinance that may well have been constitutional and needed when it was enacted, is not sacrosanct and is subject to review after the passage of time. Any other approach would "shackle" the courts to "chains which had already rusted and broken apart through the passage of time." *Quaglia, supra,* 54 A.D.2d at 439.

For all these reasons, analysis of any substantial governmental interest, and analysis of the impact on the public's access to expression, must be measured by looking at the current situation with regard whether the ordinance is now still needed to suppress unwanted secondary effects and whether the ordinance *currently* "leav[es] the quantity and accessibility of speech substantially intact." When the cobwebs are dusted off these stale 2001 Amendments, it is clear there is simply no need or justification for them now. And, in light of drastic changes in New York, enforcement of these unnecessary Amendments will dramatically reduce the public's access to this type of expression.

**Point II: The District Court failed to correctly interpret the meaning and application of the "how speech will fare" test as articulated by Justice Kennedy's controlling concurrence in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440 (2002).**

The 2001 Amendments constitute a "forbidden intrusion on free expression." Because the trial Court erred in concluding otherwise, a fundamental constitutional error has been committed and must be corrected by this Court.

### A. *Renton* analysis

It is a fixed star in the constitutional constellation that nude dancing, while not "core" political speech, is nonetheless a protected form of expression. *See Salem Inn, Inc. v. Frank,* 522 F.2d 1045 (2nd Cir. 1975), *aff'g* 381 F.Supp. 859 (E.D.N.Y 1974) (affirming invalidation of North Hempstead Town ordinance and noting that "[t]he ordinance here is really directed at the display of the partially nude female form in a place which no minor can enter (under the undisputed allegations below) and no adult who is offended by the sight, or the thought, of commercial exploitation of the human body need enter (since advertising outside the establishment indicates what the entertainment will be)."); *TJS,* 598 F.3d at 20-21 ("Adult entertainment … has been held by the Supreme Court to be protected by the First Amendment"). *See also Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 565 (1991) ("nude dancing … is expressive conduct within the outer perimeters of the First Amendment"); *accord, City of Erie v. Pap's A.M.,* 529 U.S. 277, 289 (2000); *Alameda, supra; see also*

*Bellanca v. NYS Liquor Authority,* 54 N.Y.2d 228, 231 (1981), *on remand* from 452

U.S. 714, 716-717 (1981)  ("the Supreme Court ha[s] recognized dancing as a form

of expression and had held that topless dancing, like nudity in art and sculpture, [i]s

to be accorded at least limited protection under the First Amendment (*Doran v Salem

Inn*, 422 US 922)").[13]

The Courts and litigants are by now all familiar with the *Renton* standards for

judging the facial constitutionality of adult-use zoning:

1. Is the predominant purpose of zoning to suppress the sexually explicit speech
   itself, or rather, to eliminate the "secondary effects" of adult uses?;
2. Does the zoning regulation further a substantial governmental interest?;
3. Is the zoning regulation "narrowly tailored" to affect only those uses which
   produced the unwanted secondary effects?; and
4. Does the zoning regulation leave open reasonable alternative locations for
   adult uses?

*Renton,* 475 U.S. 41.[14]

In this case, the trial Court erroneously assumed—without supporting

evidence—that the 2001 zoning restrictions imposed on so-called "60/40" eating and

---

[13] *Buzzettii v. City of New York,* 140 F.3d 134 (2nd Cir. 1998), upholding the
constitutionality of the 1995 Amendment, tacitly acknowledged that the zoning of adult
entertainment is subject to constitutional protection in accordance with *Young v. American
Mini Theatres, Inc.*, 427 U.S. 50 (1976), and *Renton, supra*.

[14] The *Renton* factors are summarized by the New York Department of State in Legal
Memorandum LU03: Municipal Regulation of Adult Uses, https://dos.ny.gov/legal-
memorandum-lu03-municipal-regulation-adult-uses (last accessed February 18, 2024).

drinking establishments ("Clubs") were supported by the same evidence that had justified the earlier 1995 restrictions imposed on so-called "100%" Clubs, thereby establishing a "substantial governmental interest" in regulating 60/40 Clubs.   But this is not the case, and there is no such evidence.

*First,* in 1994/1995 the City indisputably studied adverse secondary effects of *only* the adult establishments that existed at that time, which were all 100% uses. There was no such thing as a "60/40" use.  Accordingly, those studies established a "substantial governmental interest" in regulating the then-existing use—*not* a use that *did not exist and was not studied*.

*Second,* concomitantly, the 1994/1995 studies established that it was *only* the 100% Clubs' use of their facilities (in the context of the "gaudy" signage that has also been eliminated) that "produced the unwanted secondary effects."

*Third,* while a municipality is entitled to rely on studies conducted elsewhere to establish adverse secondary effects, in this case there were *no such studies elsewhere*.  The record is barren of any such studies from anywhere, and while the City has for more than twenty years asserted that it had a right to rely on other studies, it has never actually identified any such "other study" of 60/40 establishments on which it relied.

It cannot be overemphasized that it is *not* "nudity" or "partial nudity" (or "sexually explicit" dancing) that can be constitutionally regulated; they cannot.  *See*

*California v. LaRue,* 409 U.S. 109, 118  (1972), *Doran,* 422 U.S. at 932-33 ("customary, 'barroom' type of nude dancing" is protected"), and their progeny. It is *only unwanted secondary effects* that are subject to indirect regulation through zoning of sites regularly featuring such "uses" *that produce such effects. See*, *generally,* Hudson, *Nude Dancing and the First Amendment Overview*, https://www.thefire.org/news/nude-dancing-and-first-amendment-overview   (last accessed February 18, 2024).[15]

Thus, while the City's enactment of the 1995 zoning amendments regulating adult entertainment passed muster under the *Renton* test [*see Stringfellow's of N.Y., Ltd. v. City of New York,* 91 N.Y.2d 382 (1998); *Hickerson v. City of New York,* 146 F.3d 99 (2d Cir. 1998)], the 2001 Amendments do not.  Not only did the City *not* study the adverse secondary effects (if any) of the 60/40 Clubs and Bookstores, and did not cite to a single other study in any other jurisdiction, but when the State constitutional challenge to the 2001 Amendments was tried in Supreme Court, New York County, Justice Louis York expressly found that 60/40's are *not* of the same essential character as the 100% Clubs regulated by the 1995 Amendments (i.e., do *not* have the same "predominant sexual focus") and do *not* cause adverse secondary effects, and the Appellate Division *affirmed* those findings.  *For The People*

---

[15] The cited article in turn cites to several law review articles addressing the Secondary Effects Doctrine.

*Theatres of NY, Inc. v. City of New York,* 38 Misc.3d 663 (Sup. Ct. N.Y. Co. 2012), *aff'd* 131 A.D.3d 279 (1ˢᵗ Dept. 2015).

After making 93 specific findings of fact, Justice York expressly found and concluded that there were:

> significant and distinct differences between the 1994 adult entities and 60–40 entities, so that *the current establishments no longer resemble their 1994 predecessors. Given their current arrangements and secondary characteristics, these entities no longer operate in an atmosphere placing more dominance of sexual matters over non-sexual ones.*[16] Accordingly, *there is no need for the 2001 amendments.* On their face, therefore, they are a violation of free speech provisions of the U.S. and State Constitutions. [Emphasis added.]

As noted above, all of these findings were then affirmed by the Appellate Division, which noted that "[t]he City assumes that because the 60/40 clubs regularly feature topless dancing [in the <40% portion of their premises], this automatically means that they retain a predominant sexual focus. However, there is nothing in the prior related decisions that mandates that conclusion.  Thus, this Court finds that the City has not met its burden …."

That judgment was then set aside by the New York Court of Appeals, 29 N.Y.3d 340 (2017), on the ground that the 60/40's could be regulated based on the

---

[16] The "sexual matters" referred to by Justice York are regularly featuring "exposure of specified anatomical areas" and "specified sexual activities" as defined in AZR § 12-10. *There were and are no other "sexual matters" involved in this case at any time in its long history.*

41

City's unsubstantiated claim that there was no fundamental distinction for zoning purposes between 60/40 and 100% Clubs and its (patently false) assertion that it had always intended that 60/40 Clubs be regulated by the 1995 zoning, but the New York Court of Appeals did not reverse (or even address) the affirmed findings; it simply ignored them.[17]

In the present case, the trial Court noted but gave no weight to these affirmed findings.  (Dec. at 43-44)   This was a pivotal error of constitutional magnitude.  If (as found by the lower State Courts with jurisdiction over the facts) 60/40 Clubs "*no longer resemble their 1994 predecessors"* and *"no longer operate in an atmosphere placing more dominance of sexual matters over non-sexual ones,"* and *"there is no*

---

[17] The New York Court of Appeals has *no jurisdiction over the facts*; only over questions of law.  *See* N.Y. Const., Art. VI, § 3(a) ("a. The jurisdiction of the court of appeals shall be *limited to the review of questions of law* except where the judgment is of death, or where the appellate division, on reversing or modifying a final or interlocutory judgment in an action or a final or interlocutory order in a special proceeding, finds new facts and a final judgment or a final order pursuant thereto is entered; but the right to appeal shall not depend upon the amount involved."  *See, generally, People v. Maney,* 37 N.Y.2d 229, 233 (1975) ("These findings were affirmed by the Appellate Division and are supported by the record. Hence, we are deprived of jurisdiction to pass on the disputed fact questions.")

At bar, the Appellate Division did _not_ find new facts and the State Court of Appeals did *not* set aside the affirmed findings as a matter of law, but rather differed with the lower State Courts on whether the City has met its State constitutional burden of proof or not. That fundamental error by the State Court of Appeals is not reviewable by this Court. However, in exercising its Federal constitutional obligation to independently review the record, this Court should note that, in the absence of an error of law, the State Court of Appeals was bound by the affirmed findings of fact by Justice York and the Appellate Division, and should review the record in that light.

*need for the 2001 amendments,*" then the enactment of the 2001 Amendment cannot possibly pass constitutional muster under *Renton* and *Alameda Books*.

Critically, in Federal Court, there was *no* new evidence introduced regarding *the nature of the Clubs and Bookstores* or any adverse secondary effects attributable to them. The *only* new information adduced was with regard to the number of remaining businesses and the number of "available" sites at which they might legally operate if the 2001 Amendments were to be enforced. The reason for this is simple: as established before Justice York, *there are no adverse secondary effects attributable to the 60/40's*.[18]

This Court, in exercising its constitutional obligation to independently review the record should not—indeed, must not—similarly ignore the actual facts developed and affirmed findings in the State Court. And once those facts and findings are taken into account, there is no constitutionally adequate basis for the 2001 Amendments, since the City failed to establish a nexus between the "unwanted secondary effects" of eating and drinking establishments with a "predominant focus" on sexual matters, and the zoning of restricted zoning imposed on 60/40 Clubs and Bookstores by the 2001 Amendments.

---

[18] The Linz, Freeman and Focus Probe (Anastos) studies, and the expert affidavits which were submitted based on those studies, upon which Justice York relied, are all part of the record in this case, and fully support his conclusions. In sharp contrast, the City did not submit in the Federal litigation the affidavit of its "expert," McLeary, whom Justice York found not credible.

The record is clear that the 2001 Amendments were enacted *only* because the New York Court of Appeals rejected the City's argument that compliance with the 60/40 spatial formula, defining "substantial portion" for the purposes of the 1995 Amendments, was "sham compliance."  *See* Dezer, 95 N.Y.2d at 772-73 ("[t]he Zoning Resolution defines "substantial portion" by the percentage of floor area devoted to the above-mentioned adult uses")—a pivotal decision completely ignored by the trial Court in its skewed history of this case. Dec. at 25.[19]

---

[19] Curiously, the trial Court cited only to *Les Hommes,* 94 N.Y.2d 267, and only for the proposition that the stays of enforcement of the 1995 Zoning Amendments took effect after the Supreme Court denied a stay.  However, the real import of *Les Hommes* and *Dezer* was that the New York Court of Appeals soundly rejected the City's argument that compliance with the 1995 Amendments as enacted was "sham compliance."  To the contrary, the Court of Appeals held in both cases that "In the end, we must enforce the City's administrative guidelines as written. Either the stock is accessible or available, or it is not; either the appropriate amount of square footage is dedicated to nonadult uses, or it is not. Questions about whether the owner of Les Hommes had a good-faith desire to sell nonadult products, whether the 'essential nature' of Les Hommes is adult or nonadult, or whether the volume of nonadult stock is stable or profitable are not part of the inquiry here, where we are only called upon to determine whether items are accessible or available as stock. We cannot rewrite the City's guidelines to include these additional considerations." *Les Hommes,* 94 N.Y.2d at 273 (emphasis added).  And, "We agree with Supreme Court and the Appellate Division, each of which concluded that the "substantial portion" component applied in determining whether Dezer's club constituted an "adult establishment" subject to municipal regulation *** By so construing the ordinance, we accord meaning to every section of the City's own Zoning Resolution, whereas the interpretation urged by the City would effectively excise the 'substantial portion' component from the enactment in cases of eating or drinking establishments." (*Dezer*, 95 N.Y.2d at 773; citations omitted; emphasis added).

It was only after these decisions that the City went back and re-wrote the zoning ordinance *to do exactly that*: "excise the 'substantial portion' component in cases of eating or drinking establishments."

In *Dezer,* the Court of Appeals noted that "Dezer Properties, Inc. contends that 'substantial portion' analysis is applicable in determining whether its club, only a part of which is dedicated to adult activities, is an 'adult establishment' subject to regulation. *The City, by contrast, contends that any adult activity in a club in and of itself qualifies the entire club as a regulable 'adult establishment.'*" Dezer, 95 N.Y.2d at 772-73 (emphasis added.)

This was the City's argument (rejected by the New York Court of Appeals) *then* and it has remained its argument *ever since.* And—given the change in the statutory language in response to *Dezer*—it would be a winning argument *but for* one constitutionally critical fact:  there is nothing in the legislative record to support the argument that "*any"* adult entertainment in an eating and drinking establishment gives rise to "unwanted secondary effects" justifying the intrusion on expression that has been adopted.[20]

---

[20] It cannot be overemphasized that the City, without any other explanatory rationale, has gone from "substantial portion" (i.e., "<40%") to "*any* portion".  (Emphasis added.)  Thus, the zoning, as amended by the 2001 Amendments, would preclude regularly featuring even a single topless dancer no matter where situated in a premises.  For example, a single dancer on a platform behind a bar or raised in a corner of a room.  Thus, the record is barren of any evidence adduced by the City (which has the constitutional burden of proof) as to what the (presumed but unproven) "adverse second effects" would be if "substantial portion" were reduced to 33-1/3%, or 25% or 16-2/3% or 12.5%, or some other portion other than "any".  The City, with no supporting record, has simply been arguing "all or nothing" since 1998 and continues to do so *ipse dixit.*

It cannot be denied that it is the City's burden to establish the *Renton* factors in order to establish the constitutionality of the challenged restrictions on expression. *See NYS Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1, 24 (2022) ("[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions"), quoting from *Playboy Entertainment,* 529 U.S. at 816.

Here, the City (as it did in the State Court litigation, and as found by Justice York and the Appellate Division, First Department) utterly failed to prove any connection between "unwanted secondary effects" and 60/40 Clubs, and that abject failure of proof is attributable to one simple fact:  there are no "unwanted secondary effects" of 60/40 Clubs for two reasons:

*First,* the use of more than 60% of their space for non-adult purposes has eliminated any "predominant focus" on sexual matters—the lynchpin of the 1995 findings regarding 100% Clubs.

*Second,* the universal compliance (by both 100% Clubs and 60/40 Clubs) with the signage restrictions imposed in 1995 vastly reduced, if not eliminated, the impact that these Clubs had and have on their neighborhoods.

Absent proof that 60/40 Clubs have a "predominant focus" on sexual matters, similar to the 100% Clubs studied in 1994/1995, the conclusions that they cause "unwanted secondary effects" and that those effects are addressed by the challenged

zoning restrictions, is utterly unsupported and patently unconstitutional under the traditional *Renton* standards.[21]

### B. The City's conceded failure to provide sufficient alternative locations for existing businesses in Manhattan chills access to free expression.

Any assessment of whether there will be sufficient alternative avenues for communication, and how speech will fare, after implementation of the 2001 Amendments, must take into account the uniqueness of Manhattan (New York County) compared to the other four counties in New York City. The island of Manhattan is sui generis. Its preeminence as a unique bastion of free expression needs little scholarly vindication. Judge Liman acknowledges that New York City is "long considered a cultural capital of the United States." Dec. at 4. "Manhattan constitutes the City's central business district, home to 2.2 million—59.5%—of New York City's 3.8 million jobs, and further contains many of the City's attractions, including Central Park, the Empire State Buildings, and the High Line." Dec. at 111. Without adequate locations on the island of Manhattan—the City's tourist and commercial center—access to Plaintiffs' expression will not be substantially intact.

### 1. Availability of adult expression in Manhattan

Some statistics are necessary to put this important issue into context. In 1993, there were 177 adult establishments in New York City, with over 100 located in

---

[21] The same is true for the Bookstores, as set forth in the Bookstores' Brief.

Manhattan alone. CSF ¶160. Between 1993 and 2000, the number of adult establishments in Manhattan declined from 107 to 69. CSF ¶162. As of 2022, there were only 4 known 100% adult businesses operating at permissible locations in Manhattan. CSF ¶168. At the same time, there were 19 60/40 businesses in Manhattan (CSF ¶173)—all of which would have to eliminate constitutionally protected adult expression, close, or endeavor to relocate if the 2001 Amendments are enforced.

Based on the limited number of locations and 500-foot separation requirement between adult businesses, the actual number of possible relocation sites in Manhattan is disputed. According to the City, "at least 5 of these 19 60/40 businesses could not relocate in Manhattan at this time due to a lack of legally permissible and constitutionally countable locations." CSF ¶175. Plaintiffs asserted that "at least 10" of these 19 existing businesses could not relocate in Manhattan. CSF ¶175. The City ultimately revised its calculations and determined that "of the 204 simultaneously occupiable lots" in the entire City, only "5 are in Manhattan and 199 are in the [other] boroughs." CSF ¶246.

Regardless of which numbers are correct, one thing remains clear—*there are not sufficient alternative locations in Manhattan* for all of the existing Manhattan businesses required to relocate if the 2001 Amendments are enforced. Indeed, nearly 75% of the existing establishments will be unable to relocate in Manhattan (only up

48

to 5 of the 19 could simultaneously relocate in Manhattan). Nevertheless, the City urges that its failure to provide sufficient locations for establishments doing business in Manhattan is not relevant because there are available sites in other counties.

However, it is well settled that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975); *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76 (1981); *Reno v. A.C.L.U.*, 521 U.S. 844, 880 (1997); *Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939).

The trial court opinion attributes to this Court that "the First Amendment does not require 'proof of adequate available sites on a borough-by-borough basis.'" Dec. at 112, quoting *Hickerson, supra,* 146 F.3d at 108 n.5. This dicta, relegated to a footnote in *Hickerson*, certainly was not a holding. Moreover, *Hickerson* was decided in 1998, before Justice Kennedy's concurrence in *Alameda* and did not consider "how speech will fare under the city's ordinance." 535 U.S. at 450.

Regardless, *Appellants are not advocating that alternative sites must be considered on a borough-by-borough basis*. Instead, the gravamen of the claim is that Manhattan should be treated as a distinct real estate market for purposes of assessing how speech will fare when imposing this 23-year-old zoning ordinance on existing businesses. This is established in the testimony, and related exhibits, of two

49

top experts on New York City real estate and zoning issues—Dr. Hugh Kelly, Director of the Graduate Program at the Fordham University Real Estate Institute, and Dr. Elliott Sclar, Emeritus Professor of Urban Planning at Columbia University.

### 2. The "borough of Manhattan constitutes a distinct real estate market" particularly as to adult entertainment demand which is "separate and unique from the remaining boroughs."

Dr. Kelly's declaration contains extensive details and tables regarding distinct differences between Manhattan and the other counties regarding entertainment demand. It is Dr. Kelly's "professional opinion that the Borough of Manhattan constitutes a distinct real estate market, particularly as to entertainment demand generally and adult entertainment demand in specific, which is separate and unique from the remaining boroughs in New York City." Kelly Decl. ¶ 6.[22] Dr. Kelly testified that the "squeeze from both the demand and supply sides would in all likelihood amount to an existential threat to the adult entertainment industry's economic future." Kelly Decl. ¶ 80.

Dr. Sclar has been a member of the Columbia University faculty since 1978 and wrote the article on "Midtown" in the *Encyclopedia of New York City*, Kenneth

---

[22] After careful analysis, supported by statistics and research, Dr. Kelly found that if 60/40 businesses thriving in Manhattan are forced to relocate outside the county, this would result in the loss of affluent patronage, diminution of demand from weaker local resident spending, fewer tourists, and likely reduce patronage below a level of economic viability. Rents would be inflated because of "rent-seeking" burdening the displaced venues. Kelly Decl. ¶ 80.

Jackson (ed.) New Haven: Yale University Press, 1995. Sclar Decl. ¶¶ 4-5. Dr. Sclar testified that any determination—regarding the effect of the 2001 Resolution on expression—should consider the vast geographical and other differences between the island of Manhattan and the various boroughs. Sclar Reply Decl. ¶37.

Dr. Sclar testified that each of the five counties differs significantly from the others in terms of ethnicity, ancestry, economic background, race, national origin, residential patterns, occupational structure, household and marital patterns, cultural traditions and attributes, patterns of leisure use and other elements of social structure. Sclar Decl. ¶105. Judge Liman erred by completely overlooking the testimony of Dr. Sclar—one of the preeminent experts on zoning in New York City and the City's Zoning Resolution.[23]

Consideration should be given to the disproportionate number of adversely affected adult establishments located in Manhattan and the disproportionate and unique role that Manhattan plays in the life of the City's residents and visitors. Existing businesses that offer protected expression in Manhattan (New York County) should not be required to relocate to another county and thus forced to find

---

[23] The court indicated that "Plaintiffs designated as the directed testimony upon which they intended to rely at trial" and specifically enumerated the declarations and testimony of Plaintiffs' experts and other witnesses, as well as each of the City's witnesses. Dec. at 49. However, Judge Liman's recitation of the trial evidence completely omitted any reference to the two lengthy declarations submitted by Dr. Sclar, who was identified as a trial witness. List of Exhibits and Declarations at 14; Sclar Declaration; Sclar Reply Declaration.

a new audience. This is underscored by the paucity of permissible locations in Manhattan. No reasonable person would expect that businesses dependent on patrons drawn from the central business and tourist sectors could simply be removed from Manhattan locations ("dispersed" to the other boroughs) without material adverse effect on the accessibility of protected expression, and particularly to the large numbers of tourists who frequent Manhattan.

The City has not provided any evidentiary basis to conclude that the accessibility of speech would be substantially undiminished if the 60/40 business model were eliminated, forcing many businesses to close or leave Manhattan.

### 3. Localized land use concerns are relevant to zoning in New York City

Localized land use and economic concerns are extremely relevant to zoning in New York City. The Zoning Resolution considers localized concerns, rather than always proceeding on a citywide basis.[24] Indeed, the unique nature of Manhattan

---

[24] This is evidenced, in part, through the enactment of *special purpose districts* to respond to specific concerns of different communities. Sclar Reply Decl. ¶38. The Zoning Resolution creates Special Districts to "preserve and protect the variety of neighborhoods and communities that presently exist which contribute greatly to the livability of New York City." Z.R. § 103-00. They are also intended to "preserve and protect the character and integrity of these unique communities." *Id.* These include, but are not limited to the Special Clinton District, Special Little Italy District, Special East Harlem Corridors District, Special City Island District, Special Governors Island District, and Special Coney Island District.

was highlighted by the City Planning Commission ("CPC") when the original adult zoning restrictions were enacted back in 1995.

When the City held hearings before enacting the 1995 Amendments, "[s]ome testimony suggested that more establishments should be allowed in Manhattan because it is the traditional location of adult establishments and because of its high density of development and land use." 1995 CPC Report at 46. "Other testimony expressed fear that limiting the number of available sites in Manhattan would result in displacing 'Manhattan' adult uses to the other boroughs, along with their adverse secondary effects." *Id.*

The CPC recognized that "a majority of the existing uses are in Manhattan" and the "density of development generally and the number of potential users— workers, residents, tourists and other visitors—is greater in Manhattan than in the other Boroughs." 1995 CPC Report at 47. As a consequence, back in 1995 the City Planning Commissioner believed "it is appropriate on a land use basis to modify the proposal slightly *to allow more potential sites in Manhattan*." *Id.* (emphasis supplied). Nevertheless, if the lower court is upheld only a fraction of the establishments offering adult speech in Manhattan will remain.

Land use concerns in the other counties are, for the most part, outside the electoral reach of the residents of Manhattan, whose rights will be abridged. Under the Uniform Land Use Review Procedure ("ULURP"), mandated by the City

Charter, residents of one borough have no advisory capacity as to how land use decisions occur in other boroughs. Sclar Reply Decl. ¶42. Who is allowed to review and advise on land use determinations depends upon the scope of the Community Boards impacted by the decision. Each borough has its own President and Borough Board, which are involved in reviewing zoning plans and improvements for the specific borough. Sclar Decl. ¶107.

As a consequence, Manhattan residents in both a formal and effective political advisory sense are shut out of land use decisions in the other boroughs. Sclar Reply Decl. ¶42.[25] As recognized by Justice Blackmun concurring in *Schad v. Mt. Ephraim*, 452 U.S. 1, 78 (1981), "I would not expect my right to attend the theater or to purchase a novel to be contingent upon the availability of such opportunities" in a "community in whose decisions I would have no political voice." Speech is not free if it is heavily burdened and only accessible in another domain. Even if citywide zoning was proper when the 2001 Amendments were enacted, which is disputed, that does not absolve federal courts from considering the effect on expression when the ordinance is enforced.

---

[25] Staten Island has even attempted to secede from New York City because of its sense of independence as well as demographic and economic differences, which alienate it from the other four boroughs. Sclar Decl. ¶ 106.

**4. The Manhattan borough president opposed the 2001 Amendments and found that "few, if any, secondary effects have been observed and that the affected communities feel no need for further protection."**

The Manhattan Borough Board opposed the 2001 Amendments. CPC Report at 23. Similarly, the Manhattan Borough President recommended disapproval and stated that "few, if any, secondary effects have been observed and that the affected communities feel no need for further protection." CPC Report at 24.

Indeed, the Community Boards in Manhattan, with the largest number of 60/40 businesses, *all opposed* the 2001 Amendments. 2001 CPC Report at 21;. Community Board 4, which encompasses the westside of Manhattan from 14th Street to 59th Street / 8th Avenue to the Westside Highway, stated that "further protections from adult establishments are unneeded." 2001 CPC Report at 21. Community Board 5, which includes Midtown and Times Square, down to 14th Street, said the "proposal is unneeded and overbroad." 2001 CPC Report at 21. Community Board 7, the Upper West Side of Manhattan, stated that the regulations are "unwarranted and unenforceable intrusions on constitutional rights." 2001 CPC Report at 21.

In marked contrast, the Community Boards, Borough Boards, and Borough Presidents outside Manhattan supported the 2001 Amendments, and did not want adult businesses (historically located in Manhattan) to come into their neighborhoods. For example, Community Board 7 in Brooklyn unanimously recommended "removal of all adult establishments in the community, and more

55

restrictive regulations for adult establishments." CPC Report at 20. Staten Island Community Board 3 seemed to want it to be even more restrictive *See* CPC Report at 22-23.

It makes no sense to remove existing businesses from Manhattan—where they are wanted and not found to cause adverse consequences—and force them to endeavor to locate in communities where they are not wanted.  Instead, it makes a lot of sense to keep the businesses in Manhattan, rather than "burden" other communities with them.

### 5.    The requirement to travel to the other boroughs will effectively eliminate speech

Many of the permissible areas are on remote parts of Staten Island (Richmond County), where the City concedes "transit accessibility from outside the borough is more limited than in similar areas in other boroughs, due to lack of robust public transit options."[26] Amron Decl. ¶19. It would take "1 hour and 53 minutes during rush hour"—including a 2.6 mile walk—to get from a bookstore at 336 Eighth Avenue to the only bookstore with booths on Staten Island. Knecht Decl. ¶31. The

---

[26] Dr. Sclar's declaration includes maps showing the Staten Island subway line super imposed on the City's map of permissible areas in Staten Island, from 1995. Because of rezonings and other issues, there is less space now. The permissible areas are not anywhere near the only train line in Richmond County. Sclar Decl. ¶ 109; Sclar Decl. Exs. 11 and 12. It costs $17 just to drive to Staten Island, which is not accessible by the City's subway system. Shachaf Decl. ¶ 18.

accessibility of speech with be severely compromised if customers are forced to travel to the fringes of other counties to access constitutionally protected expression.

The First Amendment does not guarantee the right to communicate one's views at all times and places or at any manner that may be desired. However, "it must be sufficiently clear that alternative forums for the expression of respondents' protected speech exist." *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 654 (1981). And, the "First Amendment protects the right of every citizen to 'reach the minds of willing listeners and to do so there must be opportunity to win their attention.'" 452 U.S. at 655. The vast majority of willing listeners are in Manhattan, as evidenced by the fact that these businesses have been located in these areas for decades. If they are banished from the entertainment capital, there will be no opportunity for them to win their listeners' attention.

### C. The Kennedy Test: how speech will fare

The trial Court devoted significant time and effort to explaining the Kennedy Test. Dec. at 61 et seq.  However, the fatal flaw in the trial Court's application of the Kennedy Test is that the record was barren of any evidence showing that at the time of enactment of the 2001 Amendments the City made any effort whatsoever to establish or understand "how speech [would] fare" under them.

The trial Court correctly held that Justice Kennedy did intend to put a substantive gloss on the *Renton* standards by adding a new element to them.  But it

misread *TJS, supra,* both in finding that "TJS specifically took account of Justice Kennedy's *Alameda Books* concurrence" and concluding that "this Court is not permitted to indulge the assumption that the Second Circuit did not take sufficient account of the current Supreme Court jurisprudence" and "[t]he Court is … bound by the Second Circuit's decision in *TJS.*"

In fact, in *TJS,* this Court did not even mention *Alameda* in the body of the Opinion.  The sole reference to *Alameda* was in *TJS* footnote 5, in which Judge Calabresi noted that in *Alameda* Justice Kennedy had agreed with Justice Brennan's dissent in *Renton,* to the effect that zoning of adult entertainment is not "content neutral." *TJS, 598 F.3d at 22* n.5, (and Justice Souter, in dissent in *Alameda,* had characterized such zoning as "content correlated").  *The words "how speech will fare"* (or any equivalent) *do not appear in TJS* and the panel simply did *not* consider, in that case, how The Kennedy Test affects the *Renton* analysis.

In any event, regardless of whether the District Court was "bound by the Second Circuit's decision in *TJS*" or not, Dec. at 67, this Court certainly has the ability to consider (or reconsider) the issue and, upon doing so, should hold for plaintiffs' that the City at the time the 2001 Amendments were adopted, utterly failed to carry its burden of showing "how speech [would] fare" under the enactment.

It is undisputed that in enacting the 1995 Amendments to the Zoning Resolution, the City did *not* study or make any findings as to "how speech [would]

fare" if the "substantial portion" (i.e., what became the "60/40" test) were eliminated from the definition of "adult eating and drinking establishment".  The reasons for this are simple: (a) The Kennedy Test had *not* as yet been formulated, (b) "60/40" Clubs (and bookstores) did not exist in New York City or anywhere else, and (c) the 1995 Amendments *relied* on the fact that Clubs that devoted less than 40% of their customer-accessible floor space to adult entertainment (as defined) would continue to provide such protected expression, thereby passing muster under *Renton* as it was then (and continues to be) understood by the City.  Thus, only "adverse secondary effects" were studied; *not* "how speech [would] fare."

Likewise, in enacting the 2001 Amendments, the City did *not* conduct any study of "adverse secondary effects" or anything else.  Rather, in reaction to the New York Courts of Appeals decisions in *Les Hommes, supra,* and *Dezer Properties, supra,* the City took the position that 60/40 businesses continued to have the same predominant focus on sexual matters as 100% businesses studied in 1994/1995, *see* CSF ¶23, 25, and therefore could be presumed to cause the same "negative" or "adverse" secondary effects and regulated on the basis of the earlier studies.  But, in doing so, the City did *not* consider "how speech [would] fare" as a result of the elimination of the 60/40 Clubs—the very form of business featuring protected expression upon which the 1995 Amendments relied for constitutional justification.

The District Court opinion likewise does *not* analyze—because the record is barren of any information on which findings could be predicated—of "how speech [would] fare" judged as of the enactment of the 2001 Amendments eliminating 60/40 Clubs and severely restricting the operation of 60/40 Bookstores.  Simply put, the question was *not* asked or answered in 2001, nor subsequently.

The District Court (treating "how speech will fare" as an element of the second *Renton* factor) acknowledged that in order to sustain an enactment under The Kennedy Test, "the zoning ordinance must be designed to reduce the costs of secondary effects without substantially reducing speech." Dec. at 62 (internal quotation marks deleted). But, here, the City made *no attempt* to demonstrate that the 2001 Amendments "reduce the costs of secondary effects without substantially reducing speech," and the trial Court made *no such findings.*

The District Court went on to explain (Dec. at 72) that: "Just as the municipality must have some pre-enactment evidence of secondary effects, *see White River Amusement Pub. Inc. v. Town of Hartford*, 481 F.3d 163, 171 (2d Cir. 2007)*, so too must it have some pre-enactment information regarding how speech will fare under the ordinance*, see *Tollis Inc. v County of San Diego*, 505 F.3d 935, 940 (9th Cir. 2007). If the municipality's rationale is one to redistribute the locations where speech occurs without reducing its volume or quantity in order to address secondary effects and not simply to ban or reduce speech outright, then the ordinance

60

is subject to intermediate scrutiny and the alternative avenues for communication are judged at step three of *Renton* based on physical and legal availability at the time of the litigation." (Emphasis added.)

In this case, there was *neither* pre-enactment evidence of secondary effects attributable to 60/40 businesses (which did not exist in 1994/1995 when secondary effects were last studied), *nor* pre-enactment information regarding how speech will fare under the ordinance, since this was not studied at any time.

In the trial Court's view, "the relevant question here is the City's rationale at the time of adoption and *whether at the time of adoption there is 'sufficient evidence to support the proposition* ….'" Dec. at 74 (emphasis added). However, having thus framed the question, the trial Court failed in its inquiry, for the simple reasons that (a) "the City's rationale at the time of the adoption" of the 2001 Amendments was to legislatively veto the New York Court of Appeals holdings in *Les Hommes, supra,* and *Dezer, supra,* and (b) at the time of the adoption of the 2001 Amendment there was *no evidence* to support the proposition that protected expression would not be disproportionately affected adversely by elimination of 60/40 Clubs—a mainstay of the 1995 Amendments.   There was no study.  There was no analysis.  There was simply the (utterly disingenuous) argument that it was the "original intent," of the 1995 Amendments (*see, e.g,* Karnovsky Decl. ¶63) to regulate *all* adult eating and drinking establishments regularly featuring *any* adult entertainment (as defined),

61

regardless of much or how little of the premises was used for that purpose (including *de minimis* usage).

This was, at best, a complete re-writing of the history of the regulation of adult Clubs. But, putting that aspect aside, there was simply no pre-enactment information available to the City as to "how speech [would] fare" under the 2001 Amendments, and the trial Court points to none in its opinion.

Likewise, the trial Court held that, to support the 2001 Amendments, the City had to have had a "*reasonable expectations regarding how speech [would] fare.*" Dec. at 74 (emphasis added). But here there was *no such expectation expressed by the City*, nor could it have been reasonable, since there was *no information* on which to base such an expectation. There was *no projection* of how many Clubs would be able to remain at their present locations and how many would be forced to close or move, nor any contemporaneous data on which such a projection could have been based. Likewise, there was *no projection* of the impact of forcing clubs to move from the Central Business District in Manhattan to the other Boroughs (particularly Staten Island), nor data on which such a projection would have been based. There was simply *a complete absence of information* on which there could be any "reasonable expectation regarding how speech [would] fare," given that the 1995 Amendments had already been in effect for several years, the number of adult establishments had already been reduced, and there was generalized compliance

with the 1995 signage regulations, making it utterly unreasonable to rely on 1994/1995 facts and figures (which, moreover, were not even considered in the effort to deal legislatively with fictious "sham compliance").

In short, the record is barren of *any* evidence that the City *ever* considered "how speech [would] fare" if the 2001 Amendments were enacted, much less that the City has a "reasonable expectation" that it was not disproportionately eliminating protected speech under the "secondary effects" banner. Accordingly, the 2001 Amendments fail The Kennedy Test and should have been (and should be) declared unconstitutional on that ground alone.

**Point III: The District Court erred in concluding that a finding of the constitutionality of adult zoning amendments automatically requires a finding of the constitutionality of discriminatory provisions requiring termination of only adult nonconforming commercial uses, but of no other nonconforming commercial uses.**

The District Court rejected Appellants' constitutional challenges to the "mandatory termination" provision of the AZR.  Dec. at 118.  In doing so, among other things, it erroneously held that the fact that the mandatory termination provision "treats adult entertainment businesses differently from other establishments by requiring adult establishments that do not conform to the 2001 Amendments to close within one year of the date that the law goes into effect, while allowing other non-conforming uses to operate indefinitely or for longer periods of time" did not deny Appellants the Equal Protection of the Law guaranteed by the Fourteenth Amendment.  Dec. at 126.  In fact, however, it does and the District Court's conclusion in this regard should be reversed.

The District Court acknowledged that Free Expression is a "fundamental right," but reasoned that because the City has established the constitutionality of the 2001 Amendments eliminating the 60/40 business model for the Clubs (and substantially restricting the operation of the Bookstores), the "mandatory termination provisions" were subject only to "rational basis" review, and the City satisfied that standard because the 2001 Amendments were intended to "limit what it has determined are the secondary effects of adult establishments."  Dec. at 127.

But the fallacy in that analysis is glaring.  The lynchpin premise—that 60/40 establishments caused the same adverse secondary effects as 100% establishments— was never studied or proven, in New York City or anywhere else.  It was (and remains) simply an *ipse dixit* assertion that the City advanced in response to its losses in *Les Hommes, supra,* and *Dezer, supra,* and which the New York Court of Appeals adopted in *For The People Theatres, supra,* but was never supported by a scintilla of evidence (as expressly found by both the New York County Supreme Court and the Appellate Division, First Department). *For The People Theatres of NY, Inc. v. City of New York,* 38 Misc.3d 663 (Sup. Ct. N.Y. Co. 2012), *aff'd* 131 A.D.3d 279 (1st Dept. 2015).

Moreover, the "mandatory termination" provision is blatantly discriminatory. As the District Court itself noted, Dec. at 125, it "treats adult entertainment businesses differently from other establishments by requiring adult establishments that do not conform to the 2001 Amendments to close within one year of the date that the law goes into effect, while allowing other non-conforming uses to operate indefinitely or for longer periods of time."

The record is again barren of any evidence supporting the proposition that this discrimination between uses is justified by "secondary effects" or any other consideration. There is no possible justification for requiring existing businesses featuring protected Free Expression to close their doors absent proof of secondary

effects. As Justice Kennedy said in *Alameda*, "a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact. * * * The rationale of the ordinance must be that it will suppress secondary effects—and not by suppressing speech." *Alameda*, 535 U.S. at 449-450.

Because the claim of "limiting secondary effects" upon which the City and the District Court relied to justify the discriminatory "mandatory termination" provision, is wholecloth, the cases cited by the District Court are inapposite. Here there is no "differential treatment … warranted by the different secondary effects" and there is no "sufficient rationale" to justify imposing the shortest termination period on these businesses.

 Indeed, as the District Court itself noted:

> The amortization period for adult entertainment uses in New York City is shorter than that for other uses that either have a longer period of amortization, see 2001 Z.R. § 52-74 (requiring amortization within ten years of enactment of uses such as open-air dumps, lumber yards, manure storage, and scrap metal heaps), or that need not relocate at all.  [Dec. at 128]

Contrary to the conclusion reached below, the City has not articulated a rational basis for that distinction.[27] Furthermore, even, assuming, *arguendo,* that the

---

[27] The exact same business, *e.g.,* a licensed bar, without the "adult" component, would not be subject to "mandatory termination."

District Court was correct in concluding that the "mandatory termination" provision is constitutional, it erred in concluding that the "mandatory termination" provision did not nonetheless have to be "narrowly tailored."  Appellants urged that in the circumstances of this case "narrow tailoring" by "grandfathering" of existing, otherwise legal businesses—the traditional approach to rezoning—is required in order to strike the proper constitutional balance.   Unlike the City's  completely unjustified "close or move" approach, permitting the existing businesses to operate, while forcing new entries to locate in dispersed areas, would much more satisfactorily answer Justice Kennedy's question of "how speech will fare" under the new rules and address the central concerns he raised in *Alameda Books:* that the quantity and accessibility of protected speech not be diminished; that there be no impermissible discrimination against protected speech; and that protected speech not be attacked under the guise of attacking secondary effects.

In this case, "narrow tailoring" through "grandfathering" of existing businesses is the only constitutional solution to the City's attempt to essentially "wipe out" adult entertainment in all but a few locations—most of which are functionally inaccessible to the majority of people who presently patronize Appellants' and similar businesses—and the District Court erred in concluding that because the 2001 Amendments were (in its view) constitutional, it did not have to require that the "mandatory termination" provision be "narrowly tailored."

67

**Point IV: The District Court erred in using the test for truly content neutral time, place and manner restrictions to evaluate the validity of the 2001 Amendments.**

Prior to *Alameda Books, supra,* the zoning of "sexually oriented" or "adult" businesses, based on the desire to eliminate or minimize adverse secondary effects, was regarded as a "content-neutral" "time, place, and manner restriction," subject to intermediate scrutiny in accordance with *Renton* and earlier cases.

However, in *Alameda, supra,* for the first time, a majority of sitting justices on the Supreme Court agreed, in the same case, that such regulations are not "content neutral," but rather "content based" (Justice Kennedy)[28] or "content-correlated" (Justice Souter, Stevens, Ginsberg and Breyer).[29]

This Court has itself recognized that it is "by no means clear whether or how the content-neutrality requirement applies in adult entertainment zoning cases," *TJS, 598 F.3d at 22,* and "whether such ordinances are in fact content-neutral is a tricky question." *Id. at n.5.*

Building on his central premise that "content neutrality" was a "fiction" and that adult entertainment zoning ordinances are, in reality, "content based," but

---

[28] "These ordinances are content based, and we should call them so." *Alameda, 535 U.S. at 457* (Kennedy concurrence).

[29] "It would in fact make sense to give this kind of zoning regulation a First Amendment label of its own, and if we called it content correlated, we would not only describe it for what it is, but keep alert to a risk of content-based regulation that it poses." *Alameda, 535 U.S. at 457* (dissent).

nevertheless subject to heightened intermediate (rather than strict) scrutiny,[30] Justice Kennedy added the analysis of "how speech will fare" (i.e., the "Kennedy Test") to the traditional *Renton* test for "time, place, and manner" restrictions on speech that are truly "content neutral."  See Point II(C), *supra.*

The District Court here misread *TJS,* misconstrued the Kennedy Test as requiring only that at Step Two of the Renton analysis, "consideration … of whether the municipality considered how speech would fare under its contemplated ordinance" (Dec. at 75); and, as a result, subjected the challenged provisions only to barely modified traditional intermediate scrutiny under the *Renton* test, rather than the higher standards clearly imposed by the Kennedy Test, in recognition of the reality that adult zoning ordinances are "content based," not "content neutral."

In *TJS,* this Court did not discuss the Kennedy Test ("how speech will fare") *at all*.  The sole reference to *Alameda* in the *TJS* opinion was in a footnote addressing the issue of whether adult zoning restrictions are "content neutral" or not, and on this question the Court punted, electing "for the purposes of our analysis here, [to] assume that Smithtown has not violated whatever content-neutrality requirement may apply to adult entertainment zoning ordinances."  *TJS,* 538 F.3d at 22 at n.5.

---

[30] But, see, the later cases of *Reed*, and *City of Austin*, holding that content-based restrictions on expression are subject to strict scrutiny, as discussed at length in Point VI, *infra*.

Thus, contrary to the conclusion reached by the District Court, *TJS* left the issue open for future litigation.[31]

We shall establish below that Justice Kennedy clearly intended more than superficial modification of Step Two of the *Renton* test. However, before doing so, we must note that even if, *arguendo,* the District Court was correct in that conclusion, the record is barren of any evidence that the City considered, in connection with adoption of the 2001 Amendments, "how speech will fare". In sharp contrast, that issue was subsumed in the 1995 City Planning Commission Report, which—predicated on the "substantial portion" test (i.e., the 60/40 Rule) which was an integral part of the 1995 enactment—projected that under the proposed (subsequently enacted) 1995 Zoning amendments there would be more than sufficient outlets for protected expression.

But there was no such consideration given to "how speech will fare" in 2001, when the City's focus was on undoing the *Les Hommes* and *Dezer* decisions by the New York Court of Appeals and eliminating the 60/40 business form for Clubs and

---

[31] Appellants did not request that the District Court "indulge the assumption that the Second Circuit did not take sufficient account of the current Supreme Court jurisprudence." Dec. at 65. Rather, Appellants urged that this Court, in *TJS,* did not cite to or analyze application of the "how speech will fare" question clearly added to the Renton Test by Justice Kennedy. This is not an "assumption." The issues addressed and not addressed in *TJS* are clear from that opinion, and this Court's assumption "for the purposes of our analysis here," *TJS,* 538 F.3d at 22 n.5, that the zoning ordinance challenged in *TJS* "does not violate whatever content-neutrality requirement may apply to adult entertainment zoning ordinances" clearly side-stepped the issue and left it open for another day.

severely restricting it for Bookstores.  There were no studies; no projections; no attempt made to quantify or mitigate the reduction in protected speech if the 2001 Amendments were adopted.  Regardless of the extent of Justice Kennedy's intended modification of the *Renton* analysis; *i.e.,* addition to Step Two or a separate new factor, the simple fact of the matter is that the City did not have any "pre-enactment information regarding how speech will fare under the ordinance" (Dec. at 72), and, therefore, the 2001 Amendments fail the Kennedy Test even as analyzed by the District Court.

But the reality is that Justice Kennedy did not intend such a minimal modification in the constitutional evaluation.  Recall that, unlike the *Alameda* plurality and prior caselaw, he had just (finally) prevailed in marshalling a majority of the Court to hold that content neutrality was a fiction, and that adult zoning ordinances are content based (or content correlated).  Accordingly, as recognized by the District Court:

> Justice Kennedy's concurrence in *Alameda Books* articulated different tests than th[ose] articulated by the plurality. *** His concurrence can only be understood in the context of the opinion to which he was responding. The *Alameda Books* plurality believed that the claim necessary to establish content neutrality and to justify intermediate scrutiny was a relatively modest one. It stated that an ordinance would be deemed content neutral so long as it "was aimed not at the content of the films shown at adult theaters but rather at the secondary effects of such theaters." *Alameda Books*, 535 U.S. at 434, 122 S.Ct. 1728 (citing *Renton*, 475 U.S. at 47–49, 106 S.Ct. 925). *** It is this proposition that Justice Kennedy took aim at in his opinion

71

concurring in the judgment. In his view, the plurality's analysis "fail[ed] to capture an important part of the inquiry." *Id.* at 450, 122 S.Ct. 1728.

The "important part of the inquiry" is "how speech will fare." Justice Kennedy himself at no point stated that the inquiry was part of *Renton* Step Two, or only limited to the time of enactment, and these conclusions fail to give sufficient weight to the "importance" of the inquiry. Moreover, Justice Kennedy was clear in his analysis that answering the question of "how speech will fare" was part of the City's initial burden to justify the ordinance on its face (and thereby avoid summary judgment of unconstitutionality), but then was subject to re-examination at the trial: " In Justice Kennedy's words: "if these assumptions can be proved unsound at trial, then the ordinance might not withstand intermediate scrutiny." *Alameda*, 535 U.S. at 453.

What, then, is the issue to be tried? Whether the City studied/projected "how speech will fare" at the time of enactment—which is a question quickly answered by reviewing the legislative history and presents no issue for trial, or, rather "how speech will fare" if the enactment is held constitutional and enforced after trial—i.e., at the time of the challenge, not the enactment?

Here the record does not establish consideration of "how speech will fare" at the time of enactment. Accordingly, for that reason alone, the 2001 Amendments fail the Kennedy Test and should be declared unconstitutional on their face.

72

However, assuming the 2001 Amendments survive the "time of enactment" inquiry, they certainly fail to survive the "at trial" inquiry. As noted above, the City's trial evidence utterly failed to grapple with the issue of "how speech will fare" in the event the 2001 Amendments are enforced. The City's evidence at trial was quantitative (not qualitative) and addressed to the traditional *Renton* "available alternative sites" issue: how many legal sites could be occupied by adult businesses if forced to move from the existing locations? But the City admittedly did not take into account any other factors that "common experience" (another factor expressly cited by Justice Kennedy) bear on the answer to the question of "how speech will fare," including transportation, infrastructure, distance from the central business district in Manhattan—all of which, ultimately, bear on the commercial viability of the "available alternative sites" and likelihood that existing businesses can be reasonably expected to relocate to them and those seeking access to the protected Expression will frequent them.

It goes without saying that without such a reasonable expectation the 2001 Amendments fail the Kennedy Test, because they will disproportionately reduce speech while having little, if any, impact on secondary effects.

Appellants argued below that Justice Kennedy's controlling concurrence in *Alameda* required consideration of "commercial viability" in the context of "how speech will fare." The District Court's view that it was precluded from this analysis

73

by *TJS* was clearly erroneous. *TJS* did not discuss the issue of "commercial viability" in the context of the Kennedy Test ("how speech will fare"). *TJS* did not cite *Alameda* in the body of the opinion, nor did the body of the opinion mention Justice Kennedy or the Kennedy Test. The only citation to *Alameda Books* and mention of Justice Kennedy, as noted above, was note 5, discussing whether adult zoning ordinances are "content based" / "content correlated" or "content neutral." There was no discussion whatsoever of "commercial viability" in the context of the *Alameda Books* decision generally or Justice Kennedy's concurrence specifically. Accordingly, the District Court's rejection of Appellants' "commercial viability" argument as foreclosed by *TJS* is clearly erroneous.

In any event, this Court can and should revisit its "commercial viability" holding in *TJS* in light of the Kennedy Test. The traditional *Renton* question of "how many alternative available sites are there?" simply does not suffice to answer the "important part of the inquiry" added by Justice Kennedy: "how will speech fare?" If there are hundreds of alternative sites but for reasons of commercial viability "common experience" teaches us that they are not commercially viable and will not support the businesses forced to relocate, then protected speech will not fare well under the 2001 Amendments and they violate Justice Kennedy's "prime directive" of not reducing speech under the guise of reducing alleged secondary effects; ergo, they should be declared unconstitutional and enjoined.

**Point V: The District Court erred in its application of the three-part test for evaluating adult zoning ordinances required by a majority in *Alameda* by considering only the evidence presented by the City in the first part of that test and not evaluating the evidence presented by plaintiffs which a court is required to consider under the second part of that test.**

*Alameda* describes a three-step approach for evaluating adult zoning ordinances. First, the municipality must identify evidence that "fairly support[s]" its rationale for the ordinance. *Alameda*, 535 U.S. at 438. Second, the plaintiffs can introduce evidence to "cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings." *Alameda* at 438-39. And third, if the plaintiffs succeed in casting doubt on the municipality's rationale, "the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Alameda* at 439.

As articulated by the district court below, the City's rationale for the 2001 Amendments was to eliminate the negative secondary effects—"increased crime rates, depreciation of property values, deterioration of community character, and the quality of urban life"—that were caused by 60/40 establishments. Opinion at ECF 89.

At the first step of its analysis, even though the data relied upon was from before 1995 and the adoption of changes that created the 60/40 structure, the trial

court uncritically accepted the City's contentions that its evidence showed a link between these secondary effects and 60/40 establishments. *See* Opinion at ECF 88-89. The court concluded that this evidence "fairly support[ed]" the City's stated rationale for the 2001 Amendments.

However, in the second step the court significantly discounted the plaintiffs' evidence. The most obvious pieces of that evidence were the stipulated facts that the City had made no investigation into whether 60/40 establishments ever caused negative secondary effects at all. *See* CSF ¶34. For that matter, while the City contends that the 2001 Amendments were necessary to reduce the secondary effects they had found prior to 1995, the City admits and stipulates that it never actually investigated whether the negative secondary effects *even still existed* after the 1995 amendments were implemented and the first 60/40 establishments appeared. *See* CSF ¶34. Definitionally, there was no evidence connecting 60/40 establishments with anything that existed prior to their existence. The absence of any evidence linking 60/40 establishments and secondary effects certainly "cast[s] direct doubt on [the City's] rationale," *Alameda* at 438, such that step three should have been implemented and the burden "shift[ed] back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Alameda* at 439.

But the plaintiffs' evidence is even stronger than pointing out the mere absence of the City's evidence. The plaintiffs affirmatively introduced their own *contrary* evidence, showing that the very secondary effects that the City had sought to eliminate in 1995 had in fact been substantially reduced or eliminated already by 2001. In particular, violent crime and property crime had fallen by more than two thirds by 2001, *see* Freeman Aff. ¶20-21 & Fig. 1. Violent crime and property crime have continued to fall since 2001, despite the continued existence of 60/40 establishments, *id.*, and incomes and property values have showed the same positive trends. *Id.* at ¶22-23 & Fig. 2-3.

What's more is that the plaintiffs' evidence further showed that those secondary effects were not correlated (let alone caused by) 60/40 establishments in the first place—the record supports the conclusion that the majority of the negative secondary effects were actually most closely linked to "garish" (or "loud") facades or signage, rather than the mere presence of adult businesses of any type (especially 60/40 businesses). *See* CSF ¶31, ¶200 (DOB's former Building Inspector testifying to changed signage conditions); Focus Probe study, JNR Ex. 64 (linking neighborhood conditions to types of signage).

Despite being required to balance this evidence against the City's evidence in step two of the analysis, the trial court did not do so.

The trial court even said that the plaintiffs' evidence did not address the most important question at issue: "whether, if 60/40 establishments are exempted from the zoning regulations imposed on other businesses that predominantly offer sexually explicit fare on an ongoing basis, the effect of those zoning regulations will be undermined and the secondary effects they generate will be left unaddressed." Dec. at 92.

This conclusion is flatly wrong. As just discussed, the record shows that 60/40 establishments *have* been exempted from the City's adult zoning regulations for nearly thirty years—since 1995. In all that time, the effect of those zoning regulations has *not* been undermined, and the secondary effects from adult uses *have not* been left unaddressed. The 60/40 approach which created businesses that were predominately not adult has been proven effective. Unlike the city of the early 1990s, today's New York City is thriving.

The plaintiffs' evidence was more than sufficient to "cast direct doubt on [the City's] rationale," *Alameda* at 438, for the 2001 Amendments. Because of this, the district court should have implemented step three and shifted the burden back to the City "to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Alameda* at 439.

In his *Alameda* dissent, Justice Souter warned that courts must not fail to require municipalities to meet their evidentiary burdens in justifying their

78

ordinances. He wrote that "precisely because this sort of evidence is readily available, reviewing courts need to be wary when the government appeals, not to evidence, but to an uncritical common sense in an effort to justify such a zoning restriction. It is not that common sense is always illegitimate in First Amendment demonstration. . . . But we must be careful about substituting common assumptions for evidence, when the evidence is as readily available as public statistics and municipal property valuations, lest we find out when the evidence is gathered that the assumptions are highly debatable." *Alameda* at 459 (Souter, J., dissenting).

That is precisely the trap into which the district court here fell. It was error to fail to require the City to meet its burden under the third part of the test, and this Court should vacate and remand for that reason.

**Point VI: The District Court erred in concluding that the standards for evaluating adult zoning ordinances articulated in *Renton* were not modified by *Reed* and *City of Austin*, which rejected the "content neutral purpose" basis for upholding otherwise content-based time, place and manner restrictions on expression.**

The District Court concluded that the 2001 Amendments were a "content neutral" "time, place and manner" restriction on protected speech, to be evaluated under the traditional standards of *Renton,* 475 U.S. 41, and that those standards were not modified by (a) either the "different tests" articulated in Justice Kennedy's controlling concurring opinion in *Alameda,* 535 U.S. at 440, or (b) the subsequent holdings by the Supreme Court in *Reed,* 576 U.S. 155 and *City of Austin,* 596 U.S. 61.

We have already addressed the Kennedy Test ("how speech will fare") at length; see Points II(C) and IV, *supra,* and have noted that *Alameda* established, among other things, that adult entertainment zoning ordinances are not "content neutral" but rather "content based" (or "content correlated"), requiring additional inquiry beyond that called for under *Renton,* and that the District Court erred in its conclusions that the Kennedy Test was a minor gloss on Step Two of the *Renton* Test, and only applied at the time of enactment, not the time of trial.

But the District Court also erred in concluding that the *Renton/Alameda* standards have not been superseded by the holdings of the Supreme Court in its more recent decisions in *Reed* and *City of Austin*.

In *Reed,* 576 U.S. at 163, the Court explained that:

> The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., Amdt. 1. Under that Clause, a government, including a municipal government vested with state authority, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. *** This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. *** Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

> Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be " 'justified without reference to the content of the regulated speech,' " or that were adopted by the government "because of disagreement with the message [the speech] conveys," *** Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

In short, under *Reed,* content based restrictions (i.e., abridgements) of protected speech are not subject to intermediate scrutiny, but rather "are subject to strict scrutiny," requiring the government to establish that the ordinance is "narrowly tailored" to address a "compelling governmental interest." Here, the City attempted to prove neither and the District Court rejected Appellants' argument that strict scrutiny is required.

The Reed Rule, that "content based" restrictions on speed are "subject to strict scrutiny," was underscored in *City of Austin*, *supra,* in which the Supreme Court reiterated both that "[a]regulation of speech is facially content based under the First Amendment if it "target[s] speech based on its communicative content"—that is, if it "applies to particular speech because of the topic discussed or the idea or message expressed," and that "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." 596 U.S. at 69, 74.

In this case, there can be no doubt that the 2001 Amendments are "content based". First, because the Supreme Court said as much in *Alameda*. And second, because the exact same business (e.g., a licensed bar or cabaret), in the exact same location, would not be subject to the restriction if it did not "regularly feature" adult entertainment as defined by the AZR. This would be true even if the business were a traditional "night club" that regularly featured non-adult entertainment and

regardless of any alleged secondary effects attributable to the business.  It is only the constitutionally protected "adult" entertainment that leads to the challenged regulation.[32]  Nothing else.

Thus, the "adult entertainment zoning" challenged in these cases is "content based" and subject to (a) strict scrutiny under *Reed* and *City of Austin,* or alternatively (b) heightened intermediate scrutiny in accordance with Justice Kennedy's concurrence in *Alameda*.  Accordingly, in either case, the District Court clearly erred into employing the *Renton* test to evaluate the constitutionality of the 2001 Amendments at trial and the judgment appealed from should be reversed on that ground.

---

[32] The same may be said of the Bookstores.  A traditional bookstore would not be subject to the challenged restrictions, regardless of alleged "secondary effects."  It is only the presence of "adult" materials that leads to the regulation; nothing more.

**Point VII: The District Court erred in failing to find that the zoning restrictions fail, on their face, to allow a reasonable opportunity to relocate, due to their authorization of a sensitive use veto which created a well-documented chilling effect on the Plaintiffs' willingness to relocate.**

In the alternative to their request to enjoin enforcement of the City's mandatory termination requirement for termination for adult nonconforming businesses (and no others), Appellants also requested the lesser relief of merely enjoining enforcement of those requirements until such time, if ever, as the City modified its scheme for, inter alia, the permitting of adult businesses, so as to provide them with a reasonable opportunity to relocate.  See, e.g., Doc. 198.[33]

Wholly apart from their prior restraint challenges to the *permitting* scheme, Appellants asserted that the City's provisions for *vesting* of adult businesses denied them a reasonable opportunity to relocate for the reason that, both on its face and in fact, it allows for a "sensitive use veto"—something found facially unconstitutional in the only published case to have considered it, *Simi Valley*, 216 F.3d 807. Appellants presented substantial evidence that an attempt to block a club permit application through a sensitive use veto had already occurred and, based on that experience and on the relevant City Rule on vesting of adult businesses which allows such vetoes, the Club Appellants were all reasonably fearful it would be used again

---

[33] As noted *supra*, the briefing for trial was exclusively that provided by the parties' renewed motions for summary judgment and their supporting memoranda.

in the future should they attempt to proceed with the enormous capital outlay to establish another adult eating or drinking establishment. Each Appellant submitted objectively very reasonable declarations stating that their knowledge of how the system now works, combined with their knowledge of how sensitive uses and, more importantly, competitors, could and very likely would use it against them in the future, chilled and deterred them from any current attempt at relocation even if they should be lucky enough to find a reasonable site at which to relocate.

The District Court's Opinion analyzed the merits of Appellants' claim at Doc. 228, pp. 151-154, and rejected it on two bases, both of which are incorrect: (1) it erroneously concluded that the *Simi Valley* case was distinguishable from this one (*id.* at 152); and (2) it erroneously concluded that changes in the City's permitting scheme eliminated the likelihood that a sensitive use could get a building permit far more quickly than an adult entertainment business. *Id.* at 153. A more careful analysis of both the *Simi Valley* opinion and the detailed and voluminous facts presented by Appellants demonstrates the error in the District Court's analysis.

The City's adult zoning provisions prohibit adult businesses from locating within 500 feet of any existing "school" or "house of worship" (hereafter "sensitive use" [34]) or any existing adult business (*see* ZR §§ 32-01(b) and 42-01(b)). To resolve

---

[34] The City has often referred to *both* adult uses *and* sensitive uses collectively by the term "sensitive receptors." For clarity and to prevent perpetuation of this misnomer, Appellants

disputes over which came first, the City enacted 1 New York City Rules (RCNY) § [35]9000-01 (the "Rule").   Under § 9000-01(b) of that Rule, whenever an adult use or a sensitive use obtains "an appropriate Department permit," that qualifies to establish its vesting priority.  The Rule expressly recognizes either a building permit or what the Rule refers to as a "no-work" permit as an "appropriate Department permit."[36]  While the presence of an adult use (permitted or otherwise) does not disqualify a nearby sensitive use from lawfully establishing or operating, a permitted sensitive use (or other previously permitted adult use) within 500 feet *does* disqualify any new *adult* business from opening or operating.  (*C.f.* CSF ¶ 95.)

However, contrary to the constitutional mandate articulated by the only case to have considered this issue, *Young v. City of Simi Valley*, 216 F.3d 807, 814 (9th Cir. 2000) *("Simi Valley")*, the City's Rule states that vesting occurs only after the City has *issued a permit* for the use, rather than at the time the application for the permit is first submitted.  *See* § 9000-01(b) of the Rule, stating:

> (b)[T]he date of establishment of an adult establishment, house of worship, or school shall be the *date of issuance* of an appropriate department permit.

----

will not use that term but, instead, will refer to these uses as either "adult" uses or "sensitive" uses or, if addressing them collectively, as "disqualifying receptors."

[35] This Rule is reproduced in Doc. 147-10 as Exhibit 75.

[36] Presumably, an "appropriate Department permit" would also include a Certificate of Occupancy.

(Emphasis added.)

That is a fatal defect which renders the mandatory termination provisions unenforceable because it denies the Club Appellants a reasonable opportunity to relocate.

*Simi Valley* involved facts eerily similar to those described in Doc. 156, the Declaration of Michael Berzak[37] in Support of Plaintiffs Motions For Partial Summary Judgment (hereafter "Berzak PSJ Dec."). In *Simi Valley* the City's adult zoning ordinance required a use permit approving a site for an adult use before an adult use could lawfully operate. That is the same in New York City, where, under the Rule, the right to operate an adult use will not vest until either a building permit or "no-work" permit is issued for an adult use.  (*See also* CSF ¶ 209 )

In both cities, until the prospective adult use's permit is approved, any nearby sensitive use would defeat the prospective adult use's application if it gets its permit granted first, even if it filed its application long after the adult business did. And in both cities, a sensitive use like a church could (and did) get its permit issued in less than a week after it filed its application.  In *Simi Valley* a "newly established religious organization, the Joshua Institute," was granted a zone clearance one day after it

---

[37] Mr. Berzak, an architect, has been filing permit applications for adult entertainment businesses for decades and has expert knowledge of the practices of DOB in processing adult business permit applications.  *See* Berzak PSJ Dec., Doc. 156, ¶¶ 2-4 and Berzak's Supplemental Trial Declaration, Doc. 190, ¶¶ 2-3.

filed its application.  216 F.3d at 813. In New York, as detailed in ¶ 28 of the Berzak PSJ Dec., a so-called "house of worship" got its approval under the Rule just three days after it filed its application with DOB for a no-work permit, and the permit issued just three days later.[38]

In both cases the sole *purpose* of the filing by the so-called church was to impose a sensitive use veto to defeat the permit application of the adult use applicant. *See Simi Valley* at 813 and ¶¶ 27 and 43 of the Berzak PSJ Dec. [39]

In both cases the permit application of the prospective adult use took *much* longer to process. In the New York situation detailed in Berzak's PSJ Dec. ¶¶ 4-14, it took DOB 11 weeks to initially issue the prospective adult use's no-work permit[40]

---

[38] As discussed in greater detail in Point VIII, *infra*, obtaining vesting of zoning rights in New York City is a two-step process.  One must first get zoning approval of their construction documents.  (CSF ¶ 208.)  Thereafter one seeks to obtain the actual *issuance* of their permit.  While there used to be a 40-day time limit on getting initial approval and a separate 40-day time limit on thereafter getting the permit actually *issued,* the City repealed the latter requirement and has not replaced it (CSF ¶¶ 100-103) so, now, there is no time limit whatsoever for getting the permit actually issued, and, under § 9000-01(b) of the Rule, it is only *issuance* which creates the vesting right.

[39] The Berzak PSJ Declaration describes the problems which beset the DOB permit applications of a 100% adult business called Sapphire 2, located in Midtown Manhattan. That is a different business, at a different address, from Appellant Jacaranda's 60/40 business, which goes by the name "Sapphire Manhattan," or just "Sapphire."

[40] The term "initially" is used here because DOB later revoked that initial issuance of Sapphire 2's no work permit.  However, it ultimately rescinded that revocation so Appellants presume the date of the *initial* issuance would be the relevant one for vesting purposes.  Nonetheless, the time taken for those revocation proceedings added to the prior restraint impact of the permitting system, which is discussed in the following point.

but, since there is no *time limit* for issuing such permit (as explained in the margin, *supra*), the amount of time for permit issuance could potentially be even far greater.[41]

In both cases, the bogus "church" use did not actually cause the ultimate defeat of the adult use application (in *Simi* it would have but for the City's late discovery of a karate school within 500 feet, and in New York, it would have but for the fact that, after additional *months* of delay, DOB finally concluded that the "church" didn't defeat the adult use because, out of an apparent ignorance of the provisions of Rule 9000-01(b), it didn't *file* its no-work permit application until *after* the adult use had already been *issued* its initial no-work permit, Berzak PSJ Dec. ¶¶ 38-40). A short difference in timing could have had quite different results and it is unlikely any future party attempting a sensitive use veto would make that same mistake since it

---

[41] The least hazardous way for a new adult business to get established with vesting rights where there is no prior adult use present, is to first acquire a site used by a non-adult cabaret providing live entertainment, and then seek an initial "no-work" permit as an adult cabaret. Then, it can temporarily operate the site by presenting "regular" adult entertainment (so as not to lose its vesting rights) while it commences the far more time-consuming process of putting together the architectural and other plans and "construction documents" needed to apply for the requisite building permits to remodel the site in the manner contemplated when it was acquired. In the case of Sapphire 2 (described in great detail in the Berzak PSJ Declaration), it took 2 ½ months just to get the *initial* (presumably simple) no-work permit. Had Sapphire 2 attempted, instead, to acquire a site *not* previously approved for a live entertainment type use (which is most of them), it would have taken *much* longer, after acquiring its site, to get the requisite DOB permit conferring vesting, and that would have given competitors or opponents an even longer time to gear up their efforts to get a permit for some type of disqualifying nearby use.

is now well known that the vesting rule is based on the date of permit *issuance,* not when the "sensitive use" is deemed to first come into existence.

In both cases the applicable procedures insured that the time needed to be issued the permit which provided vesting would be substantially greater for an adult use than a sensitive use. Specifically, and as demonstrated by the Berzak PSJ Declaration (Doc. 156), a no-work permit application by a church would not have to prove zoning compliance and could, and did, get zoning approval in just three days (and an issued permit just three days later)[42], whereas it took the adult use 2 ½ *months*.[43] This is because it is only the adult use that must prove that there is no disqualifying receptor within 500 feet. And, as discussed in Point VII, DOB examiners of adult business permit applicants tend to err dramatically on the side of caution, being unwilling to approve an adult use permit application unless and until every possible objection has been met, no matter how unsubstantiated.

*Simi Valley* concluded that "the deterrent effect [of a potential sensitive use veto] is both 'real and substantial'." 216 F.3d at 818-819. For that reason it concluded that an adult zoning scheme which deems a prospective adult use's right to vest only as of the date its permit application is *granted,* rather than the date it is *filed,* creates the opportunity for an unconstitutional "sensitive use veto" (*id.* at 814

---

[42] *Id.* at 9, ¶ 28.

[43] *Id.*

n. 8) which denies a "reasonable opportunity to open and operate" (*id.* at 817), thereby rending the adult zoning scheme unconstitutional "*on its face*" (*id.* at 820). (Emphasis added.)

### A. The sensitive use threat here is both "real" and "substantial."

The potential for disqualification by an after-arriving sensitive use has been clearly demonstrated by the Berzak PSJ Declaration to be "both real and substantial" in New York City.

Berzak noted that when Sapphire 2 sought its no-work permit, DOB inspectors filed objections asserting (incorrectly) both that the Sapphire 2 site was too near other adult businesses, and also asserted (incorrectly) that its site was too near a sensitive receptor, a so-called "house of worship" use at 12 West 40th Street. Berzak PSJ Dec. ¶¶ 9-12. After conducting an on-site inspection, and after getting feedback from a lawyer in the DOB's General Counsel's office (who initially objected as well), DOB withdrew those objections, *but,* without explanation, *still took three weeks more* before issuing the no-work permit. All told, it took Sapphire 2 two and a half months just to get its initial no-work permit, a *more* than sufficient period for mischief.

As set forth above, an attempt was made to block Sapphire 2 by filing an application for a sensitive use within 500 feet of Sapphire 2. Fortunately, the filing was not within Sapphire 2's two and a half month window of vulnerability while

DOB examined and re-examined its zoning compliance.  Had that bogus "house of worship" been issued its permit at *any* point during the 2 and a half months that Sapphire 2's no-work permit application was initially pending, it would have automatically, per Rule 9000-01(b), defeated Sapphire 2's application without question, and even if the sensitive use did not follow through or ever get a building permit or a certificate of occupancy as a house of worship.  The mere granting of its application would have required DOB to stop Sapphire 2 in its tracks.

Finally, it is significant to note that *all* DOB permit applications (including no-work permit applications) are *publicly posted* on DOB's website.  (CSF ¶¶ 97-98.)  And, it is also significant that those working in the same industry, as well as their architects and other employees are uniquely positioned to learn, at an early date, of permit application filings by potential nearby competitors.  For this reason there is a "substantial basis" for those seeking new adult sites to reasonably fear similar efforts to those which beset Sapphire 2.  In short, the threat has unquestionably been proven to be both "real and substantial."

### B. Chilling Effect

Here, declarant Talla, who has a controlling interest in one of the Club Appellants herein (*e.g.,* Jacaranda, which operates the 60/40 business known as "Sapphire Manhattan," or simply "Sapphire"), and also in Sapphire 2, was the very one victimized by the attempted but fortunately untimely sensitive use veto.  Based

on Talla's experience, although he continues to desire to acquire sites for new adult Clubs, he would no longer attempt to convert any new site to an adult use in New York City so long as those seriously flawed vesting procedures remain in place. Talla Declaration, Doc. 157, ¶¶ 17-18.

Likewise, the declarations filed by owners on behalf of all the other Club Plaintiffs (*see* case 02-cv-4331 doc. 171 (Warech Decl.) ¶6; case 02-cv-4432 doc. 138 (Lipsitz Decl.) ¶6; case 02-cv-4432 doc. 139 (D'Amico Decl.) ¶6-7) attest that they are familiar with the circumstances described in the Berzak PSJ Declaration and that they, as well, are in fact chilled and deterred from attempting to acquire and convert any new site to an adult use because of the very real risk that such attempt might be defeated, after the investment of a great detail of time and expense, by a sensitive use veto.

Accordingly, for all the same reasons as in *Simi Valley*, so long as the Rule continues to determine vesting by the date of permit *approval* rather than *filing*, the Plaintiffs are denied a reasonable opportunity to relocate and enforcement of the mandatory termination provisions should be enjoined for that reason.[44]

---

[44] A corrected rule could provide that, although vesting is determined by the date of *filing* (rather than the date of issuance), vesting can be lost in the absence of proof of steady progress in developing the site for the proposed use, pursuant to whatever criteria DOB feels it would need to articulate. Such a rule is already in place in DOB's current provisions for loss of vesting rights if construction does not proceed in a timely manner. *See* CSF ¶99. But it could be fine-tuned and modified if further provisos are required.

## C. The District Court's Errors

As noted *supra,* the District Court Opinion rejected Appellants' challenges for two stated reasons: (1) it concluded that the *Simi Valley* case was meaningfully distinguishable from this one (Doc. 228 at 152); and (2) it concluded that changes in the City's permitting scheme had eliminated the likelihood that a sensitive use could get a building permit far more quickly than an adult entertainment business. Doc. 228 at 153. *Both* conclusions are clearly incorrect.

Taking these in reverse order, first, the District Court very clearly erred in concluding that the changes the City made in the permitting process during the course of this litigation would have any meaningful impact whatsoever in reducing the enormous disparity in the time it would take a sensitive use to get approval of a no work permit compared to the time it would take an adult use.

The only changes which occurred were: (1) adult businesses were no longer barred from submitting permit applications based upon professional certification by a licensed architect[45]; and (2) DOB removed its prior unwritten requirement that every adult business permit application must be reviewed and approved by DOB's legal counsel before it could be processed.[46]  But neither of these would close the

---

[45] *See* Buildings Bulletin 2016-010,  (Doc. 147-1).

[46] *See* Buildings Bulletin 2020-005,  (Doc. 147-2) ("[a]pplications that propose Adult Establishments *need not* be subject to *routine* review by the Department's General Counsel's office." (Emphasis added.)

enormous disparities in the time it takes for issuance of permits between adult businesses and sensitive uses. (In Sapphire 2's case, 11 weeks versus less than 1 week for the sensitive use.)

First, with respect to professional certification, the City has stipulated that even professionally certified permit applications must still be approved by DOB for zoning purposes *before the permit may issue*, and that, even in a *typical* case where "no further review is necessary," would take up to four weeks. CSF , ¶¶ 78-79 and 210. (Of course, if there is a threat of a sensitive use veto, that would not be a typical case and even the normal four weeks for such approval would likely be stretched to a significantly even longer period of time. *See, e.g.,* CSF ¶ 213 which stipulates that additional "targeted audits" of professionally certified applications occur whenever DOB receives any type of complaint. That would almost always be the case whenever there is an attempt at a sensitive use veto.)

In contrast, zoning approval for a *sensitive use* takes nothing more than a momentary looking at a zoning map at the zoning counter and determining whether the location is in a permissible district for such a use.

Moreover, before DOB will give zoning approval to any permit application for an adult use, it first requires submission of an "area diagram" showing all uses within 500 feet (*see* CSF ¶ 223) and then DOB inspectors have to conduct a site-specific analyses of all surrounding uses within 500 feet, including, where necessary,

precise measurements to and from the front door entrances to both the applicant's use and any potentially disqualifying receptor. And this process is required regardless of whether the application is professionally certified.[47] It is that process which took so long for Sapphire 2, and as the Berzak PSJ declaration explains, DOB initially found *several* potentially disqualifying receptors prior to conducting on-site investigations, and not merely the alleged "church" use. (And, following time-consuming investigations, it eliminated all but that alleged "church" use as a potentially disqualifying receptor only after the passage of substantial additional time, none of which would be factors in a no work permit application by a sensitive use.) *See* Berzak PSJ Dec. ¶¶ 6-14.

And, of course, if either a competitor or a sensitive use is intentionally trying to block issuance of the permit to an adult business applicant, the experience of Sapphire 2 shows that such an effort could potentially add several *months* to the time before even the simplest "no work" permit might issue.

---

[47] As stated in CSF ¶ 224, if the area diagram is submitted without professional certification, the zoning review must take place prior to acceptance of the area diagram. But if the application is professionally certified, the application is still, nonetheless, required to be approved by DOB through the mechanism of a post-submission zoning audit, which occurs prior to issuance of any permit. Either way, DOB must still conduct a time-consuming investigation to verify the accuracy of the area diagram, something that no sensitive use would ever have to go through.

For all these reasons, the District Court clearly erred in concluding that the DOB's removal of the bar to professional certification for adult businesses did *anything* to reduce the very real threat of a sensitive use veto.

The other changed DOB procedure referenced by the District Court, its elimination of the requirement that DOB counsel must get involved in every adult use permit application, likewise does absolutely nothing to eliminate the threat of a sensitive use veto, nor does it shorten the adult use applicant's potential period of vulnerability. The change effected by Buildings Bulletin 2020-005 leaves in place the option for DOB counsel to get involved in the pre-approval process any time DOB feels there is an issue which might require counsel's attention. That would almost certainly be the case every single time there is a threatened sensitive use veto as it would raise legal issues where DOB would (properly) want counsel's input. Appellants do not quarrel with DOB seeking the approval of counsel before issuing a potentially tricky permit. That is certainly reasonable (assuming the City would impose reasonably brief time limits for such approval). What Appellants quarrel with is the fact that if all approvals are ultimately given, but a sensitive use gets its no-work permit granted while all that review is going on, vesting is determined only by the date of *issuance* of the permit, rather than the date the application is *filed*. *That* is what *Simi Vally* found to be facially unconstitutional.

97

Second, contrary to the District Court's other finding, there is no *meaningful* difference between the present case and *Simi Valley*. As noted above, the important thing to observe is that the vesting scheme in *Simi Valley* was found *facially* unconstitutional because it determined vesting priority based on the time a permit *issued*, rather than the time it was *filed*. 216 F.3d at 820. For that reason, any minor factual differences between the two cases is of no import. And, as detailed above, there are no significant factual differences between the two cases in any event.

Lastly, the detailed declaration of Mr. Talla, the CEO of both Sapphire 2 and Appellant Jacaranda, makes extremely clear the reasonableness of his conclusion that even though he would like to acquire more adult live entertainment establishments in New York (due to the great disparity now between supply and demand), he would no longer do so unless the proposed new location was already approved as a fully-vested and approved adult use site for zoning purposes. Otherwise, the risks and costs are far too great for a reasonable businessperson to attempt to develop an adult live entertainment establishment at any site not already approved for that purpose. Those who acted in an unsuccessful and untimely fashion in their attempt to stop Sapphire 2 have learned their lesson. It is now widely understood in the industry that the sensitive use veto option can be invoked by any person who wants to try to keep out another club. Consequently, Appellants now being aware of that fact are very reasonably being chilled from attempting to relocate

while the vesting rule remains in place. These declarations cannot fairly be discounted as merely being "self-serving" ([Dec. at 114](Dec. at 114)) since the threat has been shown to been shown to be very real.

For all the reasons above, should the Court reject all of Appellants' direct challenges to the mandatory termination requirements and/or to the 2001 Amendments, at a minimum, this Court is urged to preserve the status quo by enjoining enforcement of the mandatory termination requirements until such time, if ever, as the City cures its unconstitutional vesting provisions.

**Point VIII: The District Court erred in concluding that the zoning ordinances allowed a reasonable opportunity to relocate, given that the permitting scheme fails to comply with the prior restraint procedural requirements of *FW/PBS v. City of Dallas,* 493 U.S. 215 (1990), and in further concluding that *Thomas v. Chicago Park District,* 534 U.S. 316 (2002), applies here rather than *FW/PBS.***

In the alternative to their request to enjoin enforcement of the City's mandatory termination requirement for termination of *adult* nonconforming businesses (and no others), Appellants also requested the lesser relief of merely enjoining enforcement of those requirements until such time, if ever, as the City modifies its scheme for, *inter alia,* the *permitting* of adult businesses, so as to provide them with a reasonable opportunity to relocate. *See, e.g.,* Doc. 198.[48]

Wholly apart from their challenges to the City's *vesting* scheme for adult uses, Appellants argued that the City's provisions for *permitting* of adult businesses were facially unconstitutional prior restraints on expression that denied them a reasonable opportunity to relocate.

### A. DOB's permitting scheme constitutes an invalid prior restraint of expression because it does not contain a fixed time period for granting or denying an adult use permit.

In New York City, unlike most major cities, there is no separate "adult business permit," but, instead, the "green light" to operate comes from receiving a

---

[48] As noted *supra*, the briefing for the "trial on papers" was exclusively that provided by the parties' renewed motions for summary judgment and their supporting memoranda.

DOB permit which vests the right to operate at the indicated location..[49] That permit could be a building permit, a certificate of occupancy, or a mere "no-work" permit, the latter obtained primarily, if not solely, to establish that the proposed use complies with the applicable zoning requirements. The significance of that permit for an adult business is that it prevents any other later-permitted adult or sensitive use from rendering it unlawful. The significance of that permit for a sensitive use is that it prevents any nearby later-permitted adult use from opening. Because no reasonable person contemplating opening an adult use would attempt to do so without first getting this permit, it is the de facto equivalent of the more typical adult business permit found in other cities.

Appellants pointed the District Court to numerous facial defects in DOB's permitting scheme which provided it with standardless procedural discretion to exercise censorship by delay,[50] something which the Supreme Court condemned in *FW/PBS. Inc. v. City of Dallas,* 493 U.S. 215 (1990). *FW/PBS* held that licensing requirements for adult entertainment businesses could be challenged *on their face*,

---

[49] *See* 1 NYC Rule § 9000-01 (discussed in the preceding point of argument herein) which describes the vesting criteria.

[50] Most notably, there are no time limits whatsoever for issuance of even a "no-work" permit. *See* Doc. 199, p. 67 . And, astoundingly, the City *repealed* the only time limit it previously had for issuing permits. CSF ¶¶ 100-101.

with no requirement of proof of prior abuses of discretion. *Id.* at 224-225. In explaining its ruling, the Court said:

> Petitioners involved in the adult entertainment industry and adult cabarets argue that the licensing scheme *fails to set a time limit within which the licensing authority must issue a license* and, therefore, creates the likelihood of arbitrary denials and the concomitant suppression of speech. … [W]e conclude that the city's licensing scheme lacks adequate procedural safeguards.

*Id.* at 223 (emphasis added).

> [A] prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible. . . . Like a censorship system, a licensing scheme creates the possibility that constitutionally protected speech will be suppressed where there are inadequate procedural safeguards to ensure prompt issuance of the license. . . . A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech.

*Id.* at 226.

The Court held that the following procedural requirement, *inter alia,* is mandatory in such circumstances:

> [T]he licensor must make the decision whether to issue the license within a *specified* and reasonable time period . . . .

*Id.* at 228 (emphasis added).

What is even more relevant is that although the Dallas adult business licensing scheme *did* impose a 30 day time limit on the chief of police to grant or deny the license (*id.* at 227), the Court noted that an adult business could not *qualify* for that

102

license unless it first received, *e.g.*, zoning[51] and other approvals from the relevant city authorities (including the "building official"). However, because there were no time limits for those other city authorities to complete their investigations, the entire permitting scheme was held facially invalid:

> Although the ordinance states that the "chief of police shall approve the issuance of a license by the assessor and collector of taxes to an applicant within 30 days after receipt of an application," the license may not issue if the "premises to be used for the sexually oriented business have not been approved by the health department, fire department, *and the building official* as being in compliance with applicable laws and ordinances." § 41A-5(a)(6). Moreover*, the ordinance does not set a time limit within which the inspections must occur. The ordinance provides no means by which an applicant may ensure that the business is inspected within the 30-day time period within which the license is purportedly to be issued if approved.*

*Id.* at 227 (emphases added).

In New York City, as mentioned above, there is no time limit for DOB to grant or deny a permit application, even one as simple as an application for a "no-work" permit, since the City repealed the only time limit it once had for the grant or denial of DOB permits. CSF ¶¶ 100-101.

The Court went on to point out that it is not *all* zoning or building approval requirements that trigger scrutiny as prior restraints. Zoning or building requirements which are no more onerous for adult businesses than nonadult

---

[51] "The ordinance regulates sexually oriented businesses through a scheme incorporating *zoning*, licensing, and *inspections*." *FW/PBS* at 220-21 (emphases added).

businesses are not subject to facial challenges. But, if the challenger can point to some way in which those seemingly content-neutral requirements affect adult businesses in a more onerous time-consuming manner than others, then the permit requirement is subject to facial challenge as a prior restraint:

> The city asserted at oral argument that it requires every business - without regard to whether it engages in First Amendment-protected speech - to obtain a certificate of occupancy when it moves into a new location or the use of the structure changes. Tr. of Oral Arg. 49; see also App. 42, Dallas City Code § 51-1.104 (1988) (certificate of occupancy required where there is new construction or before occupancy if there is a change in use). Under the challenged ordinance, however, inspections are required for sexually oriented businesses whether or not the business has moved into a new structure and whether or not the use of the structure has changed. Therefore, even assuming the correctness of the city's representation of its "general" inspection scheme, *the scheme involved here is more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses.* For example, inspections are required whenever ownership of a sexually oriented business changes, and when the business applies for the annual renewal of its permit. We, therefore, hold, as a threshold matter, that petitioners may raise a facial challenge to the licensing scheme, and that as the suit comes to us, the businesses challenging the scheme have a valid First Amendment interest.

*Id.* at 225 (emphasis added).

Although it is true that DOB's procedures for issuing permits apply to all businesses, and that the Constitution does not allow facial challenges to permitting schemes that do not subject adult businesses to more time constraints than others, Appellants provided unrefuted evidence to the District Court that DOB's permitting

scheme does single out adult uses for procedures and inspections that result in final action on their permit application taking *significantly* longer than for permit applications by any non-adult use.

Specifically, the parties stipulated that only *adult* business permit applicants must submit an "area diagram" showing all uses within 500 feet (CSF ¶ 223, ) and, until DOB has independently confirmed that there are no disqualifying receptors within 500 feet, no further steps will be taken to process the permit application. As discussed in the preceding point, Appellants also produced evidence that even in the absence of a complaint from an asserted sensitive use, it took two and a half *months* for one properly-zoned adult business to get zoning approval, compared to less than one week for a nearby non-adult use which was not subject to the area diagram requirement.

Moreover, the evidence showed that the two and a half months of delay could (and did) more than *double* when, after issuance of a no work permit, any type of complaint is received, no matter how groundless, objecting to the use.[52] In the case of Sapphire 2 (discussed in the preceding point), because of a totally groundless complaint received on DOB's website after its no-work permit had initially issued, a notice of intent to revoke the permit was issued[53] and, even though the grounds for

---

[52] Berzak PSJ Dec. ¶¶ 15-41.

[53] *Id.*

the complaint should have been rejected out of hand (on the basis of the fact that the asserted sensitive use was not a *permitted* sensitive use and therefore could not, as a matter of law, have disqualified Sapphire 2), that delayed issuance of the no-work permit for an *additional* 3 months, *i.e.*, 5 ½ months in all.[54]

Proof of abuse of procedural discretion is, of course, not required in a facial challenge (and particularly *see* the en banc court's opinion in *Chesapeake B & M v. Harford,* 58 F.3d 1005, 1010-1011 (4th Cir. 1995), reversing a district court's refusal to enjoin an adult business permitting scheme on grounds of procedural discretion prior to proof of any actual abuses), but the extremely well-documented proof of abuse supplied by Appellants makes abundantly clear that adult use permit applicants will always face the risk of far greater delay than others in obtaining permits strictly because of the adult nature of their permits, and that, whenever the slightest suggestion of a problem arises, DOB can use this discretion to cause exponentially even *greater* levels of delay.

Certainly if there were strict time limits on DOB's processing of permit applications for adult uses, the vast majority of the delay in processing Sapphire 2's permit application, for example, would have been avoided because the asserted "sensitive use" which caused most of that delay would likely have been rejected by

---

[54] Berzak PSJ Dec., ¶ 42.

DOB as a disqualifying receptor on day one, simply by observing that it did not have the required DOB permit to operate as a church or any other type of sensitive use! But without any time-limits forcing its hand, DOB had no motivation to act even reasonably promptly, and then caused *months* of unnecessary delay.

The District Court postulated multiple reasons for rejecting Appellants' challenges (*see* Dec. at 128-161), but none of its conclusions are sustainable.

First, and most significantly, the District Court took the position that the procedural safeguards of *FW/PBS* were not applicable because the case was controlled, instead, by *Thomas v. Chicago Park District*, 534 U.S. 316 (2002) ("*Thomas*"). A careful comparison of the values at stake in *FW/PBS* and *Thomas* demonstrates that the District Court erred in finding that Thomas supplied the applicable doctrine here.

In *FW/PBS* what was at stake was the ability to obtain a license to operate an adult entertainment business on private property. In *Thomas* what was at stake was the ability to get a license to hold a demonstration in a public park, a public forum operated by the city where the city needed to make content-neutral decisions in allocating its limited space to the public. In other words, there are two key factors which suggest that the procedural safeguards of *FW/PBS* apply here rather than those of *Thomas*: (1) the license being sought here is a prerequisite for a business to engage in a particular type of expression on its own property; and (2) because of the

requirement to submit an area diagram and then be subject to an ensuing time-consuming investigation that causes the time needed for an adult business to obtain a permit to dwarf the time it takes for a comparable non-adult business, even though the substantive criteria for issuance of a DOB permit may be content neutral, the *procedures* for obtaining a permit are anything but content-neutral. An adult entertainment business must go through a *far* longer process to get a license, all other factors being equal, than a non-adult business. That is a content-based distinction of the very type which motivated the decision in *FW/PBS*.

Specifically, the reason *FW/PBS* adopted (for an adult business license requirement) at least one of the procedural safeguards of an earlier prior restraint decision, *Freedman v. Maryland*, 380 U.S. 51 (1965), *i.e.*, the requirement that the licensor must grant or deny the permit within a specified brief period, was not because it found the *criteria for issuance* content-based, but because it found that there were content-based *procedures* which created a greater potential for delay for adult businesses than others due to mandatory investigations by, *e.g.*, the zoning department.

Because that is *exactly* the same as the DOB permit review process for adult business permit applicants, the District Court clearly erred in finding inapplicable *FW/PBS's* requirement that the licensing decision must be made within a specified brief period.

Additionally, what was sought in *Thomas* was not recognition of a requirement that an administrative decision be rendered within a specified time period. Rather the *Thomas* petitioners' only demand was for things far less reasonable, at least in the public forum context: [1] "that the Park District … must initiate litigation every time it denies a permit and [2] that the ordinance must specify a deadline for judicial review of a challenge to a permit denial." 534 U.S. at 322. The ordinance already had a reasonable 28-day time limit for the Park District to grant or deny the permit (something the Court found meaningful enough to point out [55]) so that was not at issue.

Moreover, in justifying its opinion, the *Thomas* Court emphasized that "[w]e have never required that a content-neutral permit scheme regulating speech *in a public forum* adhere to the procedural requirements set forth in *Freedman." Id.* (emphasis added). And to emphasize that its ruling was intended specifically only for licensing requirements for use of a public forum, the Court included a footnote to the quotation above (n 2) contrasting its decision in *FW/PBS,* which it described as having "applied two of the *Freedman* requirements" because *FW/PBS* "involved a licensing scheme that 'targeted businesses purveying sexually explicit speech.'"

---

[55] "Moreover, the Park District must process applications within 28 days." 534 U.S. at 324.

In other words, it was clarifying that licensing requirements for speech businesses are treated differently than licensing requirements for the use of public forums.

The District Court cited three cases in support of its interpretation of *Thomas*: *Granite State Outdoor Advertising Inc. v. City of St. Petersburg*, 348 F.3d 1278 (11th Cir. 2003); *H.D.V. – Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009); and *Gold Diggers, LLC v. Town of Berlin*, 469 F.Supp.2d 43 (D. Conn. 2007). While Appellants believe all three incorrectly understood the holding in *Thomas*, at least the first two are entirely distinguishable. Specifically, both *Granite State* and *H.D.V. – Greektown* addressed only permit requirements for signs which were regulated pursuant to truly content-neutral criteria (*e.g.*, size, etc.), and none of which treated adult businesses in any way differently than any other applicants for sign permits (unlike DOB's uniquely time-consuming investigatory requirements for adult business permit applicants). Neither one had before it the issue of the procedural safeguards that would apply to an adult business license, something *Thomas'* above-quoted footnote distinguishing *FW/PBS,* suggests that *Thomas* found meaningful. The third case cited by the District Court, *Gold Diggers*, is a district court opinion from another circuit and Appellants respectfully submit it was simply wrongly decided, failing to correctly interpret *Thomas.* In fact, *Gold Diggers* expressly concluded that *FW/PBS* involved a "licensing scheme for [sexually oriented businesses] [which] was content-neutral where its application did not totally

suppress the speech." 469 F.Supp.2d at 56. That concession would seem to totally undercut the *Gold Diggers* conclusion that the procedural safeguards of *FW/PBS* were inapplicable since its rationale for distinguishing between *FW/PBS* and *Thomas* was that *Thomas* involved a content-neutral permitting scheme and, presumably, FW/PBS did not! It is clear the *Gold Diggers* District Court did not have a firm grasp of all the principles at stake.

Moreover, these out-of-circuit decisions have even less significance because this Court, in *Lusk v. Village of Cold Spring*, 475 F.3d 480 (2d Cir. 2007), concluded that even content-neutral laws of general application which require a license to engage in a type of expression, are facially invalid if they fail to contain sufficiently brief time limits on the decision to grant or deny the permit to prevent the potential censorship of the expression by delay.

Specifically, *Lusk* involved, *inter alia,* a First Amendment challenge to an ordinance scheme (found in Chapter 64 of the City Code) which required a license from the Historic District Review Board (denominated as a "Certificate of Economic Hardship or a Certificate of Appropriateness") before one could maintain a sign in front of their house in a historic district. After first acknowledging the holding in *Thomas* (*id.* at 486), this Court presumed, without deciding, that the criteria for issuance of the license may indeed be content neutral, depending on how they are interpreted (*id.* at 494-96), but still did not invalidate the licensing requirement on

that ground. *Id.* However, it invalidated it on the alternative ground that it constituted a prior restraint because it allowed the city to take up to 75 days to rule on such an application (*id.* at 491-92), concluding that so great a time period was too much because, throughout that 75-day potential waiting period, speech rights would be irreparably lost. *Id.* at 492.

In short, this Court held in *Lusk* that the mere fact that such an ordinance may have employed content-neutral criteria did not exempt it from the requirement to ensure against censorship by delay.

But the analogy between *Lusk* and the present case is even stronger. In *Lusk* this Court emphasized that the plaintiff's speech rights in that case could be irreparably lost even under a presumably content-neutral licensing scheme if the time to review the permit application were not limited to an express and relatively short period.[56] Here, even apart from the deterring impact caused by excessive delay in acting on adult business permit applications, because of the potential of a sensitive use veto, every delay greatly increases the chance that speech rights will be

---

[56] "Where, as here a property owner wishes to take a public position on a pressing public issue, for example, or on the qualifications of a candidate for public office in an imminent election, the time required to obtain approval may prevent the property owner from doing so until after the public issue is settled or the election is over." *Id.* at 492.

And this Court found that this factor controlled even if the licensing scheme was content-neutral, thus necessarily rejecting the application of *Thomas* (to which it had cited earlier in its opinion). *See id.* at 486-87.

permanently and irreparably lost.  Accordingly, the need for time limits is as great here as it was in *Lusk*.

For all these reasons, this Court should follow its decision in *Lusk* and reject the District Court's conclusion that this case is controlled by *Thomas*.

The other reason given by the District Court for denying permit-based relief to Appellants is far less substantial and can quickly be disposed of.   The Opinion below noted that DOB is required to give its approval to "construction documents" within 40 days (albeit that there are no immediate specified consequences if it fails to do so) (Dec. at 158) and then *presumed* that the permit would issue *"immediately* upon approval of the construction documents based solely upon Defendants' assertion that would be the case, and, in the event that it were not the case, the applicant whose permit application languishes could always seek judicial review under state law.  *Id.*  But that is no substitute for specified time limits.  *See, e.g.,* the Fourth Circuit's *en banc* decision in *Chesapeake B&M v. Harford, supra,* which reversed a District Court's refusal to issue an injunction against enforcement of a licensing requirement for an adult business notwithstanding it had issued a declaratory judgment that the permitting scheme lacked specified time limits for a decision on the license.  The District Court there, like here, relied instead on the city's representation that it would timely rule on license applications and that any failure to live up to that promise could be remedied by seeking judicial review.  That

113

ruling, the Court of Appeals held, was legal error requiring reversal of the judgment below:

> However, notwithstanding this risk of indefinite delay, the court ruled that the licensing scheme is enforceable because, the court suggested, the Licensing Department might decide within a reasonably brief time whether to issue or deny a license. Put another way, the court apparently thought it determinative that the licensing scheme could be applied in a constitutional manner. But "[w]e cannot depend on the individuals responsible for enforcing the Ordinance to do so in a manner that cures it of constitutional infirmities."

58 F.3d at 1010-1011.

By analogy, in *U.S. v. Stevens*, 599 U.S. 460 (2010), a somewhat similar argument was made by Government attorneys faced with a First Amendment challenge to a criminal law prohibiting the exhibition of films depicting cruelty to animals. The Court said:

> Not to worry, the Government says: The Executive Branch construes § 48 to reach only "extreme" cruelty, Brief for United States 8, and it "neither has brought nor will bring a prosecution for anything less," Reply Brief 6-7. . . . But the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.*

*Id.* at 480 (emphasis added).

The same principle applies here, as recognized in *Chesapeake B&M.*

Where *FW/PBS* requires specified enforceable time limits for action on an adult business permit application, the possibility of seeking correction by subsequent judicial review is not an acceptable constitutional solution. The only exception

would be if the standards of *Thomas,* rather than *FW/PBS,* applied, and, for the reasons given above, that would be a misinterpretation of both *Thomas* and *FW/PBS.*

**B. DOB's permitting scheme also constitutes an invalid prior restraint of expression because it does not provide any effective remedy in the event it violates any of its own time limits**

In addition to challenging the permitting scheme for failing to contain a specified time limit for issuance of DOB permits to adult businesses, Appellants also challenged the permitting scheme to the extent that it fails to include any effective remedies for a violation of the few time limits it does have. *See* Doc. 199, Point II-C-3-c at pp. 69-71 . For the reasons stated below, the District Court erred in rejecting this challenge.

The Opinion below rejected this challenge (*see* Doc. 228, at p. 158), but erred in doing so, concluding that that the only remedy to which Appellants are entitled is to suffer further delay while seeking state court review of DOB's failure to honor its own time limits. *Id.* That is a patently inadequate remedy where the objection is that First Amendment rights are being stifled due to DOB's failure to honor its own time limits. An effective remedy on the face of the ordinance is required even if such delay only occurred in isolated instances since it is a facial deficiency in the ordinance scheme.

The evidence produced below[57] provides a dramatic example of why there is a constitutional requirement for time limits for adult business permit issuance to not only exist, but to provide effective remedies if they are violated. *See, e.g.*, *Redner v. Dean*, 29 F.3d 1495, 1500-1501 (11th Cir. 1994); *Artistic Entertainment, Inc. v. City of Warner Robins*, 223 F.3d 1306, 1310-1311 (11th Cir. 2000); *Café Erotica, et al. v. St. Johns County*, 143 F.Supp.2d 1331, 1335 (M.D. Fla. 2001); *Abusaid v. Hillsborough County Bd. of County Comm'rs*, 637 F.Supp.2d 1002 (M.D. Fla. 2007); and *Public Citizen, Inc. v. Pinellas County*, 321 F.Supp.2d 1275, 1294-1295 (M.D. Fla. 2004).

**C. DOB's permitting scheme also constitutes an invalid prior restraint of expression because it confers unbridled substantive discretion on DOB officials to institute time-consuming permit revocation proceedings against adult use permit applicants based on nothing more than unsubstantiated or even frivolous complaints received on DOB's website.**

Appellants also challenged DOB's permitting scheme for failing to restrict DOB's unbridled *substantive* discretion to institute time-consuming proceedings to

---

[57] *See* ¶ 17 on p. 87 of Doc. 62 (Declaration of Michael Berzak in Support of Permitting Issues Presented in Plaintiffs' Motion for a Preliminary Injunction), testifying that the City *routinely* takes longer to review adult business applications than 40 days. This consistent violation of its own requirements is attributable to the lack of a meaningful code-provided remedy. This Declaration was expressly incorporated into the documents submitted for trial. *See* Doc. 189, p. 3, Schedule A, # 2.

revoke permits already issued to an adult use any time a complaint is filed on its website against the permit application, regardless of its merit. *See* Doc. 199, Point II-D at pp. 71-72 . The Opinion below presumably rejected this challenge by failing to grant it, but it appears that it never directly addressed it. However, for the reasons stated below, it erred in failing to grant this relief.

As noted in the prior point, under current DOB procedures, DOB employees may unilaterally institute proceedings to revoke already-issued DOB permits and the City concedes there are no written standards articulating the criteria they must apply before instituting such proceedings. CSF ¶ 218. Instead, the City agrees that DOB officials may institute such proceedings even if they think that a permit merely *might* have issued in error. *Id.*

But the problem of such a standardless procedure is well illustrated by the improper revocation of Sapphire 2's no-work permit. The basis for that revocation was the assertion that the permit shouldn't have issued because there was allegedly a house of worship use within the "buffer zone" around Sapphire 2. However, the DOB official didn't even bother to check whether the asserted house of worship had a permit to so operate (which it didn't) and didn't even check the prior file it had in the Sapphire 2 application to see where both a DOB examiner and one of its General Counsel already concluded that the so-called church was not a disqualifying use. Instead, it appears that the revocation procedure was initiated solely because DOB

had received an anonymous complaint that Sapphire 2's use was disqualified by the asserted nearby "house of worship" use. And even a cursory investigation would have shown that not only wasn't the so called "house of worship" in fact operating as a house of worship, but it didn't even have a permit to do so, so it legally could not have disqualified Sapphire 2's application.

While proof of an abuse of discretion is not required to challenge a scheme affording licensing officials excessive discretion in acting on permit applications for businesses engaged in First Amendment activity, here, the Sapphire 2 situation provides a perfect example of why these procedural requirements exist. And, importantly, the real problem is not any fear that the threatened revocation will actually occur once it is resolved, but that DOB's acceptance of a patently frivolous complaint on its website triggered an additional three months of delay before Sapphire 2 could proceed on its no work permit. Consequently, the constitutional violation is twofold because the lack of any standards to limit DOB's discretion to institute revocation proceedings (a substantive discretion violation) triggers the procedural discretion violation of stretching the time limits for action on a simple no-work permit to preposterous lengths (which was over five months in the case of Sapphire 2).

For all the reasons above, the District Court erred in failing to enjoin enforcement of the mandatory termination requirements until such time as the City cures the facial defects in its permitting system.

**Point IX: To the extent the City justified the elimination of its original exemption of so-called 60/40 businesses based on some examples of sham compliance, its ordinance is not "narrowly tailored" because the City should have merely amended the ordinance to prohibit defined forms of sham compliance rather than eliminating all lawfully compliant pre-existing 60/40 Clubs.**

The City argued below that the 2001 Amendments were motivated by a desire to eliminate "sham compliance" at an eating and drinking establishment with the 1995 Amendments. *See* Doc. 197 (City claiming that the 2001 Amendments were set forth "as a result" of the City losing the sham-compliance cases). The district court did not discuss this rationale for the 2001 Amendments in its decision; rather, the court said that the City's rationale was the elimination of specific secondary effects. (See Point V, *supra.*)

But to the extent that elimination of sham compliance *was* the goal (or was *a* goal) of the 2001 Amendments, then the City had the burden of proof to establish that the regulations were narrowly tailored to achieve that goal. *See Alameda* at 455-456 (narrow tailoring required); *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 818 (2000) ("When First Amendment compliance is the point to be proved, the risk of non-persuasion – operative in all trials – must rest with the Government, not with the citizen.").

The City did not meet that burden at trial.

Precisely what constitutes "sham" compliance, as opposed to actual compliance, is not entirely clear from the City's evidentiary submissions. Several court decisions suggest that the ability to move between the adult and non-adult portions of a 60/40 establishment, in the City's view, is the touchstone of sham compliance for a club. *See, e.g., Ten's Cabaret, Inc. v. City of New York*, 1 Misc.3d 399, 404 (N.Y. County Sup. Ct. (Index No. 121197/02, Sept. 9, 2003) (City "assert[ed] that although Ten's and For the People Theatres erected partitions to limit the adult entertainment to less than 40% of the floor area, this constituted sham compliance"). The New York Court of Appeals also once suggested that a potential component of sham compliance for the clubs might be if adult portions of the facilities were "easy to access" from the non-adult portions of the establishment. *For the People Theatres of N.Y., Inc. v. City of New York*, 29 N.Y.3d 340, 361 (N.Y 2017). While its judgment was later reversed by the Court of Appeals, in *Dezer* the Appellate Division agreed with the City that a club had engaged in sham compliance with the 60/40 rule in part because "there [was] no separate entrance or cover charge for the topless dancing area." *City of New York v. Dezer Props.*, 259 AD.2d 116, 121 (N.Y. App. Div., 1st Dist. 1999).

The Club Appellants do not concede that they (or anyone else) engaged in any form of sham compliance, and do not concede that any unseen zoning resolution targeting sham compliance or the alleged indicia of sham compliance would be

lawful, these cases highlight how poorly the City crafted the 2001 Amendments, because it made no effort to narrowly tailor them to focus on the alleged sham conduct.

For example, given that the City repeatedly claimed that the ease of access between the adult and non-adult portions of a 60/40 Club was an indicator of sham compliance, the City very easily could have crafted the 2001 Amendments to require a separate entrance for each portion; separate cover charge for each portion; and more specifically clear separate and distinct separation. Instead of eliminating 60/40 clubs all together, the City could have drafted the 2001 Amendments to address the specific issues that it believed were so pernicious about the Clubs' compliance efforts.

But it didn't—it instead outlawed the 60/40 business model altogether. That is not "narrow tailoring," which requires specificity and precision such that the regulation does not burden any more speech than is necessary to achieve the goal. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989). To the extent that eliminating sham compliance was a goal of the 2001 Amendments, they are not narrowly tailored to achieve that goal and are therefore unconstitutional.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should reverse and remand for entry of judgment in favor of Appellants, declaring unconstitutional and enjoining enforcement against Appellants of the 2001 Amendments to the Amended Zoning Resolution of the City of New York; together with such other, further and different relief as to the Court appears just, necessary and proper, including the costs and disbursements of appeal and legal fees and expenses in accordance with law.

Respectfully submitted,

*/s/ Jerome Mooney*
**Jerome Mooney, Esq.**
**G. Randall Garrou, Esq.**
Weston, Garrou & Mooney
*Attorneys for Appellants*
*Club at 60th Street, et al.*
12121 Wilshire Boulevard
Los Angeles, California 90025
(310) 442-0072

*/s/ Edward S. Rudofsky*
**Edward S. Rudofsky, Esq.**
Zane and Rudofsky
*Attorney for Appellants*
*59 Murray Enterprises, Inc., et al.*
Five Arrowwood Lane
Melville, New York 11747
(917) 913-9697

/s/ Jeffrey M. Nye
_____

**Jeffrey M. Nye, Esq.**
Stagnaro, Saba & Patterson
*Attorney for Appellants*
*689 Eatery, et al.*
7373 Beechmont Ave
Cincinnati, Ohio 45230
(513) 533-6714

/s/ Erica T. Dubno
_____

**Erica T. Dubno, Esq.**
Fahringer & Dubno
*Attorney for Appellants*
*557 Entertainment Inc., et al.*
43 West 43rd Street
New York, New York 10036
(212) 319-5351

<u>**CERTIFICATE OF COMPLIANCE**</u>

Counsel certify that this brief complies with the type-volume limitation, and contains <u>29,820</u> words, as determined by Microsoft Word, including headings, footnotes, and quotations, and excluding items listed in FRAP 32(f).