# 24-621 (L)

## 24-623, 24-636, 24-640 (CON)

### United States Court of Appeals
### for the Second Circuit

557 ENTERTAINMENT INC., DCD EXCLUSIVE VIDEO INC.,
VIDEO LOVERS INC., JAYSARA VIDEO, INC., VISHARA VIDEO,
INC., RAINBOW STATION 7 INC., CLUB AT 60TH STREET,
INC., a Delaware corporation, JACARANDA CLUB, LLC, a
New York limited liability company, DBA Sapphire,
59 MURRAY ENTERPRISES, INC., AKA 59 Murray Corp.,

[*caption continued on inside cover*]

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES

RICHARD DEARING
INGRID R. GUSTAFSON
ELINA DRUKER
   *of Counsel*

September 30, 2024

MURIEL GOODE-TRUFANT
*Acting Corporation Counsel
of the City of New York*
Attorney for Appellees
100 Church Street
New York, New York 10007
212-356-2609
edruker@law.nyc.gov

[*continued caption*]

DBA New York Dolls, AAM HOLDING CORP., DBA Private Eyes, JNS VENTURES LTD, DBA Vixen, TWENTY WEST PARTNERS, INC., DBA Wonderland, 689 EATERY, CORP., DBA Satin Dolls, 725 EATERY, CORP., Substituting for MLB Enterprises, Corp., DBA Platinum Dolls,

*Plaintiffs-Appellants*,

336 LLC, DBA The Erotica, CHELSEA 7 CORP., 725 VIDEO OUTLET INC., GOTHAM VIDEO SALES & DISTRIBUTION INC., VISHANS VIDEO, INC., EXPLORE DVD LLC,

*Plaintiffs*,

*against*

CITY OF NEW YORK, HON. BILL DE BLASIO, as Mayor of the City of New York, MELANIE E. LA ROCCA, as Commissioner of Buildings, Department of Buildings of the City of New York, RICK D. CHANDLER, as Commissioner of Buildings, Department of Buildings of the City of New York,

*Defendants-Appellees*.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................v

PRELIMINARY STATEMENT .......................................................1

ISSUES PRESENTED.....................................................................3

STATEMENT OF THE CASE...........................................................4

    A. New York City's 1995 zoning regulations aimed at curbing the secondary effects of adult businesses ...........5

    1. The 1994 DCP Study finding that sexually oriented businesses negatively impacted City neighborhoods....5

    2. The City Council's adoption of the 1995 Adult-Use Regulation to curb the secondary effects of sexually oriented businesses .......................................................8

    3. DOB's 1998 adoption of a "60/40 Rule" to determine if a "substantial portion" of a business was "adult" in nature, leading to widespread evasion of the 1995 regulation...................................................................10

    B. The 2001 Adult-Use Amendment ..................................14

    1. The City Council's adoption of amendments in 2001 to reach predominantly adult businesses that were evading by the 1995 Adult-Use Regulation ................14

    2. Nearly two decades of state court litigation challenging the City's attempt to amend the 1995 Adult-Use Regulation to reach 60/40 businesses.......23

    C. These four lawsuits and their resolution in the City's favor after a bench trial .................................................26

    1. The Adult Businesses' challenges to the 2001 Adult-Use Amendment .......................................................26

i

## TABLE OF CONTENTS (cont'd)

**Page**

2. The district court's grant of a preliminary injunction.28

3. The district court's resolution, after a bench trial, of all claims in the City's favor .........................................29

SUMMARY OF ARGUMENT AND STANDARD OF REVIEW......35

ARGUMENT .........................................................................40

POINT I..............................................................................40

THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT IN THE CITY'S FAVOR ON THE ADULT BUSINESSES' FIRST AMENDMENT CHALLENGE TO THE 2001 ADULT-USE AMENDMENT ..............................40

A. The 2001 Adult-Use Amendment easily satisfies *Renton*'s first step because it is not a total ban on sexually oriented businesses. ..........................................42

B. Under *Renton*'s second step, the 2001 Adult-Use Amendment is subject to intermediate scrutiny............43

1. The 2001 Adult-Use Amendment was designed to curb negative secondary effects and not to suppress disfavored speech. ........................................................43

2. The Adult Businesses' arguments about *Renton*'s second step are meritless.............................................47

   a. Justice Kennedy's concurrence cannot bear the weight the Adult Businesses put on it....48

   b. *Reed* does not overrule the *Renton*/*Alameda* framework. ......................56

C. The 2001 Adult-Use Amendment passes muster under intermediate scrutiny at *Renton*'s third step. .................59

ii

# TABLE OF CONTENTS (cont'd)

**Page**

1. The 2001 Adult-Use Amendment serves a substantial governmental interest.................................................60

    a.   The City carried its burden of demonstrating a substantial governmental interest.........................................................60

    b.   The City's substantial governmental interest is assessed at the time of enactment, contrary to the Adult Businesses' arguments.....................................................70

    c.   The Adult Businesses' evidentiary arguments are meritless and misunderstand the relevant inquiry. ....................................77

    d.   The Adult Businesses misplace reliance on state court jurisprudence that refutes their claims.........................................................83

2. The 2001 Adult-Use Amendment is narrowly tailored to serve this substantial governmental interest. .........86

3. The 2001 Adult-Use Amendment leaves open adequate alternative avenues of communication. ......89

    a.   Based on a detailed analysis, the City identified ample alternative, legal sites for adult businesses............................................89

    b.   The Adult Businesses' contrary arguments are meritless. ................................................94

POINT II ....................................................................101

THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT IN THE CITY'S FAVOR ON THE ADULT BUSINESSES' FIRST AMENDMENT CHALLENGE TO DOB'S PERMITTING REQUIREMENTS...........................101

iii

# TABLE OF CONTENTS (cont'd)

**Page**

    A.  The Adult Businesses do not dispute that they lack standing to challenge DOB's permitting procedures. ...102

    B.  The district court was right that the Adult Businesses do not have standing to challenge DOB's permitting procedures. ..................................................................103

    C.  Even if they had standing, the Adult Businesses' permitting-based theories fail on the merits. ...............111

POINT III ......................................................................118

THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT IN THE CITY'S FAVOR ON THE ADULT BUSINESSES' FOURTEENTH AMENDMENT CLAIMS ..118

    A.  The 2001 Adult-Use Amendment's one-year termination provision does not violate the Adult Businesses' equal protection rights. ..............................118

    B.  Nor does the 2001 Adult-Use Amendment violate the Adult Bookstores' substantive due process rights. .......122

CONCLUSION ..............................................................127

CERTIFICATE OF COMPLIANCE ..............................................128

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*20 Dogwood LLC v. Vil. of Roslyn Harbor,*
   No. 23-930, 2024 U.S. App. LEXIS 8832 (2d Cir. Apr.
   12, 2024) .................................................................. 122

*725 Eatery Corp. v. City of N.Y.,*
   408 F. Supp. 3d 424 (S.D.N.Y. 2019) .................................. 28, 29, 30

*A.H. v. French,*
   985 F.3d 165 (2d Cir. 2021) ............................................ 35

*Agins v. Tiburon,*
   447 U.S. 255 (1980) ..................................................... 36

*Allno Enters. v. Baltimore Cnty.,*
   10 F. App'x 197 (4th Cir. 2001) ...................................... 98, 99

*Antosh v. Vil. of Mount Pleasant,*
   99 F.4th 989 (7th Cir. 2024) .......................................... 84

*Artistic Entm't, Inc. v. City of Warner Robins,*
   223 F.3d 1306 (11th Cir. 2000) ....................................... 113

*Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas,*
   83 F.4th 958 (5th Cir. 2023) .......................................... 57, 77

*Barnes v. Glen Theatre,*
   501 U.S. 560 (1991) .................................................. 41, 70, 79

*BBL, Inc. v. City of Angola,*
   809 F.3d 317 (7th Cir. 2015) .......................................... 57, 109

*Brokamp v. James,*
   66 F.4th 374 (2d Cir. 2023) ........................................... 103

*Buzzetti v. City of N.Y.,*
   140 F.3d 134 (2d Cir. 1998) ......................................*passim*

*BZAPS, Inc. v. City of Mankato,*
   268 F.3d 603 (8th Cir. 2001) .......................................... 76, 77

*Casanova Entm't Grp., Inc. v. City of New Rochelle,*
   165 F. App'x 72 (2d Cir. 2006) ........................................ 93

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Charette v. Town of Oyster Bay,*
 159 F.3d 749 (2d Cir. 1998) ......................................................... 115

*Chesapeake B & M v. Harford Cnty.,*
 58 F.3d 1005 (4th Cir. 1995) ....................................................... 107

*Citizens United v. Schneiderman,*
 882 F.3d 374 (2d Cir. 2018) ............................................ 38, 112, 115

*City of Austin v. Reagan Nat'l Adv. of Austin, LLC,*
 596 U.S. 61 (2022) ............................................................... 56, 57

*City of Erie v. Pap's A.M.,*
 529 U.S. 277 (2000)............................................................ 40, 65, 70

*City of Littleton v. Z. J. Gifts D-4, LLC,*
 541 U.S. 774 (2004) ................................................................. 113

*City of Los Angeles v. Alameda Books,*
 535 U.S. 425 (2002)...............................................................*passim*

*City of N.Y. v. Dezer Props., Inc.,*
 95 N.Y.2d 771 (2000) ....................................................... 12, 14, 47

*City of N.Y. v. Les Hommes,*
 258 A.D.2d 284 (1st Dep't 1999), *rev'd* 94 N.Y.2d 267
 (1999)........................................................................ 13, 14, 65

*City of N.Y. v. Minetta,*
 262 F.3d 169 (2d Cir. 2001) ........................................................ 102

*City of Renton v. Playtime Theatres,*
 475 U.S. 41 (1986)................................................................*passim*

*Clapper v. Amnesty Int'l USA,*
 568 U.S. 398 (2013)................................................................ 104

*Clementine Co., LLC v. Adams,*
 74 F.4th 77 (2d Cir. 2023) .......................................................... 119

*Collins v. Putt,*
 979 F.3d 128 (2d Cir. 2020) ........................................................ 122

*Cmty. Hous. Improvement Program v. City of N.Y.,*
 59 F.4th 540 (2d Cir. 2023) ........................................................ 118

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Connecticut Citizens Defense League, Inc. v. Lamont*,
6 F.4th 439 (2d Cir. 2021) ............................................................ 101

*Corbett v. Hochul*,
No. 22-3210, 2023 U.S. App. LEXIS 30200 (2d Cir. Nov.
14, 2023) ...................................................................................... 110

*Cullen v. Mello*,
No. 23-413, 2024 U.S. App. LEXIS 10564 (2d Cir. May
1, 2024) ........................................................................................ 122

*DLC Mgt. Corp. v. Town of Hyde Park*,
163 F.3d 124 (2d Cir. 1998). ....................................................... 123

*Discotheque, Inc. v. Augusta-Richmond Cnty.*,
No. 21-13218, 2022 U.S. App. LEXIS 27757 (11th Cir.
Oct. 5, 2022)................................................................... 57, 70, 81, 99

*Ellington Constr. Corp. v. Zoning Bd. of Appeals*,
77 N.Y.2d 114 (1990) ........................................................... 123, 124

*Ellwest Stereo Theatres, Inc. v. Wenner*,
681 F.2d 1243 (9th Cir. 1982)........................................................ 66

*Entm't Prods., Inc. v. Shelby Cnty.*,
721 F.3d 729 (6th Cir. 2013)..................................................... 55, 73

*Essence, Inc. v. City of Fed. Hgts.*,
285 F.3d 1272 (10th Cir. 2002)........................................... 60, 70, 79

*Faculty, Alumni, & Students Opposed to Racial
Preferences v. New York Univ.*,
11 F.4th 68 (2d Cir. 2021) ............................................................ 104

*Fantasyland Video, Inc. v. Cnty. of San Diego*,
505 F.3d 996 (9th Cir. 2007)......................................................... 66

*Flanigan's Enters. v. City of Sandy Springs*,
703 F. App'x 929 (11th Cir. 2017)............................................ 50, 51

*For the People Theatres of N.Y. Inc. v. City of N.Y.*,
6 N.Y.3d 63 (2005).................................................................*passim*

*For the People Theatres of NY Inc. v. City of N.Y.*,
29 N.Y.3d 340 (2017) .............................................................*passim*

vii

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*FW/PBS, Inc. v. Dallas*,
493 U.S. 215 (1990) .............................................................. 113, 115

*Geller v. Hochul*,
No. 21-2514-cv, 2023 U.S. App. LEXIS 1077 (2d Cir.
Jan. 18, 2023) ........................................................................ 104

*Greene v. Blooming Grove*,
879 F.2d 1061 (2d Cir. 1989) ............................................... 36

*Hickerson v. City of N.Y.*,
146 F.3d 99 (2d Cir. 1998) .......................................*passim*

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v.
EEOC*,
565 U.S. 171 (2012) ............................................................... 58

*Hunt v. Cromartie*,
526 U.S. 541 (1999) ............................................................... 55

*Indep. News, Inc. v. City of Charlotte*,
568 F.3d 148 (4th Cir. 2009) .............................. 71, 76, 77

*Jackling v. Brighthouse Life Ins. Co.*,
No. 22-1703, 2024 U.S. App. LEXIS 22693 (2d Cir. Sep.
6, 2024) .................................................................................... 101

*Joey's Auto Repair & Body Shop v. Fayette Cnty.*,
785 F. App'x 46 (3d Cir. 2019) ...................................... 123

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021) ............................................. 119

*Lacewell v. Office of the Comptroller of the Currency*,
999 F.3d 130 (2d Cir. 2021) ............................................ 104

*Lakewood v. Plain Dealer Pub. Co.*,
486 U.S. 750 (1988) ....................................................*passim*

*Le Clair v. Saunders*,
627 F.2d 606 (2d Cir. 1980) ............................................ 120

*Lund v. City of Fall Riv.*,
714 F.3d 65 (1st Cir. 2013) .............................................. 89

viii

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Lusk v. Vil. of Cold Spring,*
    475 F.3d 480 (2d Cir. 2007) .......................................................... 114

*Maloney v. Cuomo,*
    554 F.3d 56 (2d Cir. 2009) ........................................................... 125

*Marks v. United States,*
    430 U.S. 188 (1977).......................................................................... 45

*Mastrovincenzo v. City of N.Y.,*
    435 F.3d 78 (2d Cir. 2006) ...................................................... 85, 86

*Matzell v. Annucci,*
    64 F.4th 425 (2d Cir. 2023) ......................................................... 125

*Nectow v. Cambridge,*
    277 U.S. 183 (1928)....................................................................... 125

*Northwest Austin Mun. Util. Dist. No. One v. Holder,*
    557 U.S. 168 (2009)................................................................. 72, 73

*Matter of Perlbinder Holdings, LLC v. Srinivasan,*
    27 N.Y.3d 1 (2016)........................................................................ 108

*Redner v. Dean,*
    29 F.3d 1495 (11th Cir. 1994)..................................................... 113

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)...................................................................*passim*

*Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene,*
    746 F.3d 538 (2d Cir. 2014) ........................................................ 122

*Safepath Sys. LLC v. N.Y. City Dep't of Educ.,*
    563 F. App'x 851 (2d Cir. 2014) ................................................. 122

*Shelby Cnty. v. Holder,*
    570 U.S. 529 (2013)................................................................. 72, 73

*Siemens Energy, Inc. v. De Venezuela,*
    82 F.4th 144 (2d Cir. 2023) .......................................................... 35

*Stringfellow's of N.Y. v. City of N.Y.,*
    91 N.Y.2d 382 (1998) ...............................................................*passim*

## TABLE OF AUTHORITIES (cont'd)

Page(s)

*Sutton v. Chanceford Twp.*,
  763 F. App'x 186 (3d Cir. 2019) ...................................................... 60

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015) .......................................................................... 35

*TJS of NY, Inc. v. Town of Smithtown*,
  598 F.3d 17 (2d Cir. 2010) .......................................................*passim*

*Tollis Inc. v. Cnty. of San Diego*,
  505 F.3d 935 (9th Cir. 2007)............................................... 51, 53, 95

*United States v. Hatter*,
  532 U.S. 557 (2001)........................................................................... 57

*United States v. Salerno*,
  481 U.S. 739 (1987)......................................................................... 118

*United States v. Wilkerson*,
  361 F.3d 717 (2d Cir. 2004) ............................................................. 94

*Vacco v. Quill*,
  521 U.S. 793 (1997)......................................................................... 118

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)........................................................................... 86

*White Riv. Amusement Pub, Inc. v. Town of Hartford*,
  481 F.3d 163 (2d Cir 2007) ........................................... 51, 60, 69, 70

*World Wide Video of Washington, Inc. v. City of Spokane*,
  368 F.3d 1186 (9th Cir. 2004).................................................... 53, 86

*Young v. Am. Mini Theatres*,
  427 U.S. 50 (1976)............................................................. 41, 58, 97

*Young v. City of Simi Valley*,
  216 F.3d 807 (9th Cir. 2000).................................. 104, 110, 111, 112

*Zibtluda, LLC v. Gwinnett Cnty.*,
  411 F.3d 1278 (11th Cir. 2005)........................................................ 49

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

**Statutes, Rules, and Regulations**

1 RCNY § 9000-01(b) ............................................................ 22, 103, 112

NY CPLR Article 78 ..................................................... 22, 108, 112, 115

Fed. R. Civ. Proc. Rule 52(a) ................................................. 35

Indianapolis Mun. Code, tit. IV, § 807-104 ........................... 67

Indianapolis Mun. Code, tit. IV, § 807-110 ........................... 66

Jacksonville Mun. Code, tit. VI, § 150.103 ........................... 68

Jacksonville Mun. Code, tit. VI, § 150.103(e) ....................... 66

Los Angeles Zoning Code § 12.70(B)(1) ............................... 66

Los Angeles Zoning Code §12.70(B)(3) ................................ 67

N.Y.C. Admin. Code § 28-104.2.8 ............................... 107, 116

N.Y.C. Admin. Code § 28-104.2.7 ....................... 107, 112, 114

N.Y.C. Charter § 666(6)(a) ................................................ 108

N.Y.C. Charter Ch. 8 ......................................................... 6

N.C. Gen. Stat. § 14-202.10(4) ........................................ 67

Rochester Mun. Code, Part II, § 98-2 ............................. 66, 67

San Antonio Mun. Code, art. IX, § 21-236 ......................... 66

San Francisco Police Code, art. 11.2, § 791(a) .................... 68

**Other Authorities**

Demographics of New York City, WIKIPEDIA,
    https://perma.cc/69CA-HQAF ....................................... 95

Khafagy, Amir, *Goodbye, Show World: The Last Days of
    Times Square's Peep Shows*, N.Y. CURBED (Apr. 25,
    2019), https://perma.cc/QZR7-6CQF ............................ 27

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*M1 Hotel Text Amendment*, NYC PLANNING,
    https://perma.cc/76UU-R3NV ..................................................... 117

NEW YORK SAPPHIRE WEBSITE, https://perma.cc/5PS8-
    WPT2.................................................................................... 106

Pollak, Michael, *Knowing the Distance*, N.Y. TIMES (Sept.
    17, 2006), https://perma.cc/E2FH-RN9H ...................................... 8

N.Y.C. Dep't of Bldgs., Oper'l & Pol'y Proc. Notice 4/98
    (July 22, 1998) ................................................................... 11

N.Y.C. Dep't of Bldgs., Oper'l & Pol'y Proc. Notice 6/98
    (Aug. 13, 1998) .................................................................. 11

## PRELIMINARY STATEMENT

Plaintiffs in these consolidated cases operate strip clubs and topless bars that regularly feature live sexually oriented entertainment and triple-X stores that show pornography on site and sell sexually oriented books and videos. They structured their decidedly adult operations to avoid the City's 1995 adult-use zoning regulations. But in 2001, the City Council found that they and other similar businesses had circumvented the rules without making substantial changes to their fundamentally sexually oriented operations, and so amended the law to address the problem. Under the 2001 amendment, plaintiffs, like all other adult businesses, may now operate exclusively within certain commercial and manufacturing zones and must maintain a distance of at least 500 feet from schools, places of worship, and other adult businesses.

The 2001 amendment has been stayed for two decades while two separate groups of adult businesses represented by the same counsel pursued overlapping claims in state and federal court. In 2017, the City won a long-running challenge to the 2001 amendment in state court, which culminated in the state's highest court applying federal law to uphold the amendments based on the results of two bench trials. Plaintiffs now seek to relitigate many of the same arguments. After yet another bench trial, the U.S. District Court for the Southern District of New York

(Liman, J.) correctly rejected the plaintiffs' constitutional challenges, finally allowing the law to go into effect. This Court should affirm.

*First*, the district court correctly rejected the adult businesses' First Amendment challenge to the 2001 amendment. The amendment is narrowly tailored to serve a substantial governmental interest in ameliorating the negative secondary effects of adult businesses and leaves open ample alternative avenues of communication across the City. In 2001, the City Council reasonably determined that the newly regulated businesses were fundamentally the same as the adult establishments subject to the 1995 regulation, and so the same evidence it had relied on just six years earlier supported the 2001 amendment. The City demonstrated that the City Council's purpose was not to suppress disfavored speech but rather to effectuate the original purpose of the 1995 regulation already upheld by this Court by dispersing adult businesses to areas in the City where they would do less harm but could still reasonably operate.

*Second*, equally without merit is the adult businesses' theory that the Department of Buildings' permitting procedures for opening new adult businesses chill their speech or operate as a prior restraint. They do not address the district court's thorough and careful analysis concluding that they lack standing to challenge the DOB's procedures and so have waived any contrary argument. In any event, their theories fail on the

merits because the procedures for opening new adult businesses, which are largely the same sensible requirements that are imposed on all new businesses that will operate as places of assembly, include adequate procedural safeguards and properly channel the agency's discretion through a robust regulatory regime that is subject to judicial review.

*Third*, the district court correctly rejected the adult businesses' Fourteenth Amendment arguments. The requirement that adult businesses end their non-conforming use within one year of the law's adoption, subject to extension, does not violate their equal-protection rights because it rationally treats different businesses differently. Their due-process claim, which sounds in substantive due process, likewise fails because regulating the plaintiff adult bookstores is rational, well-supported, and does not deprive them of a protected property interest.

## ISSUES PRESENTED

(1)    Does the 2001 Adult-Use Amendment to the Zoning Resolution, which refines the definition of adult establishment to reach a subset of predominantly adult businesses that had evaded the 1995 regulations, which this Court has already upheld, violate the plaintiffs' First Amendment rights?

(2)     Do the Department of Buildings' robust and largely generally applicable permitting procedures for authorizing new adult businesses violate the plaintiffs' First Amendment rights?

(3)     Does the 2001 Adult-Use Amendment's (a) one-year termination requirement or (b) applicability to bookstores violate the plaintiffs' Fourteenth Amendment equal protection and substantive due process rights?

## STATEMENT OF THE CASE

The following facts are drawn from the district court record, and primarily the parties' submissions during the bench trial (S.D.N.Y. Docket 18-cv-3732 ECF Nos. ("ECF No.")[1] 121-1 to 121-10 (Consolidated Exhibits); 165-1 to 165-7 and 151 (City Declarations of Amron, Gittens, Croswell, and Ruchala);[2] 168-1 (Consolidated Statement of Facts); and 201-1 (Joint Exhibit List)).

---

[1] This Court gave appellants permission to proceed without preparing an appellate record and instead hyperlink to documents on the district court's electronic dockets (2d Cir. Dkt. No. 24-621, ECF No. 25). Citations in this brief to ("ECF No.") refer to the ECF docket number for the docket in *336 LLC. v. City of N.Y.*, S.D.N.Y. Dkt No. 18-cv-3732-LGL, which this Court has designated as the lead case in the consolidated appeals, unless otherwise noted. The other dockets consolidated here are S.D.N.Y. Dkt. Nos. 02-cv-4431, 02-cv-4432, and 02-cv-8333, which correspond to 2d Cir. Dkt. Nos. 24-640, 24-636, and 24-623, respectively.

[2] The City's witness list (ECF No. 165-1 to 165-7) was initially filed under seal. The City filed a motion to unseal (ECF No. 204), which the district court granted by a docket entry dated November 14, 2023. However, because the district court's electronic docket still restricts access to the filing, the citations and hyperlinks here are

*(cont'd on next page)*

### A. New York City's 1995 zoning regulations aimed at curbing the secondary effects of adult businesses

#### 1. The 1994 DCP Study finding that sexually oriented businesses negatively impacted City neighborhoods

It is beyond dispute that sexually oriented adult businesses such as strip clubs and triple-X book and video stores that screen pornography in private or semi-private booths can have negative secondary effects on neighboring communities (ECF No. 121-4 at 42-54). In New York City, there were only nine such establishments in 1965. *Stringfellow's of N.Y. v. City of N.Y.*, 91 N.Y.2d 382, 390 (1998). But in the 1980s and early 1990s, the number ballooned. *Id.* The City's Department of City Planning ("DCP") found that, by the mid-1990s, there were 177 sexually oriented adult businesses in the City (ECF No. 121-4 at 59). Of these, 68 were "topless bars," 86 were "adult bookstores," "video stores," or "peepshows," and 23 were adult "movie and live theaters" (ECF No. 168-1 at 57-58).[3]

---

to the identical witness list and attachments filed on docket 02-cv-4431 at ECF No. 212-1 to 212-7.

[3] DCP used the term "adult bookstore" to refer to businesses that sell, rent, or screen sexually oriented materials, typically "triple-X book and video stores" that often feature "peep booths" where patrons can view such materials on-site and potentially interact with or view other patrons in adjacent booths (ECF Nos. 121-4 at 40-41; 121-7 at 142). DCP used the term "adult theater" to refer to both movie theaters and

*(cont'd on next page)*

DCP, which is responsible for planning and zoning across the City's five boroughs, *see* N.Y.C. Charter Ch. 8, conducted a study in 1994 evaluating the nature and extent of adverse impacts that adult establishments were having on surrounding communities (ECF No. 168-1 at 107). That study laid the groundwork for the City's overhaul of its zoning law and adoption of regulations governing where adult establishments would be permitted.

DCP found, consistent with the findings of other jurisdictions across the country, that adult businesses were having negative secondary effects on neighborhood quality—particularly in parts of Manhattan and Queens where they were highly concentrated ("1994 DCP Study") (ECF No. 121-4 at 29). A study of New York City and studies from across the country found that such businesses are correlated with: increased rates of crimes including prostitution, assaults, and thefts; corresponding increases in policing costs; reduced economic development, revitalization, commercial and shopping activity and decreased property values and tax revenues; diminished community conditions including complaints

---

live performance spaces—including private booths—which show sexually oriented "X-rated movies or topless or nude entertainment" (ECF No. 121-7 at 142). And it used the phrase "adult eating or drinking establishment" to refer to "strip clubs" and "topless/nude bars," where live performers or servers go topless or nude and engage in sexually oriented conduct (ECF Nos. 121-4 at 37; 121-7 at 142).

6

about excessive noise, drunkenness, and pornographic litter; and a perceived decline of community character and quality of urban life (ECF No. 121-4 at 37, 98-105). *See also Buzzetti v. City of N.Y.*, 140 F.3d 134, 136 (2d Cir. 1998) (summarizing studies relied on by New York City).

In light of its findings, DCP recommended that adult establishments should be regulated differently from comparable commercial establishments because of their negative effects (ECF No. 121-4 at 105-07). The following year, DCP and the City Council's Land Use Committee jointly drafted proposed amendments to the Zoning Resolution (ECF No. 121-5 at 9). At the time, the City's Zoning Resolution did not distinguish between "adult" uses and other commercial uses. The proposal created new classifications for adult establishments using the comparable preexisting commercial-use categories: "bookstore," "eating or drinking establishment," and "theater." *Stringfellow's*, 91 N.Y.2d at 393-94.

In 1995, the City's Planning Commission (CPC) submitted the proposed amendments to the City Council along with CPC's 1995 Report (ECF No. 121-5 at 9-86). The 1995 Report explained that the purpose of the zoning amendment was to curb "the adverse secondary effects stemming from adult establishments" and emphasized that the proposed approach left "ample opportunity for adult establishments to locate and operate throughout New York City" (*id.* at 41). It further

explained that it was meant to apply to businesses "with a predominant, ongoing focus on sexually explicit materials or activities" as opposed to "general interest book or video stores with a selection of adult materials that is modest in scale as compared to the overall size of the establishment" (*id.* at 42, 50-60).

### 2. The City Council's adoption of the 1995 Adult-Use Regulation to curb the secondary effects of sexually oriented businesses

After conducting public hearings and reviewing, among other things, the 1994 DCP Study, CPC's 1995 Report, reports prepared by businesses and community boards in affected neighborhoods, and studies from other jurisdictions, the City Council adopted the amendments in October 1995 (ECF No. 121-5 at 4-18, 21-41, 49-50). The amendments prohibit adult establishments from operating in residential districts, certain other districts, or within 500 feet—or roughly two blocks—of a school, house of worship, or other adult establishment ("1995 Adult-Use Regulation") (*id.*; *see also* ECF No. 168-1 at 3).[4] *See* Zoning Resolution ("ZR") §§ 12-10, 32-01, 32-69, 42-01, 42-55, 52-734, 52-77, 72-40. Adult

---

[4] The Court can take judicial notice that a typical north-south block in Manhattan is roughly one twentieth of a mile or 264 feet, while the average distance between avenues is about 750 feet. *See* Pollak, Michael, *Knowing the Distance*, N.Y. Times (Sept. 17, 2006), https://perma.cc/E2FH-RN9H.

establishments may lawfully operate in certain commercial and nearly all manufacturing districts (S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-1 at 4).

When adopting the amendment, the City Council estimated that roughly four percent of the City's total land area remained open to adult establishments, and that there were more than 500 lots to which the 177 then-extant adult businesses could lawfully relocate (*see* ECF No. 121-8 at 232). *See also Stringfellow's*, 91 N.Y.2d at 404 (rejecting challenge that 1995 regulation left open insufficient sites for relocation); *Hickerson v. City of N.Y.*, 146 F.3d 99, 107-09 (2d Cir. 1998) (explaining that the state court applied the same standard that applies to federal law for determining adequacy of alternative sites).

The 1995 Adult-Use Regulation defined an "adult establishment" as a commercial establishment, a "substantial portion" of which was an adult bookstore (that is, a triple-X book and video store, with or without private viewing booths), or an adult eating or drinking establishment (that is, a topless or nude bar or club). ZR § 12-10 (1995). The regulation did not define "substantial portion."

After it was adopted, the City successfully defended the 1995 Adult-Use Regulation against a slew of state and federal free-speech and equal-protection challenges that delayed its enforcement until 1998 (ECF No.

168-1 at 5). *See, e.g.*, *Stringfellow's*, 91 N.Y. 2d 382; *Buzzetti*, 140 F.3d at 141; *Hickerson*, 146 F.3d 99.

In the end, this Court upheld the constitutionality of the 1995 Adult-Use Regulation against a First Amendment challenge, finding that it was content neutral, designed to address the well-documented secondary effects of adult uses in New York City, and allowed for reasonable alternative avenues for communication based on the City's showing that there were over 500 lots across the City where the City's 177 adult businesses could lawfully be located. *Buzzetti*, 140 F.3d at 141. The New York Court of Appeals likewise rejected a free speech challenge after finding that the regulations were "not an impermissible attempt to regulate the content of expression but rather [were] aimed at the negative secondary effects caused by adult uses, a legitimate governmental purpose" and preserved reasonable alternative avenues of communication. *Stringfellow's*, 91 N.Y.2d at 399, 400, 204.

> **3. DOB's 1998 adoption of a "60/40 Rule" to determine if a "substantial portion" of a business was "adult" in nature, leading to widespread evasion of the 1995 regulation**

The City began its enforcement efforts in 1998, once the initial wave of litigation about the 1995 Adult-Use Regulation was resolved. In connection with these efforts, the City's Department of Buildings (DOB), the

agency charged with interpreting and enforcing the Zoning Resolution, issued administrative guidance. That guidance came to be known as the "60/40 Rule" and was later exploited by some adult businesses to avoid adhering to the 1995 Adult-Use Regulation (ECF No. 168-1 at 5-6). At the direction of the City's Planning Commission, DOB interpreted the phrase "substantial portion" in the 1995 zoning regulation to craft a safe harbor to shield "general interest" video and bookstores with small adult sections (ECF No. 121-5 at 58-59). DOB initially determined that, to be covered by the 1995 Adult-Use Regulation, an establishment, whether an adult bookstore or adult eating or drinking establishment, had to devote at least 40 percent of its stock or floor area to that adult use (ECF No. 121-1 at 108, *N.Y.C. Dep't of Bldgs., Oper'l & Pol'y Proc. Notice 4/98 (July 22, 1998)*).

Less than a month later, DOB superseded that policy in part, clarifying that the 60/40 Rule should not apply to adult eating or drinking establishments (ECF No. 121-1 at 111, N.Y.C. Dep't of Bldgs., Oper'l & Pol'y Proc. Notice 6/98 (Aug. 13, 1998)). The City Council had included the phrase "substantial portion" in the umbrella definition of "adult establishment," but had omitted it from the more specific definition of "adult eating or drinking establishment" while including it in the more specific definition of "adult bookstore." ZR § 12-10. Instead, the

11

definition of "adult eating or drinking establishment" did not cover businesses that did not "regularly feature" adult entertainment. However, as further explained below, a later court decision ruled that the DOB's 60/40 Rule had to be applied to adult eating or drinking establishments too. *City of N.Y. v. Dezer Props., Inc.*, 95 N.Y.2d 771, 772 (2000).

It is undisputed that since the 1995 Adult-Use Regulation became enforceable, some regulated businesses permanently closed. There is no evidence in the record about whether the closures were attributable to the 1995 Adult-Use Regulation or to other factors—although CPC's 2001 report noted that "[f]actors apart from enforcement of the Zoning Resolution" likely contributed to the closure of some adult establishments in the city (ECF No. 121-6 at 85). Among the other factors cited were the "redevelopment of Times Square," "a strong local economy in which landlords have a choice of tenants," "the increased availability of adult material on cable television," and "the burgeoning phenomenon of access through the internet" (*id.* at 85-86).

Many of the remaining adult establishments in the City modified their configurations to satisfy the 60/40 Rule so as not to have to relocate, but did so without substantively altering their business models (ECF No. 168-1 at 6-7). By 2001, of the 136 adult establishments in the City, 35 were lawfully sited 100 percent adult establishments and nearly

12

three times more, or 101 adult businesses, were 60/40 establishments (ECF No 168-1 at 50, 58). In Manhattan, where the overall number of adult businesses decreased from 107 in 1995 to 69 in 2001, only ten were in permissible locations for adult businesses under the 1995 Amendments; the remainder were 60/40 establishments (*id*. at 57-58).

The City concluded that the 60/40 Rule was being exploited, thereby undermining the original intent of the 1995 regulation; the City deemed the surface-deep operational changes made by adult businesses a form of "sham compliance" (ECF No. 168-1 at 7). For example, some triple-X shops purchased cheap non-adult video stock in bulk with no real intent of selling that stock (ECF No. 121-6 at 112). Some strip clubs reconfigured their spaces with opaque partitions without substantively altering the nature of their operations to "skirt [the regulations] by means of superficial measures leaving the essentially non-conforming nature of their business intact." *City of N.Y. v. Hommes*, 258 A.D.2d 284, 285 (1st Dep't 1999), *rev'd* 94 N.Y.2d 267 (1999). As a result, many of the adult establishments that the City had intended to be covered by the 1995 Adult-Use Regulation evaded them by achieving technical compliance with the 60/40 Rule without otherwise changing their predominant focus on sexually explicit materials and activities.

The City's enforcement efforts against this widespread sham compliance set off another round of litigation (ECF No. 168-1 at 7), this time centering on statutory interpretation under New York law. Ultimately, the Court of Appeals construed the 1995 Adult-Use Regulation to create a 60/40 safe harbor for all adult establishments, irrespective of the type of adult business or whether compliance was only surface deep. *City of N.Y. v. Dezer Properties, Inc.*, 95 N.Y.2d 771 (2000), *rev'g* 259 A.D.2d 116 (1st Dep't 1999); *Les Hommes*, 94 N.Y.2d 267, *rev'g* 258 A.D.2d 284. To be clear, the Court did not disturb lower courts' findings that, as a factual matter, businesses were using the 60/40 Rule to evade the original intent of 1995 Adult-Use Regulation. The Court simply held that the 1995 regulations, as enacted, did not reach 60/40 establishments.

### B. The 2001 Adult-Use Amendment

#### 1. The City Council's adoption of amendments in 2001 to reach predominantly adult businesses that were evading by the 1995 Adult-Use Regulation

In 2001, when DCP updated the City Council on the results of the City's enforcement efforts, it reported that the vast majority of the City's adult businesses—101 of 136—continued to be primarily focused on sexual activities and materials despite being categorized as 60/40 businesses and located in areas off-limits to adult businesses under the 1995

14

regulations (ECF No. 121-6 at 80, 85, 88-90). More than half of these 101 establishments had been identified as "adult" by DCP in 1993 but had adopted 60/40 configurations in response to the regulations rather than relocating (*id*. at 89). By 1998, 26 new businesses, including one going by the name "Sixty/Forty Video," had opened in locations impermissible for adult uses (*id*.). Because of the high number of 60/40 establishments, adult establishments continued to concentrate in certain parts of the City—a key factor linked to negative secondary effects that DCP had identified in its 1994 Study (*id*. at 86-87; ECF No. 121-4 at 106).

To reach these predominantly adult businesses and better effectuate the City Council's original intent in enacting the 1995 Adult-Use Regulation, DCP applied to CPC for an amendment to the Zoning Resolution (ECF No. 121-6 at 83-84, 103). CPC submitted a lengthy report summarizing its findings and the need for the amendment to the City Council (*id*. at 80-146).

CPC's report recounted evidence showing that 60/40 businesses retained a predominant, ongoing focus on sexually explicit materials or activities, but were able to evade regulation due to superficial changes made to their configuration, and cited the judicial opinions that had found evidence of sham compliance (*id*. at 111-127). For example, with

respect to adult eating or drinking establishments, the City's inspectors had found that adult restaurants and strip clubs had created "artificial separation" between adult and non-adult sections, which they described as "absurd[]" because there was no conceivable reason anyone would visit the portioned-off non-adult section of 60/40 strip clubs and restaurants over any other nightclubs, bars, or restaurants (*id.* at 115).[5]

With respect to 60/40 book and video stores, City inspectors had found that the stores had purchased "carton-fulls [sic] of old instructional videos, kung-fu or karate films, cartoons and the like, which are inexpensive to purchase in bulk," offered "dozens of the same title [as] another economizing measure which nevertheless assists in achieving a mathematical compliance," and left cartons "opened on the floor of the bookstore, and in other cases … simply stacked haphazardly on shelves without any attempt at organization or categorization … to gather dust" (ECF No. 121-6 at 111-12).

The inspectors also observed that the "establishments continue to have a physical lay-out or methods of operation which reflect a

_____

[5] For example, in 2009, a DOB inspector recounted how, when inspecting a 60/40 strip club, he found an area with live topless dancing where all the patrons were, and a second floor up a spiral staircase with "some couches, a pool table, and that was about it" that no patrons visited during the entirety of his 45-minute inspection (ECF No. 121-8 at 13-14).

predominant focus on the sale of adult materials," such as "the presence of peep booths featuring adult material; a method of operation which requires customer transactions with respect to non-adult material, if any, to be made in a section of the store which includes adult material; an interior configuration and lay-out which requires customers to pass through the adult section in order to reach a non-adult section; and a greater number of different titles of adult material than non-adult material," making these "book or video stores distinct from the 'general interest' book or video store that was not intended to be the subject of the 1995 Adult Use Regulations" (*id.* at 112).

After holding public hearings, CPC agreed that amendments were needed to address attempts by businesses with a "predominant, ongoing focus on sexually explicit materials or activities" to evade compliance with the regulations (ECF No. 121-6 at 82-83, 109-115). As explained in a 2001 letter to the City Council Subcommittee on Zoning from DCP's counsel, "the sole purpose of the [proposed] amendments as they relate to topless bars and restaurants is to allow the City to implement the [1995] regulations according to their original intent" (ECF No. 121-7 at 8-10).

The legislative history also includes a lengthy environmental assessment statement addressing the potential environmental and social

17

impacts of the proposed amendment (ECF No. 121-5 at 98-162). The City found that "[t]he proposed action is expected to result in beneficial land use effects and an improved quality of life throughout the city" (*id.* at 138). The study anticipated that "[d]iscontinuance or closing of adult establishments at locations where they were not intended to be allowed under the 1995 Adult Use Regulations will remove the secondary effects of these establishments and is expected to have a revitalizing effect on the business climate as well as help promote an improved residential environment" (*id.*). The study emphasized that the amendment would "result in beneficial effects to neighborhood character in areas where adult establishments are not allowed," taking into account "land use, urban design, visual resources, historic resources, socioeconomic conditions, traffic, and noise" (*id.* at 141). The assessment also noted that there would be over 400 locations in permissible districts to which the existing 60/40 establishments could relocate (*id.* at 139).

In 2001, the City Council approved the amendments ("2001 Adult-Use Amendment") (ECF No. 121-1 at 41-58). The 2001 Adult-Use Amendment changed the 1995 regulations' definitions, eliminating the substantial-portion formula from the definition of adult eating or drinking establishments and modifying it for adult bookshops to ensure that predominantly adult businesses could not evade the City's regulation of

adult use though superficial compliance. It also clarified when adult businesses would be required to terminate their preexisting nonconforming uses.

*First*, by amending the definition of adult establishment, the City Council made clear that if any portion of an eating or drinking business regularly features live adult entertainment, it would be an adult establishment (ECF No. 121-6 at 129). Thus, under the 2001 amendments, businesses regularly featuring live performances characterized by an emphasis on "specified anatomical areas" or "specified sexual activities," or having "employees who, as part of their employment, regularly expose to patrons specified anatomical areas" are considered adult establishments if those performances regularly occur in any portion of the establishment (*id.*). ZR § 12-10.

*Second*, although the amendment retained the "substantial portion" language with respect to book and video stores, the City Council clarified that a book and video store will be classified as adult if *either*: (1) a "substantial portion" of the printed or visual material it offers for sale is "adult" (retaining the 60/40 Rule as one test), *or* (2) it meets at least one of eight objective criteria that DOB inspectors had found common among book and video stores maintaining a predominant focus on sexually explicit materials or activities. A business falls into the 'adult'

19

category if it: (1) requires customers to go through adult sections to get to non-adult areas; (2) has peep booths for viewing adult films or performances; (3) makes customers pay for non-adult items in areas where adult items are also present; (4) sells or rents more adult titles than non-adult titles; (5) offers more adult titles compared to non-adult titles, even if the adult items make up less than 40% of the inventory; (6) limits or prohibits minors from entering the store or specific sections of it; (7) displays larger signs for adult materials compared to non-adult ones, relative to the amount of each type of material; or (8) shows more adult materials in window displays or uses more display space for adult materials, compared to non-adult items. *See* ZR § 12-10(2)(d)(aa)-(ii) (ECF No. 121-1 at 47-40).

*Third*, the 2001 Adult-Use Amendment also added a provision, entitled "Continuation of Certain Adult Establishments," providing that any preexisting 60/40 business that made financial expenditures to avoid being subject to the 1995 Adult-Use Regulation would have one year from October 31, 2001 to remain in place and recoup any investments, subject to extension by the Board of Standards and Appeals "for the applicant to recover substantially all of such financial expenditures." ZR § 72-41.

More than twenty years later, the amendment still has not gone into effect, as a result of litigation stays (ECF No. 168-1 at 8). Thus, all 60/40 businesses defined as adult under the amendments and in existence at the time of the amendments' adoption have had decades to recoup their investments. All 60/40 businesses defined as adult under the amendments and founded since the time of the adoption were on notice of their lack of compliance from the time of establishment, and many have similarly had years to recoup their investments.

In the meantime, the DOB has adjusted the regulatory process for opening new adult businesses. Nowadays, most aspects of that process are largely the same as the process for other new businesses that seek to operate a place of public assembly.[6] For example, DOB requires adult businesses to obtain a certificate of occupancy; submit building-permit applications, including, if desired, self-certified applications; and abide by the City's building codes, fire codes, Zoning Resolution, and Administrative Code (ECF Nos. 121-1 at 114-19, 123-137; 121-2 at 14, 17).

---

[6] In this lawsuit, the Adult Businesses challenged several of DOB's previous permitting procedures that: (1) had prohibited 60/40 establishments from using professional self-certification available to other commercial entities when seeking building permits, which they contend is a less onerous alternative, and (2) until 2022, had required building permits for 60/40 establishments to be reviewed by DOB's Legal Counsel (ECF No. 168-1 at 36-41). These rules are no longer in effect, and the Adult Businesses expressly withdrew their argument that the DOB's professional certification requirement could be reimposed (ECF No. 183).

The permitting process is extensively regulated, governed by objective standards, and has multiple procedural protections. *See, e.g.*, N.Y. Civil Practice Law and Rules (CPLR) Article 78.

The main difference between the building-permit applications of adult businesses and other comparable businesses is that adult businesses must, in their siting applications, demonstrate compliance with the 500-foot buffer rule—that is, that they are not within 500 feet of an existing house of worship or a school, or other adult establishment (ECF Nos. 121-1 at 120-122; 121-2 at 9; S.D.N.Y. Dkt. 02-cv-4431, ECF Nos. 212-1 at 5; 212-3 at 3). There is no indication in the record that this requirement is any more burdensome than the requirements that other uses must deal with in demonstrating that their new site is consistent with zoning rules. Under 1 RCNY § 9000-01(b), once an adult establishment is "established" with proper permits from the DOB, even before it opens, it will not be displaced if, thereafter, a house of worship or school obtains permission to open within 500 feet of the lot (S.D.N.Y. Dkt. 02-cv-4431, ECF Nos. 212-1 at 5; 212-2 at 10-11).

**2. Nearly two decades of state court litigation challenging the City's attempt to amend the 1995 Adult-Use Regulation to reach 60/40 businesses**

The City's adoption of the 2001 Adult-Use Amendment was followed by yet another round of state and federal court litigation brought by separate sets of plaintiffs. *For over twenty years*, there has been at least one lawsuit pending in either state or federal court preventing the enforcement of the 2001 Adult-Use Amendment (ECF No. 168-1 at 8). Thus, despite being the law for more than two decades, none of the City's 60/40 establishments, including the plaintiffs here, have been required to comply (*id.*).

This is so even though the New York Court of Appeals unequivocally held in 2017—*seven years ago*—"that the 2001 amendments are facially constitutional" under the New York Constitution based on an application of federal precedents. *For the People Theatres of NY Inc. v. City of N.Y.*, 29 N.Y.3d 340, 363 (2017). The *People Theaters* consolidated cases ping-ponged between trial and appellate courts, and twice made their way to the New York Court of Appeals.

In 2005, the Court of Appeals generally approved of the 2001 Adult-Use Amendment but remanded for further factual development about the government's substantial interest in adopting the amendment. *For*

*the People Theatres of N.Y. Inc. v. City of N.Y.*, 6 N.Y.3d 63, 77-83 (2005). The Court remanded for fact finding into whether the 2001 City Council had a sufficient evidentiary basis for its inference that 60/40 businesses were not "so transformed in character that they no longer resemble the kinds of adult uses found, both in the 1994 DCP Study and in studies and court decisions around the country, to create negative secondary effects." *Id.* at 83-84.

The case returned to the Court of Appeals in 2017 after two bench trials. After reviewing the evidence, the court held that "the City has met its burden of demonstrating that the establishments affected by its 2001 zoning amendments retained a predominant focus on sexually explicit materials or activities," so are within the category of business that were intended to be regulated by the 1995 Adult-Use Regulation. *People Theatres of N.Y.*, 29 N.Y.3d at 344.

Indeed, the evidence adduced at the bench trials substantiated the findings of the 2001 CPC report, which the City Council had relied on in adopting the 2001 Amendment (*id.* at 351-57; *see supra* at 15). For example, the evidence established that bookstores had "peep booths for viewing adult films, with an average of about 17 booths per store," which, "by design, obviously promote sexual activities"; featured "signage, displays, and layouts to promote sexually focused adult materials

24

and activities"; and sold "sex toys, adult novelties, and the like in the nonadult sections of the stores." *Id.* at 363. Likewise, "in all the clubs, topless dancing takes place at all times daily for approximately 16 to 18 hours a day and also that lap dances, a quintessentially sexual activity, were offered by dancers in both public and private areas of the club." *Id.* (cleaned up).[7]

In sustaining the 2001 Amendment, the Court of Appeals reversed the lower courts, which had struck down the 2001 Amendment based on the same evidence. Applying U.S. Supreme Court precedent on adult-use zoning, the Court of Appeals held that the relevant question was whether the City had "fairly supported" its judgment that the 60/40 businesses covered by the 2001 Amendment were substantially the same as the businesses the City had sought to regulate in 1995, and that the lower courts had improperly substituted their judgment for the City Council on this issue. *Id.* at 357-60, 362-63. Once the lower courts' improper findings were weeded out, the remaining findings and evidence supported the City Council's determination. *Id.* at 358-63. For the same reasons, the Court rejected the plaintiffs' argument that the City was required to generate new data regarding the adverse secondary effects of

---

[7] This brief uses "cleaned up" to indicate that internal quotation marks, alterations, or citations have been omitted from quotations.

60/40 establishments because the City had shown that 60/40 establishments retained the same characteristics as other adult businesses, "which had already been determined to give rise to negative secondary effects." *Id.* at 348.

The U.S. Supreme Court denied the plaintiffs a stay pending a petition for a writ of certiorari and later denied the petition for certiorari. *Ten's Cabaret, Inc. fka Stringfellow's of New York, Inc., v. City of N.Y.*, No. 17-A38 (July 6, 2017) and No. 17-841 (Feb. 20, 2018). In 2018, the 2001 Adult-Use Amendment would have finally gone into effect, 16 years after its adoption. However, a new set of clubs and triple-X bookstores—the plaintiffs here, represented by the same counsel as the plaintiffs in the state cases—reopened this action in federal court, filed another companion case, and obtained a preliminary injunction.

### C. These four lawsuits and their resolution in the City's favor after a bench trial

#### 1. The Adult Businesses' challenges to the 2001 Adult-Use Amendment

The plaintiffs in these four cases (collectively, the "Adult Businesses"), which were consolidated (*see* ECF No. 209), brought their cases in two rounds. The adult-eating-or-drinking-establishment plaintiffs commenced actions in federal court in 2002 (S.D.N.Y. Dkt. Nos. 02-cv-4431, 02-cv-4432, and 02-cv-8333). These plaintiffs operate strip

26

clubs—called Platinum Dolls, Satin Dolls, Flashdancers, Vixen, and Sapphire—that they admit regularly feature topless dancers (ECF No. 121-10 at 86; ECF No. 168-1 at 16-24). The clubs are defined by the 2001 Adult-Use Amendment as "adult," but were exempt from the 1995 Adult-Use Regulation under the 60/40 Rule (ECF No. 168-1 at 13-14). In 2018, the plaintiffs reopened their cases, which had been administratively closed pending the outcome of state court litigation (*e.g.*, S.D.N.Y. Dkt. No. 02-cv-8333 ECF No. 42).

Another set of plaintiffs (the "Adult Bookstores") commenced their action in 2018 (S.D.N.Y. Dkt No. 18-cv-3732). They operate stores that sell or rent a mix of pornographic and general content and offer as many as 27 on-site private viewing booths where patrons can view pornographic videos—and, in some cases, view and interact with other patrons in adjacent booths, colloquially known as "buddy booths"[8] (ECF No. 168-1 at 24-36).

The Adult Businesses, like the plaintiff establishments in the long-running state litigation, contend that their businesses are configured so that adult materials and live performers cannot be seen from at least 60% of the floor space or that less than 40% of their stock consists of

---

[8] Khafagy, Amir, *Goodbye, Show World: The Last Days of Times Square's Peep Shows*, N.Y. CURBED (Apr. 25, 2019), https://perma.cc/QZR7-6CQF.

adult materials (ECF No. 168-1 at 17-36). In their complaints, they pri-
marily challenge the 2001 Adult-Use Amendment on First Amendment
grounds, often repeating arguments made in the state litigation (*e.g.*,
ECF No. 20 at 55-57). The Adult Businesses also allege that DOB's pro-
cedures for issuing building permits are prior restraints on their speech
(*id.* at 57) and argue that the extendable one-year termination require-
ment violates their free speech and equal protection rights because it
treats them differently from other preexisting, non-conforming uses (*id.*
at 58; *see* ECF No. 168-1 at 17).

The adult-eating-or-drinking-establishment plaintiffs—but not the
bookstore plaintiffs—also allege that houses of worship and schools are
impermissibly given a "veto" over their permit applications. Their the-
ory is that DOB might process applications submitted by houses of wor-
ship and schools to move within 500 feet of a lot intended for adult use
more quickly than the adult establishment's parallel application,
thereby rendering the lot unavailable for adult use (S.D.N.Y. Dkt. No.
02-cv-8333, ECF No. 42 at 57).

## 2. The district court's grant of a preliminary injunction

In September 2019, Judge Pauley granted the plaintiffs' motion for a
preliminary injunction further prohibiting enforcement of the 2001

Adult-Use Amendment (ECF No. 70; *725 Eatery Corp. v. City of N.Y.*, 408 F. Supp. 3d 424 (S.D.N.Y. 2019)). The court applied intermediate scrutiny and found that the City had amply "demonstrate[d] that the 2001 Amendments promote the City's interest in reducing secondary effects more effectively than if they did not exist," and that the City did not need to perform a new study in 2001 or study the secondary effects of 60/40 establishments, specifically. *725 Eatery Corp.,* 408 F. Supp. 3d at 465. However, Judge Pauley concluded that, on the "preliminary record," the City had not shown that the 2001 Amendment left open sufficient alternative avenues of communication because the City's preliminary lot-by-lot analysis of permissible alternative locations was focused on Manhattan and did not show how many businesses could simultaneously be located in other boroughs. *Id.* at 465, 468-69.

### 3.  The district court's resolution, after a bench trial, of all claims in the City's favor

After the parties completed discovery, they filed cross-motions for summary judgment. The district court directed the parties to proceed to a bench trial (Liman, J.), and the parties consented to submit the case on the papers (ECF Minute Entry for 11/09/2023).

The parties submitted an 80-page consolidated joint stipulated statement of facts dated May 19, 2023 (ECF No. 168-1), a joint 10-volume

record of exhibits (ECF Nos. 121-1 to 121-10), and witness declarations in lieu of live testimony (*see* S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212). The legislative and historical facts were largely undisputed, with the bulk of the parties' dispute centered on whether the alternative lots to which adult establishments could relocate satisfied the First Amendment's requirement that a zoning regulation that displaces protected activity also leave adequate alternative avenues for that speech—the only issue Judge Pauley identified as unresolved. *725 Eatery Corp*, 408 F. Supp. 3d at 468-68. The adult bookstores admit that all of them feature private viewing booths and the adult eating or drinking establishments admit that they all regularly feature adult entertainment (ECF No. 168-1 at 16-36).

After considering the evidence and holding two days of oral argument, the district court resolved the case in the City's favor in a thorough and well-reasoned 167-page decision and order (ECF No. 211).

First, the district court outlined the applicable standards under the First Amendment (*id.* 50-76). The court concluded that intermediate scrutiny applies to the Adult Businesses' challenge to the 2001 Adult-Use Amendment's elimination of the 60/40 Rule (*id.* at 77-87) and concluded that the amendment passed muster because it was crafted to serve a substantial governmental interest in curbing adult businesses'

negative secondary effects (*id*. at 87-97) and left open adequate alternative avenues of communication (*id*. at 97-118).

The parties agreed that 32 businesses would be displaced by the Amendment if allowed to go into effect. Ten adult businesses—eight clubs and two bookstores—were 100 percent adult establishments that would not need to relocate under the 2001 Adult-Use Amendment because they are in permissible locations for adult uses (ECF No. 168-1 at 59). Of the 32 that would be required to relocate in order to comply with the 2001 Adult-Use Amendment, 19 are in Manhattan, 5 in Brooklyn, 5 in Queens, 3 in the Bronx, and none in Staten Island (ECF No. 168-1 at 59-60). Of the 19 60/40 adult establishments in Manhattan that would need to relocate, 14 were adult bookstores with peepshow booths and five were eating or drinking establishments regularly featuring live adult performers (*id*. at 60).

The City submitted quantitative evidence from 2023 from the DCP's Geographic Information Systems Team Lead and Open Data Coordinator, who oversaw a "very conservative" count of the number of available lots "eliminat[ing] all lots that were deemed questionable" and who concluded that there are a minimum of 1,275 available lots for adult uses in the City (S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-3 at 6). The City reached this figure after evaluating over 2,200 lots using computer

31

software, and excluding lots based on zoning districts, lack of street frontage, minimum lot size, and tax records showing a current use of any structure within 500 feet that may potentially be a house of worship, a school, or major infrastructure (ECF No. at 168-1 at 72; (S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-3 at 5-7). The City also considered the size of the spaces and different forms of available transportation (private vehicles, mass transit, ride share, etc.) in deciding if lots were available and accessible to the public (ECF No. 168-1 at 72-77). Of the 1,275 lots that it ultimately found available, the City's analysis showed that at least 204 lots could be simultaneously used by adult establishments, given the requirement that they be located at least 500 feet away from each other (S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-3 at 7). The court credited these figures (ECF No. 211 at 100-06).

The City also submitted qualitative evidence about these available lots, which the district court also credited (*id.* at 106-118). The Department of City Planning's General Counsel submitted testimony concerning the City's Zoning Resolution and the character of the districts where adult businesses are prohibited and where they are permitted (S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-1). The evidence showed that the 1,275 lots across all five boroughs are in highly desirable neighborhoods that include retail, office, service, and entertainment, in addition to

manufacturing and industrial uses, and are readily accessible by a mix of public transportation, taxis, ride shares, and private vehicles (*id*. at 5-7).[9]

For their part, the Adult Businesses disputed the City's figures for a variety of reasons, including economic feasibility and on the theory that there were an insufficient number of available lots in Manhattan—where 19 adult businesses currently in Manhattan would need to relocate to comply with the 2001 Adult-Use Amendment and where only five Manhattan lots are available for simultaneously operating adult businesses (ECF Nos. 212 at 106; 168-1 at 78). The district court rejected their legal arguments, explaining that the lots identified by the City were part of the general commercial market and thus available, regardless of what borough they were in or whether relocating there would be economically viable (ECF No. 212 at 106-09).[10] The court also rejected the Adult

---

[9] It is undisputed that the City did not conduct a separate transportation or infrastructure analysis for each site, any economic feasibility analysis, or site visits, and that some of these lots—like much of New York City—are in areas potentially at risk for coastal flooding (ECF Nos. 168-1 at 52-54; 121-3 at 17).

[10] The Adult Bookstores—shops that currently sell or rent a mix of adult and general-interest videos, books, and sexually oriented accessories—separately argued that 110 of the 204 lots are not available to them because they are in manufacturing districts where traditional bookstores are not permitted (ECF No. 168-1 at 46, 78). The City explained that, unlike traditional bookstores, adult bookstores are allowed in all these districts, and thus, that the 32 businesses that currently operate under the 60/40 Rule could all simultaneously relocate to one of these 204 lots (ECF No. 168-1 at 59; S.D.N.Y. Dkt., ECF No. 212-1 at 5).

Businesses' arguments that the Constitution guarantees them grandfathering status under the First Amendment or the Fourteenth Amendment's substantive due process or equal protection clauses (ECF No. 211 at 118-28).

Next, the court rejected the Adult Businesses' separate challenge to the DOB's procedures for permitting them to operate in new sites. The Adult Businesses had argued that the DOB's procedures could be used to their disadvantage when trying to relocate and that they lacked sufficient procedural safeguards, and so operated as a prior restraint (ECF No. 176 at 51-72). The district court found that the adult businesses lacked standing to challenge these provisions, which had not been applied to them, on these highly speculative theories (ECF No. 211 at 139-50). Moreover, the court rejected their arguments on the merits, because they were premised on factual and legal errors (*id.* at 151-60). The City had shown that it had already eased some of the challenged restrictions and, should the 2001 Amendments be upheld, that Adult Businesses would largely be on the same footing as all other applicants for building permits (*id.* at 130-36). Moreover, the court concluded that these generally applicable provisions appropriately constrained DOB's discretion and included sufficient procedural safeguards. Finally, the

34

court rejected the Adult Businesses' due process claims out of hand as meritless under rational-basis review (*id.* at 161-66).

## SUMMARY OF ARGUMENT
## AND STANDARD OF REVIEW

This Court should affirm the district court's entry of judgment in favor of the City. The district court's thorough and well-reasoned 167-page opinion and order summarizing its findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure contains no reversible errors irrespective of the applicable standard review.

The Adult Businesses misstate the standard of review in arguing that the district court's opinion and order is due no deference at all (Consolidated Brief for Plaintiffs-Appellants ("App. Br.") at 28). This Court reviews conclusions of law and mixed questions of law and fact *de novo*. *Siemens Energy, Inc. v. De Venezuela*, 82 F.4th 144, 153 (2d Cir. 2023). This Court also reviews the "core constitutional facts" of plaintiffs' First Amendment free speech claims *de novo*. *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021). However, historical facts and facts relating to plaintiffs' Equal Protection and Due Process claims are reviewed for clear error under the highly deferential standard that generally applies when reviewing a district court's factual findings following a bench trial. Fed. R. Civ. Proc. Rule 52(a)(6). The Supreme Court has emphasized that

Rule 52(a)(6)'s standard applies both to a district court's resolution of ultimate factual disputes and to subsidiary factual findings. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 324 (2015). Here, regardless of the applicable standard of review, this Court should affirm.

*First*, the 2001 Adult-Use Amendment falls squarely within the City's broad authority to craft solutions to local land-use problems through zoning. Cities have broad authority to adopt zoning regulations that restrict the use of private property as part of their police powers. *Agins v. Tiburon*, 447 U.S. 255, 260-262 (1980); *Greene v. Blooming Grove*, 879 F.2d 1061, 1063 (2d Cir. 1989) (zoning regulations are presumed valid so long as their wisdom is "fairly debatable"). While the First Amendment imposes limits on the ability of municipalities to adopt zoning ordinances that impact speech, sexually oriented businesses receive limited protection under the First Amendment. *TJS of NY, Inc. v. Town of Smithtown*, 598 F.3d 17, 20 (2d Cir. 2010).

As the district court correctly found, the 2001 Amendment does not offend adult businesses' First Amendment rights because it was designed to enhance the City's ability to curb the negative secondary effects of adult businesses—a well-recognized substantial governmental interest—and leaves ample alternative avenues for expression. State and federal courts unanimously upheld the 1995 Adult-Use Regulation, and all

that the 2001 Adult-Use Amendment did was close a definitional loop-hole in order to better achieve the original intent of the 1995 regulation. Already seven years ago, the New York Court of Appeals found, following two bench trials, that the 2001 Amendment passed constitutional muster under the same legal framework based on the same core facts at issue here. There is no basis for this Court to reach the opposite conclusion.

The Adult Businesses' appellate brief offers a hodgepodge of arguments seemingly aimed at undermining the district court's findings on intermediate scrutiny. None carries the day. The City established that it enacted the 2001 Adult-Use Amendment to further its substantial interest in curbing negative secondary effects. It also established that there are currently more than 200 permissible lots that can be simultaneously occupied by the 32 adult businesses that will be displaced by the 2001 Adult-Use Amendment's elimination of the 60/40 rule. The Adult Businesses' attempts in their briefs to muddy the waters are meritless, and their decades-long interruption of the law's enforcement must come to an end.

*Second*, the district court also correctly rejected their challenge to the DOB's procedures for establishing new adult businesses. The Adult Businesses do not address the district court's holding that they do not

have standing to challenge provisions that were never applied to them based on mere speculation about possible harm. As a result, they have waived any contrary argument and, in any event, there is no reason to believe that the City's permitting scheme will be used to their disadvantage.

Nor is there any merit to their theory that the DOB's permitting procedures operate as a prior restraint on their speech. Municipalities may lawfully require businesses to obtain permits before engaging in protected speech, without creating an impermissible prior restraint, provided they adopt procedural safeguards and do not deploy the administrative apparatus to weed out disfavored expression before it occurs. *Citizens United v. Schneiderman*, 882 F.3d 374, 387 (2d Cir. 2018). The City demonstrated that DOB's discretion is appropriately constrained by a robust regulatory scheme, which applies in substantially the same ways for all new businesses, requires prompt processing of applications, and is subject to expeditious judicial review.

*Third*, plaintiffs' Fourteenth Amendment claims are utterly meritless, as the district court also correctly found. Their equal protection argument—premised on the City Council's decision not to give them "grandfathered" status—fails because they did not identify any similarly situated comparator who is treated differently. Other pre-existing non-

38

conforming uses are grandfathered by state law or allowed to remain in place longer because their uses are regulated for different reasons. The requirement that adult businesses end their non-conforming use after one year is rational and reasonable and reflects that the purpose of the zoning regulation is to end non-conforming uses and their negative secondary effects. Plaintiffs' arguments to the contrary are merely a repeat of their meritless First Amendment contentions and, moreover, all of the Adult Businesses have had well over a year to recoup their investments.

The district court correctly rejected the Adult Bookstores' separate argument that the City's zoning regulations violate their rights to Due Process under the Fourteenth Amendment. Although they invoke both, their claims sound in substantive—and not procedural—due process. Those claims fail because the Adult Bookstores did not identify any protected property or liberty interest in operating their businesses without the interference of government regulation, and, in any event, the 2001 Adult-Use Amendment easily survives means-end scrutiny.

## ARGUMENT

## POINT I

## THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT IN THE CITY'S FAVOR ON THE ADULT BUSINESSES' FIRST AMENDMENT CHALLENGE TO THE 2001 ADULT-USE AMENDMENT

The district court correctly applied the well-settled standards that apply to judicial review of zoning regulations that disperse adult uses and rejected the Adult Businesses' First Amendment challenge to the 2001 Adult-Use Amendment. Sexually oriented expressive conduct falls "only within the outer ambit of the First Amendment's protection." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 297 (2000). *Cf. City of Los Angeles v. Alameda Books*, 535 U.S. 425, 443-44 (2002) (Scalia, J., concurring) ("The Constitution does not prevent those communities that wish to do so from regulating, or indeed entirely suppressing, the business of pandering sex"). Given the limited free-speech protection sexually oriented speech receives and the broad municipal authority over local zoning, it is not surprising that the Supreme Court has upheld adult-use zoning regulations against First Amendment challenges on every occasion the issue has been put to it. *Alameda Books*, 535 U.S. at 453 (Kennedy, J., concurring); *Renton v. Playtime Theatres*, 475 U.S. 41, 49-50

40

(1986); *Young v. Am. Mini Theatres*, 427 U.S. 50, 70-71 (1976); *see also Barnes v. Glen Theatre*, 501 U.S. 560, 572 (1991) (upholding application of public indecency statute against nude dancing club).

From the Supreme Court's cases emerges the *Renton* three-step approach to First Amendment challenges to adult-use zoning regulations. *See Alameda Books*, 535 U.S. at 434 (plurality op.) (summarizing three-step approach). First, a court determines whether a challenged zoning regulation is an invalid total ban on adult businesses or is instead akin to a time, place, and manner regulation. *Id.* If it is the latter, at the second step, the court determines whether the regulation should be subjected to intermediate or strict scrutiny, depending on whether the legislature's purpose was to address the negative secondary effects of adult businesses or to target their content. *Id.* Finally, if intermediate scrutiny applies, the court assesses whether the ordinance serves a substantial governmental interest and allows for reasonable alternative channels of communication. *Id.*

The City's 2001 Adult-Use Amendment easily passes constitutional muster under this three-step approach. Indeed, the City Council's 1995 Adult-Use Regulation was upheld by both the state and federal courts applying this very same three-step approach. In 2001, the City Council made a narrow definitional adjustment based on a legislative judgment

that there had been broad evasion of its regulation. Since then, after years of litigation and two full trials of the merits, New York's highest court applied *Renton*'s framework to parallel state law free speech claims and found that the amendment did not offend adult businesses' free-speech rights. The Adult Businesses nonetheless want to relitigate every issue decided by state and federal courts over the last 25 years over again, based on mischaracterizations of the City's intent, the record, and the state of the law.

### A. The 2001 Adult-Use Amendment easily satisfies *Renton*'s first step because it is not a total ban on sexually oriented businesses.

The district court correctly determined that the 2001 Adult-Use Regulation is akin to a time, place, and manner regulation at *Renton*'s first step (ECF No. 211 at 77). At this step, a court asks whether the challenged zoning regulation bans sexually oriented establishments altogether, or merely requires that they be located in specific zones or a specified distance away from each other or from sensitive locations. *Alameda*, 535 U.S. at 434 (plurality op.). While total bans are impermissible, a regulation that merely restricts the location of adult uses is analyzed as though it were a "time, place, and manner regulation." *Id; see also Renton*, 475 U.S. at 49-50. Here, there is no dispute that the 1995

42

regulation was a lawful zoning restriction, not a total ban (App. Br. 40), and the 2001 Adult-Use Amendment merely modified which businesses are covered by the 1995 restrictions, and so is, likewise, not a total ban.

### B. Under *Renton*'s second step, the 2001 Adult-Use Amendment is subject to intermediate scrutiny.

#### 1. The 2001 Adult-Use Amendment was designed to curb negative secondary effects and not to suppress disfavored speech.

At *Renton*'s second step, the district court correctly determined that the 2001 Adult-Use Amendment is subject to intermediate scrutiny because the City's aim in enacting it was to reduce negative secondary effects of adult businesses, not to suppress speech by adult businesses operating under the 60/40 Rule (ECF No. 211 at 78-87). More specifically, the 2001 Adult-Use Amendment was a definitional amendment adopted in response to bad faith compliance, with the express purpose of improving the City's ability to achieve the original intent of the 1995 legislature—to reduce negative secondary effects.

Courts determine whether a regulation should be subject to intermediate or strict scrutiny by considering whether it was enacted to combat "secondary effects" or to suppress disfavored speech. *Renton*, 475 U.S. at 55; *Alameda*, 535 U.S. at 447 (Kennedy, J., concurring). Regulations aimed at combatting secondary effects are subject to intermediate

scrutiny, while regulations aimed at suppressing disfavored speech are treated as content-based, and subject to strict scrutiny review. *Alameda*, 535 U.S. at 448 (Kennedy, J., concurring).

The *Renton* majority acknowledged that zoning regulations that target businesses because of the sexually oriented content of their offerings may appear, at first blush, to be content based. 475 U.S. at 47-48. But the Court explained that such regulations should be treated as content neutral if they are "*justified* without reference to the content of the regulated speech," and the municipality's aim is not to "suppress the expression of unpopular views" but "to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life"—which the Court described as negative "secondary effects" of adult businesses. *Id.* at 48.

Applying the standard enunciated in *Renton*, in *Buzzetti*, this Court upheld the constitutionality of the 1995 Adult-Use Regulation because it was crafted to target the secondary effects of adult businesses on the City. *Buzzetti v. City of N.Y.*, 140 F.3d 134, 138 (2d Cir. 1998). This Court emphasized that the relevant question for determining the applicable level of scrutiny is the municipality's *justification* for the zoning regulation—that is, whether the municipality's "overall purpose" is to

44

impermissibly suppress disfavored content or to legitimately curb negative secondary effects. *Id.* at 139. After *Buzzetti*, the Supreme Court revisited the constitutionality of adult-use zoning restrictions and reaffirmed that such regulations are subject to intermediate scrutiny if they were crafted to curb negative secondary effects. *Alameda*, 535 U.S. at 440-43 (plurality op.); *id.* at 448-51 (Kennedy, J., concurring).[11]

Correctly applying this standard here, the district court found that under *Renton* and its progeny, the 2001 Adult-Use Amendment should be reviewed under intermediate scrutiny because it was justified by the City's well-documented goal of curbing the adverse secondary effects of adult businesses and not by a desire to suppress speech (ECF No. 211 at 78-87). After all, the Adult Businesses concede that the 1995 Adult-Use Regulation was intended to ameliorate the negative secondary effects of adult businesses (App. Br. 40). And the City's evidence overwhelmingly established that, in 2001, its intended purpose was to better advance the goals of the 1995 regulation (ECF No. 121-6 at 80-90).

The New York Court of Appeals held as much. The court found that "the 1995 Ordinance did not achieve its goal" due to widespread "sham

---

[11] This is the controlling holding of *Alameda*—that is, "the narrowest grounds" agreed upon by the four-justice plurality and Justice Kennedy's concurrence. *See Marks v. United States*, 430 U.S. 188, 168 (1977).

compliance," *People Theaters of N.Y.*, 6 N.Y.3d at 74 n.3, 83, and that the 2001 amendment aimed to bring into the fold those businesses that "retained a predominant, ongoing focus on sexually explicit entertainment, which had already been determined to give rise to negative secondary effects," *People Theaters of N.Y.*, 29 N.Y.3d at 348.

The legislative record confirms this. CPC's 2001 Report explains that an amendment was needed because 60/40 businesses retained a predominant, ongoing focus on sexually explicit materials or activities, yet were able to evade regulation by virtue of the inclusion of the phrase "substantial portion" in the Zoning Resolution (ECF No. 121-6 at 127, 160). And the City's 2001 assessment of the potential environmental and social impacts of the proposed amendment reports that the amendment would "result in beneficial land use effects and an improved quality of life throughout the city" by having a "revitalizing effect on the business climate," and improving the "residential environment" and "neighborhood character," taking into account "land use, urban design, visual resources, historic resources, socioeconomic conditions, traffic, and noise"" (ECF No. 121-5 at 138, 141). The assessment also noted that there would be over 400 locations in permissible districts to which the existing 60/40 establishments could relocate (*id.* at 139).

The Adult Businesses did not identify a single scrap of evidence suggesting that the City's true purpose in 2001 was to silence disfavored sexually oriented speech. Thus, this Court should affirm the district court's determination that the 2001 Adult Use Amendment should be reviewed under intermediate scrutiny.

### 2. The Adult Businesses' arguments about *Renton*'s second step are meritless.

The Adult Businesses advance two main arguments about *Renton*'s second step, neither of which withstands scrutiny. First, contrary to their contentions, Justice Kennedy's concurrence in *Alameda* makes no difference here. Second, plaintiffs are mistaken in arguing that *Renton*'s second-step analysis was overruled by the Supreme Court's decision in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).[12]

---

[12] The Adult Businesses' remaining argument—that the 2001 Adult-Use Amendment was adopted not to advance legitimate governmental interests but as a legislative veto of the State high court's decisions in *Dezer* and *Les Hommes*—is frivolous (App. Br. 44-45, 61). The Court of Appeals had construed the 1995 law not to cover 60/40 adult establishments. The City Council appropriately responded, after determining that the 60/40 Rule was undermining the 1995 law's purposes, by amending the law to make clear that those establishments were covered. There is nothing improper about a legislature amending a law to better achieve the scheme's intended purpose.

47

### a. Justice Kennedy's concurrence cannot bear the weight the Adult Businesses put on it.

Contrary to the Adult Businesses' contentions, Justice Kennedy's concurrence in *Alameda* refined the majority's test at *Renton*'s second step for deciding whether intermediate scrutiny applies, and did not establish some sort of hybrid, heightened version of intermediary scrutiny (App. Br. 68-74, 83). In his concurrence, Justice Kennedy agreed with the Court's plurality that intermediate scrutiny applied to the regulation of adult businesses. *Alameda*, 535 U.S. at 434-42 (plurality op.) (applying the *Renton* framework, including its application of content-neutral scrutiny); *id.* at 447 (Kennedy, J., concurring). As Justice Kennedy himself put it, he wrote separately for two modest reasons: first, to reject the use of the phrase "content neutral" as "imprecise," and second, to flag that "the plurality's application of *Renton* might constitute a subtle expansion, with which [Justice Kennedy did] not concur." *Id.* at 444-45 (Kennedy, J., concurring).

Justice Kennedy's first point is largely one of semantics. The *Renton* majority had acknowledged that calling the regulation of adult businesses content neutral was a legal fiction, because they were regulated because of secondary effects correlated to their content. *Renton*, 475 U.S. at 47-48. Justice Kennedy wrote to explain that while he did not

48

think these regulations were "content neutral," he nevertheless agreed that courts should "apply intermediate rather than strict scrutiny" because zoning laws are presumed to have a legitimate land-use purpose "which rebuts the usual presumption that content-based restrictions are unconstitutional." *Alameda*, 535 U.S. at 449 (Kennedy, J., concurring).

Thus, while a majority could not come to an agreement about why intermediate scrutiny applied and whether to use the rubric of content neutrality, they agreed that intermediate scrutiny did apply. In the years since *Alameda*, this Court has noted that while it is "by no means clear" how content neutrality applies, it is clear that intermediate scrutiny applies to adult-use regulations enacted to curb secondary effects. *TJS of NY, Inc. v. Town of Smithtown*, 598 F.3d 17, 21-22 (2d Cir. 2010). *See also Zibtluda, LLC v. Gwinnett Cnty.*, 411 F.3d 1278, 1285 (11th Cir. 2005) (explaining that post-*Alameda,* while secondary-effects ordinances are not "strictly content neutral, they are simply treated as such").

Justice Kennedy also wrote separately to add that, at *Renton*'s second step, he believed an additional inquiry was called for into whether the municipality had impermissibly aimed to curb secondary effects by proportionally reducing the amount of adult speech in the community. *Alameda*, 535 U.S. at 449-50 (Kennedy, J., concurring). He suggested that

49

intermediate scrutiny should not apply if the municipality's justification was that "inconvenience will reduce demand and fewer patrons will lead to fewer secondary effects," because that is essentially content-based discrimination. *Id.* at 449 (Kennedy, J., concurring). This is the portion of his concurrence where Justice Kennedy noted that the plurality's approach omitted the question of "how speech will fare under the city's ordinance," *id.* at 450, on which the Adult Businesses rest so much of their argument (App. Br. 25, 37-63, 68-74).

The Adult Businesses wrongly contend that, to satisfy Justice Kennedy's concerns, the City Council was required to quantify the reduction of negative secondary effects and to determine how many operators of 60/40 businesses would choose to relocate, as opposed to exit the adult entertainment business in New York City (App. Br. 59-63). They make the puzzling suggestion that a zoning law would fail under Justice Kennedy's approach if the proportion of businesses that decide not to relocate is greater than the reduction achieved in negative secondary effects (App. Br. 63). But they both misunderstand the legal effect of concurring opinions and misconstrue the import of Justice Kennedy's concurrence.

*First*, as the Eleventh Circuit has observed, even if the cited component of Justice Kennedy's concurrence could be read to add a "proportionality test" to the analysis, it would not be "binding Supreme Court

50

precedent" because it cannot be harmonized with the plurality's opinion. *Flanigan's Enters. v. City of Sandy Springs*, 703 F. App'x 929, 936-37 (11th Cir. 2017). The *Alameda* plurality explicitly refused to impose either evidentiary requirement on localities, 535 U.S. at 438-40, and Justice Kennedy explicitly stated that the plurality had not adopted his approach, *id.* at 444-45. The Eleventh Circuit thoroughly reviewed the cases and the policy reasons for and against a proportionality test, and ultimately declined to incorporate this additional step into its analysis. *Flanigan's*, 703 F. App'x at 936-37.

Since *Alameda*, this Court has likewise not incorporated a separate consideration of "how speech will fare" into the secondary-effects doctrine, despite having opportunities to do so. *TJS*, 598 F.3d at 21-22 & n.5 (citing *Alameda* and reiterating that adult-use zoning regulations aimed at secondary effects are subject to ordinary intermediate scrutiny); *White Riv. Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 170-73 (2d Cir 2007); *see also Tollis Inc. v. Cnty. of San Diego*, 505 F.3d 935, 939-41 (9th Cir. 2007) (rejecting plaintiff's "contention that *Alameda Books* imposed a heightened evidentiary burden on the County to show 'how speech would fare' under the ordinance"). Indeed, the Adult Businesses' theory that the City Council was required to specifically study how many businesses would choose to relocate cannot be

reconciled with this Court's statement in *TJS* that "whether or not sites fit the specific needs of adult businesses" is "constitutionally irrelevant." *TJS*, 598 F.3d at 28.

*Second*, and in any event, even if Justice Kennedy's concurrence added a gloss to the inquiry into whether intermediate scrutiny applies, as the district court assumed (ECF No. 211 at 78), it cannot be the one suggested by the Adult Businesses. Contrary to their argument (App. Br. 72), nothing in the concurrence suggests that the City Council was required to actively study how many 60/40 businesses would decide to reopen in a new location. Indeed, this view cannot be reconciled with Justice Kennedy's statement that "very little evidence is required" to show that a law was not designed to stifle speech, cities need not conduct any studies of their own, and, so long as a city's "inferences appear reasonable," the court should not second-guess them. 535 U.S. at 451-52 (Kennedy, J., concurring).[13]

---

[13] To better understand Justice Kennedy's concurrence, it is worth noting precisely what facts he was responding to. As the plurality flagged when responding to the concurrence, Justice Kennedy's concern was animated by the fact that the plaintiff there—who operated both an adult bookstore and an adult arcade—argued that adult arcades were not viable independent of adult bookstores. The plurality explained that Justice Kennedy's concern over "how speech will fare" was merely "a reformulation of the requirement that an ordinance warrants intermediate scrutiny only if it is a time, place, and manner regulation and not a ban." *Alameda*, 535 U.S. at 443 (plurality op.).

Courts that have adopted Justice Kennedy's "how speech will fare" test have instead suggested it screens out the narrow, fact-specific scenario when a zoning regulation is clearly pretextual and aims to reduce adverse effects just by shuttering adult businesses, and not by, say, dispersing them or concentrating them elsewhere in the community. As the Ninth Circuit sees it, "[c]onceptually, this question dovetails with the requirement that an ordinance must leave open adequate alternative avenues of communication"—a component of *Renton*'s step-three analysis. *World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186, 1195 (9th Cir. 2004). "So long as there are a sufficient number of suitable relocation sites, the County could reasonably assume that, given the draw of pornographic and sexually explicit speech, willing patrons would not be measurably discouraged by the inconvenience of having to travel to an industrial zone." *Tollis*, 505 F.3d at 941.

Here, the record shows that the City easily cleared this hurdle, because the 2001 Adult-Use Amendment was not a total ban. DCP estimated, in 1995, that there were nearly 5,000 acres of land where adult establishments were permitted, allowing more than 500 adult businesses to operate simultaneously, given distancing requirements. These figures were reviewed by and relied upon by state and federal courts when holding that the 1995 regulation left open adequate alternative

53

avenues of communication. *Stringfellow's*, 91 N.Y.2d at 404; *Hickerson*, 146 F.3d at 107-09; *see also Buzzetti,* 140 F.3d at 140.

Five years later, in 2000, due to rezonings that reduced available acreage by roughly 200 acres, there were roughly 4,800 acres available for adult use, where about 450 adult businesses could operate (ECF No. 121-7 at 181-84; *see also* ECF No. 121-5 at 139 (reducing the estimate to 428, assuming that all potential rezonings under consideration would be adopted)). CPC's investigation specifically found there was adequate space for all 136 existing 60/40 businesses to relocate (ECF No. 121-7 at 181-84). And the City's environmental assessment likewise confirmed that "there would be sufficient capacity and locational opportunities for [all existing 60/40 establishments] and future adult establishments in commercial and manufacturing areas in which adult establishments are allowed" (ECF No. 121-5 at 139). This is not the stuff of a total ban. Thus, it was entirely reasonable for the City Council to infer that speech would fare just fine under the 2001 Adult-Use Regulation because adult businesses would be able to operate across the City.

To the extent that the Adult Businesses argue—at *Renton*'s second step—that strict, rather than intermediate scrutiny should apply because they have various objections to the profitability of reopening in new locations, those arguments are more properly viewed as objections

54

to the adequacy of alternative avenues of communication—a distinct analysis that is part of intermediate scrutiny at *Renton*'s third step and which has no bearing on whether intermediate scrutiny applies (App. Br. 74). In any event, as explained in more detail below, profitability is irrelevant in assessing whether alternative locations are available (*see infra* Point I.C.3). It is likewise irrelevant to determining whether strict or intermediate scrutiny applies, because "any reduction in the availability of erotic speech [would be] due not to the operation of the [2001 Adult-Use Amendment], but to the appellants' economic choice to invest their resources elsewhere." *Entm't Prods., Inc. v. Shelby Cnty.*, 721 F.3d 729, 741-42 (6th Cir. 2013).

The Adult Businesses also suggest that the question of "how speech will fare" should be evaluated at the time of the litigation (App. Br. at 71). Justice Kennedy, however, articulated the "how speech will fare" test as a caveat to *Renton*'s second step, which is concerned solely with the government's expectations and justifications at time of enactment for the purpose of deciding whether intermediate or strict scrutiny should apply. 535 U.S. at 445 (Kennedy, J., concurring). It would be passing strange if the level of scrutiny depended on current market forces at the time of litigation—and stranger still if the same regulation could be subject to repeat challenges as the years passed under different

55

levels of scrutiny if market conditions changed. Instead, the applicable level of means-end scrutiny has long depended on the government's motivations and expectations in enacting the law. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). In any event, the record contains recent evidence demonstrating that adult businesses have over 1,200 locations open to them (*see infra* Point I.A.3.c.i).

### b. *Reed* does not overrule the *Renton*/*Alameda* framework.

The Adult Businesses also argue that the Supreme Court "superseded" *Renton* in *Reed* (App. Br. 80-83), and that *Reed* requires the application of strict scrutiny. They are wrong. In *Reed*, the Supreme Court rejected a municipal sign ordinance that exempted political speech but not religious speech—an impermissible content-based distinction. 576 U.S. at 163-165. While applying the Court's longstanding jurisprudence on content-based regulations, the Court broadly stated, in dicta, that any laws that distinguish between speakers based on the messages they convey should be viewed as content based. *Id.* at 163. But nowhere in *Reed* did the Supreme Court overturn the Court's longstanding doctrine teaching that the regulation of adult businesses based on secondary effects is subject to intermediate scrutiny.

The Supreme Court has admonished courts not to adopt "too extreme an interpretation" of *Reed* and emphasized that "restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *City of Austin v. Reagan Nat'l Adv. of Austin, LLC*, 596 U.S. 61, 69, 72 (2022) (rejecting challenge to a local law that established different rules for advertising signs based on their content—a sign could advertise for an on-site business, but not for an off-site business). The Court in *Reagan* cautioned that "*Reed* did not purport to cast doubt" on the Court's other First Amendment jurisprudence. 596 U.S. at 75. The Adult Businesses' arguments are irreconcilable with the *Reagan*'s instructions on how to read *Reed*.

In any event, the Adult Businesses' attempt to grasp onto dicta from *Reed* must be rejected because *Renton* and its progeny remain binding precedent until the Supreme Court says otherwise. *United States v. Hatter*, 532 U.S. 557, 567 (2001) (noting that it is the Supreme Court's prerogative, alone, to overrule its precedents). As the Eleventh Circuit observed when rejecting this exact argument in an adult-use zoning case, "[b]ecause *Reed* did not address the secondary-effects doctrine, ... we cannot interpret it as abrogating either the Supreme Court's or this Circuit's secondary-effects precedents." *See Discotheque, Inc. v. Augusta-Richmond Cnty.*, No. 21-13218, 2022 U.S. App. LEXIS 27757, at *15-

57

16 (11th Cir. Oct. 5, 2022). The Fifth and Seventh Circuits have reached the same conclusion.[14]

The Adult Businesses cite to *zero* contrary authority applying *Reed* instead of the framework from *Renton* and *Alameda* to an adult-use zoning regulation. And this is no surprise considering that such speech is protected by only the outermost fringes of the First Amendment, while municipalities exercise authority at the zenith of their police powers when adopting local zoning regulations. *See Renton*, 475 U.S. at 54; *Young*, 427 U.S. at 80. By contrast, the interest at stake in *Reed*—the freedom of expression of religious organizations—is called out for special solicitude by the Supreme Court and indeed, the First Amendment itself. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Thomas, J., concurring) (noting that First Amendment protections apply "with special force with respect to religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals") (cleaned up).

---

[14] *See Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas*, 83 F.4th 958, 964-65 (5th Cir. 2023); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 326 n.1 (7th Cir. 2015).

### C. The 2001 Adult-Use Amendment passes muster under intermediate scrutiny at *Renton*'s third step.

At *Renton*'s final step, if a court has determined that intermediate scrutiny applies, the court must assess whether the regulation (a) is designed to serve a substantial governmental interest, (b) is narrowly tailored to that purpose, and (c) does not "unreasonably limit alternative avenues of communication." *Renton*, 475 U.S. at 49-50; *Alameda Books*, 535 U.S. at 434. This Court has already held that the 1995 Adult-Use Regulation passes muster. *Buzzetti,* 140 F.3d at 140. The district court correctly found that the 2001 Adult-Use Amendment easily survives intermediate scrutiny too (ECF No. 211 at 87-118). It is a modest definitional adjustment that furthers the purposes of the 1995 regulation by reaching a subset of predominantly sexually oriented businesses that had previously evaded the 1995 regulation, and thereby serves the City's substantial and well-documented interest in curbing negative secondary effects while leaving open ample alternative avenues of communication (*id.*).

1. **The 2001 Adult-Use Amendment serves a substantial governmental interest.**

   a. **The City carried its burden of demonstrating a substantial governmental interest.**

To show a substantial government interest, a municipality bears the burden of showing a connection between adult businesses and asserted secondary effects. *Alameda*, 535 U.S. at 441 (plurality op.). In *Alameda*, the Court clarified that the municipality's interest in the regulation should be assessed using a burden-shifting framework, whereby: (1) the municipality bears the initial burden of fairly supporting the rationale it supplied for its ordinance; (2) the plaintiff can cast doubt on this showing either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings; and (3) if the plaintiff does so, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its regulation. *Alameda*, 535 U.S. at 438-39; *id.* at 448-51 (Kennedy, J., concurring).[15]

---

[15] There is significant overlap between *Renton*'s second and third steps. The second step aims to set to one side regulations motivated by discriminatory animus towards sexually oriented speech for a more exacting review. The third step is subtly different. At that stage, the court applies intermediate scrutiny to secondary-effects regulations by asking whether the municipality can demonstrate—with sufficient

*(cont'd on next page)*

A municipality's burden under intermediate scrutiny is not a heavy one: all that's required is that "whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51-52; *see also Alameda*, 535 U.S. at 439-440 (plurality op.) (noting that municipalities should have the leeway to try "innovative solution[s]"); *id.* at 450-51 (Kennedy, J., concurring) (municipalities need to submit "very little evidence"); *White Riv. Amusement*, 481 F.3d at 171. To be sure, "[m]erely stating the words 'secondary effects' in a preamble is insufficient." *Essence, Inc. v. City of Fed. Hgts.*, 285 F.3d 1272, 1284-85 (10th Cir. 2002). But a municipality need not conclusively prove its theory, prove the efficacy of its proposed ordinance, or provide any post-enactment evidence at all demonstrating that the ordinance curbed secondary effects. *White Riv. Amusement*, 481 F.3d at 170; *Sutton v. Chanceford Twp.*, 763 F. App'x 186, 190-91 (3d Cir. 2019) (finding that Township's evidence that it considered secondary effects was "thin" but sufficient, where it considered studies performed by other municipalities, court decisions, and State legislative findings).

---

evidence—a connection between the substantial governmental interest of ameliorating negative secondary effects that was identified at step two and the municipality's chosen approach.

Indeed, a city need not generate any independent studies at all. *Renton*, 475 U.S. at 51-52. The *Renton* Court applied intermediate scrutiny to uphold a zoning ordinance adopted by the City of Renton, Washington, that prohibited adult theaters from locating within 1,000 feet of any residential zone, dwellings, churches, parks, or schools. *Id*. at 43. At the time, the city had no adult businesses, but it was alarmed by the experience of nearby Seattle that had studied negative secondary effects. *Id*. at 44. The Supreme Court overturned the Ninth Circuit's determination that Renton needed to have itself conducted studies into the specific problems or needs of the city, because it reasonably relied "on the experience of, and studies produced by, the city of Seattle." *Id*. at 50.

Likewise, in *Alameda*, the Court upheld Los Angeles's 1983 amendment to its zoning regulation that was supported by "a single study and common experience." 535 U.S. at 451-452 (Kennedy, J., concurring). In 1978, the City of Los Angeles had passed a law to spread out adult businesses after a 1977 study showed that clustering them was linked with higher crime rates. *Id*. at 430 (plurality op.). Adult businesses found a loophole—multiple businesses could operate from a single building. *Id*. at 431. To address this, without conducting or identifying any new studies, Los Angeles amended its law to prohibit more than one adult business from operating under the same roof. *Id*. The Supreme Court

62

explained that Los Angeles did not need a new study because its earlier evidence was sufficient to support the city's inference that having multiple businesses in one location would have the same negative impacts as multiple adult businesses operating in close proximity to one another. *Id.* at 434-36.

The burden on municipal legislatures to support their inferences is modest by design. Even applying intermediate scrutiny, courts must still defer to legislative judgments. *Renton*, 475 U.S. at 52 ("It is not our function to appraise the wisdom of the city's decision[s]."); *Alameda*, 535 U.S. at 439 (plurality opinion) ("Our deference to the evidence presented by the city ... is the product of a careful balance between competing interests."). Legislatures are better positioned to make reasonable judgments and to "experiment with solutions to admittedly serious problems." *Renton*, 475 U.S. at 52; *Alameda*, 535 U.S. at 451-52 (Kennedy, J., concurring in the judgment) ("[The] City Council knows the streets of Los Angeles better than we do .... [I]f its inferences appear reasonable, we should not say there is no basis for its conclusion." (internal citations omitted)).

Applying these well-established standards, in *Buzzetti*, this Court upheld the 1995 Adult-Use Regulation because the City had demonstrated it was crafted to serve the City's substantial interest in "preventing

63

crime, maintaining property values, and preserving the quality of urban life and the character of city neighborhoods." 140 F.3d at 140. This Court emphasized that the City based its decision to enact its adult-use zoning regulation on studies from across the country, DCP's own "detailed" study, studies of "particular neighborhoods of New York City," and testimony given at public hearings in New York. *Id.*

Here, in 2001, the City sought to protect the very same "vital governmental interests" that were at stake in *Renton*, *Alameda*, and *Buzzetti*. *Renton*, 475 U.S. at 50. As the district court correctly found, in 2001, the New York City Council amended its adult-use zoning regulation to better preserve the City's safety, vitality and the quality of urban life (ECF No. 211 at 88-89). There can be no real dispute that these interests are substantial. *Renton*, 475 U.S. at 50 (noting that "a city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect") (cleaned up).

In enacting the 2001 amendment, the City reasonably relied in large part on the 1995 legislative record, including DCP's 1994 study, and studies from across the country linking sexually oriented businesses with increased crime rates, reduced economic development, property values and tax revenues, and a perceived decline of community

character and quality of urban life (ECF No. 121-4 at 37, 98-105).[16] This evidence remained highly relevant because the City Council made a legislative judgment that, based on the City's experience enforcing the 1995 regulations, 60/40 businesses maintained a predominant sexual focus on sexually oriented materials and activities and thus were largely the same as the sexually oriented adult businesses that it had already found were correlated with negative effects. Indeed, of 101 60/40 businesses in the City as of 2001, more than half had been identified as adult businesses in 1995 and had made superficial modifications to remain in place, while an additional 26 new adult establishments had opened in prohibited areas under the cover of the 60/40 Rule (ECF No. 121-5 at 136).

Thus, the City Council's judgment about 60/40 businesses was not only reasonable, but well supported. In addition to considering the record from 1995, the City supplemented the legislative record with abundant evidence establishing that an amendment was needed to better achieve the original intent of the 1995 City Council (ECF Nos. 121-5 at

---

[16] The Adult Businesses concede, as they must, that "the City's enactment of the 1995 zoning amendments regulating adult entertainment passed muster under the *Renton* test" (App. Br. 40) (cleaned up). That enactment was supported by a robust record showing that adult businesses in New York City were harming their surrounding communities. *See Buzzetti*, 140 F.3d at 134.

98-162; 121-6 at 80-146). CPC's 2001 report extensively documents pervasive efforts to avoid the new zoning restrictions by adult businesses that the legislature had originally intended to be covered (ECF No. 121-6 at 111-15). For instance, CPC recounted how adult bookstores avoided the 1995 regulation by purchasing cartonfuls of kung-fu videos or cheap instructional videos that "gather[ed] dust," even though they had common features of predominantly sexually oriented businesses, such as layouts that placed adult materials front and center or purportedly non-adult sections filled with sex toys (*id.* at 111-12). The report further cited judicial determinations that 60/40 establishments were in fact engaging in "sham compliance" based on similar evidence (*id.* at 114-15). *E.g.*, *Les Hommes*, 94 N.Y.2d at 272 (leaving in place the lower courts' findings that "the sale of nonadult videos was a sham" and the 60/40 businesses, in their "true aspect," remained "non-conforming adult video establishment[s]" (cleaned up)); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 297 (2000) (noting that a legislature "could reasonably rely on the evidentiary foundation set forth in [judicial opinions] to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood").

The report also emphasized that adult bookstores continued to use methods of operation which reflect a predominant focus on adult materials, such as the ongoing promotion of peep booths inviting customers to watch pornography on site (*id.* at 112). Indeed, the plaintiff Adult Bookstores admit that they all feature between 3 and 27 such booths (ECF No. 168-1 at 24-36). Courts have long permitted the regulation of establishments with even a single peep booth, which rely on the reasonable inference that on-site consumption of sexually explicit materials produces secondary effects like petty crime, prostitution, and unsanitary conditions. *See, e.g.*, *Fantasyland Video, Inc. v. Cnty. of San Diego*, 505 F.3d 996, 1002-04 (9th Cir. 2007); *Ellwest Stereo Theatres, Inc. v. Wenner*, 681 F.2d 1243, 1245 n.1, 1246-47 (9th Cir. 1982).[17]

With respect to adult eating or drinking establishments, the 2001 City Council determined that the 60/40 Rule had been "mistakenly applied" to them as an initial matter (ECF No. 121-6 at 114). The 1995

---

[17] This is a common approach nationwide. *See, e.g.*, Atlanta Code of Ords., pt. III, § 16-29.001(3)(c) (definition of "adult mini-motion picture theater"); Indianapolis Mun. Code, tit. IV, § 807-110 (definition of "adult motion picture arcade"); Jacksonville Mun. Code, tit. VI, § 150.103(e) (definitions of "adult entertainment establishment" and "adult motion picture booth"); Los Angeles Zoning Code § 12.70(B)(1) (definition of "adult arcade"); Rochester Mun. Code, Part II, § 98-2 (definitions of "adult arcade" and "sexually oriented business"); San Antonio Mun. Code, art. IX, § 21-236 (definitions of "adult arcade" and "arcade device"); San Diego Mun. Code, chap. 14, art. 1, div. 6, § 141.0601(a)(6), (10) (definitions of "adult mini-motion picture theaters" and "adult peep show business").

legislature had intended to define adult eating or drinking establishments as locations that regularly featured live adult entertainment without regard to how much square footage was devoted to adult entertainment (*id.*). The City Council had not contemplated that a strip club would not count as an "adult establishment" simply because it confined its regular topless dancing to only a portion of its floor area. Rather, the 1995 legislature had focused on whether sexually oriented entertainment was offered *regularly* (*id.* at 114-15), as all of the plaintiff clubs concede they do (ECF No. 168-1 at 11-12). The Department of City Planning's counsel explained that considering the floor area of strip clubs made little sense, and "there would have been no basis in the [1995] legislative record to conclude that the negative secondary impacts of a topless bar or strip club are any less present where the topless or nude entertainment is featured in only part of the customer-accessible floor space" (ECF No. 121-7 at 162).[18]

_____

[18] Indeed, counsel explained that that "no other jurisdiction ... applies a 'substantial portion' analysis to establishments regularly featuring topless or nude dancers" (ECF No. 121-7 at 163). To the contrary, that a club "regularly features" topless or nude dancing is typically enough. *See, e.g.*, Atlanta Code of Ords., pt. III, § 16-29.001(3) ("features"); Charlotte, N.C. Gen. Stat. § 14-202.10(4) ("shown for observation"); Chicago Code of Ords. § 16-16-030 ("features ... not infrequently"); Indianapolis Mun. Code, tit. IV, § 807-104 ("regularly features"); Los Angeles Zoning Code § 12.70(B)(3) ("regularly features"); Rochester Mun. Code, Part II, § 98-2 ("regularly features or offers"); San Diego Mun. Code, chap. 14, art. 1, div. 6, § 141.0601(a)(3) ("features" on

*(cont'd on next page)*

Unsurprisingly, given the unforeseen impacts of the 60/40 Rule, the statistics compiled by DCP in 2000 showed "the 1995 Ordinance did not achieve its goal" because adult businesses made superficial changes to remain in place. *People Theaters*, 6 N.Y.3d at 74 n.3; *People Theaters*, 29 N.Y.3d at 361. Much like Los Angeles amended its zoning law to close a loophole in *Alameda*, the New York City Council closed the loophole for the express purpose of more effectively achieving the legislature's original intent in regulating adult use. *Alameda*, 535 U.S. at 431, 436-38 (plurality op.). The legislative record is clear on this point; the purpose of the amendment is to "effectuate the Commission's original intent in response to efforts by the operators of adult establishments to undermine implementation of the 1995 Regulations" (ECF No. 121-6 at 109). As was true for Los Angeles, New York City's city planners were entitled to draw reasonable inferences from existing data to conclude that an amendment would better serve the legislature's original intent.

The City thus established that its City Council had ample basis to conclude that 60/40 establishments had a predominant, ongoing focus on

---

7 out of 56 consecutive calendar days); San Francisco Police Code, art. 11.2, § 791(a) (presents nude or topless dancing during 10 percent of annual presentation time); *see also* Jacksonville Mun. Code, tit. VI, § 150.103 (defining adult establishment as any establishment with any adult entertainment and adult theaters as those that feature adult films "on a regular basis").

sexually explicit entertainment and had the same negative secondary effects as other adult businesses. Lest there be any doubt on the issue, by the time the plaintiff clubs revived this lawsuit and the plaintiff triple-X book and video stores initiated yet another one, two bench trials had already been held during the long-running state litigation. After those trials, the New York Court of Appeals had unanimously found that the 60/40 establishments covered by the 2001 amendments retained a predominant sexual focus and that the City could therefore reasonably rely on the 1995 record of secondary effects. *People Theatres*, 29 N.Y.3d at 361-63.

### b. The City's substantial governmental interest is assessed at the time of enactment, contrary to the Adult Businesses' arguments.

Contrary to the Adult Businesses' claims, there is nothing "constitutionally intolerable" about relying on the City's legislative record from when it enacted its original adult-use regulations in 1995 and amended them in 2001 (App. Br. 34), rather than compiling a record about current circumstances at the time of litigation. To the contrary, this Court's decision in *White River Amusement* is directly on point and forecloses the Adult Businesses' "current needs" argument. 481 F.3d at 172. There, this Court held that a municipality must submit *pre-enactment* evidence

demonstrating that it adopted the regulation to further a substantial governmental interest. *Id.* at 171-72.

In *White River Amusement*, this Court noted that the Supreme Court had not explicitly addressed whether a municipality can show a substantial governmental interest with post-enactment evidence, but, after reviewing Supreme Court jurisprudence and surveying cases from across the country, concluded that pre-enactment evidence is critical. *Id.* (noting that the Court in *Alameda* "relied only on the pre-enactment evidence in the record" and collecting cases).[19] Other circuits likewise held that the focus must be on pre-enactment data. *See Discotheque*, 2022 U.S. App. LEXIS 27757, at *11-14 (cleaned up) (explaining that county must identify statements in the "language of the code or in the record of legislative proceedings" to show its purpose was to address secondary

---

[19] In *Barnes*, Justice Souter, concurring, rejected a strip club's argument that the government was limited in defending a public indecency statute to the evidence it considered before enactment. 501 U.S. at 582 (Souter, J., concurring). He asserted that the "appropriate focus is not an empirical enquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental interest in the service of which the challenged application of the statute may be constitutional." *Id.* In *White River Amusement*, this Court noted that "the *Barnes* approach was superseded when five justices applied the *Renton* standard in *Pap's A.M.* and either relied on pre-enactment evidence or demanded an even greater evidentiary showing," and "therefore join[ed] other circuits in reading *Renton* to require pre-enactment evidence." 481 F.3d at 171; *but cf. Essence, Inc. v. City of Fed. Hgts.*, 285 F.3d 1272, 1284-85 (10th Cir. 2002) (citing *Barnes* and concluding that, *in addition to pre-enactment evidence*, "evidence of secondary effects occurring even years after the enactment of a statute may form the basis of a government's substantial interest in limiting those secondary effects.").

71

effects); *Indep. News, Inc. v. City of Charlotte*, 568 F.3d 148, 156 (4th Cir. 2009) (rejecting a "post-enactment data" based challenge to the rationale undergirding a secondary-effects law).

Ignoring *White River Amusement*, the Adult Businesses wrongly argue that intermediate scrutiny requires an inquiry into whether the 2001 Adult-Use Amendment advances a *current* governmental interest that must be proven with new evidence from 2024 (App. Br. 29-34). First, this is incorrect, and second, even if it were right, it would not make the 2001 Adult-Amendment unconstitutional.

*First*, the Adult Businesses are incorrect. In advancing this argument, they suggest that Justice Kennedy's concurrence alters substantive intermediate-scrutiny analysis by requiring that the City show that its regulation will leave speech "substantially intact" moving forward (App. Br. 29 n.10 & 36 (quoting without attribution *Alameda*, 535 U.S. at 449 (Kennedy, J., concurring))). But, as noted above, the concurrence is explicitly limited to addressing a perceived fault in the plurality's restatement of *Renton*'s second step—that is, in identifying the necessary showing for intermediate scrutiny to apply at all—and does not purport to alter the intermediate scrutiny analysis in the third step. *Id.* at 449, 453 (Kennedy, J., concurring) (noting that the "narrow question" is "what proposition does a city need to advance in order to sustain a

secondary-effects ordinance" and noting that, on remand, Los Angeles' law will be subject to intermediate scrutiny).

Next, plaintiffs suggest that the substantialness of the government's interest should be evaluated as of the time of judgment as a logical extension of this Court's holding in *TJS*, which held that the availability of alternative avenues of expression is evaluated at the time of judgment (App. Br. 29-31). *TJS of N.Y.*, 598 F.3d at 19-22. They offer nothing to support this argument, which does not hold up to scrutiny. While it makes sense to require localities to update evidence on alternative avenues because of a practical concern that an initially lawful zoning restriction could transform into an impermissible total ban over time because of unanticipated zoning changes, the same kind of concern is not present when considering the government's recognized and ongoing substantial interests in the adult-use regulation itself.

The Adult Businesses also misplace their reliance on two Voting Rights Act preclearance cases that are entirely distinguishable (App. Br. 33-34, citing *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 168 (2009), and *Shelby Cnty. v. Holder*, 570 U.S. 529 (2013)). In *Northwest Austin*, the Supreme Court avoided resolving a constitutional challenge to the Voting Rights Act's preclearance requirements by construing the statute to allow utility districts to seek a bailout from

73

preclearance on the same terms as traditional political subdivisions. 557 U.S. at 221. The case is completely irrelevant.

In *Shelby County*, the Court explained that the Act's preclearance requirements had always worked an unprecedented and constitutionally questionable encroachment on a subset of States' sovereignty, but that the Court had previously upheld the coverage formula for deciding whether preclearance requirements apply as a temporary measure justified by extraordinary circumstances. 570 U.S. at 545-53. The Court held that Congress' 2006 reauthorization of the coverage formula was unlawful because the record before Congress in 2006 did not justify keeping the same coverage formula that was designed forty years earlier. *Id*. at 553-554.

*Shelby County*'s holding was based on the exceptional nature of the Act and its unprecedented legislative framework and is irrelevant to how courts analyze traditional zoning laws under intermediate scrutiny. And even if it had any application, the *Shelby County* Court looked to the legislative record when the coverage formula was reenacted, so the decision lends no support for the Adult Businesses' claim that cities must continually re-justify the current need for their laws.

Indeed, adopting the Adult Businesses' approach to means-end scrutiny would cause substantial mischief. By simply delaying the filing of a

lawsuit—or, as here, filing serial lawsuits in multiple venues and seeking to tie up enforcement efforts for decades—plaintiffs could set ever-shifting goalposts and require the government to reestablish the grounds for its legislative enactments and update legislative records long after enactment.

*Second*, in any event, even if "current needs" were part of the analysis, as the Adult Businesses wrongly argue (App. Br. 34-36), nothing about the intervening two decades has made the City's interest in curbing the well-documented negative secondary effects of adult businesses any less substantial. The City has an ongoing, substantial interest in stemming pornographic litter, prostitution, noise, crime, theft, decreased property values, and reduced quality of urban life. After all, in *Renton*, the seminal case on this issue, the Court upheld a zoning ordinance adopted by a city that had no adult businesses at all but anticipated they might open, and, if they did, would harm the quality of urban life. 75 U.S. at 44. Because the 2001 Adult-Use Amendment's objective is to ameliorate *and avert* negative secondary effects, there is no merit in the Adult Bookstores' claim that the City is so pleasant nowadays that

it currently lacks a "substantial and legitimate interest" in zoning adult uses to ensure that the City remains so (Bookstores' Br. 27-32).[20]

Nor is there merit to the Adult Businesses' similar claim that, "[i]n part due to the success of the 1995 Amendments, as well as significant technological, zoning, and other changes," regulating 60/40 establishments cannot currently be justified (App. Br. 35-36). No version of means-end scrutiny allows a court to reject a valid law because the government has already ameliorated some of the most significant negative effects at which it was initially directed. "[T]he Supreme Court in [no] way indicate[d] that a municipality is somehow foreclosed from experimenting with its adult use regulations just because it may have already achieved some success in reducing negative social consequences." *People Theatres*, 6 N.Y.3d at 83.

If laws stopped being justified as soon as targeted deleterious effects subsided, regulations would apply only to the first round of regulated entities, because the stragglers' impacts would be de minimis. For good reason, that is not how it works; the City has a substantial interest in ensuring *comprehensive* compliance with its zoning laws and mitigating

---

[20] The Adult Bookstores wrongly imply that 1995 regulation's "objective" was to reduce the number of adult businesses in the City (Bookstores' Br. 33). But, as noted, it was to curb secondary effects (*see supra* Point I.B.2 & I.C.1).

well-recognized harms. It is for this reason that courts across the country have consistently held that municipalities "need not show that each individual adult establishment actually generates the undesired secondary effects." *Indep. News, Inc.*, 568 F.3d at 156.[21]

### c. The Adult Businesses' evidentiary arguments are meritless and misunderstand the relevant inquiry.

The Adult Businesses put forward many variations on the argument that the City's evidence before the district court was not specific enough (App. Br. 34-36, 38-40, 46-47, 61). At bottom, the Adult Businesses repeated claim that the City did not supply "evidence that 60/40 businesses gave rise to secondary effects" (App. Br. 45) blinks reality and misunderstands both the City's burden and the key inference drawn by the City Council in adopting the 2001 Amendment.

They fault the district court for not requiring that the City submit evidence specifically about the effects of 60/40 businesses, but nothing of the sort is required (App. Br. 39-40, 61). The Sixth Circuit's decision *Richland Bookmart, Inc. v. Knox Cnty.*, is directly on point and correctly

---

[21] *See also BZAPS, Inc. v. City of Mankato*, 268 F.3d 603, 607 (8th Cir. 2001) ("[O]nce a city has validly forbidden adult uses within a particular area, it may enforce that ordinance against all adult uses in that area without showing that a particular use will produce secondary effects.").

rejects a similar argument based on a straightforward application of Supreme Court precedent. 555 F.3d 512, 525-26 (6th Cir. 2009). There, a set of plaintiffs challenged a regulation of "'combination' adult-mainstream" businesses operating under a 65/35 model. *Id.* The plaintiffs argued that the county had failed to show that this specific configuration of adult-mainstream businesses had generated adverse secondary effects with sufficiently "germane" evidence. *Id.* The Circuit rejected their argument, explaining that "[r]equiring local governments to produce evidence of secondary effects for all categories created by every articulable distinction is a misapprehension of the Supreme Court's holding that governments may rely on any evidence 'reasonably believed to be relevant.'" *Id.* (quoting *Alameda Books*, 535 U.S. at 438-39). Other Circuits have agreed that Supreme Court precedent does not require cities to produce evidence linking harms to specific kinds of businesses.[22] Here, as in *Richland*, preexisting studies that the City Council reasonably believed were relevant suggested that 60/40 businesses negatively

---

[22] *See also Assn. of Club Execs. of Dallas, Inc. v. City of Dallas*, 83 F.4th 958, 967 (5th Cir. 2023) ("The standard does not require a city to forge an ironclad connection between [adult businesses] and secondary effects or to produce studies examining precisely the same conditions at issue."); *Indep. News, Inc.*, 568 F.3d at 156; *BZAPS*, 268 F.3d at 607.

impacted surrounding neighborhoods because they maintained the predominant sexual focus of the businesses initially studied.

There is no merit to the Adult Businesses' related claim that the City Council could not draw inferences in support of the 2001 Amendment from DCP's 1994 study because 60/40 establishments did not exist at the time (App. Br. 76). In *Alameda*, the plaintiffs likewise argued that Los Angeles' empirical data was lacking because "there are no adult video arcades in Los Angeles County that operate independently of adult bookstores," so no "treatment group to compare with the control group of multiple-use adult establishments." 535 U.S. at 439 (plurality op.). Rejecting this argument, the plurality explained that the Court must defer to the city's inferences because "the Los Angeles City Council is in a better position than the Judiciary to gather and evaluate data on local problems." 535 U.S. at 439-440 (plurality op.); *id*. at 451-52 (Kennedy, J., concurring) ("The Los Angeles City Council knows the streets of Los Angeles better than we do. It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion.") (cleaned up).

Even further afield is the Adult Businesses' argument that the City needed to submit evidence that it "actually investigated whether the negative secondary effects even still existed" in 2001 (App. Br. 87). A

79

city can target "a perceived risk of secondary effects through regulation and need not wait until the secondary effects actually exist." *Essence, Inc. v. City of Fed. Hgts.*, 285 F.3d 1272, 1284-85 (10th Cir. 2002) (cleaned up); *Barnes*, 501 U.S. at 584 (Souter, J., concurring) ("[L]egislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects"). *Renton*, 475 U.S. at 52-53 (holding that a city can regulate in anticipation that a particular type of adult business will open and can later amend the regulation if it anticipates other types of adult businesses will open).

Nor are the Adult Businesses correct that, by 2001, quality of life in the City had improved to such an extent that no further regulation could be justified (App. Br. 77-78). As shown by the experience of other jurisdictions and the DCP's city-specific study from 1995, adult businesses harmed New York City neighborhoods, and the City thus had a substantial interest in closing a loophole that allowed some of those businesses to evade regulation.

The Adult Businesses also second-guess whether the City still had a substantial interest in regulating adult businesses after they voluntarily started using less "garish" signs (App. Br. 39). But this argument only cuts against them; unless 60/40 establishments are brought into the adult-use zoning scheme, they are not bound by the 1995 Adult-Use

80

Regulation's signage restrictions and thus there is no guarantee that they will continue to use such signage after this litigation. In any event, the Adult Businesses misunderstand the relevant inquiry. The question is not whether the City could have reasonably decided to focus solely on signage, but whether the City had a reasonable basis to conclude that other aspects of adult businesses also had negative impacts on their surrounding neighborhoods, or would have such impacts in the future if they remained in place. And the City Council plainly could. "Whether signs are garish has little bearing on whether a business retains a sexual focus." *People Theatres*, 29 N.Y.3d at 362. If the negative effects of adult businesses were solely attributed to garish signs, then the ordinances at issue in *Renton* and *Alameda* displacing such businesses rather than regulating their signage would not have passed constitutional muster.

The Adult Businesses wrongly claim that the district court did not consider their rebuttal evidence before deciding that they had not cast sufficient doubt on the City's showing of a substantial governmental interest to shift the evidentiary burden back onto the City (App. Br. 75-79). The district court considered plaintiffs' evidence. It simply, and correctly, found (ECF No. 211 at 89-92) that the Adult Businesses did not make a sufficient showing to undermine the City's evidence under *Alameda*'s burden-shifting framework by casting direct doubt on the City's

rationale or evidence. *See Discotheque*, 2022 U.S. App. LEXIS 27757, at *11-14 (11th Cir. Oct. 5, 2022) (holding that conjecture about a county's true motives "is not the kind of circumstantial evidence that casts direct doubt on the secondary-effects rationale" (cleaned up)).

Plaintiffs first repeat their arguments at step one, complaining again that the City did not do a new study of secondary effects in 2001 or study whether 60/40 businesses in particular cause secondary effects (App. Br. 75-76). But because no such evidence was required as an initial matter, the lack of such evidence cannot rebut the City's showing.

The Adult Businesses alternatively rely on conjecture. For example, they speculate that the City's overall improved safety and reduction in violent crime between 1995 and 2001 shows that 60/40 adult businesses had no negative secondary effects, which they attribute largely to "loud" facades that predate the 1995 regulation (App. Br. 77; ECF No. 168-1 at 66-67). But they have no evidence actually connecting their superficial change in business model or signage to a decline in the City's crime rate. And the City Council had a reasonable basis to conclude that, because of their ongoing predominant sexual focus, the location of 60/40 businesses in residential neighborhoods, clustered together, or near houses of worship or schools instead cause increased crime rates, diminished property values, and reduced quality of urban life. As in

*Richland Bookmart*, the "Plaintiffs' unsystematic and eclectic collection of information is insufficient to cast direct doubt on the relevance of the evidence relied on by the [City], or the [City]'s rationale in enacting the Ordinance," so they failed to shift the burden back onto the City. 555 F.3d at 528.

In light of the substantial deference that municipal legislatures receive, it would be error to find on this record that the Adult Businesses shifted the burden back onto the City to come up with even more evidence in support of its narrow definitional change to the 1995 Adult-Use Regulation. As Justice Kennedy emphasized, municipalities "must have latitude to experiment" and courts should not second-guess the fact-bound assessments of city planners if their inferences "appear reasonable." *Alameda*, 535 U.S. at 451-452 (Kennedy, J., concurring). At bottom, "evidence suggesting that a different conclusion is also reasonable does not prove that the County's findings were impermissible or its rationale unsustainable." *Richland Bookmart*, 555 F.3d at 527.

### d. The Adult Businesses misplace reliance on state court jurisprudence that refutes their claims.

In any event, even if the Adult Businesses had somehow succeeded at shifting the burden back on the City, the City has adduced ample

evidence supporting its initial legislative judgment. In state court, following two bench trials examining the characteristics of 60/40 establishments covered by the 2001 Amendment in detail, New York's highest court concluded in 2017 that the City had amply supported its legislative judgment that 60/40 establishments covered by the 2001 Amendments maintained a predominant sexual focus. As a result, the court concluded, the City could reasonably rely on the secondary effects record it used to justify regulations of similar businesses just six years prior.

Grasping at straws, the Adult Businesses make the surprising claim that the district court committed a "pivotal error of constitutional magnitude" by not adopting the contrary findings from an earlier state trial court decision that 60/40 establishments do not maintain a predominant sexual focus and thus the 2001 Amendment was unnecessary (App. Br. 40-42). But as the Adult Businesses elsewhere concede (ECF No. 168-1 at 12), the New York Court of Appeals expressly reversed that finding on appeal, concluding that the trial court had applied the wrong legal standard and improperly substituted its judgment for the City Council's on an issue where it was entitled to deference under U.S. Supreme Court precedent. *People Theatres of N.Y.*, 29 N.Y.3d at 357. The Court of Appeals then explained that "the evidence and the factual findings of the lower courts" regarding the actual characteristics of the

84

60/40 businesses "support only one conclusion: that the City met its burden of showing continued focus on sexually explicit activities and materials by the adult bookstores and adult eating and drinking establishments." *Id.* at 361.

Indeed, the evidence outlined by the Court of Appeals not only is compelling but also fully confirms the observations of City investigators that were detailed in the original 2001 CPC Report. The evidence established that "all but one of the adult bookstores had peep booths for viewing adult films, with an average of about 17 booths per store"; "that all the bookstores used signage, displays, and layouts to promote sexually focused adult materials and activities"; that many "sold sex toys, adult novelties, and the like in the nonadult sections of the stores"; and that at "all the clubs, topless dancing takes place at all times daily for approximately 16 to 18 hours a day and also that lap dances, a quintessentially sexual activity, were offered by dancers in both public and private areas of the club." *Id.* at 362 (cleaned up).

The Adult Businesses would nonetheless have this Court throw "equity, comity, and federalism" to the wind and reach the opposite conclusion (App. Br. 42 n.17, 43 n.18). *Antosh v. Vil. of Mount Pleasant*, 99 F.4th 989, 993 (7th Cir. 2024). But the evidence that they rely on in this

lawsuit was before the New York Court of Appeals in 2017 as well,[23] and the court correctly applied federal legal principles and precedent to conclude that it was wholly insufficient to overcome the City Council's well-supported and reasonable judgments, which are entitled to deference.

> ## 2. The 2001 Adult-Use Amendment is narrowly tailored to serve this substantial governmental interest.

The Adult Businesses argue that the 2001 Adult-Use Amendment was not narrowly tailored to serve a substantial government interest (App. Br. 120-122). They are wrong.

When a law that impinges on free-speech rights is evaluated under intermediate scrutiny, courts ask whether the law is "narrowly tailored to serve a significant governmental interest." *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 98 (2d Cir. 2006). As explained above, the 2001 Adult-Use Amendment serves the substantial governmental interest of curbing

---

[23] The plaintiffs in *People Theaters* cited the very same evidence that the Adult-Businesses here cite, including "reports of two experts, an economist and a criminologist, who opined that 60/40 bookstores and theaters do not negatively affect property values or have adverse consequences in the form of increased criminal complaints" (*Compare People Theatres*, 29 N.Y.3d at 347 *with* ECF No. 121-9 at 86-141). And they argued, as the Adult Businesses argue here (App. Br. 43), that City "had improperly relied on the 1994 DCP study that led to the original zoning regulations, and had failed to generate any new empirical data regarding the purported adverse secondary effects of 60/40 establishments, even though the entities were, according to plaintiffs, very different from the businesses reviewed in the DCP study." *People Theatres*, 29 N.Y.3d at 347.

negative secondary effects of adult businesses, including 60/40 busi-nesses (*supra* Point I.C.1.). Thus, the relevant question is whether the amendment is narrowly tailored to achieve that goal, and it is.

Narrow tailoring does not mean that a regulation must be the least restrictive means of achieving the stated interest. *Mastrovincenzo*, 435 F.3d at 98. Rather, the requirement is satisfied if the regulation pro-motes an interest that "would be achieved less effectively absent the reg-ulation." *Id*. at 98 (cleaned up); *see also World Wide Video of Washing-ton, Inc. v. City of Spokane*, 368 F.3d 1186, 1196-98 (9th Cir. 2004) (applying this definition of narrow tailoring to an adult-use zoning reg-ulation). Put differently, the regulation should be upheld unless "a sub-stantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

The Adult-Use Amendments easily pass muster. First, the burden placed on 60/40 adult businesses by requiring them to comply with the same limitations that are applicable to other adult businesses is no heav-ier than necessary to advance the City's interests. *Mastrovincenzo*, 435 F.3d at 98. And second, the interests served by the adult-use zoning reg-ulations would be achieved less effectively without the amendment bringing 60/40 adult businesses into the fold. *Id*.

In disputing that the 2001 Adult-Use Amendment is narrowly tailored, the Adult Businesses do not seriously contend that the amendment burdens substantially more speech than necessary to curb negative secondary effects. Instead, they attempt to redefine the City's interest in the 2001 Adult-Use Amendment as being limited to ending "sham compliance" and suggest that the City might achieved this end with a more targeted regulation (App. Br. 120-22). But the City's stated interest is curbing the negative secondary effects of all businesses with a predominant focus on sexually oriented materials and activities, including 60/40 adult businesses.

In any event, they have offered no support for their conclusory suggestion that the City could have instead ended superficial compliance with the 1995 Adult-Use Regulation by predominantly sexually oriented businesses through some narrower amendment, without extending the statute to 60/40 businesses (App. Br. 122). After all, the 60/40 business model that was adopted by many adult businesses to come into technical compliance with the 1995 Adult-Use Regulation is an artificial one; the 2001 amendment was a modest definitional change tailored to address this new strategy by predominantly adult businesses to evade the 1995 Adult-Use Regulation. The City tweaked the definition of adult businesses to patch a loophole that had undercut the 1995 regulation's

88

effectiveness, and otherwise left the 1995 regulations largely undisturbed (ECF No. 121-6 at 108) (noting that the amendment is "limited in nature" and will not alter the "basic provisions of the 1995 Adult-Use Regulations").

Tellingly, none of the plaintiffs here claims to be a general interest establishment wrongly caught in the dragnet of the regulation. Rather, they are all strip clubs or triple-X shops with peepshow booths—that is, sexually oriented businesses whose nature is unchanged by an opaque partition around a bar or a rack of kung-fu DVDs. The amendment burdens no more speech than necessary to achieve its purpose of closing the loophole that allowed sexually oriented businesses to evade the City's adult-use zoning regulations.

### 3. The 2001 Adult-Use Amendment leaves open adequate alternative avenues of communication.

#### a. Based on a detailed analysis, the City identified ample alternative, legal sites for adult businesses.

The district court correctly determined that the 2001 Adult-Use Amendment leaves open adequate alternative avenues of communication (ECF No. 211 at 97-118), as an adult-use zoning regulation must

do to pass muster under intermediate scrutiny. None of plaintiffs' arguments warrants reversal.

As Justice Souter has explained, determining whether alternatives are adequate is a fact-bound inquiry that factors in, among other things, how many acres are available for development for adult-use establishments, how many businesses there are, and how many open sites there are in total. *Lund v. City of Fall Riv.*, 714 F.3d 65, 71-72 (1st Cir. 2013) (Souter, J., sitting by designation). The adequacy of these sites is assessed by considering, at the time the adult-use zoning regulation is challenged, whether alternative sites "afford a reasonable opportunity to locate and operate such a business." *TJS of N.Y.*, 598 F.3d at 19, 21-22 (cleaned up).

A municipality does not need to "identify the exact locations to which adult establishments may locate." *TJS,* 598 F.3d at 22 n.4. All that's necessary is that it identify "general areas that remain available." *Id.* (cleaned up); *see also Hickerson*, 146 F.3d at 106-07. It must show that these areas contain enough potential relocation sites that are "physically and legally available" and are "part of an actual commercial real estate market in the municipality." *TJS,* 598 F.3d at 27. Thus, in evaluating sites, courts should consider the likelihood that sites will be available for *any* generic commercial enterprise, their accessibility to the general

public, their suitability of generic commercial enterprise, and the surrounding infrastructure. *Id.* at 27-28. A site should be rejected only if it is incompatible with any commercial businesses or lacks basic infrastructure. *TJS*, 598 F.3d at 28.

The City easily met this burden. There are 32 60/40 businesses that would be required to relocate in order to comply with the 2001 Adult-Use Amendment—19 in Manhattan, 5 in Brooklyn, 5 in Queens, 3 in the Bronx, and none in Staten Island (ECF No. 168-1 at 59-60). The City demonstrated that there are a minimum of 1,275 available lots for adult uses in the municipality that are part of the commercial real estate market (S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-3 at 6). Considering the requirement that adult businesses must be 500 feet from one another, the City's very conservative analysis showed that at least 204 available lots could be simultaneously used by adult establishments (*id.*; ECF No. 168-1 at 78).

The City submitted evidence that the available lots are part of the real estate market, and indeed, located in desirable and accessible areas. For instance, in Manhattan, adult establishments are permitted in the Hudson Yards, Meatpacking and Hell's Kitchen neighborhoods, which are zoned for and developed with a wide variety of commercial uses, including retail, office, service, and entertainment, in addition to

91

manufacturing and industrial uses (S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-1 at 5-6). These are high-density areas with vibrant, flourishing commercial centers that are readily accessible by public transportation and have an established pattern of commercial development, and where a high degree of future commercial development is anticipated (*id.*).

Similarly, the available lots in Brooklyn are in neighborhoods such as Sunset Park, Coney Island, East New York, and Red Hook that feature a vibrant mix of professional, entertainment, and other commercial uses, and benefit from the access to a broad base of potential customers provided by multiple subway lines and bus routes, and by taxi, personal automobile, and increasingly, users of ride-hailing services, and are in or near districts with developed hotels with over 2,000 rooms (as of September 2020) for tourists and business travelers (*id.* at 6).

The available lots in Queens likewise are located in flourishing neighborhoods, including Long Island City, Sunnyside, Maspeth, Flushing and College Point, that provide access to the city's broad customer base through their proximity to multiple subway lines and bus routes. Some of these neighborhoods, such as Long Island City, La Guardia, Flushing and Jamaica-JFK have developed hotels with over 3,000 rooms (as of September 2020) for tourists (*id.* at 6-7).

92

The Bronx neighborhoods with available lots, including Hunts Point, Port Morris/Mott Haven and Eastchester, likewise provide access to the City's broad customer base through their proximity to multiple subway lines and bus routes, and have an established pattern of commercial development (*id.* at 7). The Bronx has over 1,000 hotel rooms (as of September 2020) available for tourists who could be using Bronx-based entertainment establishments (*id.*).

The lots available in Staten Island are located in a variety of neighborhoods including the West Shore and Charleston, which are characterized by an established pattern of commercial development, albeit on a smaller scale than is seen in other boroughs (*id.*). These areas are accessible by car (*id.*). Thus, the City amply demonstrated that there are more than enough relocation sites for all of the 32 businesses that currently operate under the 60/40 Rule (ECF No. 168-1 at 59; S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-1 at 5).[24]

---

[24] Even if the Adult Bookstores are correct that they are not allowed in medium and heavy manufacturing zones—although the City has made clear that adult bookstores are not regulated like bookshops (S.D.N.Y. Dkt. 02-cv-4431 ECF No. 212-1 at 4)—this only takes off the table 110 of the 204 sites that can be simultaneously used by adult establishments (Bookstores' Br. 43-47). There would still be nearly 100 sites available for the City's 14 adult bookstores with peepshow booths that would need to relocate (ECF No. 168-1).

### b. The Adult Businesses' contrary arguments are meritless.

The Adult Businesses and Adult Bookstores advance a host of arguments about impediments to their relocating (App. Br. 46-52, 56-57; Bookstores' Br. 46-47). These arguments rest on faulty legal theories and fail to show that demand for adult use exceeds the supply of permissible locations. *See Casanova Entm't Grp., Inc. v. City of New Rochelle*, 165 F. App'x 72, 74-75 (2d Cir. 2006) (finding for city, where plaintiff "failed to show that the demand for sites in [the city] that could be used for adult entertainment businesses exceeds th[e] supply").

*First*, the Adult Businesses contend that Manhattan is so special that this Court should develop a unique constitutional rule for it and "treat it as a distinct real estate market" for purposes of assessing whether there are adequate alternative channels of communication (App. Br. 46-52), but this Court has already considered and rejected this exact argument. "The accessibility of potential sites in the so-called 'outer boroughs' disposes of plaintiffs' argument" about an insufficient number of sites in Manhattan, because the First Amendment does not "require[] proof of adequate available sites on a borough-by-borough basis." *Hickerson v. City of N.Y.*, 146 F.3d 99, 108, n. 5 (2d Cir. 1998); *see also TJS*, 598 F.3d at 29-30 (rejecting TJS's attempts to avoid "the prohibition against

94

consideration of economic impact, by asking [the court] to subdivide the real estate market" (cleaned up)). Lots across all five boroughs are part of the "commercial real estate market in the municipality," and are thus available. *TJS,* 598 F.3d at 27.

The Adult Businesses attempts to get around *Hickerson* and *TJS* are plainly meritless, and they cite zero contrary precedent to support their points. And even if their arguments had any logical or precedential support, this panel could not accept their request to revisit *Hickerson* and *TJS* anyway (Bookstores' Br. 46). When a panel of this Circuit is not the first to address an issue, the panel is "bound by the decisions of prior panels until such time as they are overruled either by an *en banc* panel of [this] Court or by the Supreme Court." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004).

The Adult Businesses ignore that the underlying logic of all zoning laws is that governments can restrict specific uses in particular zones— even in the most convenient or desirable spots—to promote the larger good, safety, and health of the community. *Alameda*, 535 U.S. at 446-47 (Kennedy, J., concurring). This analysis applies equally to adult-use zoning—that is, by redistributing adult businesses to areas where they do less harm, the City can curb their negative secondary effects without silencing them. *See id.* Patrons from Manhattan—whether residents or

tourists—can visit the lawfully sited adult businesses in Manhattan or easily travel out of Manhattan by subway, bus, ferry, rideshare, taxi, or private vehicle (ECF No. 168-1 at 52, 57; S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-1 at 5-7). Indeed, adult businesses that relocate to other boroughs may even be able to draw new patrons for whom their new locations are more convenient, particularly given that most New Yorkers don't live in Manhattan, which has fewer residents than Brooklyn, Queens, or the Bronx.[25] "So long as there are a sufficient number of suitable relocation sites, [a city] could reasonably assume that, given the draw of pornographic and sexually explicit speech, willing patrons would not be measurably discouraged by the inconvenience of having to travel to an industrial zone." *Tollis*, 505 F.3d at 941.

Moreover, contrary to the Adult Businesses' argument (App. Br. 56-57), the City amply demonstrated that the areas across the city where adult uses are permitted are in desirable, vibrant neighborhoods and accessible to the general public by mass transit, ride shares, and/or private vehicles (S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-1 at 5-7). Indeed, 80 percent of the areas in the outer boroughs where adult businesses are allowed are within a ten-minute walk of public transportation (ECF No.

---

[25] Demographics of New York City, WIKIPEDIA, https://perma.cc/69CA-HQAF.

121-5 at 52). Entirely ignoring this evidence, the Adult Bookstores insist that the 2001 Adult-Use Amendment would "banish" them to "unreasonable or essentially inaccessible areas"—but there is zero evidence supporting this histrionic rhetoric (Bookstores' Br. 46-47). And the contrary is true. There are both strip clubs and triple-X book and video stores already located in the outer boroughs, such that such establishments are plainly economically viable (ECF No. 168-1 at 59).

*Second*, the Adult Businesses argue that, for a variety of reasons, some number of lots should be excluded because relocating to them would not be profitable or even economically viable (App. Br. 50 n. 22, 52). In support of this point, they wrongly claim that Justice Kennedy implicitly added economic feasibility into the constitutional calculus (App. Br. 73-74). The district court correctly rejected this argument, because the concurrence was focused on *Renton*'s second step (ECF No. 211 at 70-74, 110-11). Moreover, for the same reasons that *Reed* did not, sub silentio, overrule the entire secondary-effects doctrine, Justice Kennedy's concurrence—even if it had represented the majority opinion in *Alameda*—cannot be read to overrule a uniform and on-point body of case law holding that economic feasibility is irrelevant to assessing whether a regulation leaves open adequate alternative avenues of communication, so long as the lot is part of the general commercial real-

97

estate market (*see supra* Point I.B.2). That is especially so considering that Justice Kennedy expressly stated that localities need not conduct any studies of their own to justify adult-use zoning regulations. 535 U.S. at 451-52 (Kennedy, J., concurring).

The law on economic feasibility is clear: "whether the acquisition or use of land might be unprofitable or commercially impracticable [is] not relevant to [the] concept of availability." *TJS*, 598 F.3d at 27; *Renton*, 475 U.S. at 54 ("That [adult businesses] must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation."). Availability, in this context, turns upon "whether proposed sites are *physically and legally available*" and "part of an actual commercial real estate market in the municipality," regardless of whether they are "already occupied," "not currently for sale or lease," or not "commercially viable." *TJS*, 598 F.3d at 27 (cleaned up). Thus, it is of no moment whether the 2001 Adult-Use Amendment might create economic losses for 60/40 businesses, because they "are affected no differently from any other commercial enterprise that suffers economic detriment as a result of land-use regulation." *Young*, 427 U.S. at 78 (Powell, J., concurring); *TJS*, 598 F.3d at 28 ("[W]hether or not sites fit the specific needs of adult

businesses—or any other precise type of commercial enterprise—is constitutionally irrelevant.").

Indeed, plaintiffs make no attempt to grapple with the practical question of how the City would evaluate the profitability of opening an adult business at the 1,275 available lots. Would it assess their state of development, construction costs, market rents, and then model the profitability of an adult establishment? Courts have sensibly never required this type of highly speculative accounting.

Likewise, there is no merit to the Adult Bookstores' contention that some of the available lots are too large, making them "unsuitable" for small businesses (Bookstores' Br. 44). They dispute the City's claim that large lots can be subdivided (*id.* 45). But this Court has clearly held that lots that are part of the general commercial real estate market are suitable, even if they require an initial expenditure to be developed or might need to be subdivided or portions sublet to smaller businesses. *TJS*, 598 F.3d at 30; *Renton*, 475 U.S. at 53 (finding reasonable alternative avenues of communication based on "acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that is criss-crossed by freeways, highways, and roads" (cleaned up)).

As the Fourth Circuit put it, the fact that "some development" is needed—whether having to build a new structure, clean up a site, or make due with less space or a lot that is too large—does not make it "unavailable," because not every impediment to relocation is of "constitutional magnitude." *Allno Enters. v. Baltimore Cnty.*, 10 F. App'x 197, 201-03 (4th Cir. 2001). The sites identified by the City are available, irrespective of whether they are larger than what the Adult Bookstores "would consider ideal." *Id.*

*Third,* the Adult Businesses' claim that they should not be required to relocate because "it makes a lot of sense to keep the businesses in Manhattan" demonstrates their fundamental misunderstanding about the applicable legal standards (App. Br. 56). Neither the businesses' views on what "makes sense," nor the views of some community board members in 2001 (*id.* 55), override a law that leaves open adequate alternative avenues of communication and was duly enacted by the New York City Council to advance a substantial governmental interest.

For the same reason, plaintiffs' suggestion that they have a First Amendment right to be grandfathered is incorrect (App. Br. 67). Regardless of whether they are a "dying breed," they have no constitutional right to remain in place (Bookstores' Br. 47). All that's required is that the City Council made legitimate legislative judgments to avert

secondary effects and left open adequate alternative avenues of communication. As the parties' consolidated stipulated facts reflect, there are 10 lawfully sited 100 percent adult businesses in the City where willing patrons can purchase sexually oriented expressive materials and there is ample space for all 32 60/40 businesses to relocate (ECF No. 168-1 at 59, 78). *See Discotheque*, 2022 U.S. App. LEXIS 27757, at *19-20 (losing out "grandfathered rights under state law does not violate the First Amendment because the Constitution does not require a grandfathering provision for existing nonconforming adult businesses") (cleaned up). The district court correctly held that their challenge to the 2001 Adult-Use Amendment failed at every turn.

## POINT II

### THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT IN THE CITY'S FAVOR ON THE ADULT BUSINESSES' FIRST AMENDMENT CHALLENGE TO DOB'S PERMITTING REQUIREMENTS

In addition to lodging a facial challenge against the 2001 Adult-Use Amendment under the First Amendment, the Adult Businesses also challenged DOB's permitting scheme for authorizing new adult businesses under the adult-use zoning regulations under two theories (App. Br. 84-119). First, they argue that the DOB's "vesting" rule denies them

101

a reasonable opportunity to relocate because it allegedly grants nefarious schools and houses of worship a "sensitive use veto" with the result that the Adult Businesses will be deterred from even attempting to relocate (App. Br. 84-99). And second, they argue that the entire permitting scheme for opening new adult businesses constitutes an unlawful prior restraint because it allegedly lacks time restrictions (App. Br. 100-115), does not contain a penalty for delays in processing building applications (App. Br. 115-116), and grants DOB broad discretion to revoke building permits (App. Br. 116-18), again deterring them from even attempting to relocate. But plaintiffs do not have standing to make these arguments, which in any event lack merit.

## A. The Adult Businesses do not dispute that they lack standing to challenge DOB's permitting procedures.

The district court found that the Adult Businesses lack standing to bring their highly speculative hypothetical claims (ECF No. 211 at 139-50). And while they rehash the same merits arguments they made below about the "vesting" and "permitting" schemes, they fail to acknowledge, let alone address, the district court's threshold finding that they lack

standing to pursue these claims (App. Br. 84-119).[26] Arguments not made in an appellant's opening brief are forfeited. *Jackling v. Brighthouse Life Ins. Co.*, No. 22-1703, 2024 U.S. App. LEXIS 22693, at *2-3 (2d Cir. Sep. 6, 2024); *City of N.Y. v. Minetta*, 262 F.3d 169, 180 (2d Cir. 2001) (arguments for reversal not made in opening brief are waived). Thus, they cannot dispute the district court's finding that they lack standing, and this Court need go no further in affirming the rejection of the claims.

### B. The district court was right that the Adult Businesses do not have standing to challenge DOB's permitting procedures.

Even if the Adult Businesses had contested the district court's finding that they lack standing, the district court reached the right result (ECF No. 211 at 139-150). In a detailed, thorough, and exhaustively researched analysis (*id.*), the court explained that to establish standing to challenge the DOB's permitting process, the Adult Businesses needed to demonstrate a concrete and particularized injury in fact that is not

---

[26] While the absence of standing can be raised at any time because it goes to subject matter jurisdiction, forfeiture of the issue by the party invoking the court's jurisdiction does not present the same concern. *See Connecticut Citizens Defense League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021) (finding standing argument not "sufficiently argued" in briefs waived) (*quoting Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998)).

conjectural or hypothetical, a causal connection between the DOB's challenged procedures and the injury, and the redressability of the injury by a favorable decision (*id.* at 139-40, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). But even a briefer treatment establishes that they failed to do so.

The Adult Businesses failed to assert a concrete, non-speculative injury in fact. First, they sought to challenge the purported "sensitive use veto." Under the City's adult-use zoning regulations, adult uses are not allowed within 500 feet of a school, house of worship, or other adult business. The DOB's rules provide that, once an adult use has been "established," it will not be displaced by a subsequent school or house of worship moving within 500 feet of its location. 1 RCNY § 9000-01(b). In deciding which business came first, the DOB looks to the "date of issuance of an appropriate department permit." *Id.* The Adult Businesses fear that, because building permit applications are publicly available, a school or house of worship could file a competing application and obtain a first-in-time permit to prevent the adult business from "vesting" (App. Br. 92). Although none of the plaintiffs has sought a permit to relocate, and although they identify no sensitive uses that they fear will interfere with their nonexistent applications, they insist that they have standing

104

because even the specter of interference deters them from attempting to relocate (App. Br. 95-99).

But this highly speculative theory fails under established principles. To demonstrate an injury sufficient to support standing to challenge a permitting scheme, plaintiffs typically must apply and have their applications denied, unless they are challenging being subject to a permitting scheme at all. *Brokamp v. James*, 66 F.4th 374, 387 (2d Cir. 2023). Indeed, that is what happened in the sole case they cite in support of their theory, *Young v. City of Simi Valley*, 216 F.3d 807 (9th Cir. 2000); the adult business was injured when its permit was denied due to competing sensitive uses, one of which was a "sensitive use veto," *see id.* at 815. And courts generally reject "standing theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Faculty, Alumni, & Students Opposed to Racial Preferences v. New York Univ.*, 11 F.4th 68, 76 (2d Cir. 2021); *Lacewell v. Office of the Comptroller of the Currency*, 999 F.3d 130, 146-48 (2d Cir. 2021). To be sure, standing requirements are more relaxed in the First Amendment context, but a plaintiff still cannot rely on a purely theoretical threat of self-censorship. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988); *Geller v. Hochul*, No. 21-2514-cv, 2023 U.S. App. LEXIS 1077, at *6 (2d Cir. Jan. 18, 2023) (dismissing First Amendment

105

claims for lack of standing where plaintiff self-censored and challenged permitting scheme pre-enforcement).

Here, that is all plaintiffs have to offer. The Adult Businesses assert that they are "chilled and deterred," and thus intend to engage in self-censorship (App. Br. 85). In support, they offer only their own conclusory, self-serving affidavits and the experience of one adult business called Sapphire 2, which encountered some permitting delays 10 years ago before being authorized to open in its chosen location, and which had faced a competing permitting application by a sensitive use that was filed *after* Sapphire 2's application and ultimately denied (App. Br. 91-93, 117-18; *see also* S.D.N.Y. Dkt. No. 02-cv-8333 ECF No. 157 at 3-7). The Adult Businesses' fear that they will experience something like what Sapphire 2 experienced except that the unidentified competing use will be successful this time remains purely theoretical.

Instead, as the district court explained, the record supports the conclusion that Sapphire 2's experience is unlikely to repeat. The delays experienced by Sapphire 2 were attributable to one-off errors that occurred a decade ago, under a regime that included the DOB's now-repealed prohibition on self-certification and requirement that agency counsel review adult businesses' permitting applications (ECF No. 211 at 146-47). What's more, Sapphire 2's application was reviewed at a time

when the DOB was tasked with actively enforcing its regulations in the midst of widespread sham compliance, which added a layer of administrative complexity that will not apply to future adult business applications once the 2001 Adult-Use Amendment goes into effect (S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-2 at 7-8). Thus, Sapphire 2's experience is largely irrelevant to the current scheme (ECF No. 211 at 146-47), and on appeal, the Adult Businesses offer no response to the district court's reasoning, other than simply recounting, yet again, that Sapphire 2 experienced delays before it successfully opened. A repeat seems highly unlikely, and indeed, Sapphire 2's owner has since opened a 100 percent adult strip club near Times Square without any difficulty.[27]

Nor did they demonstrate an injury under their second theory—claiming a prior restraint. That theory is based on a mischaracterization of DOB's permitting procedures as lacking adequate limits on its decision-making. As explained, under *Lakewood*, in the First Amendment context, a plaintiff can sometimes show an injury-in-fact sufficient to support a facial challenge without first applying and being denied a permit under a censorship theory (ECF No. 211 at 140-48). But to do so on

---

[27] "We now have 3 locations to choose from: Sapphire 60 (Upper East Side), Sapphire 39 (Midtown) and the brand new Sapphire Times Square (Midtown)." NEW YORK SAPPHIRE WEBSITE, https://perma.cc/5PS8-WPT2. *See also* S.D.N.Y. Dkt. No. 02-cv-8333, ECF No. 157 at 5-8.

the theory they now press, the Adult Businesses must show that the current scheme vests "unbridled discretion in the hands of a government official or agency" and that the discretion has "a close enough nexus to expression ... to pose a real and substantial threat of the identified censorship risks" (ECF No. 211 at 141, *quoting* Lakewood, 486 U.S. at 759).[28]

Applying the *Lakewood* standard, the district court concluded that the Adult Businesses failed to demonstrate an injury-in-fact arising out of DOB's permitting scheme because they had not established that DOB has unbridled discretion, since its permit-review process is constrained by the City's Administrative Code, as well as established signage, proximity, and construction rules (ECF No. 211 at 143-45).

Under state law, DOB is required to promptly review applications to ensure their compliance with "the provisions of this code and other

---

[28] Relying on *Chesapeake B & M v. Harford County*, 58 F.3d 1005 (4th Cir. 1995), the Adult Businesses state that they need not show any "abuse of procedural discretion" to bring their facial challenge (App. Br. 106, 113-14). But *Chesapeake* is simply an application of the well-settled standard just enunciated, which allows a regulated entity to bring a pre-enforcement facial challenge *to a standardless licensing scheme*, on the theory that it operates as a prior restraint. In *Chesapeake*, a district court held that a licensing scheme for adult businesses had no time limits, so posed a "risk of indefinite delay," and the County did not cross-appeal that ruling. 58 F.3d at 1010-1011. The Fourth Circuit rejected the proposition that a scheme that *undisputedly* "lacks an essential procedural safeguard—and thus constitutes an impermissible prior restraint—may nevertheless be enforced and challenged only on an 'as applied' basis." *Id.* at 1011.

108

applicable laws and rules" and provide written notice of approval or denial within 40 days. N.Y.C. Admin. Code §§ 28-104.2.7, 28-104.2.8. If the application is rejected, DOB must state "the grounds of rejection," *id.* § 28-104.2.8, and if the applicant submits a corrected application that otherwise complies with all requirements, the application must be granted, *id.* § 28-104.2.9. DOB may revoke approval, but it may do so only for sharply delimited reasons entirely unrelated to expressive content, and after providing notice and an opportunity to be heard. *Id.* § 28-104.2.10. DOB's final determinations cannot be arbitrary or capricious and are subject to administrative review and then judicial review under CPLR Article 78. *See* N.Y.C. Charter § 666(6)(a) (empowering the Board of Standards and Appeals of the City of New York to hear and decide appeals from DOB determinations); *see, e.g.*, *Matter of Perlbinder Holdings, LLC v. Srinivasan*, 27 N.Y.3d 1, 9 (2016) (affording judicial review of DOB permit revocation following administrative appeal). The district court rightly concluded that the process "is not opaque and unreviewable" and "sets temporal limits," and thus, the Adult Businesses lack standing under *Lakewood* (ECF No. 211 at 144-45).

The district court also concluded that the Adult Businesses lacked standing for the independent reason that they failed to show a nexus between the DOB's permitting scheme and protected expression,

109

because the scheme is generally applicable to all establishments (ECF No 211 at 121-48). As the Seventh Circuit has explained, a "preexisting zoning rule that *all* property owners seeking to make *any* change of land use must secure [a permit] ... is generally applicable and doesn't discriminate based on the content of speech, [so] it lacks a 'close enough nexus to expression' ... to entertain a facial challenge under the First Amendment." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324 (7th Cir. 2015).

On appeal, the Adult Businesses do not dispute this. Instead, they admit that "it is true that DOB's procedures for issuing permits apply to all businesses," but assert that adult-use applications take longer to process (App. Br. 104-05). But, again, the only proof for this assertion is Sapphire 2's decade-old experience, which occurred under a previous regulatory scheme. Although they further insist that it will take them longer to prepare an application because they will have to check that there isn't a school, church, or other adult business within a 500-foot (roughly two-block) radius, that claim is also speculative. All applicants must comply with the requirements that apply to their proposed use in their proposed zoning district, and plaintiffs have offered zero support for the conclusion that compliance with the 500-foot requirement is more burdensome. Thus, they have not disputed the district court's

110

standing findings, and even if they challenge some ancillary findings, they have not supplied any reason for this Court to reach a different conclusion.[29]

### C. Even if they had standing, the Adult Businesses' permitting-based theories fail on the merits.

Because plaintiffs lacked standing, the district court did not have Article III jurisdiction and should not have reached the merits (ECF No. 211 at 150 n.58). *Corbett v. Hochul*, No. 22-3210, 2023 U.S. App. LEXIS 30200, at *3-4 (2d Cir. Nov. 14, 2023) (courts should not exercise hypothetical jurisdiction where a plaintiff lacks Article III standing). But, in any event, the court correctly concluded that all of the Adult Businesses' permitting-based theories should be resolved in favor of the City because the Adult Businesses failed to identify any constitutional defect (ECF No. 211 at 151-59).

*First*, there is no support for the Adult Businesses' argument that the DOB's procedures create a "sensitive use veto" that is like the circumstances at issue in *Young v. City of Simi Valley*, 216 F.3d 807, 820 (9th Cir. 2000). Far from being "eerily similar," as plaintiffs contend (App.

---

[29] To the extent the injury they are claiming is having to relocate, that is not fairly traceable to the challenged permitting process, but rather to their challenge to the substantive adult-use zoning regulations (ECF No. 211 at 150).

Br. 87), *Simi Valley* was an extreme case in which the defendant city displayed clear hostility to an adult-business applicant; left open only *four* permissible adult use sites that could be simultaneously by occupied by adult businesses; and then also allowed private individuals to obtain "over-the-counter permits" to veto any adult use in these four lots "without any standards or reasons." *Id.* at 807, 812, 817-18. Indeed, the government had engaged in a long-running campaign to obstruct the plaintiff's attempts to open an adult business, stymieing his applications for three years through repeated delays while approving a competing use that displaced him within a single day of that application's submission. It was an egregious and nakedly transparent attempt at censorship.

By contrast, as the Supreme Court has explained, "laws of general application" like a law requiring building permits generally "carry with them little danger of censorship" because "such laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse." *Lakewood*, 486 U.S. at 760-761. *Simi Valley* was the exception, where the record showed that a generally applicable building permit process was being wielded as an instrument of censorship. We are aware of no subsequent appellate precedent applying its reasoning.

112

Here, by contrast, there is no proof of any "actual misuse" of 1 RCNY § 9000-01(b), *Lakewood*, 486 U.S. at 760-761, where—as noted above, *supra* Point II.2—the only example of a new church, school, or competing adult business potentially preventing an adult business from locating in a new site was resolved in the adult businesses' favor and was merely the result of one-off errors and processing delays caused by requirements that have since been loosened. Unlike in *Simi Valley*, DOB's discretion is cabined by its mandate to promptly act on applications to ensure compliance with applicable laws and rules, including construction and building codes. NYC Admin. Code § 28-104.2.7. It must grant the application or issue a "written notice of rejection, stating the grounds of rejection," *id.* at § 28-104.2.7, which is subject to administrative and expeditious judicial review under CPLR Article 78.

*Second*, the Adult Businesses' "prior restraint" theory is meritless because, as explained, the City's procedures include generally applicable time limits, remedies for delays, and constraints on the agency's discretion (App. Br. 100-118). The "prior restraint" doctrine provides that the government cannot "set up an administrative apparatus with the power and discretion to weed out disfavored expression before it occurs." *Citizens United v. Schneiderman*, 882 F.3d 374, 387 (2d Cir. 2018). It has no application here.

The Adult Businesses misplace their reliance on *FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990), a prior-restraint challenge to a motion-picture-censorship statute that included no time frame for issuing a license and no procedural safeguards allowing for judicial intervention (App. Br. 101-05). The *FW/PBS* plurality concluded that a licensing scheme without adequate "procedural safeguards to ensure prompt issuance of the license" was constitutionally suspect. *Id.* at 226 (plurality op.). The Supreme Court has since clarified that a licensing scheme for sexually oriented businesses must provide for prompt judicial review, and a state's "ordinary judicial review procedures suffice as long as the courts remain sensitive to the need to prevent First Amendment harms and administer those procedures accordingly." *City of Littleton v. Z. J. Gifts D-4, LLC*, 541 U.S. 774, 776, 781-82 (2004).[30]

Here, DOB's procedures easily pass muster. DOB is required to issue a decision on all applications for construction-document approval,

---

[30] The Adult Businesses cite, without any explanation, First Amendment cases that addressed the adequacy of time limits and promptness of judicial remedies with skepticism towards local governments and state courts (App. Br. 116). But those cases predate *Littleton*, which resolved a circuit split about the sufficiency of ordinary state judicial review of administrative decisions. *E.g.*, *Redner v. Dean*, 29 F.3d 1495, 1501 (11th Cir. 1994) (noting that "[t]he Court, however, has not clarified exactly what type of judicial review is sufficient to fulfill [the prompt judicial review] requirement, and our Circuit has never squarely addressed the issue in the context of a licensing ordinance"); *Artistic Entm't, Inc. v. City of Warner Robins*, 223 F.3d 1306, 1308 (11th Cir. 2000) (relying on *Redner* to find an ordinance without time limits unlawful without assessing the adequacy of state judicial review as a remedy).

including applications submitted by sexually oriented businesses, "promptly and no later than 40 calendar days after the submission of a complete application." NYC Admin. Code § 28-104.2.7. The Adult Businesses speculate that the agency could delay in issuing the actual building permit after granting an application (App. Br. 103). That is sheer conjecture, utterly refuted by DOB evidence explaining that issuing the actual permit happens "promptly after the approval of all construction documents, subject to additional compliance with code requirements for permits such as proper insurance and payment of all requisite fees" (S.D.N.Y. Dkt. 02-4431, ECF No. 212-2 at 5).[31]

And even if, as they speculate, DOB were to unreasonably sit on their approved, final submission and indefinitely refuse to the issue a permit or denial, they could seek judicial review. New York Civil Practice Law and Rules Article 78 affords judicial review of administrative action and

---

[31] The Adult Businesses reliance (at 111-12) on *Lusk v. Vil. of Cold Spring*, 475 F.3d 480 (2d Cir. 2007), is misplaced because *Lusk* involved a village ordinance that effectively silenced core political speech—a far cry from the 2001 Adult-Use Amendment. In *Lusk*, a resident was fined after posting signs on his own home protesting the local government's decision to allow a waterfront condominium development because he failed to first obtain permission from the Village's Historic Review Board, which had 75 days under a village ordinance to decide whether residents are permitted to post signs. 475 F.3d at 491-92. This Court reasoned that, "[w]here, as here, a property owner wishes to take a public position on a pressing public issue, for example, or on the qualifications of a candidate for public office in an imminent election, the time required to obtain approval may prevent him or her from doing so until after the public issue is settled or the election is over." *Id.* at 492.

provides a panoply of appropriate remedies. The DOB's exercise of discretion is appropriately channeled and constrained by time limits, and subject to prompt judicial review. That ends the inquiry under *FW/PBS*.

Moreover, the DOB's discretion to deny a building permit application is highly circumscribed. When a municipality requires a business to obtain a permit to operate in any location, "that scheme must set objective standards governing the grant or denial of license applications, in order to ensure that the officials not have the power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Charette v. Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir. 1998) (cleaned up). This Court has emphasized that "[f]acially content-neutral laws that require permits or licenses of individuals or entities engaged in certain forms of expression" are only impermissible if they "vest that official with enough discretion that it could be abused." *Schneiderman*, 882 F.3d at 387-388. "Too much space for censorial judgment creates a bureaucracy with a bias towards censorship, especially of the controversial expression most in need of constitutional protection." *Id*.

Here, DOB's permitting requirements and permit-revocation requirements are generally applicable and provide specific and objective standards. Denials are contemplated only for failure "to comply with the

provisions of [the Administrative Code] and other applicable laws and rules," Admin. Code § 28-104.2.8, and revocation is permitted based only on the same compliance failures, the erroneous issuance of a permit, or the inclusion of a false statement or misrepresentation of a material fact in an application, *id.* § 28-104.2.10.

Moreover, the process for construction plan approval and permit issuance is the same for adult establishments as non-adult establishments. Adult businesses, like all other businesses, must show that their intended use conforms with all applicable building codes and with the Zoning Resolution. The only difference between the requirements imposed on adult businesses and other businesses is that they must demonstrate that they are not moving to a location within 500 feet (or roughly two blocks) of a school, house of worship, or other adult business—a minimally burdensome requirement directly tied to the zoning regulation. Z.R. §§ 32-01(b) & 42-01(b). And other businesses may also be subject to other, comparable requirements.[32] Thus, DOB is not vested with enough discretion in permitting or permit revocation that such discretion can be abused, and its process is not a prior restraint.

---

[32] For example, hotels in manufacturing zones have special permitting requirements. *M1 Hotel Text Amendment*, NYC Planning, https://perma.cc/76UU-R3NV.

## POINT III

### THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT IN THE CITY'S FAVOR ON THE ADULT BUSINESSES' FOURTEENTH AMENDMENT CLAIMS

#### A. The 2001 Adult-Use Amendment's one-year termination provision does not violate the Adult Businesses' equal protection rights.

The Adult Businesses wrongly argue that the 2001 Adult-Use Amendment violates their equal protection rights because they were initially required to relocate within a year (subject to extension), while bars, open-air dumps, lumberyards, manure storage, and scrap metal heaps are grandfathered or allowed to remain in place longer when their uses becomes non-conforming (App. Br. 64-67). Their claim fails at every turn.

At the outset, to prevail on a facial challenge, the Adult Businesses needed to establish that there is no set of circumstances under which the 2001 Adult-Use Amendment's termination requirement would be valid. *United States v. Salerno*, 481 U.S. 739, 745 (1987). In other words, they had to show that treating them differently than, say, lumberyards, was unconstitutional in every application. *Cmty. Hous. Improvement Program v. City of N.Y.*, 59 F.4th 540, 548 (2d Cir. 2023). The Adult-Businesses came nowhere near to meeting this high burden.

118

The central premise of their equal protection theory is wrong. The Equal Protection Clause "embodies a general rule that [the government] must treat like cases alike, but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799 (1997). The Adult Businesses did not show that they are indistinguishable from bars, or lumberyards, or any other preexisting non-conforming businesses that are allegedly allowed to stay in place longer. Indeed, they did not submit any evidence that could possibly support an inference that the businesses to which they seek to compare themselves are linked with similarly increased rates of crime, including prostitution and theft, decreased property values, and a diminished quality of urban life. Instead, they simply regurgitate their meritless assertions, which also undergird their faulty First Amendment claim, that 60/40 establishments do not cause negative secondary effects (App. Br. 64-65). But as already explained, that contention does not support a viable constitutional claim on this record. The Adult Businesses' Equal Protection claim premised on this argument therefore fails for the same reason.

Moreover, the Adult Businesses' equal protection claim is subject to rational-basis review, which easily resolves in the City's favor. This Court recently rebuffed a similar challenge by theaters that alleged they were being treated less well than similarly situated houses of worship,

119

because they were required to comply with the City's pandemic-related proof-of-vaccination requirements while houses of worship were not. *Clementine Co., LLC v. Adams*, 74 F.4th 77, 89 (2d Cir. 2023). After rejecting the theaters' First Amendment claims, this Court explained that if a law does not burden a fundamental right, its differential treatment of allegedly similar establishments will be upheld so long as it "bears a rational relation to some legitimate end." *Id.* (cleaned up); *see also Kane v. De Blasio*, 19 F.4th 152, 167, n. 14 (2d Cir. 2021) (explaining that when a First Amendment claim fails, "any equal protection claims brought on the same grounds are subject only to rational-basis review" (cleaned up)). And here, for the reasons already explained, the 2001 amendments do not burden the Adult Businesses' First Amendments rights.

Even if bars or lumberyards were fair comparators to adult businesses, this claim would still fail because the 2001 Adult-Use Amendment's extendable one-year termination requirement is justified by at least a rational basis. It was not adopted with the "intent to inhibit or punish the exercise of constitutional rights." *Le Clair v. Saunders*, 627 F.2d 606, 609 (2d Cir. 1980). Rather, it is a common-sense requirement reflecting that the regulation of adult use is designed to end negative impacts on communities, which would not be achieved if preexisting

120

adult businesses could simply remain in place. Indeed, this is the entire premise underlying the 2001 Adult-Use Amendment—that 60/40 businesses are operating in locations where they are causing negative secondary effects.

As explained in DCP's declaration, when the City rezones a district to change the character of a neighborhood—say, from a manufacturing district to a mixed district allowing residential use—it generally does not require preexisting non-conforming uses to terminate (ECF No. 151 at 2-3). By contrast, when a rezoning is adopted for the purpose of addressing a specific negative secondary effect—as was the case with the adult-use zoning regulations—the preexisting non-conforming uses must terminate to achieve the legislative purpose (*id.*). Setting the termination window at one year rationally afforded owners of sexually oriented businesses a period of time to recoup their investments (*id.*). And if it had been insufficient, they could have obtained an extension of this time from the New York City Board of Standards and Appeals under Z.R. § 52-77 by showing that they had additional costs they were unable to recoup (S.D.N.Y. Dkt. 02-cv-4431, ECF No. 212-1 at 5). This highly sensible law survives rational-basis review. What's more, as a practical matter, the City's 60/40 businesses did not just have one year subject to extension to recoup their investments; they have had over twenty years.

121

**B. Nor does the 2001 Adult-Use Amendment violate the Adult Bookstores' substantive due process rights.**

The Adult Bookstores' argument that the 2001 Adult-Use Amendment bears no "reasonable relationship to the public health, safety, morals or general welfare," and therefore violates the Fourteenth Amendment's Due Process Clause as an arbitrary regulation (Bookstores' Br. 27-42) is utterly without merit. The district court correctly granted judgment to the City on these claims.

At the outset, the Adult Bookstores characterize their claim as both a procedural and substantive due process claim, but their argument—that the regulation is arbitrary—clearly sounds in substantive due process (*id.* 27). A procedural-due-process claim requires a showing that the government deprived a plaintiff of a protected property right without adequate pre-deprivation or post-deprivation process, while a substantive-due-process claim requires a showing that the government deprived a plaintiff of a protect interested arbitrarily. *See Safepath Sys. LLC v. N.Y. City Dep't of Educ.*, 563 F. App'x 851, 854 (2d Cir. 2014).

The Adult Businesses' substantive due process claim is subsumed by their First Amendment claim, which consists of "more particularized allegations of other provisions of the Constitution providing an explicit textual source of protection." *20 Dogwood LLC v. Vil. of Roslyn Harbor*,

122

No. 23-930, 2024 U.S. App. LEXIS 8832, at *3-4 (2d Cir. Apr. 12, 2024). When a "more specific constitutional protection, rather than the more general notion of substantive due process" applies, the Court need not address the substantive due process claim. *Id.*; *Collins v. Putt*, 979 F.3d 128, 136 (2d Cir. 2020) (explaining that substantive-due-process claims are subsumed by more particularized constitutional claim).

And in any event, the district court rightly held that the Adult Bookstore's claim fails on the merits (ECF No. 211 at 163-66). Their substantive-due-process claim requires a showing that the City arbitrarily or irrationally infringed a constitutionally protected liberty or property interest. *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 545 (2d Cir. 2014); *Cullen v. Mello*, No. 23-413, 2024 U.S. App. LEXIS 10564, at *4 (2d Cir. May 1, 2024). But the Adult Bookstores do not have a protected property interest in operating their businesses from the locations of their choosing without regard to zoning rules. *See Joey's Auto Repair & Body Shop v. Fayette Cnty.*, 785 F. App'x 46, 50 (3d Cir. 2019) (finding no "substantive due process right to conduct business without zoning interference").

Their reliance on *DLC Mgt. Corp. v. Town of Hyde Park*, is misplaced. 163 F.3d 124, 133 (2d Cir. 1998). In that case, this Court rejected a substantive-due-process challenge brought by plaintiffs who were

123

denied a special permit to build a shopping center because "the [town's zoning board] had the authority not to issue the Special Permit for legitimate reasons," and thus "plaintiffs lacked a protected property interest in the approvals they needed in order to build [the center]." *Id.* Nowhere does the case suggest that 60/40 bookstores have an absolute right to remain in place under New York law because their "particular zoning status ... vested" (Bookstores' Br. 37-38).

Under New York law, "where a more restrictive zoning ordinance is enacted, an owner will be permitted to complete a structure or a development which an amendment has rendered nonconforming" under certain circumstances under the State's "vested rights" doctrine. *Ellington Constr. Corp. v. Zoning Bd. of Appeals*, 77 N.Y.2d 114, 122 (1990); *see also* ZR § 11-331. However, "[t]he intractable problem of eliminating nonconforming uses" has led New York courts to sustain zoning changes that require the termination of nonconforming uses where there are "amortization provisions" that allow a reasonable period of time "to recapture the investment." *Islip v. Caviglia*, 73 N.Y2d 544, 560-61 (1989). "Reasonableness is determined by examining all the facts, including the length of the amortization period in relation to the investment and the nature of the use." *Id.* Amortization provisions are preemptively valid "unless the owner can demonstrate that the loss

124

suffered is so substantial that it outweighs the public benefit gained by the exercise of the police power." *Id.*

In *Islip*, the New York Court of Appeals held that an adult bookstore that operated more than five years after it was deemed a nonconforming use had no claim under the State's vested-rights doctrine. *Id.* at 561. Here, even the Adult Businesses concede there is only one 60/40 book-and-video-store plaintiff that was operating before the 2001 Amendment and could possibly be deemed vested (Bookstores' Br. 38-39), but that bookstore has now had more than twenty years to recoup its investment and its claim plainly fails.

Nor is there merit to their claim that the 2001 Adult-Use Amendment improperly seeks to regulate the internal operation of adult bookstores and the materials they offer (Bookstores' Br. 22). Plainly, that is not the case, or the amendment would indeed be an impermissible content-based regulation (*see supra* Point I). But adult bookstores can offer whatever (lawful) items for purchase or rent they wish. The only change brought about by the 2001 Adult-Use Amendment concerns where those businesses can operate. Under the definitional amendment, some additional establishments that were intended to be covered by the 1995 regulations are now allowed only in places where adult businesses are

allowed, thereby abating their negative secondary effects. This is well within the City's zoning authority.

Moreover, the City did not act arbitrarily or irrationally. A law that neither interferes with a fundamental right nor singles out a suspect classification may be invalidated on substantive-due-process grounds only if the plaintiff demonstrates "that there is no rational relationship between the legislation and a legitimate legislative purpose." *Maloney v. Cuomo*, 554 F.3d 56, 59-60 (2d Cir. 2009) (cleaned up); *Matzell v. Annucci*, 64 F.4th 425, 436 (2d Cir. 2023) (plaintiff must show the government's conduct is so outrageously arbitrary as to be a gross abuse of power).

The Adult Bookstores cannot carry this burden. Courts have consistently upheld local zoning regulations that "bear a substantial relation to the public health, safety, morals, or general welfare." *Nectow v. Cambridge*, 277 U.S. 183, 188 (1928). Because the 2001 Adult-Use Amendment survives intermediate scrutiny under *Renton*, as a narrowly tailored measure that advances a substantial governmental interest (*supra* Point I), it clearly overcomes the lower hurdle posed by the substantive-due-process standard. Thus, their claim that the 2001 Adult-Use Amendment was not a legitimate exercise of the City's zoning authority fails on the merits (Bookstores' Br. 27-33) and the district court

correctly granted judgment to the City on the Adult Bookstores' Fourteenth Amendment claims.

## CONCLUSION

This Court should affirm.

Dated:  New York, New York
         September 30, 2024

Respectfully submitted,

MURIEL GOODE-TRUFANT
*Acting Corporation Counsel*
*of the City of New York*
Attorney for Appellees

By:  *Elina Druker*

ELINA DRUKER
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
212-356-2609
edruker@law.nyc.gov

RICHARD DEARING
INGRID R. GUSTAFSON
ELINA DRUKER
  *of Counsel*

127

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 27,910 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____
ELINA DRUKER