# 24-621-cv(L),
## 24-623(CON), 24-636(CON), 24-640(CON)

# United States Court of Appeals
### *for the*
# Second Circuit

557 ENTERTAINMENT INC., DCD EXCLUSIVE VIDEO INC., VIDEO
LOVERS INC., JAYSARA VIDEO, INC., VISHARA VIDEO, INC., RAINBOW
STATION 7 INC., CLUB AT 60TH STREET, INC., a Delaware corporation,
JACARANDA CLUB, LLC, a New York limited liability company, DBA
Sapphire, 59 MURRAY ENTERPRISES, INC., AKA 59 Murray Corp., DBA
New York Dolls, AAM HOLDING CORP., DBA Private Eyes, JNS VENTURES
LTD, DBA Vixen, TWENTY WEST PARTNERS, INC., d/b/a Wonderland,
689 EATERY, CORP., DBA Satin Dolls, 725 EATERY, CORP., Substituting for
MLB Enterprises, Corp., DBA Platinum Dolls,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## CONSOLIDATED REPLY BRIEF FOR
## PLAINTIFFS-APPELLANTS

EDWARD S. RUDOFSKY, ESQ.
ZANE AND RUDOFSKY
*Attorney for Plaintiffs-Appellants*
    *59 Murray Enterprises, Inc., et al.*
Five Arrowwood Lane
Melville, New York 11747
(917) 913-9697

JEROME MOONEY, ESQ.
G. RANDALL GARROU, ESQ.
WESTON, GARROU & MOONEY
*Attorneys for Plaintiffs-Appellants*
    *Club at 60th Street, et al.*
12121 Wilshire Boulevard
Los Angeles, California 90025
(310) 442-0072

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS   (800) 4-APPEAL • (334790)

336 LLC, DBA The Erotica, CHELSEA 7 CORP., 725 VIDEO OUTLET INC.,
GOTHAM VIDEO SALES & DISTRIBUTION INC., VISHANS VIDEO, INC.,
EXPLORE DVD LLC,

*Plaintiffs,*

– v. –

CITY OF NEW YORK, HON. BILL DE BLASIO, as mayor of the City of New
York, MELANIE E. LA ROCCA, as Commissioner of Buildings,
DEPARTMENT OF BUILDINGS OF THE CITY OF NEW YORK, RICK D.
CHANDLER, as Commissioner of Buildings, DEPARTMENT OF
BUILDINGS OF THE CITY OF NEW YORK,

*Defendants-Appellees.*

ERICA T. DUBNO, ESQ.
FAHRINGER & DUBNO
*Attorney for Plaintiffs-Appellants*
*557 Entertainment Inc., et al.*
43 West 43rd Street
New York, New York 10036
(212) 319-5351

JEFFREY M. NYE, ESQ.
SSP LAW
*Attorney for Plaintiffs-Appellants*
*689 Eatery, et al.*
7373 Beechmont Avenue
Cincinnati, Ohio 45230
(513) 533-6714

# TABLE OF CONTENTS

**Page**

REPLY STATEMENT ................................................................................................ 1

Introduction .............................................................................................................. 1

Fallacy #1:    That the 1995 City Planning Commission Report provides
constitutionally sufficient evidence of a link between the 2001
Amendments and negative secondary effects ............................................... 2

Fallacy #2:    That establishments that feature sexually explicit activities and
materials in less than 40% of their accessible floor space ipso facto
cause negative secondary effects ................................................ 5

Fallacy #3:    That the City met its burden of demonstrating how speech will fare
under the 2001 Amendments ....................................................... 7

Fallacy #4:    That the 2001 Amendments were or are necessary to mitigate
negative secondary effects .......................................................... 14

REPLY ARGUMENT................................................................................................ 17

Reply Point I      THE CITY HAS FAILED TO ESTABLISH THE
CONSTITUTIONALITY OF THE 2001 AMENDMENTS
UNDER THE TRADITIONAL RENTON STANDARDS..................... 17

Reply Point II     THE CITY FAILED TO PROVE "HOW SPEECH WILL FARE"
IF THE 2001 AMENDMENTS ARE PERMITTED TO TAKE
EFFECT ................................................................................. 19

Reply Point III    THE GOVERNMENTAL INTEREST IN THIS ZONING
AMENDMENT THAT IMPACTS FREE EXPRESSION
SHOULD BE ASSESSED WHEN IT IS ACTUALLY IMPOSED
FOR THE FIRST TIME, NOT JUST 23 YEARS AGO WHEN IT
WAS ENACTED ...................................................................... 23

Reply Point IV     THE 2001 AMENDMENTS CHILL ACCESS TO FREE
EXPRESSION ......................................................................... 28

Reply Point V      THE CITY'S ARGUMENTS FAIL TO ADDRESS THE
CENTRAL PRINCIPLE INVOLVED IN PLAINTIFFS'
MANDATORY TERMINATION CHALLENGES................................ 30

i

Reply Point VI      THE CITY IGNORES KEY AND INDISUPTABLE FACTS WHICH ARE DISPOSITIVE OF PLAINTIFFS' CLAIM THAT THE CITY'S PERMITTING AND VESTING PROVISIONS DENY THEM A REASONABLE OPPORTUNITY TO RELOCATE AND THUS SUPPORT INJUNCTIVE RELIEF AGAINST THE CITY'S MANDATORY TERMINATION PROVISIONS UNTIL THE PERMITTING AND VESTING PROVISIONS ARE FIXED ..................................... 33

A.    Appellants have standing to challenge the permitting and vesting provisions as an ancillary component of their challenge to the mandatory termination provisions, and did not waive that claim. .......................... 33

B.    Appellants demonstrated their standing to challenge the facial invalidity of the permitting and vesting provisions. ................................... 39

    1.    Plaintiffs have standing to facially challenge the constitutionality of the City's vesting rule (which impermissibly allows sensitive-use vetos). ........................................................... 39

    2.    Plaintiffs have standing to challenge the permitting scheme because the City officials' unfettered procedural discretion to delay an application renders the scheme facially unconstitutional. .......................... 47

C.    The City has failed to adequately defend the merits of Plaintiffs' challenges to its permitting and vesting provisions. ........................... 52

    1.    The City has failed to justify its unconstitutional vesting policy. .............. 52

    2.    The City has failed to show that its permit process contains adequate procedural safeguards to prevent its abuse as an impermissible prior restraint. ........................................................... 54

      a.    The permit requirement is invalid because the ZR fails to require that an adult business permit application be granted or denied within a specified period. ................................... 54

      b.    The City has failed to show any constitutionally acceptable remedy for delay in issuance of a permit to which the applicant is otherwise entitled. ........................................... 58

Conclusion ........................................................................... 60

CERTIFICATE OF COMPLIANCE .......................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES:**

**Supreme Court**

*Bose Corp. v. Consumers Union,*
    466 U.S. 485 (1984) ................................................................. 1, 16, 19

*City of Los Angeles v. Alameda Books, Inc.,*
    535 U.S. 425 (2002) ................................................................. 12, 13, 16

*City of Renton v. Playtime Theatres, Inc.,*
    471 U.S. 1013 (1985) ...................................................................... 2

*Corner Post, Inc. v. Bd. of Governors,*
    ___ U.S. ___, 144 S.Ct. 2440 (2024) ............................................. 16

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ...................................................................... 40

*Freedman v. Maryland,*
    380 U.S. 51 (1965) ................................................................... 40, 56

*FW/PBS v. City of Dallas,*
    493 U.S. 215 (1990) ........................................................ 50, 51, 56, 57

*Great Lakes Insurance SE v. Raiders Retreat Realty Co., LLC,*
    601 U.S. 65 (2024) ....................................................................... 16

*Horne v. Flores,*
    557 U.S. 433 (2009) ...................................................................... 24

*Lakewood v. Plain Dealer,*
    486 U.S. 750 (1988) ................................................................. 39, 40

*Northwest Austin Municipal Utility District Number One v. Holder,*
    557 U.S. 193 (2009) ................................................................. 24, 32

*Secretary of State of Md. v. Joseph H. Munson Co.,*
    467 U.S. 947 (1984) ................................................................. 41, 43

*Shelby County, Alabama v. Holder,*
    70 U.S. 529 (2013) .................................................................. 24, 32

*Shuttlesworth v. Birmingham,*
  394 U.S. 147 (1969) ................................................................40

*Thornhill v. Alabama,*
  310 U.S. 88 (1940) ............................................................ 39, 40

*U.S. v. Playboy Entertainment Group, Inc.,*
  529 U.S. 803 (2000) ......................................................... 14, 17

*United States v. Stevens,*
  599 U.S. 460 (2010) ......................................................... 50, 55

*Vance v. Universal Amusement Co.,*
  445 U.S. 308 (1980) ................................................................40

*Walker v. Birmingham,*
  388 U.S. 307 (1967) ................................................................40

**Courts of Appeals**

*A.H. by and through Hester v. French,*
  985 F.3d 165 (2d Cir. 2021) ......................................................1

*Chesapeake B & M v. Harford,*
  58 F.3d 1005 (4th Cir. 1995) ............................................ 48, 49, 50, 55

*Hickerson v. City of New York,*
  146 F.3d 99 (2d Cir. 1998) ......................................................28

*White River Amuse. Pub, Inc. v. Town of Hartford,*
  481 F.3d 163 (2d Cir. 2007) ......................................................24

*Young v. Simi Valley,*
  216 F.3d 807 (9th Cir. 2000) ............................................ 46, 47, 53

**District Courts**

*689 Eatery Corp. v. City of New York,*
  716 F.Supp.3d 88 (S.D.N.Y. 2024) ......................................................21

*725 Eatery Corp. v. City of New York,*
  408 F.Supp.3d 424 (2019) ............................................ 14, 28

*Casanova Entm't Group, Inc. v. City of New Rochelle,*
  375 F.Supp.2d 321 (S.D.N.Y. 2005) ............................................ 36, 37, 38

*Independence News, Inc. v. City of Charlotte,*
  568 F.3d 148 (4th Cir. 2009) ............................................ 25, 26

*Lamar Adver. of Penn, LLC v. Town of Orchard Park*,
   356 F.3d 365 (2d Cir. 2004) ...................................................................40

*Lusk v. Vil. of Cold Spring*,
   475 F.3d 480 (2d Cir. 2007) ...................................................................58

*New York Progress & Protection PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013) .....................................................................1

*TJS of New York, Inc. v. Town of Smithtown*,
   598 F.3d 17 (2d Cir. 2010) ....................................................................23

**STATE CASES:**

*City of New York v. Dezer Properties*,
   95 N.Y.2d 771 (2000) ...........................................................................10

*City of New York v. Les Hommes*,
   94 N.Y.2d 267 (1999) ...........................................................................10

*For The People Theatres of NY, Inc. v. City of New York*,
   38 Misc.3d 663 (Sup. Ct. N.Y. Co. 2012), *aff'd*
   131 A.D.3d 279 (1st Dep't 2015) ......................................................5, 15

*Quaglia v. Incorporated Village of Munsey Park*,
   54 A.D.2d 434 (2d Dep't 1976), *aff'd*, 44 N.Y.2d 772 (1978).....................23-24

**STATUTES & OTHER AUTHORITIES:**

1 RCNY §9000-01(b).........................................................................53, 54

James Buchwalter, *Validity of Zoning Laws and Ordinances as Dependent
   on Conditions, Circumstances,* andParticular Property, 101A C.J.S.
   Zoning and Land Planning § 18.............................................................24

# REPLY STATEMENT

## <u>Introduction</u>

The City's brief[1] in response to Plaintiffs' appeal is long on rhetoric (such as mischaracterizing Plaintiffs' appeal as a "hodge-podge" of arguments) but is based on fundamentally flawed factual and legal arguments which cannot survive the "independent examination of the whole record to ensure that the judgment does not constitute a forbidden intrusion on the field of free expression," as required by the Supreme Court's ruling in *Bose Corp. v. Consumers Union,* 466 U.S. 485, 499 (1984). As this Court recently took pains to explain in *A.H. by and through Hester v. French,* 985 F.3d 165, 175 (2nd Cir. 2021) (citing cases):

> In the context of First Amendment claims under the Free Speech Clause, we have adhered to the Supreme Court's instruction to " 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" This more searching review aims to ensure that we independently "determine the constitutional importance of the facts of the case," particularly "where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts." [Footnotes omitted.]

*Accord, New York Progress & Protection PAC v. Walsh,* 733 F.3d 483, 486 (2nd Cir. 2013).

---

[1] The City's brief is referred to herein as "City Br." Page citations are to the actual page numbers of the brief (not ECF page numbers).

**Fallacy #1:** <u>That the 1995 City Planning Commission Report provides constitutionally sufficient evidence of a link between the 2001 Amendments and negative secondary effects</u>

In the field of regulating adult expression, it has been a bedrock principle of our constitutional jurisprudence since at least *City of Renton v. Playtime Theatres, Inc.* 471 U.S. 1013 (1985), that in order to carry its constitutional burden of proof, a municipality must present evidence that demonstrates a link between the type of adult establishment sought to be regulated and "negative secondary effects."

Thus, to justify the 2001 Amendments (which eliminated the "substantial portion" test of the 1995 Amendments), the City claimed and continues to argue that the 1995 Amendments were intended to apply to 60/40 establishments (*see, e.g.,* City Br. at 5 *et seq.*) and, therefore, that the 1995 City Planning Commission Report, which provided the evidentiary basis for the 1995 Amendments, likewise (*i.e.,* 6 years in advance) provided the link between the 2001 Amendments and negative secondary effects required to sustain their constitutionality.

But the 1995 City Planning Commission Report expressly conceded that:

> As a general guideline, *an establishment would have to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied* in the [1994 Department of City Planning] Study and thus be an "adult establishment …." [Doc. 121-5, at p. JNR-000450; emphasis added.] [2]

---

[2] Except as may otherwise be expressly noted, references herein to "Doc." are to documents as filed in the lead case, *336 LLC v. City of New York,* SDNY No. 18-cv-

*See, also, id.* at p. JNR-000444-45 ("Moreover, the Commission notes that *the proposed regulations apply only to certain adult uses, namely establishments similar to those studied in the DCP Study*"); and *id.* at p. JNR-000449 ("As a general matter, 'adult establishments' are intended to be *only* those establishments similar in nature to the types of enterprises described and studied in the DCP Study …. These are the *only* establishments studied by the DCP and found to have adverse secondary effects, and as such are the *only* establishments covered by the adult use regulations. Because the regulations are intended to cover this limited range of establishments, enforcement efforts should be similarly tailored." (Emphasis added.)

In other words, over the last 22 years since this action and the State actions were filed, the City has done a masterful job of misdirection, convincing the New York Court of Appeals and, more recently, the trial Court below, and now arguing in its brief on this appeal, that there was a constitutionally sufficient evidentiary basis for the 2001 Amendments (i.e., the 1995 CPC Report, based on the 1994 DCP Study). But in fact, at no time (whether 1995 or later) did the City ever study the negative secondary effects (if any) of establishments allocating less than 40% of their customer accessible floor area for adult purposes—now referred to as "60/40

---

3732. Additionally, "JNR" refers to the volumes of the judicial notice request submitted jointly by all parties on May 9, 2022, as exhibits 1-10 to document 121.

establishments"— and such establishments were expressly *not* intended to be regulated by the 1995 Amendments.[3] Thus, there was and remains no constitutionally-permissible basis for applying the 1995 Amendments to the plaintiffs, *i.e.,* no evidence of any link between 60/40 establishments and negative secondary effects, as required to be established under *Renton* and its progeny.

Because (a) the 60/40 form of establishment, despite express 2001 requests for a study, was *never* studied by the City[4] and (b) as admitted in the 1995 CPC Report, the 1995 Amendments were *never* intended to apply to 60/40 establishments, the City's arguments (then and now) that there was "sham compliance" and those rules were "circumvented" by the 60/40 establishments, and the argument that the

---

[3] The 2001 legislative record on which the City relies (City Br. at 14-17) did *not* address any alleged secondary effects. To the contrary, all of the 2001 material was addressed to the nature of the businesses (*see, e.g.,* City Br. at 16-18), not the businesses' effect on the community—the *sine qua non* of secondary effects inquiry. To overcome this defect in its record, the City urged (and continues to urge) that the nature of the businesses was "adult"; hence, the City argues that the 1995 CPC Report suffices to provide the constitutionally necessary link. But the 1995 CPC Report itself acknowledges that businesses that featured adult entertainment or materials in "less than 40%" of their accessible space w*ere not studied. Hence, there was no "link" of 60/40 businesses to negative secondary effects established in 1995, upon which the City could have possibly relied in 2001.*

[4] See Stipulated Fact 34 ([Doc. 168-1 at p. 12](Doc. 168-1 at p. 12)): "It is uncontroverted that in adopting the 2001 Amendments the City did not undertake any new study of purported negative secondary effects alleged to be attributable to establishments operating as 60/40 Businesses, and did not make any findings of the extent to which purported negative secondary affects attributable to adult establishments in the 1994 Adult Entertainment Study and the 1995 City Planning Commission Report were eliminated by the 1995 Amendments."

1994 DCP Study is constitutionally sufficient as a foundation for the 2001 Amendments, are meritless and should not survive independent examination by this Court.

**Fallacy #2:** **That establishments that feature sexually explicit activities and materials in less than 40% of their accessible floor space ipso facto cause negative secondary effects**

Separate and apart from the question of whether the 1995 CPC Report provided the pre-enactment link to negative secondary effects that would be constitutionally required to make the 2001 Amendments enforceable, they cannot survive First Amendment scrutiny based on the findings of New York County Supreme Court, affirmed by the Appellate Division, First Department, that *60/40 establishments do not, in fact, have the "same essential character" as the establishments studied in 1995 and do not cause negative secondary effects.  See, For The People Theatres of NY, Inc. v. City of New York,* 38 Misc.3d 663 (Sup. Ct. N.Y. Co. 2012), *aff'd* 131 A.D.3d 279 (1st Dept. 2015).

The New York Court of Appeals (which has extremely limited jurisdiction over *facts*) did not find any error in the affirmed findings of fact on appeal, but rather reversed and held the 2001 Amendments valid under the New York State Constitution, as a matter of *law*, based on its conclusion that the 60/40 establishments have "a continued focus on sexually explicit activities and materials."

5

[29 N.Y.3d 340, 362 (2017)](.)[5]   Whatever the appropriateness of this holding may have been for State constitutional purposes, it should not control the independent determination of the Federal constitutional issue—especially in light of the findings of fact and conclusion of unconstitutionality in the lower State Courts—and certainly did not and does not provide the necessary link between the 2001 Amendments and negative secondary effects.

In other words, the 1995 CPC Report provided a thoughtful and well-reasoned explanation of why the narrowly-tailored 1995 Amendments were constitutional with respect to establishments which were studied or which were "similar to the establishments studied"—i.e., those which regularly featured adult entertainment or materials in more than 40% of the accessible areas of the establishments—but there was never any similar evidentiary basis provided for establishments (like Plaintiffs) which featured adult entertainment or materials *in less than 40% of their interior space*, and there was no evidentiary linkage to establishments that "focus on sexually

---

[5]   The City's argument concerning the effect of the Court of Appeals ruling in *For The People* (City Br. at 25) misstates New York law.  See Appellant's Br. at 42, n. 17.  In this instance, it is undisputed that the New York Court of Appeals did not set aside any of the affirmed findings of fact.  Rather, the Court of Appeals disagreed with the conclusion reached by the  trial Court and Appellate Division on the legal effect of the facts for purposes of the New York constitutional challenge to the 2001 Amendments.  Two points thus emerge:  the City is bound by the affirmed findings of fact and cannot relitigate those factual issues under basic principles of collateral estoppel; and the New York Court of Appeals decision on the New York State constitutional issue does not control the outcome of this separate Federal constitutional challenge.

explicit activities and materials"—the sole factor that the New York Court of Appeals found (in a factual vacuum) determinative as a matter of law for New York constitutional purposes.[6]

**Fallacy #3:** **That the City met its burden of demonstrating how speech will fare under the 2001 Amendments**

In 1995, the City Planning Commission presciently engaged in a sophisticated analysis of "how speech will fare" (without using that term) under the then-proposed, subsequently adopted "1995 Amendments," which regulated adult establishments "*similar to those studied*"—i.e., establishments which allocated more than 40% or more of their accessible floor space to adult entertainment and/or materials. The Commission rigorously reviewed and analyzed (1) the background to the 1995 proposal, (2) the 1994 Department of City Planning Adult Entertainment Study, (3) the then-current proposal, (4) the areas in which adult establishments would and would not be permitted, (5) the nature and effect of the proposed buffer zones, (6) the proposed changes to signage, (7) the multiple reviews to which the

---

[6] Notably, there was also no weight given by the New York Court of Appeals to the dramatic change in exterior signage between 1995 and 2001. This was extremely significant because "negative secondary effects" relates to exterior effects in the nearby community (e.g., traffic, crime, real estate values). Since the City's own signage expert testified in the challenge to the 2001 Amendments that signage was "toned down" across-the-board as a result of compliance with the 1995 legislation—and the lower State Courts so found—the New York Court of Appeals should have (but did not) explain why elimination of adult entertainment and several restriction of adult materials was still constitutionally permissible.

proposal had been subjected (environmental, waterfront revitalization, and public), (8) the effect that proposed changes to the proposal would have in terms of making it more or less restrictive of free expression, (9) the positions expressed at public hearings on the proposal (including concerns about the constitutionality of restricting free expression), (10) the reasons the CPC was recommending adoption, (11) the effect the proposal was likely to have on adverse secondary effects, and (12) the effect the proposal was likely to have on free expression—all allowing for the fact that establishments which provided adult entertainment or materials in less than 40% of their space were *not studied*, *not intended to be regulated*, and would continue to be a source of such expression throughout the City:

> Adult uses would be able to locate in substantial numbers in all boroughs and in a variety of locations, *assuring sufficient access to adult materials.* Analyses by DCP staff make it clear that the proposed regulations would allow the opportunity for all currently operating adult establishments to relocate within the city as well as *allowing for expansion of the adult market.* *** [Doc. 121-5 at p. JNR-000444; emphasis added]

Moreover, the 1995 CPC Report specifically recognized "that a majority of the existing uses are in Manhattan" and that "the density of development generally and the number of potential users—workers, residents, tourists and other visitors—is *greater in Manhattan* than in the other Boroughs. Because of this the Commission believes that it is appropriate on a land use basis to … *allow more potential sites in Manhattan* …." *Id.* at p. JNR-000447; emphasis added.

Implementing this belief, the Commission recommended (and City Council subsequently adopted as part of the 1995 Amendments) modification of the "buffer" provisions (i.e., between uses) originally proposed between uses by the Department of City Planning, so as to *"increase the number of potential sites in Manhattan by more than 40%"* and "provide ample opportunity for both consumers and purveyors to have access to adult materials and uses."[7] [*Id.* at JNR-000448 (emphasis added).]

The CPC Report also expressly noted that "DCP staff took into account the fact that certain properties, such as wetlands, properties occupied by public works, and large properties owned by the city, were unlikely to be developed with adult establishments. DCP staff also considered only those sites fronting built roadways. Analyses by the Transportation Division of DCP indicate that 80 percent of the areas in the outer boroughs where adult establishments could

---

[7] Concomitantly, the CPC urged that any extension of the list of sensitive receptors or extension of the buffer provisions "would be beyond the scope of the present action [i.e., adoption of the 1995 Amendments] and as such require a new application for a text amendment." [Doc. 121-5, at p. JNR-000462.] In 2001, however, the City Council improperly avoided this problem by mischaracterizing the 2001 Amendments as a "technical" amendment, even though it completely eliminated the 60/40 form of adult eating and drinking establishment and severely restricted the 60/40 book- and video stores. The effect was the same as that which the CPC clearly warned against: to dramatically *decrease* the number of locations at which adult entertainment and materials are available.

locate are within a ten minute walk from a rapid transit line or major bus route."
*Id.* at JNR-000444.

However, in sharp comparison, there was no such thoughtful study or analysis of "how speech will fare" under the 2001 Amendments at the time they were considered and adopted in reflexive response to the stinging rejection by the New York Court of Appeals of the City's "sham compliance" arguments in *City of New York v. Les Hommes,* 94 N.Y.2d 267 (1999), and *City of New York v. Dezer Properties,* 95 N.Y.2d 771 (2000).[8]  It was simply the City's disingenuous position, which it has continued to maintain for 23 years, that it had "always intended" to regulate the 60/40 businesses as adult establishments under the 1995 Amendments, notwithstanding the clear statements to the contrary in the 1995 CPC Report; notwithstanding the limiting "substantial portion" language in the 1995 legislation; notwithstanding OPPNs 4/98 and 6/98 both defining "substantial portion" as "at least 40 percent"; and notwithstanding the clear stipulation on the record before

---

[8] *Dezer* and *Les Hommes* expose the lie beneath the City's "exploitation," "evasion," "skirting" and "sham compliance" arguments (City Br. 12 et seq.) that undergird its historical justification for the 2001 Amendments.  As the New York Court of Appeals made pellucidly clear in those decisions, there was *no* "exploitation," "evasion," "skirting" and "sham compliance"; rather there was exacting compliance with the "spatial" requirements set forth in the 1995 zoning scheme.  The 2001 Amendments were simply the City's "end run" around those adverse decisions, to regulate all "adult" eating and drinking establishments regardless of the amount of floor space allocated to the "adult" component of the business, regardless of the intensity of the use, and—most significantly—regardless of whether there was any link to negative secondary effects.

Judge Cedarbaum in 1998 [in *Amsterdam Video v. City of New York,* S.D.N.Y. No. 96-cv-02204-MGC], that "substantial portion" meant "40% or more."

Likewise, in sharp comparison to the City's detailed, nuanced and Free Expression-sensitive 1995 approach, the City has *stipulated* that in currently preparing the list of "available alternative sites" on which it presently relies to satisfy the "how speech will fare" test, the City:

a. *did not conduct* a specific transportation analysis to determine the accessibility of each or any site, nor relate each or any mode of transportation to each or any site;

b. *did not conduct* a basic infrastructure (or equivalent) analysis for each or any site other than to observe that all of the listed sites have street frontage;

c. *did not determine* for each or any site on its list of legally permissible alternative sites how much it would cost to convert the site into what is required for either (i) an adult establishment, or (ii) a commercial use, generally;

d. *did not analyze* whether the presence of wetlands and/or flood plains precluded a site from being commercially developed;

e. *did not confirm* that the listed sites would not be rendered unavailable by virtue of any pending proposed text

11

amendments to the Zoning Resolution;

    f.    *did not* analyze each listed site as to whether it is suitable for some generic commercial enterprise;

    g.    *did not* analyze the pragmatic likelihood of each of the listed sites ever becoming available to a generic commercial enterprise, and

    h.    *did not* exclude any lots as being too large given that they would be unfeasible for almost any single use and certainly for any adult entertainment use.

*See* Consolidated Statement of Stipulated Facts (or "CSF"), Doc. 168-1, at pp. 51-54.[9]

    The City's draconian re-definition of "adult establishment" from that carefully crafted in 1995 to the 2001 version challenged in this case thus palpably fails the "how speech will fare" test urged by Justice Kennedy in *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 444 (2002) (Kennedy, J.,

---

[9] The City attempted to explain several of these admissions with facts and circumstances it views as mitigating, as set forth in the Stipulation. The essential point, however, is that the City stipulated to all of these facts, and absent this information it was plainly impossible for the City and the District Court—and, with respect, it is likewise impossible for this Court upon independent scrutiny of the record—to engage in the "how speech will fare" calculus mandated by Justice Kennedy.

concurring).[10]   Indeed, it must be recalled that *Alameda Books* was a summary judgment decision which expressly allowed for the possibility that the City's assumptions in adopting the speech restrictions could be "proved unsound at trial." [535 U.S. at 453.]  And that is exactly what transpired in this case.  *First,* as noted above, the City conceded that it had not studied *any* of the factors necessary to determine (*i.e.,* as a matter of "common experience") "how speech will fare" under the 2001 Amendments; *second,* the City's reliance on the 1995 CPC Report to establish a link to negative secondary effects was exposed as inappropriate (at best) in light of the fact that the 60/40 business form was *not similar* to the types of business studied in 1994/1995 and not intended to be regulated by the 1995 Amendments; and, *third,* Plaintiffs' proof established that the quantity of available speech will likely be reduced disproportionately to any reduction in (unproven) negative secondary effects, in derogation of the "prime directive" of the Kennedy Test:  "that the quantity of speech will be *substantially undiminished*, and that total secondary effects will be *significantly reduced. This must be the rationale of a dispersal statute.*"  [535 U.S. at 451 (emphasis added)]  Neither of those elements

---

[10] The City has never answered the question of why it was necessary, from a zoning perspective, to re-define "substantial portion" in the case of adult eating and drinking establishments as "any portion".  If 40% was not working, why didn't the City "experiment" with 33-1/3%  Or 25%?  Or 10%.   What was the rationale for 0%?  This is precisely what Justice Kennedy warned against:  "It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech."  (535 U.S. at 451.)

were established here. Hence, the City plainly did not meet its constitutional burden of proof as a matter of law. *See, generally, U.S. v. Playboy Entertainment Group, Inc.,* 529 U.S. 803 (2000) (government has the burden of proof to establish constitutionality).

**Fallacy #4:** **That the 2001 Amendments were or are necessary to mitigate negative secondary effects**

The City continues to argue, as it has since 2001, that 60/40 establishments cause the same secondary effects as the types of businesses studied in 1995. There is not a single piece of record evidence to support that argument; as noted above, the City admits that it has never studied that issue at all. And as Judge Pauley observed in his decision granting a preliminary injunction:

> The adult-use regulations that are the subject of these now-revived constitutional challenges are a throwback to a bygone era. The City's landscape has transformed dramatically since Defendants last studied the secondary effects of adult establishments twenty-five years ago. As Proust might say, the "reality that [the City] had known no longer existed," and "houses, roads, [and] avenues are as fugitive, alas, as the years." Marcel Proust, Swann's Way, in Remembrance of Things Past (C.K. Scott Moncrieff trans., 1922) (1913).

*725 Eatery Corp. v. City of New York,* 408 F.Supp.3d 424, 470 (2019).

In fact, the 1995 Amendments (without enforcement of the 2001 Amendments, which have been stayed) worked exactly as the City Planning Commission intended it to, while preserving Free Expression. The offending

"garish" exterior signage was immediately eliminated and by 2012 the State Supreme Court expressly found that there were no negative secondary effects associated with the 60/40 establishments permitted under the 1995 enactment. *See For The People Theatres of NY, Inc. v. City of New York, supra.*[11]

Moreover, the City stipulated that the number of establishments featuring adult entertainment or materials in any portion of their premises (i.e., either "100%" or "60/40" establishments) has *already* been *reduced by 76%*—from 177 in 1995, to 42 in 2022. *See* CSF Doc. 168-1, at p. 59, ¶¶167, 170. Accordingly, any further reduction in the amount of available speech, i.e., by forcing the closing and/or relocation of 60/40 businesses (especially out of the Central Business District)[12] would be exactly the *disproportionate* reduction in the amount of

---

[11]  *See* 38 Misc.3d 663 at 672 *et seq.,* in particular Findings ##81-82 (improved quality of life in and around 60/40 establishments), ##83-84 (60/40 establishments are not criminogenic), #86 (60/40 establishments have no negative effect on property values), #87 (1995 Amendments resulted in wide-spread dispersal of 60/40 establishments), and #93 (post-1995 signage is "less garish, more subdued" than pre-1995 signage). These findings and the trial Court's conclusions were affirmed on appeal to the Appellate Division and, as noted in the text, not disturbed by the Court of Appeals, which reversed the New York constitutional conclusion as a matter of law (not fact).

[12] Per the stipulated facts, Doc. 168-1, at p. 60, ¶¶171-174), if the 2001 Amendments take effect, *all* of the known 60/40 businesses would have to close or relocate, including the 5 remaining Manhattan clubs and the 14 remaining Manhattan bookstores that feature adult entertainment or materials. Moreover, the *only* evidence of record is that the operators of these Manhattan businesses would be unlikely to relocate to the "available" locations in the other boroughs. See

speech prohibited by Justice Kennedy in his controlling *Alameda Books* concurrence [535 U.S. at 449 ("a City may not assert that it will reduce secondary effects by reducing speech in the same proportion. *** The rationale of the ordinance must be that it will suppress secondary effects—and not by suppressing speech.")] And here, moreover, the record is barren of any claim or evidence of continued "concentrations" of establishments justifying further "dispersal" zoning of them.

In short, the 2001 Amendments were at the time of enactment and continue to be a "solution in search of a problem" [*cf., e.g., Great Lakes Insurance SE v. Raiders Retreat Realty Co., LLC,* 601 U.S. 65, 75 (2024) ("a solution in search of a problem"); *accord, Corner Post, Inc. v. Bd. of Governors,* ___ U.S. ___, 144 S.Ct. 2440, 2469 (2024) (Kavanaugh, J., concurring) ("the government's answer … is a solution in search of a problem."); and should not survive the "independent examination" by this Court required to insure that they were and are not "a forbidden intrusion on the field of free expression." *Bose Corp., supra.*

---

Appellants' Br. at 21 (listing and linking to operators' declarations). We respectfully submit that *that* is "how speech will fare" under the 2001 Amendments.

## REPLY ARGUMENT

### Reply Point I

**THE CITY HAS FAILED TO ESTABLISH THE CONSTITUTIONALITY OF THE 2001 AMENDMENTS UNDER THE TRADITIONAL RENTON STANDARDS**

It is axiomatic that the City has the burden of establishing the constitutionality of the 2001 Amendments. *See, generally, U.S. v. Playboy Entertainment Group, Inc., supra.*

Here, even without consideration of the additional question of "how speech will fare" (*see* Reply Point II, *infra*), the City has failed to satisfy even the traditional *Renton* standard of proving a link between the Free Expression sought to be regulated and negative secondary effects.

Essentially, the City has engaged and continues to engage in a legal shell game. In 1995 it studied the negative secondary effects of businesses that regularly featured adult entertainment or materials in a "substantial portion" of their customer accessible space. At that time it not only explained that "substantial portion" meant "40% of more" but expressly admitted that it had not studied and did not intend to regulate establishments that allocated "less than 40%" of their space to adult entertainment or materials. Moreover, the City posited that the 1995 Amendments, as proposed and intended, would not only disperse adult uses (thereby eliminating "concentrations" such as along the 42nd Street corridor in

17

Manhattan and concomitant negative secondary effects associated with such concentrations of adult uses) but would actually result in an increase in the number of potential sites at which adult entertainment or materials could be offered to the public, albeit with less intensity of the use (and, therefore, no or far fewer negative secondary effects).

In 2001, however, the City abandoned any pretense of studying or establishing the effect of 60/40 establishments on their communities by the sleight-of-hand assertion that proof of an "ongoing predominant focus" on sexually explicit conduct or materials, was sufficient to make 60/40 establishments the same type of business as studied in 1994/1995—and therefore that 60/40 businesses could be assumed to have the same negative secondary effects as those which allocated "more than 40%" to adult use.[13]   While that

---

[13] This argument by the City is further undermined by the fact that the City's 1994 DCP Adult Entertainment Study was unable to establish a "conclusive" (Doc. 121-4, Ex. 41 at p. 35, JNR 000307 and p. 104, JNR 000376) link between adult establishments (as existed at the time) and negative secondary effects, and was reduced to relying on the "perceptions" (*see* Doc. 121-4, Ex. 41 at p. 34, JNR 000306 *et seq.* and also at p. 105, JNR 000377) of those interviewed in New York and elsewhere that concentrated adult uses lead to negative secondary effects.  "[I]n in a city as dense and diverse as New York, it is difficult to isolate specific impacts attributable to any particular land use" (Doc. 121-4, Ex. 41 at p. 36, JNR 000308 and at p. 104, JNR 000376).  But it is undisputed that no other jurisdiction ever studied the 60/40 business form.  Thus the City is simply "piling inference upon inference" in its attempt to justify the 2001 Amendments by reference to the 1995 CPC Report, which, in turn, relied on the 1994 and earlier, equally non-conclusive studies—none of which remotely addressed, much less established, a link between 60/40 uses and negative secondary effects.

patently illogical argument sufficed for New York constitutional purposes, this Court should see right through and reject it for Federal constitutional purposes, especially upon the independent examination of the whole record as required by *Bose Corp., supra.*

For these reasons, the City is wrong and the District Court erred in concluding that the 2001 Amendments, eliminating "substantial portion" from the definition of adult clubs, pass Federal constitutional muster. They do not, and the Judgment should be reversed and the 2001 Amendments declared unconstitutional in violation of the First Amendment on that ground alone.

## **Reply Point II**

### **THE CITY FAILED TO PROVE "HOW SPEECH WILL FARE" IF THE 2001 AMENDMENTS ARE PERMITTED TO TAKE EFFECT**

Despite the City's assertions in its brief, it has stipulated that other than compiling a list of legally permissible locations to which the existing 60/40 businesses could theoretically locate, it has *not* (1) conducted a transportation analysis, (2) conducted a basic infrastructure analysis, (3) determined the costs and other economic burdens of acquiring and converting the sites for adult use, (4) determined the cost of converting the site for such use, (5) analyzed

whether the use of the site is precluded by wetlands or flood plains, (6) confirmed that the use of the listed sites would not be precluded by virtue of any pending proposed text amendments to the Zoning Resolution,[14] (7) analyzed the sites to determine if they are available for generic commercial enterprises, or the pragmatic likelihood of the sites becoming available, and (8) excluded any of the listed sites as being too large. See Doc. 168-1, at pp. 51-54.

In short, other than engaging in "available alternative site-counting," the City (in sharp contrast to the 1995 CPC Report) made no effort whatsoever to determine "how speech would fare" under the 2001 Amendments, instead focusing exclusively on its effort to undo the result of the *Les Hommes* and *Dezer* rulings and thereby reduce the number of "adult establishments"

---

[14] For example, it is a matter of public record that on December 5, 2024—while Plaintiffs were preparing this reply—the City enacted the "most pro-housing zoning proposal in New York City history." https://www.nyc.gov/office-of-the-mayor/news/882-24/mayor-adams-governor-hochul-speaker-adams-celebrates-passage-most-pro-housing-proposal-in. That "citywide rezoning will enable the creation of 80,000 new homes" and increase the number of zoning districts in which residential use will be permitted. Since adult establishments are not permitted in Manufacturing Districts where residences are allowed (Z.R. 42-01), this potentially reduces drastically the number of available alternative sites. *See generally* https://www.nyc.gov/site/planning/plans/city-of-yes/city-of-yes-housing-opportunity.page, *esp.* https://storymaps.arcgis.com/stories/f266a53c9cda42d5b7f63b57dc08f849 (last accessed 12/5/2024).

*regardless* of whether this would reduce negative secondary effects (not studied) *or* disproportionately reduce the availability of protected expression (also not studied).

This cannot possibly have been the point of adding the "Kennedy Test" to the traditional *Renton* analysis. The District Court devoted a significant portion of its opinion to explaining that "Justice Kennedy's [controlling] concurrence in *Alameda Books* articulated *different tests* than that articulated by the plurality," and that "Justice Kennedy's opinion goes to an issue different but no less important than whether the law leaves reasonable alternatives. *** Before a zoning ordinance is entitled to intermediate scrutiny at all, the ordinance must be based on a *reasoned judgment* based on fact that its effect will not be to substantially reduce the quantity and accessibility of protected speech and the City, at the time of enactment, must have some *reasonable basis* to believe that interested patrons would, for the most part, be undeterred by the geographic dispersal of the adult establishments." *689 Eatery Corp. v. City of New York,* 716 F.Supp.3d 88, at 150, 153 (S.D.N.Y. 2024) (emphasis added; internal quotation marks omitted).

It is in respect of the requirement of "reasoned judgment" and a "reasonable basis" that the City's defense of the 2001 Amendments falls fatally short. The City did not in 2001 concern itself *at all* with whether it was reducing the quantity

and accessibility of the speech that it had provided for in the 1995 Adult Use Amendments to the Zoning Resolution, nor did it have any basis to believe (much less "reasonably believe") that "interested patrons would, for the most part, be undeterred by the geographic dispersal of the [newly redefined] adult establishments."

To the contrary the record is clear (and confirmed by the City's own account of what transpired) that these considerations were not taken into account by the City *at all* in its headlong rush to legislatively veto the result of the *Les Hommes* and *Dezer* rulings and eliminate (alleged) "sham compliance" with the "spatial" requirements of the 1995 Amendments (which was not "sham" at all).

In short, when the City adopted the 2001 Amendments, its intent was to accomplish exactly what Justice Kennedy identified as the constitutional evil to be avoided: the wholesale elimination of protected expression by reducing the number of affected businesses without (and disproportionate in the extreme to) any linkage to negative secondary effects.

Accordingly, for these reasons, as well as those advanced elsewhere in this brief, the Judgment should be reversed and the 2001 Amendments declared unconstitutional in violation of the First Amendment.

### Reply Point III

**THE GOVERNMENTAL INTEREST IN THIS ZONING AMENDMENT THAT IMPACTS FREE EXPRESSION SHOULD BE ASSESSED WHEN IT IS ACTUALLY IMPOSED FOR THE FIRST TIME, NOT JUST 23 YEARS AGO WHEN IT WAS ENACTED**

Two important considerations in assessing the constitutionality of an adult zoning ordinance are if it (1) serves a substantial governmental interest, and (2) allows for reasonable alternative avenues of communication. The City concedes that courts have to consider the second prong—availability of alternative avenues of expression—at the time of judgment, not just when the ordinance was enacted. City Br. at 73, citing *TJS of New York, Inc. v. Town of Smithtown*, 598 F.3d 17, 19 (2d Cir. 2010). Nevertheless, the City claims this Court should treat the first prong of this test differently, and only consider whether there was a substantial governmental interest at the time of enactment, not judgment. The City argues that the practical concerns which require localities to update evidence on alternative avenues are "not present when considering the government's recognized and ongoing substantial interests in the adult-use regulation itself." City Br. at 73.

However, the City overlooks the extensive authorities in Plaintiffs' brief at 30-32, which confirm that in New York zoning ordinances that may have been enacted for some valid purpose decades ago may be "rendered invalid by changes in circumstances subsequent to their adoption." *Quaglia v. Incorporated Village of*

*Munsey Park*, 54 A.D.2d 434, 440 (2d Dept. 1976), *aff'd*, 44 N.Y.2d 772 (1978). The validity of a zoning regulation "depends on the facts existing at the time such validity is questioned." James Buchwalter, *Validity of Zoning Laws and Ordinances as Dependent on Conditions, Circumstances, and Particular Property*, 101A C.J.S. Zoning and Land Planning § 18. And, the only way to recognize if the government has an *ongoing* substantial interest in a zoning law is to consider the current reality.

The City endeavors to distinguish cases where the Supreme Court revisited the justification for existing laws, because of the "exceptional nature" of the Voting Rights Act and its "unprecedented legislative framework." City Br. at 73-74. However, even though they do not involve zoning ordinances, the Court was clear that a statute's "'current burdens' must be 'justified by current needs.'" *Shelby County, Alabama v. Holder*, 570 U.S. 529. 536 (2013), *quoting*, *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193, 203 (2009).[15]

The City relies on *White River Amuse. Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 171 (2d Cir. 2007), where the Court held that a "municipality must show that

---

[15] While in a different context, the Supreme Court also recognizes that the "passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Horne v. Flores*, 557 U.S. 433, 447 (2009) (relating to injunctions issued in institutional reform litigation).

in enacting the legislation, it relied on some evidence 'reasonably believed to be relevant' to the problem of negative secondary effects." City Br. at 70-72. There, an indecency ordinance (not zoning law) was found unconstitutional and violative of the First Amendment because the Town failed to rely on relevant evidence of negative secondary effects *before* enacting the ordinance.

However, *White River Amusement* does not foreclose or conflict with Plaintiffs' pragmatic position, based on established New York law, that the reasonableness and necessity of this zoning amendment should be considered when it is actually imposed, not just when it was enacted. While a municipality cannot retroactively justify an ordinance based on facts that were not considered when the ordinance was enacted, a zoning ordinance that may have been justified when enacted does not remain constitutional in perpetuity. This is especially true where, as here, zoning is being used to restrict businesses that offer information protected by the First Amendment.

The City's reliance on *Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 155 (4th Cir. 2009), is misplaced. There, businesses brought an *as-applied* challenge to the rationale of an ordinance—which they conceded was facially valid when it was enacted—based on a claim that their specific businesses had not produced any unwanted secondary effects in the years since the ordinance was enacted. That is markedly different from the current case where Plaintiffs bring a *facial* challenge to an ordinance that was never enforced in nearly 25 years.

The City declares that the objective of the 2001 Amendments was to "ameliorate *and avert* negative secondary effects" City Br. at 75 (emphasis theirs), and that, if laws stopped being justified as soon as targeted deleterious effects subsided, regulations would apply only to the first round of regulated entities, because the stragglers' impacts would be de minimis. City Br. at 76. However, the 2001 Amendments are not responsible for ameliorating or averting any negative effects. Plaintiffs only seek to prevent the City from enforcing for the first time *additional* zoning restrictions which serve no governmental interest because the existing 1995 Amendments, together with the passage of time, among other factors, have already ameliorated any negative effects at which the 2001 Amendments could have been directed.

Stated plainly: the record establishes that the negative secondary effects simply are no longer present. *See, e.g.,* Freeman Aff. ¶20-21 & Fig. 1. (downward trends in property crime and violent crime) and *id.* at ¶22-23 & Fig. 2-3 (upward trends in property values and incomes), and the 2001 Amendments have nothing to do with that marked change. In addition to the 2001 Amendments never having been enforced, the record shows a link between the reduction in "garish" signage under the 1995 Amendments and the reduction in negative secondary effects; *see* CSF ¶31, ¶200 (DOB's former Building Inspector testifying to changed signage conditions);

26

and Focus Probe study, Doc. 121-9, JNR Ex. 64 (ECF p. 121 *et seq.*) (linking neighborhood conditions to types of signage).

The City claims that "adopting the Adult Businesses' approach to means-end scrutiny would cause substantial mischief," by delaying the filing of a lawsuit or "seeking to tie up enforcement efforts for decades." City Br. at 74. However, courts already have to evaluate the availability of alternative avenues of expression at the time of judgment. Here, that involved assessing thousands of lots across five counties. Such an analysis is much more time consuming and complicated than evaluating if the zoning amendment still serves a substantial government interest. Moreover, there is nothing in the record to support the City's suggestion that Plaintiffs, or other adult businesses in New York, acted in bad faith or for purposes of delay to render the case stale. City Br. at 74-75. To the contrary, Plaintiffs have zealously litigated these complex constitutional challenges, which happen to have a labyrinthine history.

Contrary to the City's contentions, Plaintiffs do not suggest that municipalities must "continually re-justify the current need for their laws." City Br. at 74. Plaintiffs are not asking the Court to create a sweeping law stating that in all circumstances the substantial purpose of an adult ordinance, or any other law, must always be considered at the time of enactment *and* judgment. Instead, under the unique but extremely important circumstances of this case—where a zoning ordinance that

impacts free expression has never been enforced in nearly 25 years—the Court can open its eyes to the truth that currently there is no substantial governmental interest in adding restrictions on cabarets and bookstores. After all, as recognized by Judge Pauley back in 2019, the reality the City "had known no longer exists." *725 Eatery Corp. v. City of New York*, 408 F.Supp.3d at 459.

### Reply Point IV

## THE 2001 AMENDMENTS CHILL ACCESS
## TO FREE EXPRESSION

Under the City's strict zoning restrictions, there are *very* few places left in Manhattan where adult establishments can be located. In fact, only 3 of the 19 existing businesses could simultaneously relocate in Manhattan.[16] As a consequence, consideration should be given to the disproportionate number of adversely affected businesses located in Manhattan, which would be forced to move from the entertainment capital.

The City urges this Court has "already considered and rejected that exact argument." City Br. at 94. That is not the case. The City cites to a footnote in *Hickerson v. City of New York*, 146 F.3d 99, 108 n.5 (2d Cir. 1998), where the Court noted that the First Amendment does not require "proof of adequate available sites

---

[16] The City contends that 5 of the 19 existing businesses could simultaneously relocate in Manhattan, but as discussed in Appellants' Brief at 19, the record evidence shows that 2 of the City's 5 sites are not in fact legally available, due to their proximity to a sensitive receptor.

on a borough-by-borough basis." However, that is *not* Plaintiffs' argument and they are not asking the Court to overrule *Hickerson*, which was decided four years before Justice Kennedy's controlling concurrence in *Alameda Books*. Instead, the claim is that under the standard from *Alameda Books*, Manhattan should be treated as a distinct real estate market for purposes of assessing how speech will fare if the 2001 Amendments are enforced against existing businesses.

The City claims that Plaintiffs do not cite any precedent to support this point. City Br. at 95. However, unlike *Hickerson* (which was decided on a preliminary injunction record) this case comes with a *trial* record full of uncontroverted evidence from top experts on New York City zoning and real estate issues from Columbia and Fordham Universities.[17] This evidence—the Dr. Elliott Sclar Declaration, the Sclar Reply Declaration, and the Dr. Hugh Kelly Declaration—was discussed at pages 50-52 of Appellants' Brief. The City also ignores the 1995 CPC Report, Doc. 121-5, Ex. 41-3, at JNR 000447 (ECF p. 55), which recognized the uniqueness of Manhattan and found it "appropriate on a land use basis" to "allow more potential sites in Manhattan."

---

[17] Rather than address the expert opinions, the City cites to *Wikipedia* to support its claim that adult businesses that relocate to other boroughs can attract new customers given that Manhattan has fewer residents than Brooklyn, Queens, or the Bronx. City Br. at 96. But even that crowd-sourced cite reveals that Manhattan has more than 200,000 more residents than the Bronx.

The City urges that "[p]atrons from Manhattan—whether residents or tourists—can visit the lawfully sited adult businesses in Manhattan or easily travel out of Manhattan by subway, bus, ferry, rideshare, taxi, or private vehicle." City Br. at 96. However, it would take nearly two hours to get from Eighth Avenue in Manhattan to the only bookstore on Staten Island with booths. Knecht Decl. ¶31. Dr. Kelly, a professor of real estate and economics, testified that most people would not even make the trip out of Manhattan because of travel time and added cost. Kelly Decl. ¶63. It is also a matter of public record that congestion pricing is scheduled to begin in Manhattan on January 5, 2025,[18] which would add even greater cost to tourists staying in the Times Square area who would have to travel out of the congestion zone to access constitutionally protected expression. Manhattan is *sui generis*. And the evidence in this record establishes that as such, it should be treated as a distinct real estate market for the purpose of assessing the impact of the 2001 Amendments on expression.

## Reply Point V

## THE CITY'S ARGUMENTS FAIL TO ADDRESS THE CENTRAL PRINCIPLE INVOLVED IN PLAINTIFFS' MANDATORY TERMINATION CHALLENGES

---

[18] https://congestionreliefzone.mta.info/

30

In Point III of its Brief, the City's primary argument is to mischaracterize Plaintiffs' challenge to the City's mandatory termination provisions as being an equal protection challenge not involving fundamental constitutional rights. If that were a correct characterization, their objections may be well taken. That is not a correct characterization. Instead, Plaintiffs' equal protection challenge asserts that the City has singled out businesses engaged in fundamental First Amendment rights for differential treatment.

The City further argues that if Plaintiffs' First Amendment challenges to the 2001 Amendments fail, then they have no distinct First Amendment claim to the mandatory termination provisions. That is also wrong. The mandatory termination provisions create unique discriminatory provisions which are not part of Plaintiffs' general challenges to the 2001 Amendments.

For example, even assuming this Court were to find that the First Amendment would not be violated by a lack of justification for enactment of the locational restrictions of the 2001 Amendments (allowing enforcement of those restrictions against all *new* uses), it would be an entirely separate question whether there was adequate justification for enforcing those provisions against pre-existing 60/40 uses, and particularly given the lack of evidence in 2001 that these few pre-existing 60/40 businesses were causing a problem.

And it is a separate question whether the mandatory termination provisions can be justified *today* (against the very few remaining *pre-2001* 60/40 live entertainment establishments[19]), given that the Supreme Court has said that long-existing restrictions on fundamental rights may be re-examined to see if they continue to be needed to combat previously recognized problems.[20] The drastic reduction in the number of adult establishments since the turn of the century establishes that those mandatory termination provisions (which would apply only to these few remaining businesses operating on 60/40 sites since prior to 2001) are no longer needed even if the overall zoning restrictions are still justified.

But even more than all of that, and apart from the fact that the *overwhelming* majority of non-conforming uses in New York grandfather with *no* amortization requirement whatsoever, the mandatory termination provisions present the unique issue that adult entertainment businesses are the *only* ones which may be repeatedly divested in the future whenever the City changes the zoning of either the land they sit on, or, far worse, the zoning of nearby areas. It is certainly a unique First Amendment/equal protection issue whether mandatory termination provisions are facially constitutional for denying a reasonable opportunity to relocate where

---

[19] All of which Plaintiffs believe are plaintiffs in these lawsuits.

[20] *See, e.g., Northwest Austin,* 557 U.S. at 203, and *Shelby County,* 570 U.S. at 556, both discussed *supra.*

Plaintiffs can uniquely be divested in the future any time the City hereafter merely changes the zoning of any district within 500 feet of such businesses. And although there is no telling what locations the City may rezone in the future, the fact that it is constantly in the process of doing so is well documented.[21]

For all these reasons, even if the Court upholds the 2001 Amendments against all of Plaintiffs' other challenges, it should prevent enforcement of the mandatory termination provisions against these few previously lawful 60/40 businesses.

### Reply Point VI

**THE CITY IGNORES KEY AND INDISPUTABLE FACTS WHICH ARE DISPOSITIVE OF PLAINTIFFS' CLAIM THAT THE CITY'S PERMITTING AND VESTING PROVISIONS DENY THEM A REASONABLE OPPORTUNITY TO RELOCATE AND THUS SUPPORT INJUNCTIVE RELIEF AGAINST THE CITY'S MANDATORY TERMINATION PROVISIONS UNTIL THE PERMITTING AND VESTING PROVISIONS ARE FIXED**

**A.  Appellants have standing to challenge the permitting and vesting provisions as an ancillary component of their challenge to the mandatory termination provisions, and did not waive that claim.**

The City claims that Plaintiffs may not even *assert* the unconstitutionality of the City's permitting and vesting provisions because the opening brief did not

---

[21]  *See* note 14, *supra.* Also, for example, *see* https://www.nytimes.com/2024/12/05/nyregion/nyc-housing-city-of-yes.html ("New York City Approves a Plan to Create 80,000 New Homes") (last accessed 12/5/2024).

33

specifically challenge the District Court's ruling that they lacked standing to make these challenges. City Br. Point II-A. However, the City has inaccurately described what the District Court held on this point and misdescribes Plaintiffs' claim.

The District Court did not say that Plaintiffs lacked standing to make *any* type of challenge to the City's permitting and vesting provisions. Rather, the District Court characterized the issue it was addressing as follows: "Plaintiffs have not established that they have standing to challenge the permitting procedures *on a standalone basis*." Doc. 211, p. 139 (emphasis added).

Plaintiffs have not made a standalone challenge to the permitting and vesting provisions. Their challenge to the permitting and vesting provisions is and always has been an ancillary one in support of their claims for *injunctive* relief against enforcement of the mandatory termination requirement based on lack of a reasonable opportunity to relocate. Specifically, in none of their pleadings below did Plaintiffs seek a standalone injunction against enforcement of the challenged permitting and vesting provisions. Rather, in both their complaints and partial summary judgment notices of motion, they sought an injunction only against the *zoning* restrictions because, so long as the unconstitutional permitting and vesting provisions remained, Plaintiffs lacked a reasonable opportunity to relocate.[22]

---

[22] *None* of the Plaintiffs' *complaints* sought injunctive relief specifically against enforcement of the permitting and vesting provisions, even though they all

These were presented only as ancillary claims because, since Plaintiffs all *currently* had permits and were vested, they had no current standing to seek an injunction preventing enforcement of the permitting and vesting provisions as a standalone challenge.[23]

---

mentioned their unconstitutionality. *See, e.g.*, Doc. 42 in case 1:02-cv-8333; Doc. 26 in case 1:02 cv-04432; Doc. 77 in case 1:02 cv-04431; and Doc. 78 in case 1:18-cv-03732. The same is true of their *notices of motion* in support of their partial summary judgment motions. Doc. 198 in case 1:02-cv-8333; Doc. 179 in case 1:02 cv-04432; Doc. 221 in case 1:02 cv-04431; and Doc. 173 in case 1:18-cv-03732. Rather, the only *injunctive* relief they sought where the permitting and vesting provisions were relevant was their claim for injunctive relief solely against the *zoning* provisions for denial of a reasonable opportunity to relocate. *See, e.g.,* Doc. 77 in case 1:02-cv-04431 at p. 58, ¶¶204-205; Doc. 42 in case 1:02-cv-8333 at p. 53-54, ¶¶210-211 and p. 58, ¶¶228-30; Doc. 26 in case 1:02-cv-04432 at pp. 56-57, ¶¶209-210.

[23] Plaintiffs also sought a declaratory judgment regarding the unconstitutionality of the permitting and vesting procedures, but that was a distinct claim from their claim for injunctive relief. Since Plaintiffs adequately raised these challenges as ancillary challenges to their injunctive claims, they had no need to dispute whether the District Court correctly concluded that they could not challenge the permitting and vesting provisions in a "standalone" challenge.

Plaintiffs' Partial Summary Judgment Reply Memoranda very clearly made this distinction.[24]  Specifically, at pp. 16-17, the Club Plaintiffs' Joint PSJ Reply Memoranda[25] stated:

> [T]he only *injunctive* relief Plaintiffs have sought here is *limited* to an order preventing enforcement of the *zoning* restrictions, allowing them to stay at their current locations.  They do not seek, and have not sought, an injunction preventing enforcement of the City's unconstitutional permitting and vesting provisions.

Moreover, in those same memoranda, Plaintiffs went to pains to point out that their standing to challenge the permitting and vesting provisions was similar to the standing recognized in *Casanova Entm't Group, Inc. v. City of New Rochelle, 375 F.Supp.2d 321, 335 (S.D.N.Y. 2005); aff'd Casanova Entm't. Group, Inc. v. City of New Rochell, 165 Fed. Appx. 72, 75 (2d Cir. 2006) (unpublished)*.  This point was discussed extensively at pp. 13-17 of Plaintiffs' PSJ Reply Memoranda[26] and is presented more succinctly here.

---

[24] The Club Plaintiffs filed identical Partial Summary Judgment Joint Reply Memoranda (*see* Doc. 203 in Case 1:02-cv-08333, Doc. 184 in Case 1:02-cv-04432, and Doc. 226 in Case no. 1:02-cv-04431, all at pp. 16-17) and the Bookstore Plaintiffs (Case no. 1:18-cv-03732) expressly adopted the Club Plaintiffs' briefing on this point (see Doc. 180 at p.1).

[25] This is found, *e.g.,* at Doc. 203 in case 1:02-cv-08333 at pdf pages 21-22.

[26] Doc. 203, in case 1:02-cv-08333; Doc. 226 in case 1:02-04431; Doc. 184 in case 1:02-cv-04432; and pp. 1-2 in Doc. 180 in case 1:18-cv-03732.

In *Casanova,* the plaintiff sought injunctive relief to allow it to open an adult cabaret in a zone where it was not allowed.  It asserted two arguments in support of that requested relief.  First, it argued that the city had failed to allow reasonable sites for an adult business so the zoning law was unenforceable.  375 F.Supp.2d at 334.

Next, it alternately argued that the city's permitting provisions failed to contain the substantive and procedural safeguards required for a First Amendment licensing law and, therefore, plaintiffs should be allowed to open in their chosen location.  *Id.* After examining the amount of available space in the city (*see id.* at pp. 326-333), the court concluded that there *was* a reasonable number of alternative sites (*id.* at 339-342) so it rejected the plaintiff's first argument.[27]

The *Casanova* court separately addressed plaintiff's argument that the entire zoning law was unenforceable because it denied a reasonable opportunity to relocate anywhere in the city due to the assertedly unconstitutional permit requirement. There, as here, the plaintiff asserted the invalidity of the permit requirement as an ancillary argument in support of a claim that the *locational restrictions* were unenforceable because the permit requirements denied the plaintiff a reasonable opportunity to open, rather than a standalone claim seeking to be exempt from the

---

[27] Unlike the plaintiff in *Casanova,* Plaintiffs here are not trying to get a permit to open at an improper location.  They are merely trying to prevent their forced relocation until such time as the City has fixed its unconstitutional permitting and vesting system so as to give them a reasonable opportunity to do so.

permit requirement.  In the context of *that* claim, the *Casanova* court correctly concluded that the plaintiff *did* have standing to challenge the permit requirement as an ancillary claim in support of a reasonable opportunity argument to prevent enforcement of the *locational* restrictions, not as a standalone claim seeking direct relief against enforcement of the permit requirement.  375 F.Supp.2d at 335. [28]

Because the standing ruling of the District Court here was limited to rejecting any "standalone" claim, Plaintiffs do not specifically challenge that ruling on appeal, but are not precluded from continuing to assert their ancillary challenges in support of the claims for injunctive relief against the City's locational restrictions (in this case its mandatory termination requirement) based upon the denial of a reasonable opportunity to relocate.  And, of course, in this appeal Appellants have strongly challenged the District Court's rulings on the permitting and vesting issues on their merits, including their briefing of their standing needed to raise those issues in support of their request for an injunction against enforcement of the mandatory termination requirements based on the lack of a reasonable opportunity to relocate.

**B.     Appellants demonstrated their standing to challenge the facial invalidity of the permitting and vesting provisions.**

---

[28] It is immaterial to its *standing* ruling that the *Casanova* court ultimately upheld the challenged permit requirement.

The City argues (at pp. 103-110) that the evidence Plaintiffs presented was insufficient to show their standing to make their ancillary challenges to the mandatory termination requirements based on the City's permitting and vesting provisions denying them a reasonable opportunity to relocate.

**1. Plaintiffs have standing to facially challenge the constitutionality of the City's vesting rule (which impermissibly allows sensitive-use vetos).**

Plaintiffs' standing to challenge the City's *vesting* rule is even more clearly established than its standing to challenge the lack of time limits in the *permitting* provisions. *Lakewood v. Plain Dealer*, 486 U.S. 750, 760 (1988), opined that only an "as-applied" challenge would lie to a building permit requirement of general application because it applied to all equally. But the City's *vesting rule* challenged here is clearly not a rule of general application, but a content-based rule applicable only where adult businesses are involved. It is thus subject to facial challenge.

The City does not dispute this but argues (p. 105) that Plaintiffs' standing to assert a sensitive use veto challenge to the vesting provisions is defeated because it is "highly speculative" that a sensitive use veto would occur in the future and that Plaintiffs first must "apply and have their applications denied." Id. But the law is clear that in the First Amendment area, one need not first apply for a license in order to challenge a facially invalid permit scheme. *See, e.g., Thornhill v. Alabama*, 310

U.S. 88, 97 (1940); *Freedman v. Maryland*, 380 U.S. 51, 56 (1965); *Vance v. Universal Amusement Co.*, 445 U.S. 308, 315, n.12 (1980); *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. at 755-56 (1988); *Shuttlesworth v. Birmingham,* 394 U.S. 147, 151 (1969); *Walker v. Birmingham*, 388 U.S. 307, 345-346 (1967); and *Lamar Adver. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 374 (2nd Cir. 2004). *See also* *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992):

> It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.

> As the Supreme Court stated in its landmark ruling in *Thornhill*:

> Proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas. … It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion.

> 310 U.S. at 97.

Here, the existence of the City's rule depriving an adult business permit applicant of vesting if a later-filed use gets its permit first, creates the pervasive and realistic ongoing threat to freedom of speech. It is a *facially* invalid provision because its very existence would deter all but the most determined businesspersons from even *attempting* to acquire a new site for an adult club due to the enormous up-front cost commitment necessary to acquire an interest in the land and then the costs

of construction, knowing full well that after incurring all that expense there is a very real possibility that a competitor or other opponent could defeat or indefinitely delay its application simply by sponsoring an inexpensive nearby sensitive use and quickly obtaining a priority permit. (This is not merely a theoretical possibility. This has actually happened; see below regarding "Sapphire 2.")

Another reason for relaxed standing requirements in First Amendment cases was articulated in *Secretary of State of Md. v. Joseph H. Munson Co.*:

> [W]hen there is *a danger of chilling free speech*, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."

467 U.S. 947, 957-57 (1984) (citation omitted, emphasis added).

Here, Plaintiffs describe the chilling of their own rights of expression, but their standing also serves the salutary purpose of eliminating the danger of the chilling of First Amendment rights of other potential entrepreneurs not before the Court. Plaintiffs thus have standing under *Munson*.

The City and District Court further assert that Plaintiff Club Owners' declarations describing a very real chilling effect should be ignored merely because they happen to also be self-serving. But that doesn't make them either inadmissible or non-credible evidence.

That's especially so when one looks at all the facts in the record in the well-documented case of Sapphire 2.[29]  The Club Owners' declarations make clear that *any* reasonable businessperson aware of how the City's vesting rule works, and aware of how it was used to severely delay – and ultimately almost force denial of – Sapphire 2's permit application, would be chilled and deterred from attempting to open a new adult club at any site which did not already have zoning priority as a pre-existing adult use. [30]

---

[29] The relevant declarations describing the events involving Sapphire 2's permit application are Doc. Nos. 131 (¶¶5-44) (Berzak Declaration in Support of Club Plaintiffs' Motion for Partial Summary Judgment, hereafter "Berzak PSJ Declaration"); and 32 (¶¶37-42) (Berzak Declaration In Support of Permitting Issues Presented in Plaintiffs' Motion For A Preliminary Injunction); and Doc. 157 filed only in Case 1:02-cv-0833 (¶¶8-18) (Declaration of David M. Talla in Support of Club Plaintiffs' Motions For Partial Summary Judgment "Talla PSJ Declaration").

[30] David Talla (who sought the Sapphire 2 permit) averred that "unless and until the City changes its rules governing vesting priority, I would never again seek to establish an adult establishment in New York City on a site which had not previously been approved for adult use." Doc. 157 (filed only in case 1:02-cv-08333), ¶18. Besides Talla, the owners in the other club cases filed their own declarations indicating their familiarity with the facts of the Sapphire 2 permit saga, and that they were in fact chilled and deterred from seeking a new location by their knowledge that any new permit application could easily be defeated by an after-filing sensitive use even after a great input of time and money on their part in attempting to find, acquire and develop a new site. *See, e.g.,* Warech Declaration (Doc. 171, case 1:02-cv-04431), p. 2, ¶7; D'Amico declaration (Doc. 139, case 1:02-cv-04432), p. 3, ¶7; Lipsitz declaration (Doc. 138, case 1:02-cv-04432), p. 3, ¶7;  These declarations show the declarants to be reasonable business people and gave no cause for doubting the sincerity of their statements.  In short, their chill was an objectively reasonable one.

The City further argues that the Sapphire 2 example should be ignored because it is ten years old. But the City has not put in the record evidence of so much as a *single* new 100% adult club which has opened since the debacle in opening Sapphire 2 at a site in New York where there was not a pre-existing adult use which already had priority under the City's vesting scheme. The only new 100% club the City has identified is the third club of Sapphire 2's owner. (*See* City Br., Doc. 70, p.121.) But the undisputed evidence made clear that the *only* reason he acquired that site was because it was *already vested* by virtue of a prior adult use at that site.[31] And he further made clear that even though he would very much want to open another adult club (because he believes the market in Manhattan would support it[32]), he would not do so unless the City changes its vesting rule so a permit can't be denied because of a later-filed application that then receives vesting priority.[33]

The City next asserts that "[t]he delays experienced by Sapphire 2 were attributable to one-off errors that occurred a decade ago, under a regime that included the DOB's now-repealed prohibition on self-certification and requirement that agency counsel review adult businesses' permitting applications." This is also

---

[31] *See* ¶¶18-19 of Talla PSJ Declaration ([Doc. 157](#) in case 1:02-cv-08333).

[32] *Ibid.* at [¶20](#).

[33] *Ibid.* at [¶18](#).

43

entirely incorrect. The evidence is clear that adult and non-adult businesses take vastly different tracks to obtain vesting and that the delays have absolutely nothing to do with any procedures that have now been corrected. The problems experienced by Sapphire 2 are no different than would face any new adult business applicant today.

The problem with the City's argument is that regardless of whether an application is professionally certified, an adult business must still submit a detailed area diagram of all uses arguably within 500 feet[34] and then undergo a time-consuming analysis by DOB staff to verify the validity of its zoning.[35] And, as was the case with Sapphire 2, this procedure can take several months, and *particularly* if any competitor or opponent files an objection to the use (as was done in the case of Sapphire 2[36]). (DOB's licensing rules require it to investigate all complaints against permit applicants from the public, including to even require "*additional* targeted audits" of zoning compliance upon receipt of any complaint, and this is true even if

---

[34] *See* Berzak PSJ Declaration (Doc. 131), p. 3, ¶6, and CSF (Doc. 168-1), p. 71, ¶223, and DOB's Operations Policy and Procedure Notice #7/02 (Doc. 121-1, Exh. 14), p. 122, ¶I-D-1 (submitted for trial consideration in Doc. 201 at pp. 1 and Doc. 201-1 at p. 2).

[35] As the parties stipulated, DOB zoning review is required of adult business permit applications *even if those applications are professionally certified. See* ¶210 (at p. 68) of Doc. 168-1 (CSF), stipulating that even professionally certified permit applications must go through DOB's zoning audit review process.

[36] *See* ¶¶16-18, 26, 27, 36 and 43 of Doc. 131, (Berzak PSJ Declaration).

the application is professionally certified.[37])  And it will likely require on-site examinations by DOB staff to make measurements of the distance from any potentially disqualifying uses (many of which were *asserted* against Sapphire 2, but once all on-site measurements were taken, *none* was in fact too close).  Again, none of this would be different if the adult use's application were professionally certified, nor if General Counsel review is no longer necessarily required in every case.[38]

---

[37] See CSF (Doc. 168-1) at p. 69, ¶213.  Moreover, the Sapphire 2 saga made clear that DOB will even hold up permit applications to adult businesses when entirely unsupportable and baseless charges are leveled anonymously on their web site.  Even though the private party's online complaint asserted objections that could have been disproven easily from DOB's own records (such as its assertion that the proximity of an *unpermitted* sensitive use defeated Sapphire 2's application), they nonetheless triggered several more *months* of delay before DOB staff properly found them groundless.  *See* Berzak PSJ Declaration (Doc. 131) at ¶¶16-17 and 22.

[38] As Sapphire 2 illustrates, the vast majority of the delay was attributable to DOB staff, not General Counsel.  Moreover, merely removing the requirement of mandatory General Counsel review in every case does not prevent DOB from asking General Counsel for their opinion whenever there are any challenging zoning issues facing them.  (And DOB staff apparently are frequently challenged in addressing these issues since the most persistent problem in the Sapphire 2 case—i.e., whether there was a disqualifying sensitive use—should have been easily resolvable by DOB staff on its own, merely by checking its own records to see if that use already had a priority permit.  Instead, it repeatedly checked with General Counsel, something it could continue to do today under the current system.)

However, even though it still takes a *minimum* of several weeks (and usually *much* longer[39]) for a qualified adult use to get zoning approval (a prerequisite to getting even a "no-work" permit), it remains the case that a sensitive use would likely get zoning approval immediately at the DOB counter and could establish its priority virtually *overnight,* long before DOB had completed review of a contemporaneously-filed application for an adult business.[40]  No changes in the City's procedures could entirely fix that problem because at least *some* extra time is an unavoidable necessity in administering a permitting system that includes special buffer requirements only for adult uses.

Because it creates a huge disparity in the comparative time needed for adult uses and sensitive uses to get permitted, vesting priority must be determined when the application is *filed*, rather than when it is *granted*.

Finally, the City asserts that *Young v. Simi Valley*, 216 F.3d 807 (9th Cir. 2000), should not be followed because the plaintiff there had actually submitted a

---

[39] Again, even the mundane aspects of the Sapphire 2 permit application not involving any complaints from a sensitive use, show the seemingly endless time-consuming objections an applicant must overcome from DOB staff.  Wholly apart from the allegation of that one sensitive use which sought a priority permit, DOB staff, on its own, asserted that several *other* nearby sites constituted disqualifying uses, though after extensive time-consuming inspections, DOB withdrew its own objections as meritless.  *See, e.g.,* Berzak PSJ Declaration (Doc. 131) at ¶¶7-10 and 13-14.

[40] *See* Berzak PSJ Declaration, ¶28.

permit application. That is a distinction without a difference. The court found that Simi Valley's vesting scheme denied adult business applicants a reasonable opportunity to open and operate and thus was "*facially* invalid under the First Amendment." *Id.* at 814 (emphasis added).

Indeed, because an alternative ground existed for denying Young's adult business permit (namely, the presence of a nearby karate school), the *only* way the court could have ruled for the adult business was if the zoning scheme was *facially* invalid. Any as-applied challenge based on the sensitive-use veto attempted by the church would have been mooted by the actual disqualifying factor (the karate school). Thus, even if one were not to take the *Simi Valley* court at its word, the only possible interpretation of its facts is that it (like these cases) involved a facial challenge to the vesting scheme. *Simi Valley* is fully applicable here.

### 2. Plaintiffs have standing to challenge the permitting scheme because the City officials' unfettered procedural discretion to delay an application renders the scheme facially unconstitutional.

For many of the same reasons that the City is wrong in asserting that Plaintiffs lack standing to facially challenge the City's adult business *vesting* provisions, it is also wrong in asserting that Plaintiffs lack standing to facially challenge the City's *permitting* procedures for adult businesses.

Where one is challenging a licensing requirement for First Amendment businesses as conferring either impermissible substantive or procedural discretion

on licensing officials, the Supreme Court has held that a *facial* challenge will lie. Proof of abuse of discretion in a licensing scheme for First Amendment businesses has never been required.[41]  But even if it were, the severe delays documented in the Sapphire 2 case establish an objectively reasonable basis for Plaintiffs' standing to assert that they are chilled and deterred from relocating until there are fixed and enforceable time limits for final action on their permit applications.  As noted in the Talla PSJ Declaration (Doc. 157, case 1:02-cv-0833, at p. 6, ¶16) and the Talla Declaration in Support of Plaintiffs' Motion for Preliminary Injunction (Doc. 32, pp.7-8, ¶¶31 and 33),  the additional costs his company incurred solely by virtue of the delays in DOB's processing of his Sapphire 2 application cost him *an additional $480,000* and would deter him from attempting to establish a new location which did not already have vesting priority, and this deterrent impact was entirely apart from any fear of ultimately being disqualified by an after-arriving sensitive use.

The City next argues that Plaintiffs lack standing to raise the unconstitutionality of the permitting provisions based on their assertion that Plaintiffs have failed to "show that the current scheme vests 'unbridled discretion in the hands of a government official or agency' and that the discretion has 'a close

---

[41]*See, e.g., Chesapeake B & M v. Harford,* 58 F.3d 1005, 1010-1011 (4th Cir. 1995), and numerous cases cited *supra* at p. 46.

enough nexus to expression … to pose a real and substantial threat of the identified censorship risks.'"  (City's Brief at 108.) This is also wrong.

To support this argument, the City argues that "its permit-review process is constrained by the City's Administrative Code" but the undisputed facts clearly show the exact opposite.  An adult business' right to exist cannot vest until a permit is issued so there must be a fixed time limit for issuance of such a permit.  However, that is no longer the case.  As the parties have stipulated, the City *used to* have one time limit for the approval of plans and a second one, thereafter, for the issuance of the permit.[42]  But when the City amended its Administrative Code in 2008 (while this case was pending) it simply *removed* its prior time limit for issuance of the permit and did not replace it with any new time limit.[43]  It is the classic example of a licensing scheme which puts no constraints whatsoever on the time limit for issuance of a permit.

The City responds by saying that its customary practice is to issue a permit shortly after approval of construction documents.  (City's Brief at 115.) But a customary practice is no substitute for fixed time limits when a licensing law is challenged as a *facially* unconstitutional prior restraint on expression. *See*

---

[42] CSF (Doc. 168-1 at p. 42) ¶¶100-101.

[43] CSF (*id.*) ¶103.

*Chesapeake B&M v. Harford,* 58 F.3d at 1010-1011 ("We cannot depend on the individuals responsible for enforcing the Ordinance to do so in a manner that cures it of constitutional infirmities"); *United States v. Stevens*, 599 U.S. 460, 480 (2010) ("the First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

The City also argues that "DOB's final determinations cannot be arbitrary or capricious"[44] but the point is not whether these determinations are made arbitrarily, but whether they are made in a timely fashion within a fixed, ordinance-specified, and brief time period.

The City's final argument against Plaintiffs' standing to challenge the permitting scheme is its assertion that the First Amendment time limits of *FW/PBS v. City of Dallas,* 493 U.S. 215 (1990), are inapplicable to a permitting scheme that applies to all businesses. (City Br. at 110.) It asserts, incorrectly, that the only evidence for the disparity in the time needed to grant or deny permits to *adult* businesses (compared to all others) is the experience of Sapphire 2, and then asserts that experience should be discounted since it "occurred under a previous regulatory scheme." (*Id.*) Both assertions are incorrect.

---

[44] City Br. at 109.

First, Plaintiffs have consistently asserted that the time needed to obtain zoning approval from DOB is significantly longer for adult businesses than all others because they are the only ones who cannot simply get zoning approval over the counter. Instead, adult businesses must submit a detailed area diagram which requires City officials to go out and take detailed measurements,[45] as well as making legal determinations regarding the nature of any of the surrounding uses and whether they constitute disqualifying uses.[46] Sapphire 2 merely illustrates how long the process can take. Absolutely nothing has changed in the zoning resolution since Sapphire 2's application which has any impact on this time-disparity. Area diagrams must still be submitted, measurements must be confirmed by DOB inspectors, and legal disputes regarding disqualifying uses must still be resolved. *No* other business

---

[45] The need to make individual on-site inspections in most cases is triggered by the fact that the City does not calculate measurements from the lot lines of an adult business, but from one of two potential other places; either "from the center line of the door(s) of the principal entrance" of the adult establishment "or from the center line of the door(s) giving the most direct street access to [the] adult establishment." OPPN 8/96 (at pp. 103-104 of Doc. 121-1), Volume 1 of JNR), which was incorporated as a trial exhibit (*see* Doc. 201-1 at p. 2). That same OPPN further states that measurements to another adult use are likewise made to one of those two potential measuring points for the other adult use. And where measurements are required to "sensitive receptors," the measurement is taken to "the outside face of the closest demising wall of the school or place of worship." *Id.* All of these measurements require time-consuming on-site inspections and measurements, none of which are required for any other type of use.

[46] And its own procedures require it to take additional time to investigate complaints of zoning non-compliance posted, even anonymously, on its website. *See* CSF (Doc. 168-1 at p. 69) ¶213 and Berzak PSJ Declaration (Doc. 131, p. 5) ¶¶16-18.

seeking a license must go through this process. For these reasons, the mere fact that the City requires permits of all businesses does not exempt it from the application of First Amendment standards in its application to adult entertainment businesses when the underlying rules applied to different applicants are not the same.

**C.    The City has failed to adequately defend the merits of Plaintiffs' challenges to its permitting and vesting provisions.**

### 1.    The City has failed to justify its unconstitutional vesting policy.

At City Br. pp. 111-113, the City presents its merits arguments in support of its adult business vesting provisions which create vesting priority based upon the date a permit is issued, rather than on the date of filing of a fully complying permit application. None succeed in justifying that scheme.

First, the City's primary argument is its unsuccessful attempt to characterize *Simi Valley* as a ruling that Simi Valley's permit scheme was only unconstitutional as-applied, rather than on its face. It makes this argument in hopes of fitting *Simi Valley* into the statement in *Lakewood* that First Amendment-based challenges to generally applicable business licensing requirements should usually be made as applied, rather than facially. But here, as demonstrated above, the City's *vesting* requirement is certainly not a generally applicable one but one created specifically to regulate expression, *i.e.*, the zoning of adult businesses, and, on top of that, is one

52

which subjects adult businesses to far more onerous time constraints than potentially competing sensitive uses.

Moreover, *Simi Valley itself* concluded that the challenge which it upheld there was not an as applied challenge, but a facial one. Again, as we noted above, the court found that Simi Valley's vesting scheme denied adult business applicants a reasonable opportunity to open and operate and, for that reason, it was "*facially* invalid." (*Id.* at 814.)

The City's only other argument offered in defense of the vesting scheme of 1 RCNY §9000-01(b) is that "there is no proof of any 'actual misuse'" of that provision. (City Br. at 113.) But its only argument in support of that statement is to repeat its incorrect assertion that the Sapphire 2 example doesn't count because the procedures have changed since then and Sapphire 2 was ultimately able to get its permit. Again, as noted previously herein, none of the changed procedures would have any impact in preventing the abuses documented in Sapphire 2, and the mere fact that Sapphire 2 was ultimately able to get its permit was only due to the amazing bit of luck (for Sapphire 2) that those responsible for filing the complaint to try to stop Sapphire 2 were originally ignorant of the fact that a sensitive use could only defeat an adult business if it had first obtained its own priority permit. The facts make very clear that had it known of that, it could easily have stopped Sapphire 2 at

an early stage since it was able to get that permit virtually overnight once it applied for it.

Lastly, the City argues that its vesting scheme is saved because DOB "must grant the application or issue a 'written notice of rejection, stating the grounds of rejection,' … which is subject to administrative and expeditious judicial review under CPLR Article 78." (City Br. at 113.) This too is a totally inadequate defense.

Specifically, because 1 RCNY §9000-01(b) sets up a priority race between a sensitive use and an adult business, it is hardly any type of remedy that review procedures may exist to extend even further the time needed for an adult business to get a permit. That merely creates a greater window of time for a competing sensitive use to first get its permit, thereby ending the adult use's hopes. At least insofar as Plaintiffs' challenge to the City's *vesting* rule is concerned, the potential availability of administrative review or Article 78 judicial review is meaningless.

**2. The City has failed to show that its permit process contains adequate procedural safeguards to prevent its abuse as an impermissible prior restraint.**

**a. The permit requirement is invalid because the ZR fails to require that an adult business permit application be granted or denied within a specified period.**

At City Br. pp. 113-117, the City presents the merits of its defense to Plaintiffs' prior restraint challenges to its permitting scheme as applied to adult businesses. Again, its asserted defenses run afoul of established constitutional requirements.

The City's primary argument here is founded on its assertion that *FW/PBS* is inapplicable. *FW/PBS* held that a requirement to obtain a permit which takes longer to get for adult businesses than others must, at a minimum, be subject to a fixed and brief time period for issuance of the permit.[47] But the facts here show the facial invalidity of the City's scheme. As noted *supra*, issuance of a permit is the only thing which vests an adult use's right to operate, and the City has stipulated that there is no time limit whatsoever for DOB to issue a permit even after it has approved any relevant construction documents or an application for a no-work permit.

The only thing the City can say is its assertion that DOB states that permit issuance happens promptly after the approval of all construction documents (p. 115). But, as noted *supra,* the case law is clear that is no substitute for written provisions establishing strict time limits for issuance of the permit. *See Chesapeake B&M v. Harford,* 58 F.3d at 1010-1011 and *United States v. Stevens*, 599 U.S. at 480 .

And, more importantly, the City's asserted conjectural defense that it will always issue the permit immediately after approving construction documents simply doesn't apply where an adult business seeks a "no-work" permit rather a permit to start construction. In the no-work permit context, there are minimal, if any,

---

[47] Contrary to the City's assertion at City Br. 114-115, Plaintiffs do not, and have never, challenged the City's permit scheme based on a failure to provide for prompt judicial review.

construction documents to be approved and the primary concern is zoning compliance. And to the extent an adult business must submit any type of "construction documents" in the "no-work permit" context, the City cannot possibly claim (nor has it) that the permit will issue to an adult business immediately after approval of any minimal construction documents in the "no-work permit" context.

Moreover, the potential availability of prompt judicial review of a permit denial is no substitute for the requirement that there be a fixed time-period for final action on the permit. Those are entirely separate constitutional procedural requirements. *See FW/PBS,* recognizing that the following two procedural safeguards identified in the earlier case of <u>*Freedman v. Maryland,* 380 U.S. 51 (1965),</u> are "essential" for permit requirements for adult entertainment businesses: "[1] the licensor must make the decision whether to issue the license *within a specified* and reasonable *time period* … *and* [2] there must be the possibility of prompt judicial review in the event the license is erroneously denied." <u>FW/PBS, 493 U.S. at 228</u> (emphases added). Again, Plaintiffs do not assert the "judicial review" requirement here. However, as noted *supra*, the City not only does not require the permit to issue within a "specified" time, but it actually *repealed* its previous requirement that it do so!

Lastly, defending against a challenge Plaintiffs have not even raised, the City spends two pages (115-116) maintaining that the criteria for issuing the permit do

not confer discretion on City officials because they apply exclusively objective criteria. Plaintiffs do not dispute that. But the City misses the point. In *FW/PBS* the Court pointed out that the First Amendment prohibits two different types of discretion in connection with licensing laws for First Amendment activities: one is *substantive* discretion and the other is *procedural* discretion. "Our cases addressing prior restraints have identified two evils that will not be tolerated [in schemes to license First Amendment activities]." It described the first as "a scheme that places 'unbridled discretion in the hands of a government official'." 493 U.S. at 225-226. These are schemes which establish vague standards. That is not the challenge Plaintiffs are making here. Rather, it is the second type of licensing scheme condemned by *FW/PBS* which Plaintiffs assert here: one that "fails to place limits on the time within which the decisionmaker must issue the license." 493 U.S. at 226.

Since the City places no time limits whatsoever on the time within which DOB must actually issue the permit, the application of the permit requirement to adult entertainment businesses is facially invalid and Plaintiffs should not be compelled to relocate until a valid permit scheme is established since being forced to submit to a facially invalid permitting scheme would deny them a reasonable opportunity to relocate. And *Renton* itself made clear that the one constitutional minimum

57

requirement for an adult zoning scheme is that it must afford "a reasonable opportunity to open and operate … within the City." 475 U.S. at 54.

Finally, the City fails in its attempt to distinguish this Court's decision in *Lusk v. Vil. of Cold Spring,* 475 F.3d 480 (2d Cir. 2007). Relegating its discussion of *Lusk* to a mere footnote (n. 31 at p. 115), the City argues that it is inapplicable because it involved a permit application to engage in time-sensitive *political* speech. But *Lusk* is not so easily distinguished. *Lusk* invalidated a content-neutral permit requirement due to its lack of strict time limits for issuance of a sign permit, and it did so because, in that instance, First Amendment rights could be irrevocably lost by delay in ruling on the permit. Because of the possibility of a sensitive use obtaining its priority while the decision on an adult permit requirement is delayed, the adult use's First Amendment rights, just like those of the plaintiff in *Lusk,* could be irrevocably lost. (And that even assumes that the permit requirement here is content-neutral, something Plaintiffs have shown not to be the case due to vastly different tracks for obtaining zoning approval.)

  **b.** **The City has failed to show any constitutionally acceptable remedy for delay in issuance of a permit to which the applicant is otherwise entitled.**

At City Br. p. 114, n. 30, the City responds to some of Plaintiffs' cases on the issue of remedy, apparently mis-apprehending Plaintiffs' claim as one of a failure to provide prompt judicial review. That has never been Plaintiffs' claim. Rather, given

that priority can be lost to a sensitive use or competitor while any judicial review is pending, the only effective remedy is one which occurs at the time any deadline is missed. Examples of such remedies could be at least holding the City responsible for damages caused to an adult business proven to be tied to impermissible delay in granting their permit application; or a rule that if DOB fails to timely rule on an adult business permit application, it is estopped from disputing the permissible zoning of the location. This is not to exhaust the list of potential remedies, but in the absence of some type of effective remedy, there is simply no penalty to deter DOB officials from failing to meet their own published time limits (to the extent they exist) for acting on adult business permit applications. Absent some type of effective remedy, the existing system is facially invalid since it fails to adequately protect First Amendment rights.

For all the reasons above, the City's permitting and vesting schemes for adult uses impose a facially invalid restraint on expression and impermissibly deny a reasonable opportunity for Plaintiffs to relocate their adult businesses in the event this Court should otherwise uphold the City's adult business zoning restrictions. Accordingly, Plaintiffs reiterate the sole relief they seek in regard to this point: to enjoin the City from enforcing its mandatory termination provisions against them until such time, if ever, as the City cures its unconstitutional permitting and vesting provisions.

## **Conclusion**

For the foregoing reasons, as well as all of the reasons set forth in the Opening Brief, the Court should reverse and remand for entry of judgment in favor of Appellants, declaring unconstitutional and enjoining enforcement against Appellants of the 2001 Amendments to the Amended Zoning Resolution of the City of New York; together with such other, further and different relief as to the Court appears just, necessary and proper, including the costs and disbursements of appeal and legal fees and expenses in accordance with law.

Respectfully submitted,

/s/ Jerome Mooney
**Jerome Mooney, Esq.**
**G. Randall Garrou, Esq.**
Weston, Garrou & Mooney
*Attorneys for Appellants*
*Club at 60th Street, et al.*
12121 Wilshire Boulevard
Los Angeles, California 90025
(310) 442-0072

/s/ Edward S. Rudofsky
**Edward S. Rudofsky, Esq.**
Zane and Rudofsky
*Attorney for Appellants*
*59 Murray Enterprises, Inc., et al.*
Five Arrowwood Lane
Melville, New York 11747
(917) 913-9697

*/s/ Jeffrey M. Nye*
**Jeffrey M. Nye, Esq.**
SSP Law, Co, LPA
*Attorney for Appellants*
*689 Eatery, et al.*
7373 Beechmont Ave
Cincinnati, Ohio 45230
(513) 533-6714

*/s/ Erica T. Dubno*
**Erica T. Dubno, Esq.**
Fahringer & Dubno
*Attorney for Appellants*
*557 Entertainment Inc., et al.*
43 West 43rd Street
New York, New York 10036
(212) 319-5351

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel certify that this brief complies with the type-volume limitation, and contains 14,922 words, as determined by Microsoft Word, including headings, footnotes, and quotations, and excluding items listed in FRAP 32(f).

/s/ Jerome Mooney
**Jerome Mooney, Esq.**
**G. Randall Garrou, Esq.**
Weston, Garrou & Mooney
*Attorneys for Appellants*
*Club at 60th Street, et al.*
12121 Wilshire Boulevard
Los Angeles, California 90025
(310) 442-0072

/s/ Edward S. Rudofsky
**Edward S. Rudofsky, Esq.**
Zane and Rudofsky
*Attorney for Appellants*
*59 Murray Enterprises, Inc., et al.*
Five Arrowwood Lane Melville,
New York 11747 (917) 913-9697

*/s/ Jeffrey M. Nye*
**Jeffrey M. Nye, Esq.**
SSP Law, Co, LPA
*Attorney for Appellants*
*689 Eatery, et al.*
7373 Beechmont Ave
Cincinnati, Ohio 45230
(513) 533-6714

*/s/ Erica T. Dubno*
**Erica T. Dubno, Esq.**
Fahringer & Dubno
*Attorney for Appellants*
*557 Entertainment Inc., et al.*
43 West 43rd Street
New York, New York 10036
(212) 319-5351